UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL FAIR HOUSING ALLIANCE; FAIR
HOUSING JUSTICE CENTER, INC.; HOUSING
OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.; FAIR HOUSING
COUNCIL OF GREATER SAN ANTONIO,

Index No:  18 Civ. 2689

                    Plaintiffs,

**COMPLAINT**

        v.

  FACEBOOK, INC.,

                    Defendant.

## I.      PRELIMINARY STATEMENT

1.      This year marks the 50th anniversary of the Fair Housing Act ("FHA"), a statute intended to end discrimination in housing markets throughout the United States.  For decades, the FHA has prohibited both publishers and advertisers from "targeting" ads based on sex, family status, disability, national origin, and other protected characteristics.

2.      Given this milestone, it is all the more egregious and shocking that Defendant Facebook continues to enable landlords and real estate brokers to bar families with children, women, and others from receiving rental and sales ads for housing.  Facebook has created a pre-populated list of demographics, behaviors, and interests that makes it possible for housing advertisers to exclude certain home seekers from ever seeing their ads.  Facebook's conduct is illegal under the FHA.

3.      Housing advertising has of course changed in the last fifty years, moving beyond billboards, "for rent" signs, and classifieds in the newspaper, to online advertising.  Facebook's ability to customize an online audience for advertisements based on its vast trove of user data has

made it the biggest advertising agency in the world—the advertising platform of choice for millions of businesses.  But Facebook has abused its enormous power.

4.      Over the past months, Plaintiffs, four nonprofit organizations with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct.  Plaintiffs created dozens of housing advertisements and completed Facebook's full ad submission and review process.  Plaintiffs' investigations in New York, Washington D.C., Miami, and San Antonio confirm that Facebook first provides the option for advertisers to exclude families with children and women from receiving advertisements, as well as users with interests based on disability and national origin.  Then Facebook approves and permits advertisers to publish these ads in a discriminatory manner without consumers ever knowing they have been excluded.

5.      Discriminatory advertising is just as damaging as discrimination at the point of rental or sale.  If women with school-age children are categorically excluded from the Facebook advertising audience for a rental apartment in a community with high-performing schools and other amenities, they are effectively denied access to that housing opportunity.  Facebook and its advertisers have made the ad invisible to them.  At the same time, Facebook's ad platform can further that same landlord's illegal efforts to maintain a segregated, adults-only rental complex.  Whereas in the past, the excluded group might see the "for rent" sign or newspaper classified ad because the ads were located in a public forum, the stealth nature of Facebook's technology hides housing ads from entire groups of people.  Facebook's algorithms can ensure exclusion and deny access to housing.  As technology develops, Facebook's precise ability to target groups and promote discrimination will surely only grow.

6.      Even before Plaintiffs conducted their most recent investigations, Facebook was on notice for more than a year—from Plaintiffs and media reports (including by ProPublica)— that its advertising platform violated fair housing laws.

7.      As Facebook significantly increases its presence in housing advertising and the housing marketplace,[1] it must first end its discriminatory advertising practices.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs assert federal claims under the FHA; under 28 U.S.C. § 1343(a)(4) as Plaintiffs seek to secure equitable and other relief under federal civil rights laws; and under 42 U.S.C. § 3613(a)(1)(A) as Plaintiffs seek appropriate relief regarding a discriminatory housing practice under the Fair Housing Act.

9.      The Court has supplemental jurisdiction over Plaintiffs' local law claims under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367(a), as these claims are so related to their federal claims in this action that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Facebook pursuant to Fed. R. Civ. P. 4(k)(1) and New York Civil Practice Law and Rules § 302(a)(1) because Facebook transacts business within the state, § 302(a)(2) because Facebook has committed tortious and discriminatory acts within the state, § 302(a)(3)(i) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and regularly does business in the state, § 302(a)(3)(ii) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and derives substantial revenue from interstate commerce, and § 302(a)(4).

---

[1] Ben Lane, *Facebook Launches Massive Push Into Real Estate Listings*, Housingwire.com (Nov. 13, 2017), https://www.housingwire.com/articles/41797-facebook-launches-massive-push-into-real-estate-listings.

11.     Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as Defendant Facebook resides in this District in which it is subject to the Court's personal jurisdiction, and pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**A.     Facebook's Contacts with New York**

13.     Facebook maintains a corporate office in this District located at 335 Madison Avenue, New York, New York, 10017.

14.     Facebook is registered with the New York State Division of Corporations and assigned DOS ID #3842367l, with an appointed agent for service located at 80 State Street, Albany, New York, 12207.

15.     Upon information and belief, Facebook employs approximately 1,000 people.

16.     Facebook opened its New York office in 2012, stating that the New York office "won't just be a satellite office, it will be a core part of our engineering staff."[2]

17.     Facebook conducts advertising, engineering, and other activities in this District.

18.     According to Facebook, "Almost all of our big teams are centered around products that *specifically benefit from being in New York* . . . either teams working closely with local industries, products that address the experience of an urban environment, or center around talent that is abundant on the east coast (like AI Research or Mobile Engineering)."[3]

---

[2] Jason Kincaid, Facebook To Open Engineering Office in NYC, techcrunch.com (Dec. 2, 2011), https://techcrunch.com/2011/12/02/facebook-to-open-engineering-office-in-nyc.

[3] Director of Engineering at Facebook AI Explains the Advantages of New York Tech, Huffington Post.com (Jan. 22, 2016), https://www.huffingtonpost.com/quora/director-of-engineering-a_b_9052764.html (emphasis supplied).

19.     As the largest city in the United States, New York City—with a total of more than 3 million households according to the 2010 United States Census—is also the largest housing market in the country.[4]  As of 2011, New York City had a total of 3.35 million housing units, of which 65% were rental units, 30% were owner units, and 5% were vacant but not available for sale or rent.  The vacancy rate in 2011 for rental units in New York City was only 3.12%.  Half of the City's housing units were in buildings of 20 or more units as of 2011.

