UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; FAIR HOUSING JUSTICE CENTER, INC.; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO,<br><br>                    Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>                    Defendant. | No: 18 Civ. 2689 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE, OR ALTERNATIVELY TO DISMISS PLAINTIFFS' COMPLAINT**

**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, CA  94105
(415) 512-4000

*Counsel for Facebook, Inc.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................1

II.    BACKGROUND AND SUMMARY OF ALLEGATIONS ................................3

III.   THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA ......................................................................................6

     A.    Plaintiffs Agreed to Litigate Any Claims Against Facebook in California ............7

     B.    A "Competing Lawsuit" Has Been Pending in the Northern District of California for Over a Year .....................................................................9

     C.    Transfer to the Northern District of California Serves the "Interests of Convenience and Justice" Under 28 U.S.C. § 1404(a) ..........................................11

IV.   PLAINTIFFS DO NOT ALLEGE FACTS ESTABLISHING PERSONAL JURISDICTION OVER FACEBOOK IN NEW YORK ...................................12

V.    PLAINTIFFS DO NOT ALLEGE FACTS DEMONSTRATING ARTICLE III STANDING ..........................................................................................14

VI.   PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE CDA .................17

     A.    Facebook Is an Interactive Computer Service Provider .......................................19

     B.    Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers ........................................................19

     C.    Plaintiffs' Claims Treat Facebook as a Publisher or Speaker ...............................23

VII.  PLAINTIFFS DO NOT ALLEGE ANY UNLAWFUL CONDUCT BY FACEBOOK ...........................................................................................25

     A.    Plaintiffs Fail to State a Claim Under the Fair Housing Act ................................25

     B.    Plaintiffs Fail to State a Claim Under New York Law ..........................................29

VIII. CONCLUSION.......................................................................................31

CERTIFICATION OF COMPLIANCE ..................................................................32

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*,
  860 F. Supp. 128 (S.D.N.Y. 1994) ...................................................................12

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
  98 F.3d 25 (2d Cir. 1996)..............................................................................14

*Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd.*,
  160 F.3d 433 (8th Cir. 1998) .........................................................................15

*Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*,
  571 U.S. 49 (2013).......................................................................................8, 9

*Atlantic Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)...............................................................18

*Baldino's Lock & Key Serv., Inc. v. Google LLC*,
  285 F. Supp. 3d 276 (D.D.C. 2018) .................................................................23

*Barnes v. Yahoo! Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ........................................................................24

*Bennett v. Spear*,
  520 U.S. 154 (1997)......................................................................................17

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) ........................................................................22

*Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co.*,
  236 F.3d 629 (11th Cir. 2000) ........................................................................16

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)......................................................................................29

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
  519 F.3d 666 (7th Cir. 2008) .....................................................................19, 24

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................................16

*Cohen v. Facebook, Inc.*,
  252 F. Supp. 3d 140 (E.D.N.Y. 2017) ....................................................18, 24, 25

# TABLE OF AUTHORITIES
## (continued)

Page

*Creative Socio-Medics Corp. v. City of Richmond*,
  219 F. Supp. 2d 300 (E.D.N.Y. 2002) .................................................................14

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014).............................................................................................13

*Decker v. Nw. Envtl. Def. Ctr.*,
  133 S. Ct. 1326 (2013) ........................................................................................28

*Dolin v. Facebook, Inc.*,
  289 F. Supp. 3d 1153 (D. Haw. 2018) ...................................................................7

*Dyroff v. Ultimate Software Grp., Inc.*,
  2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) .....................................................22

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
  885 F. Supp. 2d 894 (S.D. Ill. 2012)......................................................................7

*Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*,
  522 F.3d 271 (2d Cir. 2008)...........................................................................10, 11

*Eres N.V. v. Citgo Asphalt Refining Co.*,
  605 F. Supp. 2d 473 (S.D.N.Y. 2009)..............................................................11, 12

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................................21, 25

*Fair Housing Council of Suburban Philadelphia v. Main Line Times*,
  141 F.3d 439 (3d Cir. 1998)..................................................................................15

*First City National Bank and Trust Co. v. Simmons*,
  878 F.2d 76 (2d Cir. 1989).....................................................................................9

*Force v. Facebook, Inc.*,
  ___ F. Supp. 3d ___, 2018 WL 472807 (E.D.N.Y. Jan. 18, 2018)........................19

*FTC v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016).................................................................... *passim*

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012)............................................................7, 9, 12

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..........................................................23, 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Guevara v. UMH Props., Inc.*,
   2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ....................................................28

*Gullen v. Facebook.com, Inc.*,
   2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ...........................................................13

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982).............................................................................................15

*Herrick v. Grindr, LLC*,
   ___ F. Supp. 3d ___, 2018 WL 566457 (S.D.N.Y. Jan. 25, 2018) ........................18, 21, 22, 24

*Herrick v. Grindr, LLC*,
   2017 WL 744605 (S.D.N.Y. Feb. 24, 2017)...........................................................22

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
   943 F.2d 644 (6th Cir. 1991) ...........................................................................26, 28

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
   731 F. Supp. 801 (S.D. Ohio 1990) .....................................................................26

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016)..................................................................................25

*Jewell v. Music Lifeboat*,
   254 F. Supp. 3d 410 (E.D.N.Y. 2017) ..................................................................13

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ...............................................................................20

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*,
   342 U.S. 180 (1952)...............................................................................................9

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) .............................................................................18

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ...........................................................................19

*Lopez v. Shopify, Inc.*,
   2017 WL 2229868 (S.D.N.Y. May 23, 2017) .......................................................13

*Martinez v. Bloomberg LP*,
   883 F. Supp. 2d 511 (S.D.N.Y. 2012)...................................................................29

**TABLE OF AUTHORITIES**
(continued)

Page

*Martinez v. Optimus Props., LLC,*
2017 WL 1040743 (C.D. Cal. Mar. 14, 2017)......................................................28

*MasterCard Int'l, Inc. v. Lexcel Solutions, Inc.,*
2004 WL 1368299 (S.D.N.Y. June 16, 2004) ........................................................9

*Miller v. Facebook, Inc.,*
2010 WL 9525523 (N.D. Ga. Jan 15, 2010) ..........................................................7

*Mobley v. Facebook, Inc.,*
No. 5:16-cv-06440-EJD (N.D. Cal.).......................................................10, 11, 12

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.,*
591 F.3d 250 (4th Cir. 2009) ................................................................................18

*New Moon Shipping Co. v. MAN B&W Diesel AG,*
121 F.3d 24 (2d Cir. 1997)......................................................................................8

*Pennie v. Twitter, Inc., et al.,*
281 F. Supp. 3d 874 (N.D. Cal. 2017) ..................................................................19

*Ragin v. N.Y. Times Co.,*
923 F.2d 995 (2d Cir. 1991)............................................................................27, 28

*Ricci v. Teamsters Union Local 456,*
781 F.3d 25 (2d Cir. 2015)....................................................................................18

*Rivera v. Incorporated Village of Farmingdale,*
2011 WL 1260195 (E.D.N.Y. Mar. 30, 2011)......................................................29

*Roberts v. Babkiewicz,*
582 F.3d 418, 419 (2d Cir. 2009) (per curiam)......................................................6

*Saponaro v. Grindr, LLC,*
93 F. Supp. 3d 319 (D.N.J. 2015) .........................................................................22

*South-Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors,*
935 F.2d 868 (7th Cir. 1991) ................................................................................28

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016)..........................................................................................14

*Tate-Small v. Saks Inc.,*
2012 WL 1957709 (S.D.N.Y. May 31, 2012) ......................................................10

**TABLE OF AUTHORITIES**
(continued)

Page

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct. 2507 (2015)....................................................................26

