UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL FAIR HOUSING ALLIANCE; FAIR
HOUSING JUSTICE CENTER, INC.; HOUSING
OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.; FAIR HOUSING
COUNCIL OF GREATER SAN ANTONIO,

                      Plaintiffs,

     v.

  FACEBOOK, INC.,

                     Defendant.

No. 1:18-cv-02689

**FIRST AMENDED COMPLAINT**

## I.    PRELIMINARY STATEMENT

1.    This year marks the 50th anniversary of the Fair Housing Act ("FHA"), a statute intended to end discrimination in housing markets throughout the United States.  For decades, the FHA has prohibited both publishers and advertisers from "targeting" ads based on sex, family status, disability, national origin, and other protected characteristics.

2.    Given this milestone, it is all the more egregious and shocking that Defendant Facebook continues to create content for landlords and real estate brokers to bar families with children, women, and others from receiving rental and sales ads for housing.  Facebook has engaged in discrimination by design—stripping data from its users and using it to create discriminatory advertising content: a pre-populated list of demographics, behaviors, and interests from which housing advertisers select in order to exclude certain home seekers from ever seeing their ads.

3.    Housing advertising has of course changed in the last fifty years, moving beyond billboards, "for rent" signs, and classifieds in the newspaper, to online advertising.  Facebook's

ability to customize an online audience for advertisements based on its vast trove of user data has made it the biggest advertising agency in the world—the platform of choice for millions of businesses.  But Facebook has abused its enormous power.

4.      Over the past months, Plaintiffs, four nonprofit organizations with the common mission of eliminating housing discrimination and promoting residential integration, investigated Facebook's conduct.  Plaintiffs created dozens of housing advertisements and completed Facebook's full ad submission and review process.  Plaintiffs' investigations in New York, Washington, D.C., Miami, and San Antonio confirm that Facebook first provides the option for advertisers to exclude families with children and women from receiving advertisements, as well as users with interests based on disability and national origin.  Then Facebook approves the ads and permits advertisers to publish these ads in a discriminatory manner without consumers ever knowing they have been excluded.

5.      Discriminatory advertising is just as damaging as discrimination at the point of rental or sale.  If women with school-age children are categorically excluded from the Facebook advertising audience for a rental apartment in a community with high-performing schools and other amenities, they are effectively denied access to that housing opportunity.  Facebook and its advertisers have made the ad invisible to them.  At the same time, Facebook's ad platform can further landlords' illegal efforts to maintain a segregated, adults-only rental complex.  Whereas in the past, the excluded group might see the "for rent" sign or newspaper classified ad because the ads were located in a public forum, the stealth nature of Facebook's technology hides housing ads from entire groups of people.  Facebook's algorithms can ensure exclusion and deny access to housing.  Facebook's ability to target groups and promote discrimination so precisely will surely only improve as the company continues to refine its technology.

2

6.      Even before Plaintiffs conducted their most recent investigations, Facebook was on notice for more than a year—from Plaintiffs and media reports (including by ProPublica)—that its advertising platform violated fair housing laws.

7.      As Facebook significantly increases its presence in housing advertising and the housing marketplace,[1] it must first end its discriminatory advertising practices.

## II.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs assert federal claims under the FHA; under 28 U.S.C. § 1343(a)(4) as Plaintiffs seek to secure equitable and other relief under federal civil rights laws; and under 42 U.S.C. § 3613(a)(1)(A) as Plaintiffs seek appropriate relief regarding a discriminatory housing practice under the FHA.

9.      The Court has supplemental jurisdiction over Plaintiffs' local law claims under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367(a), as these claims are so related to their federal claims in this action that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Facebook pursuant to Fed. R. Civ. P. 4(k)(1) and New York Civil Practice Law and Rules § 302(a)(1) because Facebook transacts business within the state, § 302(a)(2) because Facebook has committed tortious and discriminatory acts within the state, § 302(a)(3)(i) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and regularly does business in the state, § 302(a)(3)(ii) because Facebook has committed a tortious and discriminatory act without the state causing injury to persons within the state, and derives substantial revenue from interstate commerce, and § 302(a)(4).

---

[1] Ben Lane, *Facebook Launches Massive Push Into Real Estate Listings*, Housingwire.com (Nov. 13, 2017), https://www.housingwire.com/articles/41797-facebook-launches-massive-push-into-real-estate-listings.

11.    Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and 2202.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as Defendant Facebook resides in this District in which it is subject to the Court's personal jurisdiction, and pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### A.    Facebook's Contacts with New York

13.    Facebook maintains a corporate office in this District located at 335 Madison Avenue, New York, New York 10017.

14.    Facebook is registered with the New York State Division of Corporations and assigned DOS ID #3842367l, with an appointed agent for service located at 80 State Street, Albany, New York 12207.

15.    Upon information and belief, Facebook employs approximately 1,000 people.

16.    Facebook opened its New York office in 2012, stating that the New York office "won't just be a satellite office, it will be a core part of our engineering staff."[2]

17.    Facebook conducts advertising, engineering, and other activities in this District.

18.    According to Facebook, "Almost all of our big teams are centered around products that *specifically benefit from being in New York* . . . either teams working closely with local industries, products that address the experience of an urban environment, or center around talent that is abundant on the east coast (like AI Research or Mobile Engineering)."[3]

---

[2] Jason Kincaid, *Facebook To Open Engineering Office in NYC*, techcrunch.com (Dec. 2, 2011), https://techcrunch.com/2011/12/02/facebook-to-open-engineering-office-in-nyc.

[3] *Director of Engineering at Facebook AI Explains the Advantages of New York Tech*, Huffington Post.com (Jan. 22, 2016), https://www.huffingtonpost.com/quora/director-of-engineering-a_b_9052764.html_(emphasis supplied).

19.     As the largest city in the United States, New York City—with a total of more than 3 million households according to the 2010 United States Census—is also the largest housing market in the country.[4]  As of 2011, New York City had a total of 3.35 million housing units, of which 65% were rental units, 30% were owner units, and 5% were vacant but not available for sale or rent.  The vacancy rate in 2011 for rental units in New York City was only 3.12%.  Half of the City's housing units were in buildings of 20 or more units as of 2011.

20.     The New York City housing market is unique in that, unlike other cities in the United States where landlords handle advertising and renting apartments directly, many landlords use real estate agents to advertise apartments for rent and locate prospective renters. As of 2013, Manhattan alone had 27,000 licensed real estate brokers and sales persons working in both the sales and rental markets.[5]  These real estate brokers and agents use online real estate advertising, including on Facebook.

21.     For the New York City housing consumer, access to Facebook's online real estate advertising is crucial given the City's low vacancy rate, high competition for dwelling units, and heavy reliance on real estate brokers and agents.

22.     Upon information and belief, Facebook receives a substantial amount of revenue from advertisements that are sold to New York-area companies or target New York residents, including an estimated reach of millions of people within the District.

23.     Upon information and belief, a portion of this substantial revenue comes from housing advertisements that are sold to landlords and real estate brokers in the New York-area and target New York residents.

[4] New York City Consolidated Plan, 2015-2-19 Needs Assessment & Market Analysis, December 16, 2016, NA-1.

[5] Leigh Kamping-Carder, *Ranks of Manhattan brokers swell, as market strengthens*, The Real Deal (Dec. 10, 2012), https://therealdeal.com/2012/12/10/ranks-of-new-york-city-brokers-swell-as-market-strengths/.

### III.   THE PARTIES

24.     Plaintiff National Fair Housing Alliance ("NFHA") is a national, nonprofit, public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C.  NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states.  NFHA's sole mission is to end discrimination in housing and to promote residential integration.  NFHA works to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, community development activities that promote inclusive communities, investigation of fair housing violations, and enforcement.  NFHA engages in fair housing education and enforcement throughout the United States where no local private fair housing organization exists, as well as in cooperation with its members.  NFHA creates and distributes national educational media campaigns to teach people about their rights and responsibilities under fair housing laws.  NFHA also provides grants to people to rent, purchase, or renovate housing; to stave off foreclosure; and to stabilize neighborhoods harmed by the foreclosure crisis.