20.     The New York City housing market is unique in that, unlike other cities in the United States where landlords handle advertising and renting apartments directly, many landlords use real estate agents to advertise apartments for rent and locate prospective renters. As of 2013, Manhattan alone had 27,000 licensed real estate brokers and sales persons working in both the sales and rental markets.[5]  These real estate brokers and agents use online real estate advertising, including on Facebook.

21.     For the New York City housing consumer, access to Facebook's online real estate advertising is crucial given the City's low vacancy rate, high competition for dwelling units, and heavy reliance on real estate brokers and agents.

22.     Upon information and belief, Facebook receives a substantial amount of revenue from advertisements that are sold to New York area companies or target New York residents, including an estimated reach of millions of people within the District.

23.     Upon information and belief, a portion of this substantial revenue comes from housing advertisements that are sold to landlords and real estate brokers in the New York area and target New York residents.

---

[4] New York City Consolidated Plan, 2015-2-19 Needs Assessment & Market Analysis, December 16, 2016, NA-1.

[5] Leigh Kamping-Carder, *Ranks of Manhattan brokers swell, as market strengthens*, The Real Deal (Dec. 10, 2012), available at https://therealdeal.com/2012/12/10/ranks-of-new-york-city-brokers-swell-as-market-strengthens/.

### III.    THE PARTIES

24.    Plaintiff National Fair Housing Alliance ("NFHA") is a national, nonprofit, public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC.  NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states.  NFHA's sole mission is to end discrimination in housing and to promote residential integration.  NFHA works to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, community development activities that promote inclusive communities, investigation of fair housing violations, and enforcement.  NFHA engages in fair housing education and enforcement throughout the United States where no local private fair housing organization exists, as well as in cooperation with its members.  NFHA creates and distributes national educational media campaigns to teach people about their rights and responsibilities under fair housing laws.  NFHA also provides grants to people to rent, purchase, or renovate housing; to stave off foreclosure; and to stabilize neighborhoods harmed by the foreclosure crisis.

25.    Plaintiff Fair Housing Justice Center ("FHJC") is a nonprofit organization with an office located in Queens, New York.  FHJC serves the five boroughs of New York City, and seven suburban New York counties.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.

26.    Among other things, FHJC (a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; (b) provides intake counseling to individuals and organizations with allegations of housing discrimination; (c)

conducts testing and other investigations of allegations of housing discrimination; (d) makes legal referrals to cooperating attorneys; (e) assists with the preparation and filing of administrative housing discrimination complaints; and (f) provides post-referral litigation support services.  FHJC provides these services free of charge and without regard to income.

27.     FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

28.     Plaintiff Housing Opportunities for Project Excellence, Inc. ("HOPE") is the first nonprofit fair housing agency organized in the State of Florida and is located in Miami, Florida. HOPE's mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration.

29.     Plaintiff HOPE employs a three-tiered system of education and outreach, intake and counseling, and private enforcement to affirmatively further fair housing.  HOPE's activities include, but are not limited to, counseling and obtaining facts regarding alleged acts of discrimination; conducting training seminars, presentations, and workshops on fair housing laws; assisting community leaders and members of the housing industry in developing fair housing strategies; developing resources to provide fair housing assistance; attempting resolution of complaints through litigation, conciliation or appropriate referral; and providing assistance to the general public on housing-related issues such as predatory lending.

30.     Plaintiff Fair Housing Council of Greater San Antonio ("FHCGSA") is a nonprofit corporation organized under the laws of the State of Texas and located in San Antonio,

Texas.  FHCGSA's mission is to promote fair housing and non-discrimination in housing across the South Texas area.  FHCGSA serves thirty-seven counties in South Texas and is dedicated to eliminating discriminatory housing practices and promoting residential integration.

31.     FHCGSA provides various programs and services which include, but are not limited to, conducting complaint intake and counseling for consumers who allege housing discrimination; investigating housing discrimination complaints; submitting reasonable accommodation and modification requests to housing providers on behalf of consumers with disabilities, attempting to resolve complaints through mediation, referrals to administrative agencies or private attorneys, and conducting education and outreach activities for consumers, housing providers, and others.  FHCGSA also works to promote accessible and affordable housing in South Texas through various activities including maintaining a Directory of Accessible Housing and providing fair housing training to developers of low-income housing tax credit rental units in Texas.

32.     Defendant Facebook, Inc. ("Facebook") is a publicly traded corporation, headquartered at 1601 Willow Road, Menlo Park, California, 94025, incorporated under the laws of the State of Delaware.  Facebook owns and operates an online social networking web site that allows its billion-plus daily users to communicate with each other through the sharing of text, photograph, and video.  Part of Facebook's website is an advertising platform that allows businesses and individuals to pay money to have Facebook provide marketing, recruitment, sourcing, advertising, branding, information, and/or hiring services, including displaying advertisements for housing for sale or rent.  In 2017, Facebook earned 98% of its $40.65 billion in revenues from third parties who advertised on Facebook.[6]

---

[6] Facebook Investor Relations, https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

33.     As of March 2017, Facebook had approximately 4 million advertisers using its platform. Many of these advertisers are real estate brokers, residential property owners, and real estate management companies offering housing for rent or for sale.[7]

## IV.     LEGAL BACKGROUND: DISCRIMINATORY ADVERTISING

34.     The Fair Housing Act states that it shall be unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap,[8] familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).

35.     Under its implementing regulations, the FHA provides that:

> "(c) Discriminatory notices, statements and advertisements include, but are not limited to: (1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin . . . (3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin. (4) Refusing to publish advertising for the sale or rental of dwellings . . . because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75.

36.     The Fair Housing Act's advertising prohibitions apply to "all written or oral notices or statements by a person engaged in the sale or rental of a dwelling" which include "any applications, flyers, brochures, deeds, signs, banners, posters, billboards, or any documents used with respect to the sale or rental of a dwelling."  24 C.F.R. § 100.75(b).

---

[7] *See Facebook Marketplace to Post Apartment List Rental Homes*, naahq.org (Nov. 9, 2017), https://www.naahq.org/news-publications/facebook-marketplace-post-apartmentlist-rental-homes .

[8] Hereinafter, the term "disability" shall be used for the term "handicap."