*United States ex rel. Cestra v. Cephalon, Inc.*,
    2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014) ........................................10

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)...............................................................13, 14

*Wyler-Wittenberg v. MetLife Home Loans, Inc.*,
    899 F. Supp. 2d 235 (E.D.N.Y. 2012) ................................................10

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ...........................................................24

STATE CASES

*Cross v. Facebook, Inc.*,
    14 Cal. App. 5th 190 (2017) ............................................................19

*D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
    29 N.Y.3d 292 (2017) ....................................................................14

*Foley v. Mobil Chem. Co.*,
    647 N.Y.S.2d 374 (Sup. Ct. 1996).....................................................29

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. App. 2012).......................................................23

*McBride v. KPMG Int'l*,
    135 A.D.3d 576 (App. Div. 2016) ......................................................30

*Nat'l Org. for Women v. Buffalo Courier-Express, Inc.*,
    337 N.Y.S.2d 608 (Sup. Ct. 1972).................................................29, 30

*In re New York Times Co. v. City of N.Y. Comm'n on Human Rights*,
    41 N.Y.2d 345 (1977) ....................................................................30

*People v. Kaplan*,
    76 N.Y.2d 140 (1990) ....................................................................30

FEDERAL STATUTES

28 U.S.C. § 1404(a) .............................................................1, 6, 11

**TABLE OF AUTHORITIES**
(continued)

Page

Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*:

    42 U.S.C. § 3604(a) ......................................................................................6, 25, 26

    42 U.S.C. § 3604(c) ..................................................................................6, 25, 27, 28

    42 U.S.C. § 3604(f).......................................................................................6, 25, 26

Communications Decency Act ("CDA"), 47 U.S.C. § 230:

    47 U.S.C. § 230(c)(1)................................................................................ *passim*

    47 U.S.C. § 230(e)(3)...........................................................................................18

    47 U.S.C. § 230(f)(2)...........................................................................................19

**STATE STATUTES**

Human Rights Law, N.Y.C. Admin. Code § 8-107(6) ............................................6, 29

**FEDERAL REGULATIONS**

24 C.F.R. § 100.75(c)(3).........................................................................................27, 28

## I.      INTRODUCTION

Facebook, Inc. ("Facebook") operates an online platform that enables people around the world to connect and share with those who matter to them and to discover content that may interest them.  Facebook also allows people to place ads about products and services they offer and to target the people who are most likely to be interested in them.  Advertisers using traditional print and broadcast media have done this for decades—for example, by running ads for women's clothing in Vogue or during Oprah, for men's athletic shoes in Sports Illustrated or during the Super Bowl, for Spanish-speaking audiences on Telemundo, and for back-to-school sales in Parents magazine.

Advertisers on Facebook similarly can use self-serve tools that allow, but do not require, them to target their ads based on information users provide through their activities on Facebook, including gender, location, and thousands of interests.  Facebook provides guidelines about what type of ad content is allowed on its service and makes clear that discrimination, including through use of these targeting tools, is strictly prohibited.  Facebook has also implemented a series of technical changes intended to prevent such misuse.  Plaintiffs, nevertheless, bring this case against Facebook, alleging that Facebook is liable under the Fair Housing Act and New York Human Rights Law because these targeting tools *make it possible* for advertisers to place discriminatory housing ads on Facebook—though Plaintiffs do not identify any such ads.

Plaintiffs' claims suffer from multiple fatal defects, but the Court need not reach those issues because this case should be transferred to the Northern District of California.  Plaintiffs agreed to resolve any claims against Facebook in California and offer no reason to suggest they should not be bound by that agreement.  Transfer is also warranted by the first-filed rule, because another case asserting substantially the same claims has been pending in that district for well over a year, and under the factors considered in the 28 U.S.C. § 1404(a) transfer analysis.

Alternatively, this case should be dismissed on multiple independent grounds.  *First*, Plaintiffs do not allege facts establishing personal jurisdiction over Facebook in New York. Facebook is not subject to general jurisdiction in New York, and specific jurisdiction does not exist because Facebook's ad platform and the challenged targeting tools are available for use by *all* advertisers in all housing markets throughout the United States.  Plaintiffs' claims therefore do not arise out of any conduct by Facebook directed toward New York.

*Second*, Plaintiffs have not alleged any actual injury to establish Article III standing because they allege only that the targeting tools *make it possible* for third parties to place discriminatory housing ads on Facebook, but that does not establish an injury in fact that is fairly traceable to alleged wrongdoing by Facebook.

*Third*, the Communications Decency Act ("CDA") bars all of Plaintiffs' claims because they are premised on the publication of allegedly discriminatory housing ads by third parties on Facebook, and therefore seek to hold Facebook liable "as the publisher or speaker" of third-party content in violation of the CDA.  47 U.S.C. § 230(c)(1).  In Plaintiffs' own words, Facebook allegedly "provides the option for *advertisers* to exclude [protected classes] from receiving [housing] advertisements" and "permits *advertisers* to publish these ads in a discriminatory manner."  Compl. ¶ 4 (emphases added).  Advertisers, not Facebook, are responsible for what Plaintiffs allege may result in publication of discriminatory housing ads on Facebook: advertisers create the ad content—*i.e.* text or images—offering housing opportunities, and select the targeting options Plaintiffs claim are discriminatory when used in conjunction with housing ads. Facebook's provision of neutral tools allowing all advertisers to engage in the commonplace practice of targeted advertising that, according to Plaintiffs, some housing advertisers *may* choose to use for an unlawful purpose falls squarely within the scope of CDA immunity.

*Finally,* Plaintiffs fail to state any claim against Facebook under the Fair Housing Act or New York law.  Plaintiffs' theory of liability under the Fair Housing Act is not supported by the text of the asserted statutory provisions and regulations, and has never been accepted by any court applying those laws.  And New York law does not apply here, as Plaintiffs agreed to a California choice-of-law provision when creating and continuing to use their Facebook accounts. But Plaintiffs' claims fail in any event because they do not and cannot allege any discriminatory act or intent *by Facebook* related to any use of the targeting tools by advertisers.

## II.    BACKGROUND AND SUMMARY OF ALLEGATIONS

Third parties can place ads on Facebook using self-serve tools available on Facebook's ad platform.  Compl. ¶¶ 40-44.  Advertisers upload text and/or images, set a budget and billing method, and then have the option to select an audience using tools that allow them to include and/or exclude "hundreds of demographics, behaviors, and interests."  *Id.* ¶¶ 45-50.  Plaintiffs refer to these tools as "pre-populated lists," but, as depicted in Exhibit A to the complaint, they are actually drop-down menus from which advertisers may (but are not required to) select one or more—*or none*—of the options listed.  Among the targeting options challenged by Plaintiffs are multicultural affinities,[1] men, women, parents with early school-age children, moms of grade

---

[1] Plaintiffs acknowledge that these targeting options are no longer available for housing ads, but wrongly allege that they "provided housing advertisers with the option of excluding [Facebook users] on the basis of … race and national origin."  Compl. ¶¶ 74(a), (b).  As Facebook has explained publicly, including in statements quoted in the complaint, multicultural affinity is not based on a user's race or national origin.  Facebook does not collect information on the race or ethnicity of its users, and does not permit users to provide that information in their user profiles. Instead, users become part of a "multicultural affinity" audience when, through their activities on Facebook, they express an interest in content related to African-American, Asian-American,

school kids, moms of high school kids, fit moms, soccer moms, disabled American veterans, disabled parking permit, disability.gov, Telemundo, and other targeting options Plaintiffs allege reflect "interests that are the equivalent of protected characteristics."  *Id.* ¶ 74.