25.     Plaintiff Fair Housing Justice Center ("FHJC") is a nonprofit organization with an office located in Queens, New York.  FHJC serves the five boroughs of New York City and seven suburban New York counties.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.

26.     Among other things, FHJC (a) provides information to the public and other nonprofit organizations in the New York City region about fair housing laws; (b) provides intake counseling to individuals and organizations with allegations of housing discrimination; (c)

6

conducts testing and other investigations of allegations of housing  discrimination; (d) makes legal referrals to cooperating attorneys; (e) assists with the preparation and filing of administrative housing discrimination complaints; and (f) provides post-referral litigation support services.  FHJC provides these services free of charge and without regard to income.

27.     FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further FHJC's mission, including the publication and dissemination of reports and educational materials.

28.     Plaintiff Housing Opportunities for Project Excellence, Inc. ("HOPE") is the first nonprofit fair housing agency organized in the State of Florida and is located in Miami, Florida. HOPE's mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration.

29.     Plaintiff HOPE employs a three-tiered system of education and outreach, intake and counseling, and private enforcement to affirmatively further fair housing.  HOPE's activities include, but are not limited to, counseling and obtaining facts regarding alleged acts of discrimination; conducting training seminars, presentations, and workshops on fair housing laws; assisting community leaders and members of the housing industry in developing fair housing strategies; developing resources to provide fair housing assistance; attempting resolution of complaints through litigation, conciliation, or appropriate referral; and providing assistance to the general public on housing-related issues such as predatory lending.

30.     Plaintiff Fair Housing Council of Greater San Antonio ("FHCGSA") is a nonprofit corporation organized under the laws of the State of Texas and located in San Antonio,

Texas.  FHCGSA's mission is to promote fair housing and non-discrimination in housing across the South Texas area.  FHCGSA serves thirty-seven counties in South Texas and is dedicated to eliminating discriminatory housing practices and promoting residential integration.

31.     FHCGSA provides various programs and services which include, but are not limited to, conducting complaint intake and counseling for consumers who allege housing discrimination; investigating housing discrimination complaints; submitting reasonable accommodation and modification requests to housing providers on behalf of consumers with disabilities, attempting to resolve complaints through mediation, referrals to administrative agencies, or private attorneys; and conducting education and outreach activities for consumers, housing providers, and others.  FHCGSA also works to promote accessible and affordable housing in South Texas through various activities including maintaining a Directory of Accessible Housing and providing fair housing training to developers of low-income housing tax credit rental units in Texas.

32.     Defendant Facebook, Inc. ("Facebook") is a publicly traded corporation, headquartered at 1601 Willow Road, Menlo Park, California, 94025, incorporated under the laws of the State of Delaware.  Facebook owns and operates an online social networking web site that allows its billion-plus daily users to communicate with each other through the sharing of text, photograph, and video.  Part of Facebook's website is an advertising platform that allows businesses and individuals to pay money to have Facebook provide marketing, recruitment, sourcing, advertising, branding, information, and/or hiring services, including displaying advertisements for housing for sale or rent.  In 2017, Facebook earned 98% of its $40.65 billion in revenues from third parties who advertised on Facebook.[6]

---

[6] Facebook Investor Relations, https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

33.     As of March 2017, Facebook had approximately 4 million advertisers using its platform.  Many of these advertisers are real estate brokers, residential property owners, and real estate management companies offering housing for rent or for sale.[7]

## IV.   LEGAL BACKGROUND: DISCRIMINATORY ADVERTISING

34.     The Fair Housing Act states that it shall be unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap,[8] familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).

35.     Under its implementing regulations, the FHA provides that:

> (c) Discriminatory notices, statements and advertisements include, but are not limited to: (1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin . . . . (3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin. (4) Refusing to publish advertising for the sale or rental of dwellings . . . because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75.

36.     The Fair Housing Act further makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(d).

---

[7] *See Facebook Marketplace to Post Apartment List Rental Homes*, naahq.org (Nov. 9, 2017), https://www.naahq.org/news-publications/facebook-marketplace-post-apartmentlist-rental-homes .

[8] Hereinafter, the term "disability" shall be used for the term "handicap" unless quoting from the statutory text.

37.     The Fair Housing Act's advertising prohibitions apply to "all written or oral notices or statements by a person engaged in the sale or rental of a dwelling" which include "any applications, flyers, brochures, deeds, signs, banners, posters, billboards, or any documents used with respect to the sale or rental of a dwelling."  24 C.F.R. § 100.75(b).

38.     In the advertising context, these prohibitions apply to both the person who drafted or placed the ad as well as the publisher of the ad because the negative effect of discriminatory advertising would be magnified if widely circulated by newspapers and other mass media.  *See United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972).  Under the FHA, illegal advertising practices not only discourage or prevent buyers and renters from accessing information about housing opportunities, but also create an impression that housing segregation is legal, thus facilitating future discrimination by others.  *See Spann v. Colonial Village, Inc*., 899 F.2d 24, 29 (D.C. Cir. 1990).

39.     It is black-letter law that publishing advertisements that indicate discriminatory preferences or limit the information available on the basis of discriminatory preferences is illegal.  *See Ragin v. New York Times*, 923 F.2d 995 (2d Cir. 1991); 24 C.F.R. § 100.80(b)(4) (explaining that § 3604(d) prohibits "[l]imiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin").

40.     The continuing presence of discriminatory advertising practices serves to encourage both the housing provider and the home seeker to believe housing discrimination is "an accepted norm despite the FHA's pronouncements to the contrary."  Robert Schwemm, *Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, 29 Fordham Urb. L.J. 187, 250 (2001).

10

41.     Lastly, the FHA provides that "it shall be unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or *other service, organization, or facility relating to the business of selling or renting dwellings*, or to discriminate against him in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3606 (emphasis added).

42.     This prohibition applies to multiple-listing services, real estate organizations, rental listing services, and other entities in the business of providing services and/or information related to selling or renting housing.  *See United States v. Space Hunters, Inc.*, No. 00-CIV-1781, 2001 WL 968993, at *5 (S.D.N.Y. Aug. 24, 2001), *aff'd in relevant part*, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 421 (2d Cir. 2005).

## V.     FACTUAL ALLEGATIONS

### A.     Facebook's Powerful and Far-Reaching Advertising Platform

43.     Facebook generated over $40 billion in revenue last year, almost all of which was made through selling advertisements on its website.

44.     Facebook's platform provides advertisers with "a number of different ways to engage with people on Facebook, the most important of which is the News Feed which displays an algorithmically-ranked series of stories and advertisements individualized for each person."[9]

45.     As Facebook promotes itself to its prospective advertisers, its greatest advertising asset is its user base of over 2 billion people.[10]  This user base includes not only Facebook users,

---

[9] Facebook Investor Relations, https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=12512043 (Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).

[10] Facebook Business, *Facebook Ads*, https://www.facebook.com/business/products/ads (last visited March 21, 2018).

but also users of other applications owned by Facebook, including Instagram.  Facebook collects a remarkable amount of information about each one of these users.

46.    Although Facebook users often voluntarily provide limited personal information, such as their age, gender, employer, and limited other categories, most of the data Facebook collects is not self-reported.[11]

47.    The vast majority of this information comes from Facebook's collection, evaluation, and processing of their users' behavior both on and off Facebook to learn about users' demographics (for example, their family status), their interests (for example, their political leanings or hobbies), and their behaviors (for example that they are "recent mortgage borrowers" or that their "spending method" is "primarily cash").[12]

48.    Users are given no choice but to provide this data when they register for a Facebook account, as allowing Facebook to "process" this information about its users is a mandatory condition of using the Facebook site.[13]

49.    The end result has been described as "arguably the most complete consumer profile on earth,"[14] as it reflects each Facebook user's demographics, location, interests, and online behaviors.