37.     In the advertising context, these prohibitions apply to both the person who drafted or placed the ad as well as the publisher of the ad because the negative effect of discriminatory advertising would be magnified if widely circulated by newspapers and other mass media.  *See United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972).  Under the FHA, illegal advertising practices not only discourage or prevent buyers and renters from accessing information about housing opportunities, but also create an impression that housing segregation is legal, thus facilitating future discrimination by others.  *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990).

38.     It is black-letter law that publishing advertisements that indicate discriminatory preferences is illegal.  *See Ragin v. New York Times*, 923 F.2d 995 (2d Cir. 1991).

39.     The continuing presence of discriminatory advertising practices serves to encourage both the housing provider and the home seeker to believe housing discrimination is "an accepted norm despite the FHA's pronouncements to the contrary."  Schwemm, Robert, *Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, 29 Fordham Urb. L. J. 187, 250 (2001).

## V.     FACTUAL ALLEGATIONS

### A.     Facebook's Powerful and Far-Reaching Advertising Platform

40.     Facebook generated over $40 billion dollars in revenue last year, almost all of which was made through selling advertisements on its website.

41.     Facebook's platform provides advertisers with "a number of different ways to engage with people on Facebook, the most important of which is the News Feed which displays an algorithmically-ranked series of stories and advertisements individualized for each person."[9]

---

[9] Facebook Investor Relations,  https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

42.     As Facebook promotes itself to its prospective advertisers, its greatest advertising asset is its user base of over 2 billion people.[10]  This user base includes not only Facebook users, but users of other applications owned by Facebook, including Instagram.  Facebook collects a remarkable amount of information about each one of these users.  It gathers this information both through self-reported information on Facebook, and through tracking its users' online activity— both on Facebook itself and elsewhere through the internet.  The end result has been described as "arguably the most complete consumer profile on earth,"[11] as it reflects each Facebook user's demographics, location, interests, and online behaviors.

43.     Facebook then uses this treasure trove of information to enable advertisers to "target the people who are right for [their] business."[12]

44.     Using its vast collection of user data, Facebook has created a platform that enables advertisers to seek out potential audiences with great specificity.  Advertisers can target users based on information as general as geographic location, or as specific as their birthday.

### 1.  Facebook's Use of "Include" and "Exclude" Options

45.     Facebook has designed its advertising platform so that advertisers can "target" their audience using two general actions—"including" specific types of people and "excluding" specific types of people.

46.     Facebook develops and provides its advertisers with a pre-populated list of hundreds of demographics, behaviors, and interests (the "Facebook Pre-Populated List").

---

[10] https://www.facebook.com/business/products/ads (last visited March 21, 2018).

[11] Caitlin Dewey, *98 personal data points that Facebook uses to target ads to you*, Wash. Post (Aug. 19, 2016), https://www.washingtonpost.com/news/the-intersect/wp/2016/08/19/98-personal-data-points-that-facebook-uses-to-target-ads-to-you/?utm_term=.58ce94764ccf .

[12] https://www.facebook.com/business/products/ads/ad-targeting (last visited March 21, 2018).

Advertisers then scroll through this Facebook-created content and select which characteristics they would like to "include" and which they would like "exclude" from the ad's audience.

47.     For example, when an advertiser checks the pre-populated box to "include" the demographic of parents with toddlers (01-02), parents with toddlers (01-02) become the target audience for the ad and only parents will receive the ad on their Facebook pages or in their News Feeds.  Non-parents will not receive the ad.

48.     When an advertiser "excludes" a specific demographic, behavior, or interest, no person who reflects that quality will receive the ad.  If an advertiser checks the pre-populated box to exclude people who have an interest in cooking, no one with that interest will receive the advertisement on their Facebook page or in their News Feed.

49.     These features can also be used simultaneously.  For example, if an advertiser "includes" parents but also "excludes" people with an interest in cooking, the ad will only appear on the Facebook pages or in the News Feeds of parents who do not have an interest in cooking.  Non-parents (who are excluded because they were not "included" in the "target" audience) and people with an interest in cooking (who were "excluded" even if they otherwise would be in the target audience) will not receive the ad.

50.     As advertisers add and subtract groups from their potential audience, Facebook provides them with real time estimates of how many people can view their advertisements.  A screenshot of how this appears on Facebook's platform is attached hereto as Exhibit A.

51.     Facebook has placed these features on at least two different advertising platforms—by "boosting" posts and through Facebook Ad Manager.

### 2. Facebook's Use of "Boosts"

52.     In order to "boost" a post, a business will first create a post to be published on its Facebook page.  This could be information about the business, a new promotion—anything that the business would like to share with its customers.

53.     The advertiser may then pay to "boost" that post by having it appear as an advertisement on the Facebook pages or in the News Feeds of various other Facebook users.

54.     To select which Facebook users receive that "boosted" advertisement, the business may use the same "inclusion" and "exclusion" features described above.

55.     While any Facebook user may view the ad on the business's Facebook page, only users in the audience selected by the advertiser will receive a "boosted" advertisement on their own Facebook pages or in their news feeds.

56.     For example, a restaurant may post about a new addition to its menu on its Facebook page.  It could then "boost" that post to an "included" or "targeted" audience—i.e., persons who live within 10 miles of the restaurant and have an interest in Italian food—both categories in the Facebook Pre-Populated List.  In this circumstance, any Facebook user could view the post by navigating to the restaurant's Facebook page, but only those in the targeted audience would receive the advertisement on their own pages or in their News Feeds.

### 3.     Facebook "Ad Manager"

57.     Facebook also offers its advertisers the option to use Facebook Ad Manager. Using Ad Manager, an advertiser can customize exactly who will receive its advertisement, as well as various other features such as where and how frequently the ad appears on the Facebook accounts of its targeted audience.  In this circumstance, only the audience selected using the "inclusion" and "exclusion" features above will be able to view the ad.

58.     For example, a restaurant could create an advertisement using Ad Manager for a

new menu item and then select its audience using the "inclusion" and "exclusion" features—i.e.,

"include" persons who live within ten miles of the restaurant and have an interest in Italian food

but "exclude" persons with an interest in cooking.  In this circumstance only persons who live

within ten miles of the restaurant, have an interest in Italian food, but do not have an interest in

cooking, will be able to view the post.