According to Plaintiffs, by making these targeting tools available on its ad platform, Facebook "makes it possible" for *advertisers* to publish discriminatory housing ads on Facebook. Compl. ¶ 2 (Facebook "enable[s] *landlords and real estate brokers* to bar families with children, women, and others from receiving rental and sales ads for housing" and "makes it possible for *housing advertisers* to exclude certain home seekers from ever seeing their ads") (emphases added); *see also id.* ¶ 4 (Facebook "provides the option for *advertisers* to exclude families with children and women from receiving advertisements, as well as users with interests based on disabilities and national origin," and "approves and permits *advertisers* to publish these ads in a discriminatory manner") (emphasis added).

But Plaintiffs do not, and cannot, allege that the targeting tools have no lawful purpose. For example, a Spanish-language publication may target ads to users who have expressed an interest in Telemundo and/or the Hispanic (Spanish dominant) affinity; a seller of women's clothing may choose to target ads to women; a yoga studio may choose to target ads to users who have expressed an interest in fit moms; or an organization serving persons with disabilities may target ads to users who have expressed an interest in disability.gov or disabled American veterans.

───────────────────

Hispanic, Hispanic (Bilingual), Hispanic (Spanish dominant), or Hispanic (English dominant) communities.  Because multicultural affinities are based on interests and not race or ethnicity, users may be in one or more—*or none*—of these affinities at a given time and move between them over time as their activities on Facebook change.

Advertisers may also use the targeting tools to exclude certain audiences in ways that are lawful and not discriminatory, and in fact promote diversity and inclusion through "parallel advertising."  For example, an advertiser may run two ads on Facebook for the same product, one in Spanish and the other in English.  To avoid duplication, the advertiser can target the Spanish ad to users expressing an interest in Telemundo and/or the Hispanic (Spanish dominant) affinity and the English ad to exclude those audiences because they were targeted to receive the Spanish ad.  This is more efficient for the advertiser and provides a better user experience.

Advertisers can also run parallel ads through varying media channels.  For example, an advertiser that wants to run an ad in Spanish and English for the same product might create a Spanish ad to run on Telemundo and an English ad to run on Facebook, targeting it to exclude users who have expressed an interest in Telemundo, since that audience was already targeted to see the ad on Telemundo.  Similarly, a real estate agent marketing a house he believes is especially appealing to families may run ads on Facebook or across advertising media using different creatives, one with a picture of a playset in the backyard and one with a picture of the kitchen.  The agent might run the playset image on local parenting blogs and/or on Facebook targeting it to audiences who have expressed an interest in parenting-related topics (*e.g.*, parents with toddlers) and run the kitchen image on Facebook excluding the same parenting-related options because those audience segments have already been targeted through other advertising on Facebook and other advertising media.

Plaintiffs also do not, and cannot, allege any discriminatory conduct by *Facebook*.  In fact, Plaintiffs repeatedly acknowledge that it is the advertisers—not Facebook—who decide whether and how to use the targeting tools they challenge.  In fact, Facebook explicitly prohibits discrimination on Facebook, including through use of its ad targeting tools, and requires all

advertisers to comply with its policies and all applicable antidiscrimination laws.[2]

At bottom, Plaintiffs' claims against Facebook are based on its operation of an online platform that allows third parties to publish ads using neutral, self-serve tools.  That certain third parties *may* misuse these tools for the purpose of publishing discriminatory housing ads is something Facebook takes seriously and has taken significant steps to address.  But it does not render Facebook liable for any such ads under the federal Fair Housing Act, 42 U.S.C. § 3604 (a), (c), (f); or the New York Human Rights Law, N.Y.C. Admin. Code § 8-107(6).

## III.   THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Transfer of this case to the Northern District of California is warranted on three independent grounds: (1) Plaintiffs agreed to a forum selection clause requiring them to litigate any claims against Facebook in California, (2) a "competing lawsuit" is already pending in the Northern District of California, and (3) transfer serves "the interests of convenience and justice" under 28 U.S.C. § 1404(a).

---

[2] *See* Declaration of Rosemarie T. Ring ("Ring Decl."), Ex. A ["[A]dvertisers may not (1) use our audience selection tools to (a) wrongfully target specific groups of people for advertising …; or (b) wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory content in their ads."]; *see also* Ex. B (Advertising Policy 7.1 mandates that advertisers "must not use targeting options to discriminate against … users[.]").  Facebook's motion to dismiss can and should be granted regardless of whether the Court takes judicial notice of these documents, which simply provide additional "factual background of the case."  *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) (per curiam); *see also* Request for Judicial Notice (filed concurrently with this motion).

6

### A.      Plaintiffs Agreed to Litigate Any Claims Against Facebook in California

All of the Plaintiffs have active Facebook accounts.  *See* Compl. ¶¶ 75-100.  When creating their accounts, each of them agreed to Facebook's Terms of Use, sometimes referred to as the Statement of Rights and Responsibilities ("SRRs"), a binding contract that governs the relationship between Plaintiffs and Facebook.  Declaration of Michael Duffey ("Duffey Decl.") ¶¶ 5-9, 15-16, 22-23, 29-30, 36-37; *see, e.g.*, *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 834-35, 841 (S.D.N.Y. 2012) (transferring case to N.D. Cal. because plaintiff "assented to" Facebook's SRRs and "agreed to litigate all disputes regarding his Facebook account" in that district); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 905-06 (S.D. Ill. 2012) (transferring case to N.D. Cal. because the plaintiff agreed to Facebook's SRRs and forum selection clause); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1160-61 (D. Haw. 2018) (same); *Miller v. Facebook, Inc.*,  2010 WL 9525523, at *4 (N.D. Ga. Jan 15, 2010) (same).  In agreeing to these terms, each of the Plaintiffs also agreed to be bound by later updates to the terms.  *See* Duffey Decl. ¶¶ 15, 22, 29, 36 & Exs. B, D, F.

Facebook's current terms of service include the following forum selection and choice-of-law clause:

> For **any claim, cause of action, or dispute** you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved **exclusively** in the U.S. District Court for the Northern District of California or a state court located in San Mateo County.  You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

Ring Decl., Ex C at 6-7 (emphases added).  Each Plaintiff therefore has agreed to bring *any* claim against Facebook *arising out or relating to Facebook exclusively* in the Northern District of California or San Mateo Superior Court.[3]

"[A] valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases."  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (internal quotation marks omitted); *see also New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997) ("A forum selection clause is enforceable unless it is shown that to enforce it would be unreasonable and unjust or that some invalidity such as fraud or overreaching is attached to it.") (internal quotation marks and citation omitted).  Accordingly, where, as here, the parties have agreed to a valid forum selection clause, Plaintiffs' choice of forum "merits no weight" and Plaintiffs "bear[] the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Atl. Marine*, 571 U.S. at 63.  By agreeing to the SRR's forum selection clause, Plaintiffs also have "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."  *Id.* at 64.  Because the remaining factors[4] of the transfer analysis

---

[3] Each Plaintiff also agreed to a similar California forum selection clause at the time they agreed to the terms when they signed up for Facebook.  *See* Duffey Decl. ¶¶ 16, 23, 30, 37.  Three of the four Plaintiffs agreed to a California choice-of-law clause at the time they signed up for Facebook; the fourth, NFHA, agreed to a Delaware choice-of-law clause, *see id.*, though that has since been superseded by the current California choice-of-law clause.