---

[11] Upturn, *Leveling the Platform: Real Transparency for the Paid Messages on Facebook*, at 8 (May 2018), available at https://www.teamupturn.org/static/reports/2018/facebook-ads/files/Upturn-Facebook-Ads-2018-05-08.pdf.

[12] *Id.*

[13] Facebook, *Data Policy*, https://www.facebook.com/full_data_use_policy (last visited June 25, 2018).

[14] Caitlin Dewey, *98 personal data points that Facebook uses to target ads to you*, Wash. Post (Aug. 19, 2016), https://www.washingtonpost.com/news/the-intersect/wp/2016/08/19/98-personal-data-points-that-facebook-uses-to-target-ads-to-you/?utm_term=.58ce94764ccf.

50.     Facebook then employs algorithms to analyze, sort, and repurpose this treasure trove of information so that advertisers can "target the people who are right for [their] business."[15]

51.     These algorithms automatically designate each Facebook user as falling into the various categories it has determined fit that user's demographics, interests, and behaviors.

52.     Facebook users' personal information regarding demographics, interests, and behaviors does not just passively flow untouched from the users to advertisers.  Rather, Facebook extracts data from its users' online behavior, both on Facebook and off, and uses algorithms designed to sort that data, process it, and repackage it to group potential customers into new and salient categories for advertisers to choose from when targeting their ads.

53.     These data-analyzing algorithms and the resulting Facebook-created content empower advertisers to seek out potential audiences with incredible specificity.  Advertisers can target users based on information as general as geographic location, or as specific as their birthday or preferred methods of payment.  Advertisers would not be able to engage in this targeted advertising without the categories and content that Facebook creates and develops.

### 1.  Facebook's Use of "Include" and "Exclude" Options

54.     Facebook has designed its advertising platform so that advertisers can "target" their audience using two general actions—"including" specific types of people and "excluding" specific types of people.

55.      Once Facebook has analyzed the immense amount of personal data it collects and has used it to classify potential customers by categories based on their perceived demographics, interests, and behaviors, Facebook then provides its advertisers with a pre-populated list of these

---

[15] Facebook Business, *Choose Your Audience*,  https://www.facebook.com/business/products/ads/ad-targeting (last visited March 21, 2018).

demographics, interests, and behaviors (the "Facebook Pre-Populated List").  As explained

above, only a handful of categories (age, gender, location, language, university, field of study,

employer, and any "liked" pages) are self-reported by users.  The majority of these hundreds of

categories are new categories that Facebook's algorithms create after Facebook sorts and

analyzes each Facebook user's online activity.

56.     Advertisers then scroll through this Facebook-created content and select which

characteristics they would like to "include" and which they would like "exclude" from the ad's

audience.

57.     For example, when an advertiser checks the pre-populated box to "include" the

Facebook-created demographic category of parents with toddlers (01-02), parents with toddlers

(01-02) become the target audience for the ad and, through Facebook's algorithms arranging the

ad delivery process, only parents with toddlers will receive the ad on their Facebook pages or in

their News Feeds.  Non-parents will not receive the ad.

58.     When an advertiser "excludes" a specific demographic, behavior, or interest, no

person who reflects that quality will receive the ad.  If an advertiser checks the pre-populated

box to exclude the Facebook-created interest category of people who have an interest in cooking,

Facebook's algorithms similarly ensure that no one with that interest will receive the

advertisement on their Facebook page or in their News Feed.

59.     These features can also be used simultaneously.  For example, if an advertiser

"includes" parents with toddlers but also "excludes" people with an interest in cooking, the ad

will only appear on the Facebook pages or in the News Feeds of parents with toddlers who do

not have an interest in cooking.  Facebook's algorithms prevent non-parents, or parents with non-

toddler children, (who are excluded because they were not "included" in the "target" audience)

and people with an interest in cooking (who were "excluded" even if they otherwise would be in the target audience) from receiving the ad.

60.    Facebook creates, in whole or in part, almost all of the information provided to advertisers to "include" or "exclude" certain persons.

61.    As advertisers add and subtract groups from their potential audience, Facebook provides them with real-time estimates of how many people can view their advertisements.  A screenshot of how this appears on Facebook's platform is attached hereto as Exhibit A.

62.    Facebook has placed these features on at least two different advertising platforms—by "boosting" posts and through Facebook Ad Manager.

63.    Facebook has also created algorithms to provide "lookalike" audiences to advertisers.  Under this feature, advertisers provide Facebook custom audiences they believe are good for their business, and Facebook employs its own algorithms to create new audiences that resemble that custom audience.  As Facebook itself explains, "[a] Lookalike Audience is a way to reach new people who are likely to be interested in your business because they're similar to your best existing customers."[16]  After the advertiser provides Facebook with its custom audience, Facebook will "hash [its] data, upload it and create the [new] audience."[17]  In creating these new "Lookalike Audiences" Facebook's algorithms consider protected characteristics such as sex, familial status, disability, race, and national origin.[18]

---

[16] Facebook Business, *Advertising Help Center*, https://www.facebook.com/business/help/164749007013531 (last visited June 25, 2018).

[17] Facebook Business, *Advertising Help Center*, https://www.facebook.com/business/help/170456843145568 (last visited June 25, 2018).

[18] Upturn, *Leveling the Platform: Real Transparency for the Paid Messages on Facebook*, at 9 (May 2018), available at https://www.teamupturn.org/static/reports/2018/facebook-ads/files/Upturn-Facebook-Ads-2018-05-08.pdf.

### 2. Facebook's Use of "Boosts"

64.     In order to "boost" a post, a business will first create a post to be published on its Facebook page.  This could be information about the business, a new promotion—anything that the business would like to share with its customers.

65.     The advertiser may then pay to "boost" that post by having it appear as an advertisement on the Facebook pages or in the News Feeds of various other Facebook users.

66.     To select which Facebook users receive that "boosted" advertisement, the business may use the same "inclusion" and "exclusion" features described above.

67.     While any Facebook user may view the ad on the business's Facebook page, only users in the audience selected by the advertiser will receive a "boosted" advertisement on their own Facebook pages or in their news feeds.

68.     For example, a restaurant may post about a new addition to its menu on its Facebook page.  It could then "boost" that post to an "included" or "targeted" audience—i.e., persons who live within 10 miles of the restaurant and have an interest in Italian food—both categories in the Facebook Pre-Populated List.  In this circumstance, any Facebook user could view the post by navigating to the restaurant's Facebook page, but only those in the targeted audience would receive the advertisement on their own pages or in their News Feeds.

### 3. Facebook "Ad Manager"

69.     Facebook also offers its advertisers the option to use Facebook Ad Manager.  Using Ad Manager, an advertiser can customize exactly who will receive its advertisement, as well as various other features such as where and how frequently the ad appears on the Facebook accounts of its targeted audience.  In this circumstance, only the audience selected using the "inclusion" and "exclusion" features above will be able to view the ad.

70.     For example, a restaurant could create an advertisement using Ad Manager for a new menu item and then select its audience using the "inclusion" and "exclusion" features—i.e., "include" persons who live within ten miles of the restaurant and/or have an interest in Italian food but "exclude" persons with an interest in cooking.  In this circumstance only persons who live within ten miles of the restaurant or have an interest in Italian food, but do not have an interest in cooking, will be able to view the post.