**B.     ProPublica Reveals Facebook's Discriminatory Housing Advertising
         Platform**

59.     On October 28, 2016, the investigative news nonprofit ProPublica published an

article reporting that Facebook's online platform enabled advertisers to exclude Facebook users

assigned black, Hispanic and other "ethnic affinities" from seeing advertisements in the housing

category through its advertising portal.[13]

60.     In response to ProPublica's article, NFHA investigated Facebook's practices.

61.     On November 3, 2016, NFHA created an advertisement using Facebook Ad

Manager.  The ad was for a fictitious apartment for rent and NFHA selected for it to be

advertised across the United States.  Using the "exclusions" feature within Ad Manager, NFHA

selected the demographic preset options of "African-Americans" and "Hispanics" to exclude

African-Americans and Hispanics from the ad's potential audience.  Facebook approved this ad.

NFHA was able to run its ad for three days.  A screenshot of these demographic preset options is

attached hereto as Exhibit B.

62.     On November 3, 2016, NFHA sent Facebook a letter stating that Facebook's

advertising features appeared to violate the FHA and state laws, and that it was "illegal for an

---

[13] Julia Angwin and Terry Parris Jr., Facebook Lets Advertisers Exclude Users By Race, Propublica.org (Oct. 28, 2016), https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race.

online advertiser to filter housing-related advertising in a discriminatory manner on the basis of race, religion, national origin and other protected characteristics."

63.     On November 7, 2016, Facebook's representative responded to NFHA via email stating: "We think ethnic affinity marketing is really valuable in promoting diversity of the voices and images on our platform, but we also understand the concerns we're hearing about wrongful discrimination.  At this point, we're listening to stakeholders like you and considering the way forward."

64.     On November 10, 2016, NFHA met with Facebook representatives with regard to the discriminatory advertising platform.  NFHA explained to the Facebook representatives present that the Fair Housing Act and civil rights laws prohibited any system which excluded certain categories of people from viewing advertisements for housing, employment or credit. NFHA requested that Facebook cease and remedy its discriminatory behavior.

65.     On November 11, 2016, NFHA sent Facebook citations to legal cases regarding its liability for its advertising platform.

66.     On November 11, 2016, Facebook posted a statement on its "Newsroom" titled "Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing," in which it stated that it would "disable the use of ethnic affinity marketing for ads that we identify as offering housing, employment or credit."[14]

67.     On February 8, 2017, Facebook published a statement on its website titled, "Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools."[15]

---

[14] Erin Egan, *Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing*, newsroom.fb.com, (Nov. 11, 2016), https://newsroom.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/.

[15] *Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools*, newsroom.fb.com, (Feb. 8, 2017), https://newsroom.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/.

Facebook committed to end the use of "ethnic affinity marketing" for ads that it identified as offering housing, employment, or credit.  For ads that use Facebook's other exclusion and inclusion categories, Facebook said it would require housing, employment, and credit advertisers to "self-certify" that their ads complied with anti-discrimination laws.

68.     In its self-certification feature, Facebook states that "when running an ad for an apartment for rent, it may be illegal to exclude people who have children from that opportunity."[16]

69.     On November 21, 2017, more than a year after its original report, ProPublica published a second story revealing that Facebook continued to create content enabling housing advertisers to exclude users by prohibited categories such as race and national origin.[17]

70.     ProPublica reported that it had bought dozens of rental housing ads on Facebook, but asked that they not be shown to certain categories of users, such as African-Americans, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina, and Spanish speakers.  Facebook had approved all of these ads.

71.     Based on Facebook's prior announcement that it would end the use of "ethnic affinity marketing" for housing opportunities, Facebook should have rejected the ads purchased by ProPublica that excluded viewers on the basis of race.  The other ads should have prompted a screen to pop up asking for self-certification.  ProPublica reported that it never encountered a self-certification screen, and Facebook rejected none of its ads.

---

[16] *Id.*

[17] Julia Angwin, Ariana Tobin and Madeleine Varner, *Facebook (Still) Letting Housing Advertisers Exclude Users by Race*, propublica.org (Nov. 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin.

C.      **Plaintiffs' Investigation Into Facebook's Housing Advertising Platform Confirms Discriminatory Practices Continue**

72.     In response to ProPublica's November 21, 2017 report, NFHA commenced an investigation into Facebook's advertising practices.

73.     On November 30, 2017, NFHA created a Facebook page for a non-existent real estate company entitled "Metro Boutique Rentals."  Through this page, NFHA staff viewed Facebook's Ad Manager and Boost features.

74.     In summary, NFHA's initial investigation into Facebook's practices found as follows:

a.  The Facebook Pre-Populated List provided housing advertisers with the option of excluding potential audience members from housing ads on the basis of demographic categories that Facebook created, including race and national origin.

b.  At some point, Facebook eliminated the option from the Facebook Pre-Populated List for housing advertisers to exclude potential audience members from housing opportunities on the basis of race and national origin.

c.  The Facebook Pre-Populated List made it possible for housing advertisers to exclude people from seeing their ads on the basis of their family status in a variety of ways.  It provided checkboxes that housing advertisers could use to remove persons from their potential audience, such as parents with toddlers (01-02), parents with preschoolers (03-05), parents with early school-age children (06-08), moms of grade school kids, and moms of high school kids.  A screenshot of how these exclusions appear on Facebook's Boost and Ad Manager features is attached hereto as Exhibit C.

d.  The Facebook Pre-Populated List made it possible for housing advertisers to "include" potential audience members based on an interest in "no kids."