[4] The "[p]ublic-interest factors" that may be considered even where a valid forum selection clause applies "may include: the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the

"will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

Here, there can be no dispute that Plaintiffs agreed to the forum selection clause because they could not otherwise have registered for a Facebook account. *See* Duffey Decl. ¶ 9; *Fteja*, 841 F. Supp. 2d at 835 ("In order to have obtained a Facebook account, Fteja must have" assented to forum selection clause.). Because the forum selection clause is presumptively enforceable and Plaintiffs cannot carry the "heavy burden" of demonstrating that the clause should be invalidated, and because "'the interest of justice' is served by holding parties to their bargain," this action should be transferred to the Northern District of California. *Atl. Marine*, 571 U.S. at 66.

## B. A "Competing Lawsuit" Has Been Pending in the Northern District of California for Over a Year

"[W]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989). Cases "compete" when there are "sufficient overlapping factual and legal issues" between them. *MasterCard Int'l, Inc. v. Lexcel Solutions, Inc.*, 2004 WL 1368299, at *8 (S.D.N.Y. June 16, 2004). Strong policy considerations dictate application of this rule to prevent duplicative litigation and promote "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation[.]" *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952).

---

trial of a diversity case in a forum that is at home with the law." *Atl. Marine*, 571 U.S. at 62 n.6 (internal quotation marks and citation omitted). Plainly, none of these factors apply here.

Here, the first-filed case, *Mobley v. Facebook, Inc.*, No. 5:16-cv-06440-EJD (N.D. Cal.), which has been pending in the Northern District of California for well over a year, is a "competing lawsuit" because, just as Plaintiffs do here, the *Mobley* plaintiffs assert claims against Facebook under the Fair Housing Act based on allegations that advertisers *may* use neutral targeting tools on Facebook's ad platform to place discriminatory housing ads. *See supra* at 3-6; Ring Decl., Exs. D, E (*Mobley* complaints). The policy justifications underlying application of the first-filed rules exist even where non-overlapping claims and parties exist. For example, in *United States ex rel. Cestra v. Cephalon, Inc.*, 2014 WL 1087960, at *4 (S.D.N.Y. Mar. 19, 2014), the court applied the first-filed rule because, notwithstanding different parties and claims, transfer served the interests of judicial economy and comity because the two actions "share[d] significant factual allegations, legal issues, and parties." *See also Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F. Supp. 2d 235, 244-45 (E.D.N.Y. 2012) (same); *Tate-Small v. Saks Inc.*, 2012 WL 1957709, at *2-3 (S.D.N.Y. May 31, 2012) (same).

The same is true here. This case and *Mobley* require resolution of the same core factual and legal issues, including how Facebook's ad platform and targeting tools work, whether claims against Facebook based on ad targeting by advertisers are barred by the CDA or fail for lack of standing, and the viability of plaintiffs' novel theory under the FHA that a publisher can be liable for the targeting decisions of advertisers. Because these issues are currently pending before the *Mobley* court in the Northern District of California, allowing this case to proceed in this district would "present[] redundancies that contravene the interests of judicial economy and implicate issues of comity." *Cephalon*, 2014 WL 1087960, at *6.[5]

---

[5] Neither exception to the first-filed rule applies. As discussed *infra*, the "balance of convenience" factors weigh in favor of transfer. *See Employers Ins. of Wausau v. Fox Entm't*

**C.      Transfer to the Northern District of California Serves the "Interests of Convenience and Justice" Under 28 U.S.C. § 1404(a)**

Courts evaluating whether transfer serves the interests of convenience and justice under 28 U.S.C. § 1404(a) typically consider: (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the location of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the forum's familiarity with the governing law; (7) the relative means of the parties; (8) the weight afforded plaintiff's choice of forum; and (9) judicial economy and the interests of justice generally.  *See Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 478-79 (S.D.N.Y. 2009).

Here, these factors weigh in favor of transfer.  Because Facebook is headquartered in California, and Plaintiffs' claims challenges Facebook's advertising policies, practices and platform, it will be far more convenient to litigate this case in California than in New York.  All or nearly all of the witnesses who will testify about Facebook's advertising policies, practices and platform will be Facebook employees based in California.  *See* Duffey Decl. ¶ 3.  Likewise, all of the relevant documents and sources of proof are likely to be located in California.  *See id.* ¶ 4.  The locus of operative facts is also in California because Facebook makes decisions about its advertising policies, practices and platform at its Menlo Park headquarters.  *See id.* ¶ 3; *see*

---

*Grp., Inc.*, 522 F.3d 271, 275 (2d Cir. 2008) (explaining that the "balance of convenience" factors "are essentially the same as those considered in connection with motions to transfer venue" under section 1404(a)).  And no "special circumstances," such as obviously forum shopping, exist that warrant giving priority to this case over *Mobley*, since the *Mobley* plaintiffs filed their case well over a year ago in the district where Facebook is headquartered, consistent with the forum selection clause also agreed to by Plaintiffs in this case.  *Id.*

*also 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 135 (S.D.N.Y. 1994) (locus of operative facts where defendant's business decisions and practices occurred).

Judicial economy and the interests of justice also weigh heavily in favor of transfer.  As discussed *supra*, the interests of justice are served by enforcing Plaintiffs' agreement to litigate any claims against Facebook in California, which also waived their right to challenge that forum as inconvenient and means their choice of any other forum is given no weight in this analysis. Moreover, *Mobley*, a "competing lawsuit," has been pending in California for over 18 months.

The remaining factors are neutral or should be given little weight.  Both districts are familiar with the relevant law.  There are no facts to indicate that Plaintiffs would be unable to litigate this action in California, since NFHA is a national organization and two of the other three Plaintiffs reside outside of this district and would have to expend comparable resources regardless of venue.  *See Fteja*, 841 F. Supp. 2d at 844.  Plaintiffs' choice of forum should be given little weight, as only one Plaintiff is located in this district.  Moreover, the importance of a plaintiff's choice of forum is significantly reduced when, as here, "the operative facts have few meaningful connections to the plaintiff's chosen forum."  *Eres N.V.*, 605 F. Supp. 2d at 483.

**************

This case should be transferred to the Northern District of California for all of the reasons set forth above.  If the Court does not transfer the case, Plaintiffs' claims should be dismissed on multiple independent grounds.

## IV.    PLAINTIFFS DO NOT ALLEGE FACTS ESTABLISHING PERSONAL JURISDICTION OVER FACEBOOK IN NEW YORK

Plaintiffs' claims must be dismissed because this Court lacks personal jurisdiction over Facebook.  Facebook is not subject to general jurisdiction in New York because it is incorporated in Delaware with its principal place of business in California.  Compl. ¶ 32.  And Plaintiffs do

not allege any facts that would make this an "exceptional case" creating general jurisdiction outside a corporation's state of incorporation or principal place of business.  *Daimler AG v. Bauman*, 571 U.S. 117, 137, 139 n.19 (2014).

Plaintiffs also fail to allege any basis for specific jurisdiction, which exists only where "the *defendant's* suit-related conduct … create[s] a substantial connection with the forum state." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (emphasis added); *see also id.* at 1122 ("We have consistently rejected attempts to satisfy the [personal jurisdiction] inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.").  Plaintiffs do not allege any conduct by Facebook targeted to New York.  Instead, as Plaintiffs' repeatedly allege, their claims against Facebook are based on the availability of targeting tools that they claim *may* be used by housing advertisers to place discriminatory ads throughout the United States.  Compl. ¶¶ 2, 4, 41-51.  But the law is clear that a plaintiff's use of a website that is available throughout the United States is "not … sufficient for personal jurisdiction" in a particular state.  *See Lopez v. Shopify, Inc.*, 2017 WL 2229868, at *8 n.9 (S.D.N.Y. May 23, 2017), *report and recommendation adopted*, 2018 WL 481891 (S.D.N.Y. Jan. 17, 2018) ("the Court is not satisfied that the theoretical availability of RRHustle's allegedly infringing goods to anyone with internet use in any state, including New York, means that Shopify has 'purposefully directed' its activities at New York"); *Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 419-20 (E.D.N.Y. 2017) (the plaintiffs' use of a website available throughout the United States was "not … sufficient for personal jurisdiction" in New York); *accord Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at *2 (N.D. Ill. Jan. 21, 2016) (rejecting Illinois plaintiffs' attempt to bring claims against Facebook in Illinois because "the fact that its site is accessible to Illinois residents does not confer specific jurisdiction over Facebook").