**B.     ProPublica Reveals Facebook's Discriminatory Housing Advertising Platform**

71.     On October 28, 2016, the investigative news nonprofit ProPublica published an article reporting that Facebook's online platform enabled advertisers to exclude Facebook users assigned black, Hispanic and other "ethnic affinities" from seeing advertisements in the housing category through its advertising portal.[19]

72.     In response to ProPublica's article, NFHA investigated Facebook's practices.

73.     On November 3, 2016, an NFHA employee using a personal Facebook account created an advertisement using Facebook Ad Manager.  The ad was for a fictitious apartment for rent and the employee selected for it to be advertised across the United States.  Using the "exclusions" feature within Ad Manager, the employee selected the demographic preset options of "African-Americans" and "Hispanics" to exclude African-Americans and Hispanics from the ad's potential audience.  Facebook approved this ad.  The ad ran for three days.  A screenshot of these demographic preset options is attached hereto as Exhibit B.

74.     On November 3, 2016, NFHA sent Facebook a letter stating that Facebook's advertising features appeared to violate the FHA and state laws, and that it was "illegal for an

---

[19] Julia Angwin and Terry Parris Jr., *Facebook Lets Advertisers Exclude Users By Race*, Propublica.org (Oct. 28, 2016), https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race.

online advertiser to filter housing-related advertising in a discriminatory manner on the basis of race, religion, national origin and other protected characteristics."

75.    On November 7, 2016, Facebook's representative responded to NFHA via email stating: "We think ethnic affinity marketing is really valuable in promoting diversity of the voices and images on our platform, but we also understand the concerns we're hearing about wrongful discrimination.  At this point, we're listening to stakeholders like you and considering the way forward."

76.    On November 10, 2016, NFHA met with Facebook representatives with regard to the discriminatory advertising platform.  NFHA explained to the Facebook representatives present that the Fair Housing Act and civil rights laws prohibited any system which excluded certain categories of people from viewing advertisements for housing, employment or credit. NFHA requested that Facebook cease and remedy its discriminatory behavior.

77.    On November 11, 2016, NFHA sent Facebook citations to legal cases regarding its liability for its advertising platform.

78.    On November 11, 2016, Facebook posted a statement on its "Newsroom" titled "Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing," in which it stated that it would "disable the use of ethnic affinity marketing for ads that we identify as offering housing, employment or credit."[20]

79.    On February 8, 2017, Facebook published a statement on its website titled, "Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools."[21]

---

[20] Erin Egan, *Improving Enforcement and Promoting Diversity: Updates to Ethnic Affinity Marketing*, newsroom.fb.com, (Nov. 11, 2016), https://newsroom.fb.com/news/2016/11/updates-to-ethnic-affinity-marketing/.

[21] *Improving Enforcement and Promoting Diversity: Updates to Ads Policies and Tools*, newsroom.fb.com (Feb. 8, 2017), https://newsroom.fb.com/news/2017/02/improving-enforcement-and-promoting-diversity-updates-to-ads-policies-and-tools/.

Facebook committed to end the use of "ethnic affinity marketing" for ads that it identified as offering housing, employment, or credit.  For ads that use Facebook's other exclusion and inclusion categories, Facebook said it would require housing, employment, and credit advertisers to "self-certify" that their ads complied with anti-discrimination laws.

80.    In its self-certification feature, Facebook states that "when running an ad for an apartment for rent, it may be illegal to exclude people who have children from that opportunity."[22]

81.    On November 21, 2017, more than a year after its original report, ProPublica published a second story revealing that Facebook had not followed through on its commitment to remedy its discriminatory conduct, and that Facebook continued to create content that enables housing advertisers to exclude users by prohibited categories such as race and national origin.[23]

82.    ProPublica reported that it had bought dozens of rental housing ads on Facebook, but asked that they not be shown to certain categories of users, such as African-Americans, mothers of high school kids, people interested in wheelchair ramps, Jews, expats from Argentina, and Spanish speakers.  Facebook had approved all of these ads.

83.    Based on Facebook's prior announcement that it would end the use of "ethnic affinity marketing" for housing opportunities, Facebook should have rejected the ads purchased by ProPublica that excluded viewers on the basis of race.  The other ads should have prompted a screen to pop up asking for self-certification.  ProPublica reported that it never encountered a self-certification screen, and Facebook rejected none of its ads.

---

[22] *Id.*

[23] Julia Angwin, Ariana Tobin, Madeleine Varner, *Facebook (Still) Letting Housing Advertisers Exclude Users by Race*, propublica.org (Nov. 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin.

C.     **Plaintiffs' Investigation Into Facebook's Housing Advertising Platform Confirms Discriminatory Practices Continue**

84.     In response to ProPublica's November 21, 2017 report, NFHA commenced an investigation into Facebook's advertising practices.

85.     On November 30, 2017, an NFHA employee using a personal Facebook account created a Facebook page for a non-existent real estate company entitled "Metro Boutique Rentals." Through this page, NFHA staff viewed Facebook's Ad Manager and Boost features.

86.     In summary, NFHA's initial investigation into Facebook's practices found as follows:

a.  The Facebook Pre-Populated List provided housing advertisers with the option of excluding potential audience members from housing ads on the basis of demographic categories that Facebook created based on its own analysis of users' online activity, including race and national origin.

b.  At some point, Facebook eliminated the option from the Facebook Pre-Populated List for housing advertisers to exclude potential audience members from housing opportunities on the basis of race and national origin.

c.  The Facebook Pre-Populated List created the capability for housing advertisers to exclude people from seeing their ads on the basis of their family status in a variety of ways. It provided checkboxes of family-status related categories created by Facebook from analyzing and repurposing users' data that housing advertisers could use to remove persons from their potential audience, such as parents with toddlers (01-02), parents with preschoolers (03-05), parents with early school-age children (06-08), moms of grade school kids, and moms of high school kids. A screenshot of how

20

these exclusions appear on Facebook's Boost and Ad Manager features is attached

hereto as Exhibit C.

d.  The Facebook Pre-Populated List created the capability for housing advertisers to

"include" potential audience members based on an interest in "no kids."

e.  The Facebook Pre-Populated List created content for housing advertisers to exclude

people from seeing their ads on the basis of sex.  It provided checkboxes that housing

advertisers could use to exclude either men or women from viewing their ads by

checking the box to "include" the other.  A screenshot of how these exclusions appear

on Facebook's Boost and Ad Manager features is attached hereto as Exhibit D.

f.  The Facebook Pre-Populated List created content for housing advertisers to exclude

on the basis of interest categories created by Facebook and derived from Facebook's

data analysis that are the equivalent of protected characteristics, such as: Interest in

Disabled American Veteran, Interest in Disabled Parking Permit, Interest in

Disability.gov, Interest in Telemundo, and Interest in English as a second language.

Screenshots of how these exclusions on Facebook's Boost and Ad Manager features

are attached hereto as Exhibit E.

g.  Facebook had created algorithms to provide "suggested" audiences to advertisers

based on the audiences selected in their prior ads.  Facebook's "suggestions" included

demographic and interest categories that discriminate on the basis of protected

characteristics such as sex, familial status, disability, race, or national origin.

### 1.   Facebook's Discrimination in the Washington, D.C. Housing Market
#### a.  Boost Investigation

87.    On January 2, 2018, an NFHA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to

promote the ad in Washington, D.C.  Using the Facebook Pre-Populated List and the

"exclusions" feature within Boost, the employee selected the preset options of those with

interests in the "National Association for Bikers with a Disability," "Disabled American

Veterans," "Disability.gov," and "Disabled Parking Permit" to exclude from the Boost's

potential audience.   Facebook estimated that the Boost would reach 1.2 million people.

88.     On January 2, 2018, an NFHA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to

promote the ad in Washington, D.C.  Using the Facebook Pre-Populated List and the

"exclusions" feature within Boost, the employee selected the preset options of those with

interests in "Telemundo," "English as a second language," and "Univision Deportes" to exclude

from the Boost's potential audience.  Facebook estimated that the Boost would reach 1.2 million

people.

89.    On January 3, 2018, an NFHA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target

the ad to the Washington, D.C. market.  Using the Facebook Pre-Populated List and the

"inclusion" feature within Boost, the employee selected the preset demographic option of "men,"

thereby excluding women from the Boost's potential audience.  Facebook estimated that the

Boost would reach 500,000 people.