17

e.  The Facebook Pre-Populated List enabled housing advertisers to exclude people from
    seeing their ads on the basis of sex.  It provided checkboxes that housing advertisers
    could use to exclude either men or women from viewing their ads by checking the
    box to "include" the other.  A screenshot of how these exclusions appear on
    Facebook's Boost and Ad Manager features is attached hereto as Exhibit D.

f.  The Facebook Pre-Populated List enabled housing advertisers to exclude on the basis
    of interests that are the equivalent of protected characteristics, such as: Interest in
    Disabled American Veteran, Interest in Disabled Parking Permit, Interest in
    Disability.gov, Interest in Telemundo, and Interest in English as a second language.
    Screenshots of how these exclusions on Facebook's Boost and Ad Manager features
    are attached hereto as Exhibit E.

g.  Facebook had created algorithms to provide "suggested" audiences to advertisers
    based on the audiences selected in their prior ads.  Facebook's "suggestions" included
    demographic and interest categories that discriminate on the basis of protected
    characteristics such as sex, familial status, disability, race, or national origin.

### 1.    Facebook's Discrimination in the Washington, D.C. Housing Market

### a.  Boost Investigation

75.     On January 2, 2018, NFHA created an ad for a fictitious apartment for rent and
then used Facebook's Boost feature to promote the ad in Washington, D.C.  Using the Facebook
Pre-Populated List and the "exclusions" feature within Boost, NFHA selected the preset options
of those with interests in the "National Association for Bikers with a Disability," "Disabled
American Veterans," "Disability.gov," and "Disabled Parking Permit" to exclude from the
Boost's potential audience.   Facebook estimated that the Boost would reach 1.2 million people.

76.     On January 2, 2018, NFHA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to promote the ad in Washington, D.C.  Using the Facebook Pre-Populated List  and the "exclusions" feature within Boost, NFHA selected the preset options of those with interests in "Telemundo," "English as a second language," and "Univision Deports" to exclude from the Boost's potential audience.  Facebook estimated that the Boost would reach 1.2 million people.

77.     On January 3, 2018, NFHA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Washington, D.C. market.  Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, NFHA selected the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 500,000 people.

78.     On January 3, 2018, NFHA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Washington, D.C market.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, NFHA selected the preset demographic options of "parents with toddlers (01-02 years), parents with preschoolers (03-05 years), parents with early school-age children (06-08 years), and parents with preteens (13-18 years)" to exclude families with young children from the Boost's potential audience.  Facebook estimated that the Boost would reach 1.2 million people.

79.     In January 2018 and February 2018, NFHA created multiple ads for fictitious apartments for rent and again used Facebook's Boost feature to target each ad to the Washington, D.C market.  NFHA then used the Facebook Pre-Populated List and the "exclusion" features within Boost to select multiple combinations of the  preset demographic options of "parents with toddlers (01-02)," "parents with preschoolers (03-05)," "parents with early school-age children

19

(06-08)," "parents with teenagers (13-18)," "parents with preteens (08-12)," "corporate moms,"

"stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms,"

"green moms," "big-city moms," "trendy moms," "soccer moms," and "moms of preschool kids"

to exclude families with young children and mothers from the Boost's potential audience.  In

many of these Boosts and in additional Boosts targeted to the Washington, D.C. market, NFHA

used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the

preset demographic option of "men," thereby excluding women from the Boosts' potential

audience.  Facebook estimated that these Boosts would reach anywhere from 58,000 to 580,000

people.

### b.  Ad Manager Investigation

80.     On December 14, 2017, NFHA created an ad using Facebook Ad Manager for a

fictitious apartment for rent.  NFHA selected Washington, D.C. as the market for the ad to run in.

Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, NFHA

selected the preset demographic options of "new parents (0-12 months)" and "parents with

preschoolers (03-05)" to exclude families with young children from the ad's potential audience.

Facebook estimated that the ad would reach 77,000 people.

81.     Throughout February 2018, NFHA created additional ads for fictitious apartments

for rent using Facebook Ad Manager and again selected Washington, D.C. as the market for the

ads to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad

Manager, NFHA selected combinations of the preset options of "corporate moms," "stay-at-

home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green

moms," "big-city moms," "trendy moms," "soccer moms" and "moms of preschool kids" to

exclude mothers from the ad's potential audience.  In many of these ads and in additional ads

targeted to the Washington, D.C. market, NFHA used the Facebook Pre-Populated List and the

"inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience.  Facebook estimated that these ads would reach anywhere from 48,000 to 820,000 people.

### c.  Investigation of Other Major Housing Markets

82.     In light of its investigation of Facebook's practices in the Washington, D.C. housing market, NFHA investigated other major housing markets across the United States.

83.     On February 1, 2018, NFHA created four ads for fictitious apartments for rent and then used Facebook's Boost feature to target one ad each to four major markets in different regions of the country.  Using the Facebook Pre-Populated List and Boost's "inclusion" feature, NFHA selected the preset interest inclusion option of "no kids" and the present demographic inclusion option of "men" to target for the ad.  Using the "exclusions" feature within Boost for each ad,  NFHA selected the demographic preset options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02)," "parents with preschoolers (03-05)," "parents with early school-age children (06-08)," "parents with teenagers (13-18)," and "parents with preteens (08-12)" to exclude families with young children and mothers from each Boost's potential audience.  Facebook estimated that these four Boosts would reach a total of 463,000 people.

84.     Having determined that Facebook had likely developed the same discriminatory content in other major housing markets, NFHA contacted three of its member groups; FHJC, HOPE, and FHCGSA.  NFHA provided these groups with training on how to use the Facebook advertising features and conduct a similar investigation.  These groups investigated on their own and jointly with NFHA to assess Facebook's discriminatory practices in their home markets.

> **2. Facebook's Discrimination in the New York, New York Housing Market**
>
> **a. Boost Investigation**

85.     On January 30, 2018, NFHA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the New York City, New York market. Using the Facebook Pre-Populated List and Boost's "inclusion" and "exclusion" features, NFHA selected combinations of (1) the preset interest inclusion option of "no kids" and the present demographic inclusion option of "men" to target for the ad, and (2) the preset demographic exclusion options of "moms of grade school kids," "moms of high school kids," "moms of preschool kids" and "stay-at-home moms," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years) to exclude families with children and mothers from the Boost's potential audience.  Facebook estimated that this Boost would reach 280,000 people.

86.     On February 13, 2018, FHJC created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the New York City, New York market and its surrounding areas within ten miles.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, FHJC selected the preset demographic options of  "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years), and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience.  NFHA also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," and thereby exclude women from the Boost's potential audience.  Facebook estimated that the Boost would reach 95,000 people.