13

Here, Plaintiffs' claims are based on targeting tools that are available for use throughout the United States, and indeed, throughout the world.  Facebook has not directed these tools to New York in any way, let alone in a way that would constitute "purposeful availment" of the benefits and protections of New York.  *See D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017) ("purposeful availment occurs when the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship" giving rise to the lawsuit).  Asserting personal jurisdiction over Facebook in New York because Plaintiffs or a third party chooses to use these generally available targeting tools does not comport with due process, requiring conduct *by Facebook* to "create a substantial connection with" New York.  *Walden,* 134 S. Ct. at 1121.  And Plaintiffs offer no explanation at all as to how their claims concerning the housing markets in Washington D.C., Miami, and San Antonio, *see* Compl. ¶¶ 75-84, 91-100, bear any connection to New York.[6]

## V.   PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' claims must be dismissed because they have not alleged facts demonstrating Article III standing.  The "'irreducible constitutional minimum' of standing consists of three elements":  (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Plaintiffs cannot meet this standard.

_____

[6] Facebook's California forum selection provision also weighs in favor of declining to find that the court has personal jurisdiction under these circumstances.  *Supra* at 7-8; *see, e.g.*, *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *Creative Socio-Medics Corp. v. City of Richmond*, 219 F. Supp. 2d 300, 307 (E.D.N.Y. 2002).

In two directly analogous cases, federal courts of appeal have held that advocacy organizations, like Plaintiffs, lack standing to sue based on discriminatory housing advertisements.  In *Fair Housing Council of Suburban Philadelphia v. Main Line Times*, 141 F.3d 439 (3d Cir. 1998), the plaintiff argued that it suffered injury when it "was forced to divert resources from counseling and other activities" because of "the discriminatory effect of … advertisements" placed in a local newspaper.  *Id.* at 442.  The court held that the plaintiff organization "failed to establish the necessary 'causal connection between the injury and the [advertisements],'" because it alleged "discriminatory advertising *generally*," not that it had suffered harm as a result of specific advertisements the newspaper printed.  *Id.* at 443.  Similarly, in *Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd.*, 160 F.3d 433 (8th Cir. 1998), the court held that the plaintiff organization lacked standing because it had not alleged "specific facts establishing distinct and palpable injuries fairly traceable to [the defendant's] advertisements."  *Id.* at 435.

Here, Plaintiffs' standing allegations are even more tenuous.  The plaintiff organizations in *Main Line Times* and *Arkansas ACORN* were at least able to point to *actual* ads they alleged were discriminatory, even though they were unable to connect those ads to their alleged injuries.  *Main Line Times*, 141 F.3d at 443; *Ark. ACORN*, 160 F.3d at 434.  Here, Plaintiffs allege only fictitious ads that *they created* and targeted using the ad platform's tools and the *possibility* that some unidentified third parties *may* use those tools to place real discriminatory ads.  *See* Compl. ¶¶ 117-128.  This is plainly insufficient.

Plaintiffs likely will argue that they can establish organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  But *Havens* serves only to underscore the deficiency in Plaintiffs' allegations.  In *Havens*, a white housing applicant and a black housing

applicant inquired about availability at a particular apartment complex in Virginia.  The black

applicant was told no apartments were available, and the white applicant was told the opposite.

*Id.* at 368.  The organizational plaintiff in *Havens*, in other words, had shown precisely what

Plaintiffs here have not: harm to its mission stemming from *actual* discrimination occurring with

respect to *specific* housing opportunities.  Other courts have rightly interpreted *Havens* in this

way, recognizing the "obvious difference" between a situation, like the one here, in which "an

organization manufacturers the injury necessary to maintain a suit" and the situation in *Havens*

where "an organization incurs diversion of resources and frustration of purpose damages as a

result of *specific documented incidents* of unlawful discrimination."  *Cent. Ala. Fair Hous. Ctr.,*

*Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000) (emphasis added).

     Plaintiffs make a series of allegations regarding the expenditures they supposedly have

made as a result of the targeting options on Facebook's ad platform, including "public education

campaigns" (Compl. ¶ 124), "draft[ing] guidelines for housing advertisers that it posted on its

website" (*id.* ¶ 125), "design[ing] advertisements for social media" (*id.* ¶ 126), and "expend[ing]

staff time to communicate and coordinate with each other" about their education campaigns (*id.*

¶ 127).  But the problem for Plaintiffs is that they do not allege any facts tying these allegations

to specific discriminatory uses of the targeting options these expenditures supposedly addressed.

Absent a connection between these expenditures and "specific documented incidents of unlawful

discrimination," which Plaintiffs do not allege, Plaintiffs cannot "manufacture[]" their own

"injury" for Article III purposes by pointing to fictitious and potential discriminatory ads.

*Lowder Realty*, 236 F.3d at 642; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416

(2013) (rejecting plaintiffs' attempt to "manufacture standing merely by inflicting harm on

themselves" through expenditures "based on their fears of hypothetical future harm").  And even

if this theory of injury were cognizable—which it is not—it still would not establish harm fairly traceable *to Facebook* because simply making these neutral targeting tools available does not have any "determinative or coercive effect" on any decision by an advertiser to use them in discriminatory ways. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

## VI.   PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE CDA

Plaintiffs seek to hold Facebook liable for discriminatory housing ads they allege unidentified third-party advertisers *may* have placed on Facebook.  Attempting to plead around the CDA, Plaintiffs frame their challenge as one to Facebook's "conduct" in creating targeting tools, which they claim "make it possible" for advertisers to place discriminatory ads.  But Plaintiffs cannot escape the simple fact that, even under their theory of liability, there can be no violation of the FHA without *publication of a discriminatory housing ad*, and there can be no publication of a discriminatory housing ad unless a *third-party advertiser* runs a housing ad and uses the targeting tools in a way that results in discrimination.  *See* Compl. ¶ 2 (Facebook "makes it possible for *housing advertisers* to exclude certain home seekers from ever seeing their ads.") (emphasis added); *id.* ¶ 4 (Facebook "provides the option for *advertisers* to exclude families with children and women from receiving advertisements, as well as users with interests based on disability and national origin," and "approve and permits *advertisers* to publish these ads in a discriminatory manner.") (emphasis added); *id.* ¶ 74 (Facebook "made it possible for *housing advertisers* to exclude people from seeing their ads on the basis of their family status;" Facebook "enabled *housing advertisers* to exclude people from seeing their ads on the basis of sex;" Facebook "enabled *housing advertisers* to exclude on the basis of interests that are the equivalent of protected characteristics.") (emphasis added).

The CDA prohibits Plaintiffs from seeking to impose liability on Facebook for publishing third-party content they allege is discriminatory.  Under Section 230 of the CDA, "[n]o provider

17

or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The law bars liability "under any State or local law that is inconsistent with this section," *id*. § 230(e)(3), and also extends to federal claims. The Second Circuit and courts across this country have "construed [Section 230] broadly" to "effectuate the statute's speech-protective purpose." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015).