90.     On January 3, 2018, an NFHA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target

the ad to the Washington, D.C market.  Using the Facebook Pre-Populated List and the

"exclusions" feature within Boost, the employee selected the preset demographic options of

"parents with toddlers (01-02 years), parents with preschoolers (03-05 years), parents with early

22

school-age children (06-08 years), and parents with preteens (13-18 years)" to exclude families

with young children from the Boost's potential audience.  Facebook estimated that the Boost

would reach 1.2 million people.

91.      In January 2018 and February 2018, an NFHA employee using a personal

Facebook account created multiple ads for fictitious apartments for rent and again used

Facebook's Boost feature to target each ad to the Washington, D.C. market.  The employee then

used the Facebook Pre-Populated List and the "exclusion" features within Boost to select

multiple combinations of the  preset demographic options of "parents with toddlers (01-02),"

"parents with preschoolers (03-05)," "parents with early school-age children (06-08)," "parents

with teenagers (13-18)," "parents with preteens (08-12)," "corporate moms," "stay-at-home

moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"

"big-city moms," "trendy moms," "soccer moms," and "moms of preschool kids" to exclude

families with young children and mothers from the Boost's potential audience.  In many of these

Boosts, and in additional Boosts targeted to the Washington, D.C. market, the employee used the

Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset

demographic option of "men," thereby excluding women from the Boosts' potential audience.

Facebook estimated that these Boosts would reach anywhere from 58,000 to 580,000 people.

### b.  Ad Manager Investigation

92.      On December 14, 2017, an NFHA employee using a personal Facebook account

created an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employee

selected Washington, D.C. as the market for the ad to run in.  Using the Facebook Pre-Populated

List and the "exclusions" feature within Ad Manager, the employee selected the preset

demographic options of "new parents (0-12 months)" and "parents with preschoolers (03-05)" to

23

exclude families with young children from the ad's potential audience.  Facebook estimated that the ad would reach 77,000 people.

93.     Throughout February 2018, an NFHA employee using a personal Facebook account created additional ads for fictitious apartments for rent using Facebook Ad Manager and again selected Washington, D.C. as the market for the ads to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employee selected combinations of the preset options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms" and "moms of preschool kids" to exclude mothers from the ad's potential audience.  In many of these ads and in additional ads targeted to the Washington, D.C. market, the employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience.  Facebook estimated that these ads would reach anywhere from 48,000 to 820,000 people.

### c.  Investigation of Other Major Housing Markets

94.     In light of its investigation of Facebook's practices in the Washington, D.C. housing market, NFHA investigated other major housing markets across the United States.

95.     On February 1, 2018, an NFHA employee using a personal Facebook account created four ads for fictitious apartments for rent and then used Facebook's Boost feature to target one ad each to four major markets in different regions of the country.  Using the Facebook Pre-Populated List and Boost's "inclusion" feature, the employee selected the preset interest inclusion option of "no kids" and the present demographic inclusion option of "men" to target for the ad.  Using the "exclusions" feature within Boost for each ad,  the employee selected the demographic preset options of "corporate moms," "stay-at-home moms," "moms of grade school

kids," "moms of high school kids," "fit moms," "green moms,"  "big-city moms," "trendy

moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02)," "parents

with preschoolers (03-05)," "parents with early school-age children (06-08)," "parents with

teenagers (13-18)," and "parents with preteens (08-12)" to exclude families with young children

and mothers from each Boost's potential audience.  Facebook estimated that these four Boosts

would reach a total of 463,000 people.

96.     Having determined that Facebook had likely developed the same discriminatory

content in other major housing markets, NFHA contacted three of its member groups; FHJC,

HOPE, and FHCGSA.  NFHA provided these groups with training on how to use the Facebook

advertising features and conduct a similar investigation.  These groups investigated on their own

and jointly with NFHA to assess Facebook's discriminatory practices in their home markets.

> **2.     Facebook's Discrimination in the New York, New York Housing
> Market**

> **a.  Boost Investigation**

97.     On January 30, 2018, an NFHA employee using a personal Facebook account

created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target

the ad to the New York, New York market.  Using the Facebook Pre-Populated List and Boost's

"inclusion" and "exclusion" features, the employee selected combinations of (1) the preset

interest inclusion option of "no kids" and the present demographic inclusion option of "men" to

target for the ad, and (2) the preset demographic exclusion options of "moms of grade school

kids," "moms of high school kids," "moms of preschool kids" and "stay-at-home moms,"

"parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with

early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents

with preteens (08-12 years)" to exclude families with children and mothers from the Boost's

potential audience.  Facebook estimated that this Boost would reach 280,000 people.

98.     On February 13, 2018, an FHJC employee created a personal Facebook account,

created an ad for a fictitious apartment for rent, and then used Facebook's Boost feature to target

the ad to the New York, New York market and its surrounding areas within ten miles.  Using the

Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected

the preset demographic options of "parents with toddlers (01-02 years)," "parents with

preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents

with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with

young children from the Boost's potential audience.  The employee also used the Facebook Pre-

Populated List and the "inclusion" feature within Boost to select the preset demographic option

of "men," and thereby exclude women from the Boost's potential audience.  Facebook estimated

that the Boost would reach 95,000 people.

99.     On February 13, 2018, FHJC employees used a personal Facebook account to

create an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target

the ad to the New York City, New York market and its surrounding areas within ten miles.

Using the Facebook Pre-Populated List "inclusion" feature within Boost, the employee selected

the preset demographic option of "men," thereby excluding women from the Boosts' potential

audience.  Facebook estimated that the Boost would reach 44,000 people.

### b.  Ad Manager Investigation

100.    In February 2018, an NFHA employee using a personal Facebook account created

two ads for fictitious apartments for rent, and selected New York, New York as the market for

the ads to run in.  Using the Facebook Pre-Populated List and Ad Manager's "exclusions"

feature, the employee selected the preset demographic options of "corporate moms," "stay-at-

home moms," "moms of grade school kids,"  "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ads' potential audience.  In one of these ads, the employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," and thereby exclude women from the ad's potential audience.  Facebook estimated that the ads would reach 80,000 to 10 million people.

101.    On February 21, 2018, an FHJC employee using a personal Facebook account created an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employee selected New York, New York and its surrounding areas within twenty-five miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employee selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"  "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children and mothers from the ad's potential audience.  The employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," and thereby exclude women from the ad's potential audience.   Facebook estimated that the ad would reach 5 million people.

102.    On February 23, 2018, FHJC and NFHA employees using a personal Facebook account collaborated to create an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employees selected New York, New York and its surrounding areas within twenty-five miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employees selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the ad's potential audience.  Facebook estimated that the ad would reach 5.2 million people.

### 3.    Facebook's Discrimination in the Miami, Florida Housing Market

#### a.    Boost Investigation

103.    On February 21, 2018, a HOPE employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the Miami, Florida market and its surrounding area within ten miles.  Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)"  to exclude families with young children from the Boost's potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 450,000 people.

104.    On February 21, 2018, a HOPE employee using a personal Facebook account created an additional ad for a fictitious apartment for rent and used Facebook's Boost feature to

target the ad to the Miami, Florida market and its surrounding areas within ten miles.  Using the

Facebook Pre-Populated List and the "inclusion" feature within Boost, the employee selected the

preset demographic option of "men," thereby excluding women from the Boost's potential

audience.  Facebook estimated that the Boost would reach a total of 490,000 people.

### b.  Ad Manager Investigation

105.    On February 12, 2018, an NFHA employee using a personal Facebook account

created a fictitious apartment for rent and selected Miami, Florida as the market for the ad to run

in.  Using the Facebook Pre-Populated List and the "exclusion" feature within Ad Manager, the

employee selected the preset demographic options of "corporate moms," "stay-at-home moms,"

"moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city

moms," "trendy moms," "soccer moms," and "moms of preschool kids" to exclude families with

young children and mothers from the ad's potential audience.  The employee also used the

Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset

demographic option of "men," thereby excluding women from the ad's potential audience.