87.     On February 13, 2018, FHJC created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the New York City, New York market and its surrounding areas within ten miles.  Using the Facebook Pre-Populated List "inclusion" feature within Boost, FHJC selected the preset demographic option of "men", thereby excluding women from the Boosts' potential audience.  Facebook estimated that the Boost would reach 44,000 people.

### b.  Ad Manager Investigation

88.     In February 2018, NFHA created two ads for fictitious apartments for rent, and selected New York City, New York as the market for the ads to run in.  Using the Facebook Pre-Populated List and Ad Manager's "exclusions" feature, NFHA selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids,"  "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years), and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ads' potential audience.  In one of these ads, NFHA used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," and thereby exclude women from the ad's potential audience.  Facebook estimated that the ads would reach 80,000 – 10 million people.

89.     On February 21, 2018, FHJC created an ad -using Facebook Ad Manager for a fictitious apartment for rent.  FHJC selected New York City, New York and its surrounding areas within twenty-five miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, FHJC selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of

high school kids," "fit moms," "green moms,"  "big-city moms," "trendy moms," "soccer

moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with

preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents

with teenagers (13-18 years)," and "parents with preteens (08-12 years)"  to exclude families

with young children and mothers from the ad's potential audience.  FHJC used the Facebook

Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset

demographic option of "men," and thereby exclude women from the ad's potential audience.

Facebook estimated that the ad would reach 5 million people.

90.     On February 23, 2018, FHJC and NFHA collaborated to create an ad using

Facebook Ad Manager for a fictitious apartment for rent.  FHJC and NFHA selected New York

City, New York and its surrounding areas within twenty-five miles as the market for the ad to

run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager,

FHJC and NFHA selected the preset demographic options of "parents with toddlers (01-02

years),"  "parents with preschoolers (03-05 years)," "parents with early school-age children (06-

08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to

exclude families with young children from the ad's potential audience.  Facebook estimated that

the ad would reach 5.2 million people.

### 3.     Facebook's Discrimination in the Miami, Florida Housing Market
#### a.  Boost Investigation

91.     On February 21, 2018, HOPE created an ad for a fictitious apartment for rent and

then used Facebook's Boost feature to target the ad to the Miami, Florida market and its

surrounding area within ten miles.  Using the Facebook Pre-Populated List and the  "exclusions"

feature within Boost, HOPE selected the preset demographic options of "parents with toddlers

(01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age

24

children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience. HOPE also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience. Facebook estimated that the Boost would reach 450,000 people.

92. On February 21, 2018, HOPE created an additional ad for a fictitious apartment for rent and used Facebook's Boost feature to target the ad to the Miami, Florida market and its surrounding areas within ten miles. Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, HOPE selected the preset demographic option of "men," thereby excluding women from the Boost's potential audience. Facebook estimated that the Boost would reach a total of 490,000 people.

### b. Ad Manager Investigation

93. On February 12, 2018, NFHA created a fictitious apartment for rent and selected Miami, Florida as the market for the ad to run in. Using the Facebook Pre-Populated List and the "exclusion" feature within Ad Manager, NFHA selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," and "moms of preschool kids" to exclude families with young children and mothers from the ad's potential audience. HOPE also used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience. Facebook estimated that the ad would reach 200,000 people.

94. On February 21, 2018, HOPE created an ad using Facebook Ad Manager for a fictitious apartment for rent. HOPE selected Miami, Florida and its surrounding areas within twenty-five miles as the market for the ad to run in. Using the Facebook Pre-Populated List and

the "exclusions" feature within Ad Manager, HOPE selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ad's potential audience. HOPE also used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience. Facebook estimated that the ad would reach 750,000 people.

95.    On February 23, 2018, HOPE and NFHA collaborated to create an ad using Facebook Ad Manager for a fictitious apartment for rent. HOPE and NFHA selected Miami, Florida and its surrounding areas within ten miles as the market for the ad to run in. Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, HOPE and NFHA selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)," to exclude families with young children from the ad's potential audience. HOPE also used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience. Facebook estimated that the ad would reach 450,000 people.

96.    On February 23, 2018, HOPE and NFHA collaborated to create an additional ad using Facebook Ad Manager for fictitious apartments for rent. HOPE and NFHA selected

Miami, Florida and its surrounding areas within sixteen miles as the market the markets for the ad to run in.  Using the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager, HOPE and NFHA selected the preset demographic option of "men," thereby excluding women from the ads' potential audience.  Facebook estimated that the ad would reach 2.8 million people.

       **4.**      **Facebook's Discrimination in the San Antonio, Texas Housing Market**

                   **a.**  **Boost Investigation**

     97.     On February 12, 2018, NFHA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, NFHA selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience.  NFHA also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 280,000 people.

     98.     On February 16, 2018, FHCGSA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market and its surrounding area within ten miles.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, FHCGSA selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with

early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude mothers and families with young children from the Boost's potential audience.  FHCGSA also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 270,000 people.

99.    On February 21, 2018, FHCGSA created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to promote the ad in the San Antonio, Texas market and its surrounding area within ten miles.  Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, FHCGSA selected the preset option of "women," thereby excluding men from the Boost's potential audience.  Facebook estimated that the Boost would reach 330,000 people.

**b.  Ad Manager Investigation**

100.    On February 23, 2018, FHCGSA created three ads using Facebook Ad Manager for fictitious apartments for rent.  FHCGSA selected San Antonio, Texas and its surrounding areas within ten miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, FHCGSA selected combinations of the preset options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"  "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)"  to exclude mothers and families with young children from the ad's potential audience.  In two of these ads, FHCGSA used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select

28

the preset demographic option of "men," thereby excluding women from the ads' potential audience.  Facebook estimated that the ads would reach 340,000, and 440,000 people respectively.

> **D.    Common Allegations Regarding the Results of Plaintiffs' Investigation into Facebook's Discriminatory Housing Advertising**

101.    Facebook approved all of the Boosts and ads described above in paragraphs 75-100 in anywhere from one minute to approximately one hour.