Section 230 "was enacted based on a congressional concern that treating providers of computer services the same way as traditional publishers would impede the development of the Internet," and Congress thus "made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009). "None of this means, of course, that the original culpable party who posts [unlawful content] would escape accountability," but "Congress made a policy choice" to preempt "tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Ricci*, 781 F.3d at 28. Because the CDA is intended to protect websites "not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles,'" courts "aim to resolve the question of § 230 immunity at the earliest possible stage." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Thus, courts routinely apply the CDA to dismiss cases on the pleadings. *See, e.g.*, *Ricci*, 781 F.3d at 26; *Herrick v. Grindr, LLC*, ___ F. Supp. 3d ___, 2018 WL 566457, at *4 (S.D.N.Y. Jan. 25, 2018); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 155 (E.D.N.Y. 2017); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting plaintiff's "effort to circumvent the CDA's protections through 'creative' pleading").

CDA immunity applies when (1) the defendant is "a provider or user of an interactive computer service," (2) "the claim is based on information provided by another information content provider," and (3) "the claim would treat [the defendant] as the publisher or speaker of that information." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016). Applying this standard, courts repeatedly have held that the CDA protects Facebook from claims arising from it publication of content created by third parties alleged to be unlawful. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Cohen*, 252 F. Supp. 3d at 158; *Force v. Facebook, Inc.*, ___ F. Supp. 3d ___, 2018 WL 472807, at *10 (E.D.N.Y. Jan. 18, 2018); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 206 (2017); *Pennie v. Twitter, Inc., et al.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017). Courts have also applied the CDA to bar claims against websites, like Facebook, for publishing allegedly discriminatory housing ads. *See Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008) ("given § 230(c)(1), [a plaintiff] cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful discrimination"). The logic of these cases applies with equal force here because Plaintiffs assert that Facebook published allegedly discriminatory housing ads created by third parties.

### A.    Facebook Is an Interactive Computer Service Provider

It is beyond dispute that Facebook is a provider of an interactive computer service. *See, e.g.*, *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access … to a computer server,' 47 U.S.C. § 230(f)(2)"); *Cohen*, 252 F. Supp. 3d at 156 (same).

### B.    Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers

The "information" upon which Plaintiffs' claims are based—allegedly discriminatory

housing ads—is "provided by another information content provider."  47 U.S.C. § 230(c)(1).  As Plaintiffs repeatedly allege, any discriminatory housing ads are created by advertisers.  *See, e.g.*, Compl. ¶ 2 (targeting tools "make[] it possible for *housing advertisers* to exclude certain home seekers from ever seeing their ads") (emphasis added); *id.* ¶ 4 (Facebook "provides the option for *advertisers* to exclude families with children and women from receiving advertisements") (emphasis added); *id.* ¶¶ 40-58 (describing various ways in which "advertisers" create ads and use targeting tools).  Facebook is therefore not a "content creator" within the meaning of the CDA because Plaintiffs do not, and cannot, allege that Facebook "materially contribut[ed] to [the] alleged unlawfulness" *of the content*, or "assisted in the development of *what made the content unlawful*."  *LeadClick Media*, 838 F.3d at 174 (emphases added); *accord, e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (explaining that "[a] material contribution" to the alleged illegality of content under the CDA "means being responsible for what makes the displayed content allegedly unlawful").

As explained below, Facebook's creation of neutral targeting tools that third parties may use to place housing ads is irrelevant for purposes of determining whether Facebook is an "information content provider" under the CDA, as courts consistently have held.  *See infra* at 20-22 & n.7 (collecting cases in which courts have held the CDA protects websites that provide "neutral tools" that third-party users may use for lawful or unlawful purposes).

Here, what makes the content at issue allegedly unlawful is controlled by third-party advertisers who create the housing ads and then target them in ways Plaintiffs claim are discriminatory.  But Plaintiffs do not and cannot allege that Facebook makes these decisions.  Instead, they allege that Facebook "makes it possible" for advertisers to make those decisions.  But it is the decisions, not the *possibility* they will be made, that result in alleged discriminatory

housing ads.  Thus, third-party advertisers are the only "information content provider[s]" of the content at issue.

The targeting tools challenged by Plaintiffs are exactly the type of "neutral tool[]" protected by the CDA.  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc).  Courts uniformly have held that such neutral tools, which facilitate the publication of third-party content and may be used for either "proper or improper purposes," do not "contribute[] materially to the alleged illegality" of third-party content.  *Id.* at 1168, 1172.  As a court in this district recently held, defendants "may not be held liable for so-called 'neutral assistance,' or tools and functionality that are available equally to bad actors and the [website's] intended users."  *Herrick*, 2018 WL 566457, at *5 (quoting *LeadClick Media*, 838 F.3d at 176).  Importantly, such neutral tools are protected *even if* they may be deemed in some sense to contribute to the illegality of the content at issue, as long as the tool are "equally to all users and are not intrinsically offensive or unlawful."  *Id.*

In *Herrick*, the plaintiff alleged that Grindr, an online dating app, had facilitated stalking and harassment by providing tools that allowed the plaintiff's ex-boyfriend to "impersonate [him] by posting fake profiles to Grindr" that invited unwanted sexual advances.  2018 WL 566457, at *1.  Like Plaintiffs here, the plaintiff attempted to avoid CDA immunity by arguing that "Grindr contributes to what makes the impersonating profiles offensive," by creating and providing tools such as a "drop-down menu for 'preferred sexual position,'" that were used by the plaintiffs' ex-boyfriend to post fake profiles.  *Id.* at *5-6.  The court rejected this argument and dismissed the complaint with prejudice, emphasizing that "[t]o the extent Grindr contributes to the impersonating profiles, it is through [] … 'neutral assistance'" in the form of tools that

21

were "available equally to all users and are not intrinsically offensive or unlawful." *Id.* at *5.[7]

"There is nothing … illegal about Grindr's drop-down menus, its geolocational function, or its sorting, aggregation, and display functions," even though the defendant had allegedly misused those tools and functions for improper purposes. *Id.* at *6.

*Herrick* relied upon similar cases from other jurisdictions, most notably *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003). *See Herrick*, 2018 WL 566457, at *5. In *Carafano*, a dating website provided its users with a "detailed questionnaire" that included multiple-choice questions where "members select[ed] answers ... from menus providing between four and nineteen options" in creating their profiles. 339 F.3d at 1121. The plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the creation of a defamatory impersonated profile. *Id.* The Ninth Circuit held that "[d]oubtless, the questionnaire facilitated the expression of information by individual users" but the "selection of the content was left exclusively to the user"; thus, the defendant "cannot be considered an 'information content provider'" because "no profile has any content until a user actively creates it." *Id.* at 1124.[8]

---

[7] An prior ruling by the same court had dismissed an earlier version of the complaint as well. *See Herrick v. Grindr, LLC*, 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017).

[8] Numerous other cases, many of which were cited and discussed by the *Herrick* court, are to the same effect. *See, e.g.*, *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 324 (D.N.J. 2015) (holding that Grindr was entitled to CDA immunity against claim that it improperly allowed minors to use its app because it "merely provided *neutral* tools to carry out what may be unlawful or illicit conduct"); *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *1, *10 (N.D. Cal. Nov. 26, 2017) (holding that a "social-network website" was entitled to CDA immunity against claim brought by the mother of a man who died of a heroin overdose alleging that the cite "us[ed] its proprietary algorithms" to "steer[]" her son toward drug forums and dealers, because the website

The same is true here.  The availability of neutral targeting tools, which advertisers may but are not required to use, are not "what made the content [allegedly discriminatory housing ads] unlawful."  *LeadClick Media*, 838 F.3d at 174.  Any such ads are the result of decisions made by third parties to create and target their ads in allegedly discriminatory ways.