Facebook estimated that the ad would reach 200,000 people.

106.    On February 21, 2018, a HOPE employee using a personal Facebook account

created an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employee

selected Miami, Florida and its surrounding areas within twenty-five miles as the market for the

ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad

Manager, the employee selected the preset demographic options of "corporate moms," "stay-at-

home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green

moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents

with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early

school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with

preteens (08-12 years)" to exclude families with young children and mothers from the ad's potential audience.  The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience.  Facebook estimated that the ad would reach 750,000 people.

107.    On February 23, 2018, HOPE and NFHA employees using a personal Facebook account collaborated to create an ad using Facebook Ad Manager for a fictitious apartment for rent.  The employees selected Miami, Florida and its surrounding areas within ten miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employees selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)," to exclude families with young children from the ad's potential audience.  The employees also used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ad's potential audience.  Facebook estimated that the ad would reach 450,000 people.

108.    On February 23, 2018, HOPE and NFHA employees using a personal Facebook account collaborated to create an additional ad using Facebook Ad Manager for fictitious apartments for rent.  The employees selected Miami, Florida and its surrounding areas within sixteen miles as the market the markets for the ad to run in.  Using the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager, the employees selected the preset demographic option of "men," thereby excluding women from the ads' potential audience.  Facebook estimated that the ad would reach 2.8 million people.

### 4.   Facebook's Discrimination in the San Antonio, Texas Housing Market

#### a.   Boost Investigation

109.   On February 12, 2018, an NFHA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market.   Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude families with young children from the Boost's potential audience.   The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.   Facebook estimated that the Boost would reach 280,000 people.

110.   On February 16, 2018, an FHCGSA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to target the ad to the San Antonio, Texas market and its surrounding area within ten miles.   Using the Facebook Pre-Populated List and the "exclusions" feature within Boost, the employee selected the preset demographic options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms," "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)" to exclude mothers and families with young children from the Boost's potential audience.   The employee also used the Facebook Pre-Populated List and the "inclusion" feature within Boost to

31

select the preset demographic option of "men," thereby excluding women from the Boost's potential audience.  Facebook estimated that the Boost would reach 270,000 people.

111.    On February 21, 2018, an FHCGSA employee using a personal Facebook account created an ad for a fictitious apartment for rent and then used Facebook's Boost feature to promote the ad in the San Antonio, Texas market and its surrounding area within ten miles. Using the Facebook Pre-Populated List and the "inclusion" feature within Boost, the employee selected the preset option of "women," thereby excluding men from the Boost's potential audience.  Facebook estimated that the Boost would reach 330,000 people.

### b.  Ad Manager Investigation

112.    On February 23, 2018, an FHCGSA employee using a personal Facebook account created three ads using Facebook Ad Manager for fictitious apartments for rent.  The employee selected San Antonio, Texas and its surrounding areas within ten miles as the market for the ad to run in.  Using the Facebook Pre-Populated List and the "exclusions" feature within Ad Manager, the employee selected combinations of the preset options of "corporate moms," "stay-at-home moms," "moms of grade school kids," "moms of high school kids," "fit moms," "green moms,"  "big-city moms," "trendy moms," "soccer moms," "moms of preschool kids," "parents with toddlers (01-02 years)," "parents with preschoolers (03-05 years)," "parents with early school-age children (06-08 years)," "parents with teenagers (13-18 years)," and "parents with preteens (08-12 years)"  to exclude mothers and families with young children from the ad's potential audience.  In two of these ads, the employee used the Facebook Pre-Populated List and the "inclusion" feature within Ad Manager to select the preset demographic option of "men," thereby excluding women from the ads' potential audience.  Facebook estimated that the ads would reach 340,000, and 440,000 people respectively.

D.     **Common Allegations Regarding the Results of Plaintiffs' Investigation into Facebook's Discriminatory Housing Advertising**

113.    Facebook approved all of the Boosts and ads described above in paragraphs 87-112 in anywhere from one minute to approximately one hour.

114.    After Facebook approved them, all of the Boosts and ads described above in paragraphs 87-112 were removed from Facebook by the respective persons who created them.

115.    Facebook's Advertising Policies do not comply with the Fair Housing Act or with state and local fair housing laws, including in New York.

116.    Under the caption "Discriminatory Practices," Facebook states: "Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition."[24]

117.    This policy misleads Facebook users because, for example, it does not state that there are additional categories of prohibited discrimination in state and local fair housing laws such as marital status, military status, status as a survivor of domestic violence, lawful source of income, including rental subsidies, and others.

118.    The policy further misstates the obligations imposed by the FHA because, among other things, it does not explain that indicating a preference or limitation based on a protected characteristic constitutes illegal discrimination and that advertisements that deny information about housing opportunities to particular segments of the housing market violate the FHA.

119.    Although Facebook stopped approving housing advertisements that used its "ethnic affinity" option in late 2017, it continues to curate an entire system of discriminatory

---

[24] Facebook, *Discriminatory Practices*,
https://www.facebook.com/policies/ads/prohibited_content/discriminatory_practices# (last visited June 25, 2018).

advertising—analyzing and repurposing user data to create and develop content created so that advertisers can exclude protected classes from receiving housing ads.

120. Facebook created the Pre-Populated List so that landlords and real estate agents can target certain persons or groups for, and exclude other persons or groups from, receiving housing ads.

121. The vast majority of the categories provided on the Facebook Pre-Populated List are not from data voluntarily given by users. Instead, through its own analysis of user data, Facebook develops and provides these new and salient categories so that landlords and real estate agents can include and exclude people from receiving housing advertisements, including on the basis of family status.

122. Between December 14, 2017 and February 23, 2018, Facebook accepted for publication 40 advertisements from Plaintiffs that excluded potential home seekers on the basis of family status and/or sex.

123. Facebook also uses the data it gathers from its users' online activity to create "interests" categories for housing advertisements that permit a landlord or real estate firm to exclude users based on disability-related factors (for example, by checking the pre-populated category of "Interest in Disabled Parking Permit") and national origin (for example, "Interest in Telemundo").

124. These categories deny information about housing opportunities to persons with disabilities, persons living with or associating with persons with disabilities, and/or persons who are Hispanic or speak Spanish and are more likely to be Hispanic. These Facebook-created "interest" categories are the equivalent of demographic exclusion categories labeled "disability"

or "Hispanic." There is no lawful reason for Facebook to create this content so that advertisers can exclude potential audience members for housing ads on these bases.

125.    As recently as March 23, 2018, an NFHA employee attempted to "edit" an ad that it created in November 2016 that excluded potential audience members only on the basis of race and national origin. The employee received a message from Facebook stating that "some of the detailed targeting selections you originally used in your Saved Audience are no longer available. They won't show up in this audience targeting, *but the associated ads will still deliver to the original audience*. However, you'll be unable to use these detailed targeting selections if you edit this audience or try running future ads with it." (emphasis added).

126.    Based on this message, it appears that even though Facebook removed discriminatory demographic selections that allowed advertisers to exclude on the basis of race and national origin from the Facebook Pre-Populated List, it still allows previously existing ads that excluded or targeted on these bases to continue to do so.

127.    When Facebook users grant Facebook access to their data, they do not authorize Facebook to use that data to discriminate against them on the basis of their protected characteristics, such as their sex, family status, race, national origin, and disability status. By exploiting users' data in this manner, Facebook transforms the character of the data in a manner to which the users did not consent and could not reasonably foresee.

128.    There is no lawful purpose for a housing advertiser to include or exclude a prospective renter from viewing a housing ad on the basis of that renter's sex, family status, disability status, race, or national origin.