102.    After Facebook approved them, all of the Boosts and ads described above in paragraphs 75-100 were removed from Facebook by the respective Plaintiff that created them.

103.    Facebook's Advertising Policies do not comply with the Fair Housing Act or with state and local fair housing laws, including in New York.

104.    Under the caption "Discriminatory Practices," Facebook states: "Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition."[18]

105.    This policy misleads Facebook users because, for example, it does not state that there are additional categories of prohibited discrimination in state and local fair housing laws such as marital status, military status, status as a survivor of domestic violence, lawful source of income, including rental subsidies, and others.

106.    The policy further misstates the obligations imposed by the FHA because, among other things, it does not explain that indicating a preference or limitation based on a protected

---

[18] https://www.facebook.com/policies/ads/prohibited_content/discriminatory_practices# (last visited March 27, 2018).

characteristic constitutes illegal discrimination and that advertisements that deny particular segments of the housing market information about housing opportunities violate the FHA.

107.     Although Facebook stopped approving housing advertisements that used  its "ethnic affinity" option in late 2017, it continues to create and develop content that facilitates advertisers excluding certain audiences based on legally protected characteristics.

108.     Facebook develops and provides the Facebook Pre-Populated List that enables landlords and real estate agents to exclude people from receiving housing advertisements based on family status and sex.

109.     Between December 14, 2017 and February 23, 2018, Facebook accepted for publication forty advertisements from Plaintiffs that excluded potential home seekers on the basis of family status and/or sex.

110.     Facebook provides "interests" categories for housing advertisements that permit a landlord or real estate firm to exclude users based on disability-related factors (for example, by checking the pre-populated category of "Interest in Disabled Parking Permit") and national origin (for example, "Interest in Telemundo").

111.     These categories deny information about housing opportunities to persons with disabilities, persons living with or associating with persons with disabilities, and/or persons who are Hispanic or speak Spanish and are more likely to be Hispanic.  These "interest" categories are the equivalent of demographic exclusion categories labeled "disability" or "Hispanic."  There is no lawful reason for Facebook to create this content that enables advertisers to exclude potential audience members for housing ads on these bases.

112.     As recently as March 23, 2018, NFHA attempted to "edit" an ad that it created in November 2016 that excluded potential audience members only on the basis of race and national

30

origin.  NFHA received a message from Facebook stating that "some of the detailed targeting selections you originally used in your Saved Audience are no longer available.  They won't show up in this audience targeting, *but the associated ads will still deliver to the original audience*.  However, you'll be unable to use these detailed targeting selections if you edit this audience or try running future ads with it" (emphasis added).

113.   Based on this message, it appears that even though Facebook removed discriminatory demographic selections that allowed advertisers to exclude on the basis of race and national origin from the Facebook Pre-Populated List, it still allows previously existing ads that excluded or targeted on these bases to continue to do so.

114.   By creating the Facebook Pre-Populated List, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

115.   Plaintiffs' investigation demonstrates that despite notice from NFHA and other civil rights groups as early as 2016 of its clear violations of the federal Fair Housing Act, Facebook has continued to engage in discriminatory housing advertising practices.

116.   Facebook has acted intentionally, willfully, and with reckless disregard of existing federal and local fair housing rights.

## VI.   HARM TO PLAINTIFFS CAUSED BY FACEBOOK THROUGH DIVERSION OF RESOURCES AND FRUSTRATION OF MISSION

117.   Facebook's discriminatory and unlawful practices have frustrated and continue to frustrate each Plaintiff's mission of ensuring that all people have equal access to housing opportunities and promoting residential integration across the country, as well as in the New York City, Washington, D.C., Miami, and San Antonio metropolitan areas.

118.   In an effort to address and to counteract the effects of Defendant's discriminatory conduct, prior to the filing of this action, each of the Plaintiffs has diverted resources and staff

from other activities to investigate and document Defendant's policies and practices.  Each Plaintiff also engaged in public education efforts, prior to this filing, to raise awareness of discriminatory housing advertising practices in the communities each Plaintiff serves.

119.    Prior to the filing of this Complaint, NFHA diverted and expended financial resources and staff time to, among other things, design and implement the investigation, including time to train and work with other Plaintiffs on their investigations; review and analyze the investigative results; and conduct legal research and seek legal advice from attorneys.

120.    FHJC, HOPE, and FHCGSA each expended staff time and other resources to investigate Defendant's advertising practices, which diverted staff and resources away from other organizational activities, prior to the filing of this Complaint.  Among other things, FHJC, HOPE, and FHCGSA spent time being trained by NFHA to use Facebook's advertising platform, create a non-existent realty firm, and design and document their efforts to create and place housing advertisements on Facebook.

121.    If Facebook had complied with the requirements of the FHA after being informed of them by NFHA, then Plaintiffs would not have devoted considerable staff time and resources to identify the nature and scope of Facebook's advertising policies and practices.

122.    Each Plaintiff's mission is frustrated when Facebook excludes members of the public from access to housing advertising and information about housing opportunities based on their sex, familial status, disability, race, national origin, or other protected characteristics.

123.    Because Facebook's discriminatory advertising practices alleged in this Complaint violate federal, state, and local fair housing laws they undermine rather than advance equal housing opportunity and perpetuate the harms of residential segregation.

124.    To address and attempt to counteract the effects of Facebook's discriminatory conduct, prior to the filing of this action, each Plaintiff has engaged in public education campaigns to raise public awareness of the problem of discriminatory housing advertising and to educate housing providers about their legal obligations under fair housing laws not to advertise housing for rent or sale in a discriminatory manner.

125.    In early 2018, NFHA drafted guidelines for housing advertisers that it posted on its website in English and Spanish with a link to specific information about each state's fair housing laws, a copy of the HUD fair housing logo for advertisers to use, previously produced public service announcements, and a recorded webinar on discriminatory advertising held by NFHA in April 2017.

126.    In early 2018, each Plaintiff expended staff time to develop education campaigns and design advertisements for social media aimed to reach housing providers who place ads and consumers searching for housing in the Washington D.C., New York City, Miami, and San Antonio metropolitan regions.  Plaintiffs posted these ads on Facebook and Twitter on an ongoing basis, including translating ads into Spanish.