### C.  Plaintiffs' Claims Treat Facebook as a Publisher or Speaker

The final element of CDA immunity also is satisfied because Plaintiffs are attempting to impose liability on Facebook because it allegedly "*permits advertisers to publish … ads* in a discriminatory manner," Compl. ¶ 4 (emphasis added), and "enables advertisers to seek out" and "target" "potential audiences with great specificity," *id.* ¶ 44.  *See also id.* ¶ 52 (third party "create[s]" an ad "to be published on its Facebook page"); *id.* ¶ 131(b) (Facebook has "[m]a[de], print[ed], or publish[ed], or caus[ed] to be made, printed, or published" unlawful advertisements).  Selling ad space to third parties and allowing them to choose the target audience for their ads is a classic publishing activity protected by the CDA.

Courts have recognized that a lawsuit treats a defendant as a publisher or speaker when it seeks to "hold a service provider liable for its exercise of a publisher's traditional editorial

---

"merely provide[d] a framework that could be utilized for proper or improper purposes"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197-98 (N.D. Cal. 2009) (Google's "Keyword Tool" that "suggest[ed] the phrase 'free ringtone' to advertisers, allegedly facilitating fraudulent advertising, was a "neutral tool" because it did "nothing more than provide options that advertisers may adopt or reject at their discretion"); *Baldino's Lock & Key Serv., Inc. v. Google LLC*, 285 F. Supp. 3d 276, 282 (D.D.C. 2018) (CDA protected Google's provision of "neutral mapping tools" that certain businesses used fraudulently); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. App. 2012) (pricing tool for tickets that suggested prices above that allowed by law was "a prototypically 'neutral tool'").

functions—such as deciding whether to publish, withdraw, postpone or alter content."
*LeadClick Media*, 838 F.3d at 174.  "A provider of information services might get sued for
violating anti-discrimination laws … or even for negligent publication of advertisements that
cause harm to third parties. … [W]hat matters is not the name of the cause of action," but
"whether the duty that the plaintiff alleges the defendant violated derives from the defendant's
status or conduct as a 'publisher or speaker.'"  *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1101-02
(9th Cir. 2009); *accord LeadClick Media*, 838 F.3d at 175 (quoting and citing *Barnes* on this
point); *Herrick*, 2018 WL 566457, at *6 (noting that "[c]ourts have interpreted 'publication'
capaciously to reach claims that, although pleaded to avoid the CDA, 'implicitly require recourse
to that content [posted by a third party] to establish liability or implicate a defendant's role'")
(quoting *Cohen*, 252 F. Supp. 3d 156).

Applying these principles, numerous cases recognize that the publication of third-party
ads falls squarely within the realm of traditional publisher functions protected by the CDA, even
if the ads themselves are discriminatory or otherwise unlawful under federal or state law.  *See,
e.g.*, *Chi. Lawyers Comm.*, 519 F.3d at 671-72 (CDA barred claim against Craigslist for
publishing allegedly discriminatory housing ads in violation of federal FHA); *Goddard*, 640 F.
Supp. 2d at 1195-96 (CDA barred claim premised on "allegedly fraudulent web-based
advertisements" published by Google); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 329 (4th Cir.
1997) (CDA barred claim premised on allegedly fraudulent third-party ads).

Likewise, Facebook's provision of tools that allow "an advertiser" to "customize exactly
who will receive its advertisement" and control "where and how frequently the ad appears on the
Facebook accounts of its targeted audience," Compl. ¶ 57, falls squarely within the traditional
publisher functions protected by the CDA.  Indeed, publishers routinely allow advertisers to

24

target ads and assist them in doing so.  For instance, newspapers might sell sporting-goods stores advertising space in the sports section.  A broadcast network might sell some advertisers airtime on one channel while selling other advertisers airtime on another.  The publication of ads entails more than blindly displaying them; it also entails providing advertisers tools that they can use to reach their target audience.

That is the same type of service Facebook and other online publishers protected by the CDA offer to advertisers.  Courts have consistently held in analogous contexts that ad targeting is a traditional publisher function protected by the CDA.  *See, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) (tools allowing ad buyers to "target their advertisements" based on geography would be protected); *Roommates*, 521 F.3d at 1169 (tools allowing users "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria" would be protected, even though such tools "might help some users exclude email from other users of a particular race or sex").  All of Plaintiffs' claims are based on alleged discriminatory uses of targeting tools by third-party advertisers in selecting the audience for their ads.  "Facebook's role in publishing that content is thus an essential causal element of [Plaintiffs'] claims."  *Cohen*, 252 F. Supp. 3d at 158.  Thus, Plaintiffs claims attempt to treat Facebook as the publisher of unlawful content and are barred by the CDA.

## VII.  PLAINTIFFS DO NOT ALLEGE ANY UNLAWFUL CONDUCT BY FACEBOOK

### A.    Plaintiffs Fail to State a Claim Under the Fair Housing Act

Plaintiffs allege that "Facebook's creation of [targeting tools] on its advertising platform that facilitate unlawful discrimination in housing advertisements" by third-parties violate three provisions of the FHA: 42 U.S.C. § 3604(a), (c), and (f).  Compl. ¶ 131.  None of these provisions apply to Facebook under Plaintiffs' novel theory of liability which challenges ad

*targeting*, as opposed to *content*, and seeks to hold a publisher liable for those targeting decisions made by advertisers.  No court has adopted this expansive view of the FHA, and this Court should reject Plaintiffs' invitation to be the first to do so.

Plaintiffs fail to state any claim against Facebook under 42 U.S.C. § 3604(a) and (f).  These provisions make it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny" or "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny" a dwelling because of membership in a protected class.  But Plaintiffs do not, and cannot, allege that *Facebook* sells or rents any dwelling.  Instead, they allege that "housing advertisers" do this.  Compl. ¶ 2 (targeting tools "enable landlords and real estate brokers to bar families with children, women, and others from receiving rental and sales ads for housing" and "make[ ] it possible for housing advertisers to exclude certain home seekers from ever seeing their ads").  Moreover, neither of these provisions apply to claims based on advertising, let alone targeted advertising.  *See Hous. Opportunities Made Equal v. Cincinnati Enquirer, Inc.*, 731 F. Supp. 801, 803 n.1 (S.D. Ohio 1990) (holding that claim against publisher under § 3604(a) based on allegedly discriminatory advertisements was "without any basis"), *aff'd*, 943 F.2d 644 (6th Cir. 1991).

Nor do Plaintiffs state any claim against Facebook under these provisions based on a disparate impact theory.  A disparate-impact claim under the FHA requires a plaintiff to allege "facts at the pleading stage" consisting of "statistical evidence demonstrating a causal connection" between the challenged conduct of the defendant and a disparity based on protected classes.  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015); *see also id.* at 2524 (cautioning that courts must "examine with care … at the

pleading stage" whether a plaintiff has stated a disparate-impact claim, lest defendants face

"abusive disparate-impact claims" that "displace valid governmental and private priorities").

Plaintiffs do not even attempt to make such allegations.  Nor do Plaintiffs allege any facts

meeting the "robust causality requirement" the law requires.  *Id.* at 2523.  Any discriminatory

targeting would be caused by the intentional choices of advertisers alone.

Plaintiffs also fail to state a claim under 42 U.S.C. § 3604(c), which makes it unlawful to

"make, print, or publish … any notice, statement, or advertisement, with respect to the sale or

rental of a dwelling that indicates any preference, limitation, or discrimination based on"

membership in a protected class.  A HUD regulation, also cited by Plaintiff, provides that it is a

violation of Section 3604(c) to "[s]elect[] media or locations for advertising the sale or rental of

dwellings which deny particular segments of the housing market information about housing

opportunities" based on such class membership.  24 C.F.R. § 100.75(c)(3).  While this provision

and its related regulation, unlike the first two provisions above, address advertising, Plaintiffs'

theory of liability as to Facebook still fails.