129.    By creating the Facebook Pre-Populated List, a database that sorts users by these protected characteristics and allows advertisers to include and exclude its audience members on

those bases, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

130.    By exploiting user data, gathered from analyzing Facebook users' activities on Facebook, Instagram, and elsewhere throughout the internet, to create new categories based on these protected characteristics within the Facebook Pre-Populated List, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

131.    By creating and developing algorithms that use data regarding protected characteristics such as sex, familial status, disability, race, and national origin to create "suggested" or "lookalike" audiences for advertisers, Facebook materially contributes to ongoing violations of the Fair Housing Act made through its advertising platform.

132.    Plaintiffs' investigation demonstrates that despite notice from NFHA and other civil rights groups as early as 2016 of its clear violations of the federal Fair Housing Act, Facebook has continued to engage in discriminatory housing advertising practices.

133.    Facebook has acted intentionally, willfully, and with reckless disregard of existing federal and local fair housing rights.

**VI.    HARM TO PLAINTIFFS CAUSED BY FACEBOOK THROUGH DIVERSION OF RESOURCES AND FRUSTRATION OF MISSION**

134.    Facebook's discriminatory and unlawful practices have frustrated and continue to frustrate each Plaintiff's mission of ensuring that all people have equal access to housing opportunities and promoting residential integration across the country, as well as in the New York City, Washington, D.C., Miami, and San Antonio metropolitan areas.

135.    In an effort to address and to counteract the effects of Defendant's discriminatory conduct, prior to the filing of this action, each of the Plaintiffs has diverted resources and staff from other activities to investigate and document Defendant's policies and practices.  Each

Plaintiff also engaged in public education efforts, prior to this filing, to raise awareness of discriminatory housing advertising practices in the communities each Plaintiff serves.

136.    Prior to the filing of this Complaint, NFHA diverted and expended financial resources and staff time to, among other things, design and implement the investigation, including time to train and work with other Plaintiffs on their investigations; review and analyze the investigative results; and conduct legal research and seek legal advice from attorneys.

137.    FHJC, HOPE, and FHCGSA each expended staff time and other resources to investigate Defendant's advertising practices, which diverted staff and resources away from other organizational activities, prior to the filing of this Complaint.  Among other things, FHJC, HOPE, and FHCGSA spent time being trained by NFHA to use Facebook's advertising platform, create a non-existent realty firm, and design and document their efforts to create and place housing advertisements on Facebook.

138.    If Facebook had complied with the requirements of the FHA after being informed of them by NFHA, then Plaintiffs would not have devoted considerable staff time and resources to identify the nature and scope of Facebook's advertising policies and practices.

139.    Each Plaintiff's mission is frustrated when Facebook excludes members of the public from access to housing advertising and information about housing opportunities based on their sex, familial status, disability, race, national origin, or other protected characteristics.

140.    Because Facebook's discriminatory advertising practices alleged in this Complaint violate federal, state, and local fair housing laws, they undermine rather than advance equal housing opportunity and perpetuate the harms of residential segregation.

141.    To address and attempt to counteract the effects of Facebook's discriminatory conduct, prior to the filing of this action, each Plaintiff has engaged in public education

campaigns to raise public awareness of the problem of discriminatory housing advertising and to educate housing providers about their legal obligations under fair housing laws not to advertise housing for rent or sale in a discriminatory manner.

142.    In early 2018, NFHA drafted guidelines for housing advertisers that it posted on its website in English and Spanish with a link to specific information about each state's fair housing laws, a copy of the HUD fair housing logo for advertisers to use, previously produced public service announcements, and a recorded webinar on discriminatory advertising held by NFHA in April 2017.

143.    In early 2018, each Plaintiff expended staff time to develop education campaigns and design advertisements for social media aimed to reach housing providers who place ads and consumers searching for housing in the Washington D.C., New York City, Miami, and San Antonio metropolitan regions.  Plaintiffs posted these ads on Facebook and Twitter on an ongoing basis, including translating ads into Spanish.

144.    During this same time period, each Plaintiff expended staff time to communicate and coordinate with each other about their individual education campaigns to ensure Plaintiffs were providing a consistent message reaching both housing providers and consumers in each metropolitan area.  Each Plaintiff also has expended staff time prior to filing this Complaint to begin to design workshops, a webinar, consumer flyers, and/or fact sheets.  Finally, NFHA has begun to contact online education providers who offer courses on using social media for advertising to request that they distribute information about housing advertising guidelines and best practices that comply with fair housing laws.

145.     As a direct and proximate result of Facebook's discriminatory practices described above, each Plaintiff has suffered and will continue to suffer a diversion of its resources and a frustration of its mission.

### FIRST CLAIM FOR RELIEF
(Fair Housing Act, 42 U.S.C. § 3604(a), (c), (d), (f): Familial Status, Sex, Disability, Race, and National Origin Discrimination)

146.     Plaintiffs restate and incorporate by reference the preceding paragraphs above as if fully set forth herein.

147.     The housing advertised for rent or sale on Facebook using the platform described above are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

148.     Facebook's creation of unlawful preset categories on its advertising platform, exploitation of user data to create those categories, and use of those categories to create discriminatory "suggested" or "lookalike" audiences illegally discriminated against, and continues to discriminate against, Plaintiffs by:

    a.  Making unavailable or denying a dwelling to any person because of sex, familial status, race or national origin.  42 U.S.C. § 3604(a).

    b.   Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on sex, disability familial status, race or national origin, or an intention to make any such preference, limitation, or discrimination.  42 U.S.C. § 3604(c).

    c.  Representing to any person because of race, color, religion, sex, disability, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.  42 U.S.C.A. § 3604(d).

d.  Making unavailable or denying, a dwelling to any buyer or renter because of a

disability of (A) that buyer or renter; (B) a person residing in or intending to reside in

that dwelling after it is so sold, rented, or made available; or (C) any person

associated with that buyer or renter.  42 U.S.C. § 3604(f)(1).

149.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C.

§ 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful

discriminatory conduct.

150.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages,

punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
(Fair Housing Act, 42 U.S.C. § 3606: Familial Status, Sex, Disability, Race, and National Origin
Discrimination)

151.    Plaintiffs restate and incorporate by reference the preceding paragraphs above as

if fully set forth herein.

152.    The housing advertised for rent or sale on Facebook using the platform described

above are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602(b).

153.    Facebook provides a "service . . . relating to the business of selling or renting

dwellings" within the meaning of 42 U.S.C. § 3606.

154.    Facebook's creation of unlawful preset categories on its advertising platform,

exploitation of user data to create those categories, and use of those categories to create

discriminatory "suggested" or "lookalike" audiences illegally discriminated against, and

continues to discriminate against, Plaintiffs by "deny[ing] any person access to . . . [Facebook's]

service, organization, or facility relating to the business of selling or renting dwellings,[and]

discriminat[ing] against [such persons] in the terms or conditions of such access, membership, or

40

participation, on account of race, color, religion, sex, handicap, familial status, or national

origin."

155.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C.

§ 3602(i), and have sustained damages as a direct and proximate result of Defendant's unlawful

discriminatory conduct.

156.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages,

punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
(Plaintiffs NFHA and FHJC)
(New York City Human Rights Law: Aiding and Abetting
Familial Status and Gender Discrimination)

157.    New York City Administrative Code § 8-107(6) declares that it "shall be an

unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of

any of the acts forbidden under this chapter."

158.    The housing advertised for rent or sale on Facebook using the platform described

above are "housing accommodations" as defined by the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-102(10).

159.    Facebook's creation of unlawful preset categories on its advertising platform,

exploitation of user data to create those categories, and use of those categories to create

discriminatory "suggested" or "lookalike" audiences constitutes aiding, abetting, inciting and

compelling the doing of acts forbidden under Section 8-107(5)(3) of the New York City

Administrative Code, including the "declar[ing], print[ing] or circulat[ing] or caus[ing] to be

declared, printed or circulated any statement, advertisement or publication . . . which expresses,

directly or indirectly, any limitation, specification or discrimination as to race, creed, color,

national origin, *gender*, age, disability, sexual orientation, marital status, partnership status, or

alienage or citizenship status, or any lawful source of income, or *whether children are, may be, or would be residing with a person*, or any intent to make such limitation, specification or discrimination" (emphasis added).