127.    During this same time period, each Plaintiff expended staff time to communicate and coordinate with each other about their individual education campaigns to ensure Plaintiffs were providing a consistent message reaching both housing providers and consumers in each metropolitan area.  Each Plaintiff also has expended staff time prior to filing this Complaint to begin to design workshops, a webinar, consumer flyers, and/or fact sheets.  Finally, NFHA has begun to contact on-line education providers who offer courses on using social media for advertising to request that they distribute information about housing advertising guidelines and best practices that comply with fair housing laws.

128.     As a direct and proximate result of Facebook's discriminatory practices described above, each Plaintiff has suffered and will continue to suffer a diversion of its resources and a frustration of its mission.

### FIRST CLAIM FOR RELIEF
(Fair Housing Act, 42 U.S.C. § 3604(a),(c),(f): Familial Status, Sex, Disability, Race, and National Origin Discrimination)

129.     Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

130.     The housing advertised for rent or sale on Facebook using the platform described above are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

131.     Facebook's creation of preset categories on its advertising platform that facilitate unlawful discrimination in housing advertisements illegally discriminated against, and continues to discriminate against, Plaintiffs by:

   a.   Making unavailable or denying, a dwelling to any person because of sex, familial status, race or national origin.  42 U.S.C. § 3604(a).

   b.    Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on sex, disability familial status, race or national origin, or an intention to make any such preference, limitation, or discrimination.  42 U.S.C. § 3604(c).

   c.   Making unavailable or denying, a dwelling to any buyer or renter because of a disability of — (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter.  42 U.S.C. § 3604(f).

132.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C.

§ 3602(i), and as a direct and proximate result of Defendant's unlawful discriminatory conduct

have sustained damages.

133.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages,

punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
(Plaintiffs NFHA and FHJC)
(New York City Human Rights Law: Aiding and Abetting
Familial Status and Gender Discrimination)

134.    New York City Administrative Code § 8-107(6) declares that it "shall be an

unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of

any of the acts forbidden under this chapter."

135.    The housing advertised for rent or sale on Facebook using the platform described

above are "housing accommodations" as defined by the New York City Human Rights Law, § 8-

102(10).

136.    Facebook's creation of preset categories on its advertising platform that facilitate

unlawful discrimination in housing advertisements constitutes aiding, abetting, inciting and

compelling the doing of acts forbidden under Section 8-107(5)(3) of the New York City

Administrative Code, including the "declar[ing], print[ing] or circulat[ing] or caus[ing] to be

declared, printed or circulated any statement, advertisement or publication . . . which expresses,

directly or indirectly, any limitation, specification or discrimination as to race, creed, color,

national origin, *gender*, age, disability, sexual orientation, marital status, partnership status, or

alienage or citizenship status, or any lawful source of income, or *whether children are, may be,*

*or would be residing with a person*, or any intent to make such limitation, specification or

discrimination" (emphasis added).

137.    Facebook's creation of preset categories on its platform that enable unlawful discrimination in housing advertisements violated, and continues to violate, Section 8-107(5)(e) by denying persons access to Facebook's real estate advertisements on the basis of familial status and gender.

138.    NFHA and FHJC are "aggrieved persons" as defined in the New York City Administrative Code, § 8-502(a), and have suffered damages as a direct and proximate result of Defendant's discriminatory conduct.

139.    Accordingly, under New York City Administrative Code §§ 8-502(a) and (g), NFHA and FHJC are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

(a)    Declaring that Defendant's discriminatory policies and practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq*. and the New York City Administrative Code § 8-107 *et seq*.;

(b)    Enjoining Defendant, Defendant's subsidiaries, Defendant's agents, employees, and successors, and all other persons in active concert or participation from:

(i)    Denying or withholding housing, or otherwise making housing unavailable on the basis on family status, sex, gender, disability, race, or national origin;

(ii)    Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling or a housing accommodation that indicates any

36

preference, limitation, or discrimination based on family status, sex, gender, disability, race, or national origin;

(iii) Aiding, abetting, inciting and compelling the doing of acts forbidden under the New York City Human Rights Law including declaring, printing or circulating or causing to be declared, printed or circulated any statement advertisement or publication which expresses directly or indirectly, any limitation, specification or discrimination as to family status, gender, disability, race, or national origin or any intent to make such limitation, specification or discrimination; and

(iv) Coercing, intimidating, threatening or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted by the Fair Housing Act or New York City Human Rights Law.

(c) Enjoining Defendant and its agents, employees, successors, and all other persons in active concert or participation with Defendant to:

(i) Make all necessary modifications to Defendant's policies, practices, and procedures to comply with fair housing laws, including eliminating check boxes, selection categories, and other content that facilitates and enables advertisers to restrict or limit access to housing advertisements;

(ii) Develop a written fair housing advertising policy that is not dependent on self-certification by advertisers and communicate it publicly, as well as to Defendant's employees and agents;

(iii)    Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' housing advertising platform on fair housing laws;

(iv)    Allow monitoring of Defendant's advertising platform and housing advertisements for multiple years;

(v)    Retain records to allow for appropriate monitoring by Plaintiffs.

(d)    Awarding such damages to Plaintiff NFHA as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

(e)    Awarding such damages to Plaintiff FHJC as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

(f)    Awarding such damages to Plaintiff HOPE as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

(g)    Awarding such damages to Plaintiff FHCGSA as will fully compensate it for the diversion of resources and frustration of mission caused by Defendant's unlawful practices;

(h)    Awarding punitive damages to Plaintiffs;

(i)    Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

(j)      Granting Plaintiffs such other and further relief as may be just and proper.

Dated:  March 27, 2018
            New York, New York

EMERY CELLI BRINCKERHOFF & ABADY LLP

By:    /s/ Diane L. Houk
            Diane L. Houk
            Katherine Rosenfeld
            David S. Berman
            600 Fifth Avenue, 10th Floor
            New York, NY  10020
            212-763-5000

# Exhibit A





# Exhibit B



# Exhibit C



# Exhibit D



# Exhibit E