*First*, Plaintiffs do not allege any actual housing ads targeted in a discriminatory way

have been "made, printed, or published" on Facebook.  Their own fictitious ads offering

fictitious housing opportunities do not qualify.  *Second*, even if Plaintiffs were able to identify

housing ads targeted by advertisers in a discriminatory way, Section 3604(c) does not extend to

those targeting decisions.  The standard applied in determining whether an ad "indicates any

preference, limitation, or discrimination" in violation of Section 3604 (c) is whether it "suggests

to an ordinary reader" that a protected class of individuals is "is preferred or dispreferred for the

housing in question."  *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991).  This test

assumes that the plaintiff actually sees an advertisement whose content is either facially or

implicitly discriminatory.  Here, Plaintiffs challenge that targeting decisions by advertisers, not any advertisement whose content itself is allegedly discriminatory.  Plaintiffs therefore fail to state a claim under section 3604(c).  *Cf. Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991) (rejecting claim under section 3604(c) against publisher based on allegedly discriminatory "aggregate" effect of multiple advertisements).

Plaintiffs' reliance on 24 C.F.R. § 100.75(c)(3) is misplaced.  As noted above, this regulation prohibits "[s]electing media or locations for advertising."  This plain language applies to advertisers *selecting* media or locations for ads, not to Facebook and other platforms on which ads are placed.  No case has held, or even suggested, that publishers, such as Facebook, are subject to this regulation.  *See Martinez v. Optimus Props., LLC*, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (claim *against advertiser* challenging allegedly discriminatory ad targeting decisions); *Guevara v. UMH Props., Inc.*, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) (same); *South-Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 873 (7th Cir. 1991) (same).

In addition, even if the HUD regulation applied to publishers—which it does not—the regulation is invalid because it is inconsistent with the statute, which prohibits advertisements that "*indicate[]* any preference, limitation, or discrimination based on" a protected class.  42 U.S.C. § 3604(c) (emphasis added); *see Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1334 (2013) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.").  The statutory text encompasses only ads that, on their face, are either explicitly or implicitly discriminatory.  *See Ragin*, 923 F.2d at 999.  It does not cover ad *targeting*.

28

Finally, Plaintiffs cannot rely on an aiding-or-abetting theory of liability to skirt these fatal flaws in their FHA claims.  The text of the FHA does not provide for such liability, so it is not available.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994); *Rivera v. Incorporated Village of Farmingdale*, 2011 WL 1260195, at *3 (E.D.N.Y. Mar. 30, 2011) (noting that an aiding-and-abetting theory of liability under the FHA has not been recognized).

### B.       Plaintiffs Fail to State a Claim Under New York Law

First and foremost, Plaintiffs' claims under New York law fail because Facebook's terms of service, which govern Plaintiffs' relationship with Facebook, contain a valid California choice-of-law clause.  *Supra* at 6-8 & n.3 (noting Plaintiffs' assent to Facebook's terms of service and California choice-of-law clause); *see, e.g.*, *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513-14 (S.D.N.Y. 2012) (dismissing claim under Human Rights Law based on choice-of-law and forum-selection clauses).  Each Plaintiff therefore agreed that any claim they may have against Facebook would be governed by California law, not New York law.

Even if New York law could apply, Plaintiffs' claim would still fail.  Plaintiffs rely entirely on the aiding-and-abetting provision of the Human Rights Law, N.Y.C. Admin. Code § 8-107(6), *see* Compl. ¶¶ 134-137, which New York courts have held, in construing parallel language under New York state law, is subject to common law principles of aiding and abetting. *See Nat'l Org. for Women v. Buffalo Courier-Express, Inc.*, 337 N.Y.S.2d 608, 610 (Sup. Ct. 1972) (applying "judicial principles governing criminal liability through accessorial conduct"); *accord Foley v. Mobil Chem. Co.*, 647 N.Y.S.2d 374, 381 (Sup. Ct. 1996) (the "concept of an aider and abettor written into the [Human Rights Law] must retain its common law characteristics in the absence of [express] statutory definition").  These common law principles foreclose Plaintiffs' theory of liability.

29

Aiding-and-abetting liability requires a plaintiff to plead and prove that the defendant had a "shared intent or purpose" with the person committing the offense.  *People v. Kaplan*, 76 N.Y.2d 140, 144-45 (1990); *accord Buffalo Courier-Express*, 337 N.Y.S.2d at 610 (same).  Here, even assuming Plaintiffs could allege any actual discriminatory housing ads placed by advertisers, they do not and cannot allege that Facebook shared a discriminatory intent or purpose with those unidentified advertisers.  Allegations that Facebook made available neutral targeting tools to *all* advertisers and that *some* of those advertisers *may* misuse them does not come close to demonstrating a shared illegal intent.  Common law principles also require an aider and abettor to provide "substantial assistance" to the offender, which "means more than just performing routine business services for the alleged" violator.  *McBride v. KPMG Int'l*, 135 A.D.3d 576, 579 (App. Div. 2016).  But, again, that is all that Plaintiffs allege here—that Facebook made available neutral targeting tools to all advertisers that some *may* use to target housing ads in ways Plaintiffs claim are discriminatory.  Compl. ¶¶ 40-58.

Moreover, in cases that involved print publishers and predated enactment of the CDA, New York courts rejected attempts to impose liability on print publishers on an aiding-and-abetting theory unless the ad at issue is unlawful on its face, which Plaintiffs do not allege here. *See In re N.Y. Times Co. v. City of N.Y. Comm'n on Human Rights*, 41 N.Y.2d 345, 351 (1977); *see also Buffalo Courier-Express*, 337 N.Y.S.2d at 610-11.  In the *Times* case, the appellate court rejected claims by the Human Rights Commission that, by publishing employment ads in apartheid-era South Africa, the *Times* was liable for aiding or abetting discriminatory employment practices in South Africa, *id.* at 358, 361, holding that the *Times* "may be held as an aider and abettor of discrimination only if it published *advertisements that expressed discrimination*," *id.* at 351 (emphasis added).  Under that standard, which is binding New York

law, there is no claim against Facebook on an aiding-and-abetting theory.

## VIII.   CONCLUSION

For the above reasons, the Court should transfer this action to the Northern District of

California, or, alternatively, dismiss Plaintiffs' complaint without leave to amend.

DATED:  June 4, 2018                    MUNGER, TOLLES & OLSON LLP

                                        By:   */s/ Rosemarie T. Ring*
                                              ROSEMARIE T. RING
                                        Attorneys for Defendant Facebook, Inc.

                                        MUNGER, TOLLES & OLSON LLP
                                        560 Mission Street, 27th Floor
                                        San Francisco, CA  94105
                                        (415) 512-4000

                                        ROSEMARIE T. RING
                                        rose.ring@mto.com
                                        JONATHAN H. BLAVIN
                                        jonathan.blavin@mto.com
                                        JOSHUA PATASHNIK
                                        josh.patashnik@mto.com
                                        ELIZABETH A. KIM
                                        elizabeth.kim@mto.com

**CERTIFICATION OF COMPLIANCE**

In compliance with this Court's Individual Practice 2(D), the undersigned counsel states that this brief is 9,650 words long, excluding the portions exempted by the rule.  *See* ECF No. 26 (order setting limit of 10,000 words for this motion).  In preparing this certificate, I relied on the word count generated by Microsoft Word.  I also certify that the brief complies with this Court's formatting rules.

/s/ Rosemarie T. Ring
Rosemarie T. Ring

32