160.    Facebook's creation of these unlawful preset categories on its platform for housing advertisements violated, and continues to violate, Section 8-107(5)(e) by denying persons access to Facebook's real estate advertisements on the basis of familial status and gender.

161.    NFHA and FHJC are "aggrieved persons" as defined in Section 8-502(a) of the New York City Administrative Code, and have suffered damages as a direct and proximate result of Defendant's discriminatory conduct.

162.    Accordingly, under Section 502(a) and (g) of the New York City Administrative Code, NFHA and FHJC are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

(a)    Declaring that Defendant's discriminatory policies and practices violate the Fair
         Housing Act, as amended, 42 U.S.C. § 3601 *et seq*. and the New York City
         Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq*.;

(b)    Enjoining Defendant, Defendant's subsidiaries, Defendant's agents, employees,
         and successors, and all other persons in active concert or participation from:

   (i)    Denying or withholding housing, or otherwise making housing
            unavailable on the basis on family status, sex, gender, disability, race, or
            national origin;

(ii)     Making, printing, or publishing, or causing to be made, printed, or

published any notice, statement, or advertisement, with respect to the sale

or rental of a dwelling or a housing accommodation that indicates any

preference, limitation, or discrimination based on family status, sex,

gender, disability, race, or national origin;

(iii)    Representing to any person because of race, color, religion, sex, disability,

familial status, or national origin that any dwelling is not available for

inspection, sale, or rental when such dwelling is in fact so available;

(iv)    Denying any person access to Facebook's service, organization, or facility

relating to the business of selling or renting dwellings, and discriminating

against such persons in the terms or conditions of such access,

membership, or participation, on account of race, color, religion, sex,

disability, familial status, or national origin;

(v)     Aiding, abetting, inciting, and compelling the doing of acts forbidden

under the New York City Human Rights Law, including declaring,

printing or circulating or causing to be declared, printed or circulated any

statement advertisement or publication which expresses directly or

indirectly, any limitation, specification or discrimination as to family

status, gender, disability, race, or national origin or any intent to make

such limitation, specification or discrimination; and

(vi)    Coercing, intimidating, threatening or interfering with any person in the

exercise or enjoyment of, or on account of his having exercised or

enjoyed, or on account of his or her having aided or encouraged any other

43

person in the exercise or enjoyment of, any right granted by the Fair

Housing Act or New York City Human Rights Law.

(c)     Enjoining Defendant and its agents, employees, successors, and all other persons

in active concert or participation with Defendant to:

(i)     Make all necessary modifications to Defendant's policies, practices, and

procedures to comply with fair housing laws, including eliminating check

boxes, selection categories, and other content created to restrict or limit

access to housing advertisements;

(ii)    Develop a written fair housing advertising policy that is not dependent on

self-certification by advertisers and communicate it publicly, as well as to

Defendant's employees and agents;

(iii)   Train all Defendant's current and future employees and agents with

responsibilities related to the design, implementation, and operation of

Defendants' housing advertising platform on fair housing laws;

(iv)    Allow monitoring of Defendant's advertising platform and housing

advertisements for multiple years;

(v)     Retain records to allow for appropriate monitoring by Plaintiffs.

(d)     Awarding such damages to Plaintiff NFHA as will fully compensate it for the

diversion of resources and frustration of mission caused by Defendant's unlawful

practices;

(e)     Awarding such damages to Plaintiff FHJC as will fully compensate it for the

diversion of resources and frustration of mission caused by Defendant's unlawful

practices;

44

(f)     Awarding such damages to Plaintiff HOPE as will fully compensate it for the

         diversion of resources and frustration of mission caused by Defendant's unlawful

         practices;

(g)     Awarding such damages to Plaintiff FHCGSA as will fully compensate it for the

         diversion of resources and frustration of mission caused by Defendant's unlawful

         practices;

(h)     Awarding punitive damages to Plaintiffs;

(i)     Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in

         prosecuting this action; and

(j)     Granting Plaintiffs such other and further relief as may be just and proper.

Dated:  June 25, 2018
         New York, New York

                              EMERY CELLI BRINCKERHOFF & ABADY LLP

                              By:    /s/ Diane L. Houk
                                     Diane L. Houk
                                     Katherine Rosenfeld
                                     David S. Berman
                                     600 Fifth Avenue, 10th Floor
                                     New York, NY  10020
                                     212-763-5000

# Exhibit A





# Exhibit B



# Exhibit C



# Exhibit D



# Exhibit E

Metro Boutique Rentals

Page | Inbox | Notifications | Insights | Publishing Tools | Settings | Help ▾

Ale | Home | Find Friends

Metro Boutique Rentals
@metroboutiqueusa

Home
Posts
Reviews
▸ See more

Promote

Manage Promotions

**Boost Post**

POST BUTTON (Optional)

Add a button to your post

No Button ▾

AUDIENCE

● People you choose thro

Your audience
Location - Living In: Unite
Age: 18 - 65+

○ Metro Boutique Rentals

○ Sample

BUDGET AND DURATION

Total budget

$7.00 USD

Estimated People Reached

By clicking Boost

Metro Boutique Rentals
Published by Ale Aleman [?] · 1 hr · 

LE NEWS FEED

👍 Like Page

s, grocery stores, and
s!

Boost

Cancel

**Edit "People you choose through targeting" Audience**

18 ▾ - 65+ ▾

Locations

United States
● District of Columbia
Add locations

Detailed Targeting

INCLUDE people who match at least ONE of the following

Add demographics, interests or behaviors   Suggestions | Browse

EXCLUDE people who match at least ONE of the following

| Disability| | Browse |

Disability Scoop | Interest
Disability.gov | Interest
Learning disability | Fields of Stud
Inclusion (disability rights) | Interest
National Disability Insurance Scheme | Interest
Social model of disability | Interest

Specific ——— Broad

Your audience size is **defined**. Good job!
Potential Audience Size: 1,300,000 people

Cancel | Save

Privacy · Terms · Advertising · Ad Choices ▷
Cookies · More ▾
Facebook © 2018

Metro Boutique Rentals

Ale   Home   Find Friends   Settings   Help ▾

Page   Inbox   Notifications   Insights   Publishing Tools

LE NEWS FEED

Boost Post

**Edit "People you choose through targeting" Audience**

POST BUTTON (Optional)

Add a button to your post

No Button ▾

Detailed Targeting ⓘ

Add locations

INCLUDE people who match at least ONE of the following ⓘ

Add demographics, interests or behaviors          Suggestions | Browse

AUDIENCE

• People you choose thro…

EXCLUDE people who match at least ONE of the following ⓘ

Your audience

Interests > Additional Interests

Location - Living in: Unite…
Age - 18 - 65+

Disability.gov

Disabled American Veterans

Metro Boutique Rentals

Disabled parking permit

○ Sample

National Association for Bikers with a Disability

Add demographics, interests or behaviors          Browse

BUDGET AND DURATION

▲ Demographics

Total budget ⓘ

▲ Interests

$7.00 USD

▲ Behaviors

Estimated People Reached

▲ More Categories

By clicking Boost

Estimates for your audience are unavailable.

Cancel   Save

Metro Boutique Rentals
Published by Ale Aleman [?]  1 hr  ⊗

…, grocery stores, and
…s!

👍 Like Page

Boost   Cancel

Metro Boutique Rentals

@metroboutiqueusa

Home

Posts

Reviews

▸ See more

**Promote**

Manage Promotions

FOR RENT

Privacy · Terms · Advertising · Ad Choices ▷
Cookies · More ▾