UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; FAIR HOUSING JUSTICE CENTER, INC.; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO,<br><br>                    Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>                    Defendant. | No: 18 Civ. 2689 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE, OR ALTERNATIVELY TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, CA  94105
(415) 512-4000

*Counsel for Facebook, Inc.*

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................1

II.    BACKGROUND AND SUMMARY OF ALLEGATIONS ...............................3

III.   THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA ........................................................................6

      A.    Plaintiffs Agreed to Litigate Any Claims Against Facebook in California ............6

      B.    Two "Competing Lawsuits" Are Pending in the Northern District of California, One of Them for Over a Year ................................................................9

      C.    Transfer to the Northern District of California Serves the "Interests of Convenience and Justice" Under 28 U.S.C. § 1404(a) .........................................11

IV.   PLAINTIFFS DO NOT ALLEGE FACTS ESTABLISHING PERSONAL JURISDICTION OVER FACEBOOK IN NEW YORK ...................................12

V.    PLAINTIFFS LACK ARTICLE III STANDING ............................................14

VI.   PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE CDA .................17

      A.    Facebook Is an Interactive Computer Service Provider .........................................19

      B.    Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers ........................................................................19

      C.    Plaintiffs' Claims Treat Facebook as a Publisher or Speaker ...............................23

VII.  PLAINTIFFS DO NOT ALLEGE ANY UNLAWFUL CONDUCT BY FACEBOOK ...................................................................................................25

      A.    Plaintiffs Fail to State a Claim Under the Fair Housing Act ................................25

      B.    Plaintiffs Fail to State a Claim Under New York Law .........................................29

VIII. CONCLUSION.................................................................................................31

CERTIFICATION OF COMPLIANCE .......................................................................32

i

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*,
  860 F. Supp. 128 (S.D.N.Y. 1994) ..................................................................12

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
  98 F.3d 25 (2d Cir. 1996) ...............................................................................14

*Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd.*,
  160 F.3d 433 (8th Cir. 1998) ..........................................................................15

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*,
  571 U.S. 49 (2013) .......................................................................................7, 8

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) .............................................................18

*Baldino's Lock & Key Serv., Inc. v. Google LLC*,
  285 F. Supp. 3d 276 (D.D.C. 2018) ................................................................23

*Barnes v. Yahoo! Inc.*,
  570 F.3d 1096 (9th Cir. 2009) .........................................................................24

*Bennett v. Spear*,
  520 U.S. 154 (1997) .........................................................................................16

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) .........................................................................22

*Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*,
  236 F.3d 629 (11th Cir. 2000) .........................................................................16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) .........................................................................................29

*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
  519 F.3d 666 (7th Cir. 2008) ...........................................................................24

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .........................................................................................16

*Cohen v. Facebook, Inc.*,
  252 F. Supp. 3d 140 (E.D.N.Y. 2017) .............................................18, 19, 24, 25

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Creative Socio-Medics Corp. v. City of Richmond*,
219 F. Supp. 2d 300 (E.D.N.Y. 2002) ...................................................................14

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)........................................................................................13

*Decker v. Nw. Envtl. Def. Ctr.*,
568 U.S. 597 (2013)........................................................................................29

*Dolin v. Facebook, Inc.*,
289 F. Supp. 3d 1153 (D. Haw. 2018) ...................................................................7

*Dyroff v. Ultimate Software Grp., Inc.*,
2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ......................................................22

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
885 F. Supp. 2d 894 (S.D. Ill. 2012)......................................................................6

*Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*,
522 F.3d 271 (2d Cir. 2008)...............................................................................10

*Eres N.V. v. Citgo Asphalt Refining Co.*,
605 F. Supp. 2d 473 (S.D.N.Y. 2009)..................................................................11

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) .........................................................21, 25

*Fair Housing Council of Suburban Philadelphia v. Main Line Times*,
141 F.3d 439 (3d Cir. 1998)...............................................................................15

*First City Nat'l Bank & Trust Co. v. Simmons*,
878 F.2d 76 (2d Cir. 1989)..................................................................................9

*Force v. Facebook, Inc.*,
304 F. Supp. 3d 315 (E.D.N.Y. 2018) .................................................................18

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016)......................................................................... passim

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)............................................................. passim

*Goddard v. Google, Inc.*,
640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...........................................................22, 24

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Guevara v. UMH Props., Inc.*,
  2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ....................................................29

*Gullen v. Facebook.com, Inc.*,
  2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ...........................................................13

*Hall Street Assocs., LLC v. Mattel, Inc.*,
  552 U.S. 576 (2008)...........................................................................................26, 27

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...........................................................................................15, 16

*Herrick v. Grindr, LLC*,
  2017 WL 744605 (S.D.N.Y. Feb. 24, 2017)..........................................................21

*Herrick v. Grindr, LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018)...............................................18, 21, 22, 24

*Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
  731 F. Supp. 801 (S.D. Ohio 1990) .......................................................................26

*Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
  943 F.2d 644 (6th Cir. 1991) ...........................................................................26, 28

*Jane Doe No. 1 v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) ...........................25

*Jewell v. Music Lifeboat*,
  254 F. Supp. 3d 410 (E.D.N.Y. 2017) ...................................................................13

*Jones v. Dirty World Entm't Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) .................................................................................19

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*,
  342 U.S. 180 (1952)..................................................................................................9

*Kimzey v. Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016) .........................................................................18, 20

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014).......................................................................18, 19

*Lopez v. Shopify, Inc.*,
  2017 WL 2229868 (S.D.N.Y. May 23, 2017) .......................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Martinez v. Optimus Props., LLC*,
  2017 WL 1040743 (C.D. Cal. Mar. 14, 2017)......................................................28

*MasterCard Int'l, Inc. v. Lexcel Solutions, Inc.*,
  2004 WL 1368299 (S.D.N.Y. June 16, 2004) ...........................................................9

*Miller v. Facebook, Inc.*,
  2010 WL 9525523 (N.D. Ga. Jan 15, 2010) ..............................................................7

*Mobley v. Facebook, Inc.*,
  No. 5:16-cv-06440-EJD (N.D. Cal.).....................................................9, 10, 11, 12

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*,
  591 F.3d 250 (4th Cir. 2009) .................................................................................18

*New Moon Shipping Co. v. MAN B&W Diesel AG*,
  121 F.3d 24 (2d Cir. 1997).......................................................................................7

*Pennie v. Twitter, Inc., et al.*,
  281 F. Supp. 3d 874 (N.D. Cal. 2017) ...................................................................18

*Ragin v. N.Y. Times Co.*,
  923 F.2d 995 (2d Cir. 1991)..............................................................................28, 29

*Ricci v. Teamsters Union Local 456*,
  781 F.3d 25 (2d Cir. 2015)...............................................................................17, 18

*Riddick v. Facebook, Inc.*,
  No. 3:18-cv-04529 (N.D. Cal.) ...............................................................................11

*Rivera v. Incorporated Village of Farmingdale*,
  2011 WL 1260195 (E.D.N.Y. Mar. 30, 2011) ........................................................29

*Roberts v. Babkiewicz*,
  582 F.3d 418, 419 (2d Cir. 2009) (per curiam)........................................................6

*Saponaro v. Grindr, LLC*,
  93 F. Supp. 3d 319 (D.N.J. 2015) ..........................................................................21

*South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*,
  935 F.2d 868 (7th Cir. 1991) ............................................................................27, 29

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)............................................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page

*Tate-Small v. Saks Inc.*,
2012 WL 1957709 (S.D.N.Y. May 31, 2012) ..........................................................................10

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
135 S. Ct. 2507 (2015)...........................................................................................................27

*United States ex rel. Cestra v. Cephalon, Inc.*,
2014 WL 1087960 (S.D.N.Y. Mar. 19, 2014) .......................................................................10

*Walden v. Fiore*,
134 S. Ct. 1115 (2014)......................................................................................................13, 14

*Wyler-Wittenberg v. MetLife Home Loans, Inc.*,
899 F. Supp. 2d 235 (E.D.N.Y. 2012) ...................................................................................10

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) .................................................................................................24

STATE CASES

*Cross v. Facebook, Inc.*,
14 Cal. App. 5th 190 (2017) ..................................................................................................18

*D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
29 N.Y.3d 292 (2017) ............................................................................................................14

*Foley v. Mobil Chem. Co.*,
647 N.Y.S.2d 374 (Sup. Ct. 1996) .........................................................................................30

*Gentry v. eBay, Inc.*,
99 Cal. App. 4th 816 (2002) ..................................................................................................20

*McBride v. KPMG Int'l*,
135 A.D.3d 576 (N.Y. App. Div. 2016) ................................................................................30

*Nat'l Org. for Women v. Buffalo Courier-Express, Inc.*,
337 N.Y.S.2d 608 (Sup. Ct. 1972)........................................................................................30

*In re New York Times Co. v. City of N.Y. Comm'n on Human Rights*,
41 N.Y.2d 345 (1977) ............................................................................................................30

*People v. Kaplan*,
76 N.Y.2d 140 (1990) ............................................................................................................30

# TABLE OF AUTHORITIES
## (continued)

**Page**

**FEDERAL STATUTES**

28 U.S.C. § 1332(d) ........................................................................................................11

28 U.S.C. § 1404(a) ...........................................................................................1, 6, 10, 11

Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*:

    42 U.S.C. § 3604 ...............................................................................................2, 6, 9

    42 U.S.C. § 3604(a) .............................................................................................25, 26

    42 U.S.C. § 3604(c) ...............................................................................25, 27, 28, 29

    42 U.S.C. § 3604(d) ...................................................................................................25

    42 U.S.C. § 3604(f) ....................................................................................................25

    42 U.S.C. § 3606 .................................................................................6, 25, 26, 27

Communications Decency Act ("CDA"), 47 U.S.C. § 230:

    47 U.S.C. § 230 ................................................................................................ passim

    47 U.S.C. § 230(c)(1) .......................................................................................2, 17, 19

    47 U.S.C. § 230(e)(3) .................................................................................................17

    47 U.S.C. § 230(f)(2) ...........................................................................................2, 18

**STATE STATUTES**

Unruh Civil Rights Act,
Cal. Civ. Code §§ 51, 51.5 .............................................................................................11

New York Human Rights Law,
N.Y.C. Admin. Code § 8-107(6) ...............................................................................1, 6, 29

**FEDERAL REGULATIONS**

24 C.F.R. § 100.75(c)(3) .............................................................................................27, 28

## I.    INTRODUCTION

Facebook, Inc. ("Facebook") operates an online platform that enables people around the world to connect and share with those who matter to them and to discover content that may interest them. Facebook also allows people to place ads about products and services they offer and to target the people who are most likely to be interested in them. Advertisers using traditional print and broadcast media have done this for decades—for example, by running ads for women's clothing in Vogue or during Oprah, for men's athletic shoes in Sports Illustrated or during the Super Bowl, for Spanish-speaking audiences on Telemundo, and for back-to-school sales in Parents magazine.

Advertisers on Facebook similarly can use self-serve tools that allow, but do not require, them to target their ads based on information users provide through their activities on Facebook, including gender, location, and thousands of interests. Facebook provides guidelines about what type of ad content is allowed on its service and makes clear that discrimination, including through use of these targeting tools, is strictly prohibited. Facebook has also implemented a series of technical changes intended to prevent such misuse. Plaintiffs, nevertheless, bring this case against Facebook, alleging that Facebook is liable under the Fair Housing Act and New York Human Rights Law because these targeting tools *make it possible* for advertisers to place discriminatory housing ads on Facebook—though Plaintiffs do not identify any such ads.

Plaintiffs' claims suffer from multiple fatal defects, but the Court need not reach those issues because this case should be transferred to the Northern District of California. Plaintiffs agreed to resolve any claims against Facebook in California and offer no reason to suggest they should not be bound by that agreement. Transfer is also warranted by the first-filed rule, because another case asserting substantially the same claims has been pending in that district for well over a year, and under the factors considered in the 28 U.S.C. § 1404(a) transfer analysis.

Alternatively, this case should be dismissed on multiple independent grounds.  *First*, Plaintiffs do not allege facts establishing personal jurisdiction over Facebook in New York. Facebook is not subject to general jurisdiction in New York, and specific jurisdiction does not exist because Facebook's ad platform and the challenged targeting tools are available for use by *all* advertisers in *all* housing markets throughout the United States.  Plaintiffs' claims therefore do not arise out of any conduct by Facebook directed toward New York.

*Second*, Plaintiffs do not allege facts establishing Article III standing.  Plaintiffs allege that Facebook's ad platform and the challenged targeting tools *make it possible* for *advertisers* to place discriminatory housing ads on Facebook.  But this does not establish an injury in fact, let alone one that is fairly traceable to any wrongdoing by *Facebook*.

*Third*, the Communications Decency Act ("CDA") bars all of Plaintiffs' claims because they are premised on Facebook's publication of ads that advertisers create and target in ways that Plaintiffs claim are discriminatory, and therefore seek to hold Facebook liable "as the publisher or speaker" of third-party content in violation of the CDA.  47 U.S.C. § 230(c)(1).  In Plaintiffs' own words, Facebook allegedly "provides the option for *advertisers* to exclude [protected classes] from receiving [housing] advertisements" and "permits *advertisers* to publish these ads in a discriminatory manner."  First Amended Complaint ("FAC") ¶ 4 (emphases added). Facebook's provision of neutral tools that, according to Plaintiffs, *may* be used by some *advertisers* for an unlawful purpose falls squarely within the scope of CDA immunity.

*Finally*, Plaintiffs fail to state any claim under the Fair Housing Act or New York law. Plaintiffs' theory of liability under the Fair Housing Act has never been accepted by any court, and Plaintiffs' New York claims fail because they agreed to a California choice-of-law provision and, in any event, do not and cannot allege any discriminatory act or intent by Facebook.

## II.    BACKGROUND AND SUMMARY OF ALLEGATIONS

Third parties can place ads on Facebook using self-serve tools available on Facebook's ad platform.  FAC ¶¶ 40-53.  Advertisers upload text and/or images, set a budget and billing method, and then have the option to select an audience using tools that allow them to include and/or exclude "hundreds" of "demographics, interests, and behaviors" reflecting information provided by users and/or user activities on Facebook.  *Id.* ¶ 55; *see also id.* ¶ 47.  Plaintiffs describe these tools as a "[p]re-[p]opulated [l]ist," but as depicted in Exhibit A to the FAC, they are actually drop-down menus from which advertisers may (but are not required to) select one or more—*or none*—of the options listed.  Among the targeting options challenged by Plaintiffs are multicultural affinities,[1] men, women, parents with toddlers, moms of high school kids, fit moms, disability.gov, Telemundo, and other targeting options Plaintiffs allege reflect "interest[s] … that are the equivalent of protected characteristics."  *Id.* ¶ 86(f).

---

[1] Plaintiffs acknowledge that these targeting options are no longer available for housing ads, but wrongly assert that they "provided housing advertisers with the option of excluding [Facebook users] on the basis of … race and national origin."  FAC ¶¶ 86(a), (b).  As Facebook has explained publicly, including in statements quoted in the complaint, multicultural affinity is not based on a user's race or national origin.  Facebook does not collect information on the race or ethnicity of its users, and does not permit users to provide that information in their user profiles.  Instead, users become part of a multicultural affinity when, through their activities on Facebook, they express an interest in content related to one or more of the following culture and communities:  African-American, Asian-American, Hispanic, Hispanic (Bilingual), Hispanic (Spanish dominant) and/or Hispanic (English dominant).  Because these affinities are based on expressed interests and not race or ethnicity, users may be in one or more—*or none*—of these affinities at a given time and move between them over time as their Facebook activities change.

According to Plaintiffs, by making these targeting tools available, Facebook "created the capability" for *advertisers* to publish discriminatory housing ads on Facebook. FAC ¶ 86(c); *see also id.* ¶ 2 (Facebook enables "*landlords and real estate brokers* to bar families with children, women, and others from receiving rental and sales ads for housing" and makes it possible for "*housing advertisers* … to exclude certain home seekers from ever seeing their ads") (emphases added); ¶ 4 (Facebook "provides the option for *advertisers* to exclude families with children and women from receiving advertisements, as well as users with interests based on disabilities and national origin," and "approves the ads and permits *advertisers* to publish these ads in a discriminatory manner") (emphasis added).

But Plaintiffs do not, and cannot, allege that the targeting tools have no lawful purpose and therefore must admit they are "neutral" tools. For example, a Spanish-language publication may target ads to *include* users who have expressed an interest in Telemundo and/or the Hispanic (Spanish dominant) affinity; a women's clothing store may target ads to women; a yoga studio may target ads to users who have expressed an interest in fit moms; and an organization serving persons with disabilities may target ads to users who have expressed an interest in disability.gov.

Advertisers may also use the targeting tools to *exclude* users in ways that are lawful and promote diversity and inclusion through "parallel advertising." For example, an advertiser may run two ads on Facebook for the same product—one in Spanish and the other in English. To avoid duplication, the advertiser may target the Spanish ad to users expressing an interest in Telemundo and/or the Hispanic (Spanish dominant) affinity and target the English ad to exclude those audiences because they were already targeted to see the Spanish ad. This is more efficient for the advertiser and provides a better user experience.

Parallel advertising also occurs across media channels, not just on Facebook. For example, an advertiser may run a Spanish ad on Telemundo and an English ad on Facebook, targeting it to *exclude* users who have expressed an interest in Telemundo, since that audience was already targeted to see the ad on Telemundo. Similarly, a real estate agent marketing a house he believes is especially appealing to families may run ads with pictures of the backyard and playset on local parenting blogs and/or on Facebook targeting it to audiences who have expressed an interest in parenting-related topics (*e.g.*, parents with toddlers) and run ads with pictures of the kitchen on Facebook excluding the same parenting-related topics because those users were already targeted through other ads on Facebook and other advertising media.

Plaintiffs also do not, and cannot, allege any discriminatory conduct by *Facebook*. Instead, Plaintiffs make the conclusory allegation that "Facebook has engaged in discrimination by design" by making the challenged targeting tools available on its ad platform. FAC ¶ 2. But these are neutral tools and, as Plaintiffs repeatedly allege, it is advertisers—not Facebook—who decide whether and how to use them. To the extent advertisers *may* use them for unlawful or discriminatory purposes, Facebook explicitly prohibits advertisers from engaging in such conduct, and requires all advertisers to comply with its policies and all applicable antidiscrimination laws.[2]

---

[2] *See* Declaration of Rosemarie T. Ring ("Ring Decl."), Ex. A ("[A]dvertisers may not (1) use our audience selection tools to (a) wrongfully target specific groups of people for advertising …; or (b) wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory content in their ads."); *see also* Ex. B (Advertising Policy 7.1 mandates that advertisers "must not use targeting options to discriminate against … users[.]"). Facebook's motion to dismiss can and should be granted regardless of whether the Court takes judicial notice

At bottom, Plaintiffs' claims against Facebook are based on its operation of an online platform that allows third parties to publish ads using neutral, self-serve tools. That certain third parties *may* misuse these tools for the purpose of publishing discriminatory housing ads is something Facebook takes seriously and has taken significant steps to address. But it does not render Facebook liable for any such ads under the federal Fair Housing Act, 42 U.S.C. §§ 3604, 3606; or the New York Human Rights Law, N.Y.C. Admin. Code § 8-107(6).

## III.   THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Transfer of this case to the Northern District of California is warranted on three independent grounds: (1) Plaintiffs agreed to a forum selection clause requiring them to litigate any claims against Facebook in California, (2) two "competing lawsuits" are already pending in the Northern District of California, and (3) transfer serves the interests of "convenience" and "justice" under 28 U.S.C. § 1404(a).

### A.   Plaintiffs Agreed to Litigate Any Claims Against Facebook in California

All of the Plaintiffs have active Facebook accounts. Declaration of Michael Duffey ("Duffey Decl.") ¶¶ 5-8. When creating their accounts, each of them agreed to Facebook's Terms of Use, referred to as the Statement of Rights and Responsibilities ("SRRs"), a binding contract that governs the relationship between Plaintiffs and Facebook. *Id.* ¶¶ 5-9, 15-16, 22-23, 29-30, 36-37; *see, e.g.*, *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 834-35, 841 (S.D.N.Y. 2012) (transferring case to N.D. Cal. because plaintiff "assented to" Facebook's SRRs and "agreed to litigate all disputes regarding his Facebook account" in that district); *E.K.D. ex rel.*

---

of these documents, which simply provide additional "factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) (per curiam); *see also* Request for Judicial Notice (filed concurrently with this motion).

*Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 905-06 (S.D. Ill. 2012) (transferring case to N.D.

Cal. because the plaintiff agreed to Facebook's SRRs and forum selection clause); *Dolin v.*

*Facebook, Inc.*, 289 F. Supp. 3d 1153, 1160-61 (D. Haw. 2018) (same); *Miller v. Facebook, Inc.*,

2010 WL 9525523, at *4 (N.D. Ga. Jan 15, 2010) (same).  Each of the Plaintiffs also agreed to

be bound by updates to Facebook's SRRs.  *See* Duffey Decl. ¶¶ 15, 22, 29, 36 & Exs. B, D, F.

> Facebook's current SRRs include the following forum selection/choice-of-law clause:
>
> For **any claim, cause of action, or dispute** you have against us that arises out of
> or relates to these Terms or the Facebook Products[3] ("claim"), you agree that it
> will be resolved **exclusively** in the U.S. District Court for the Northern District of
> California or a state court located in San Mateo County.  You also agree to submit
> to the personal jurisdiction of either of these courts for the purpose of litigating
> any such claim, and that the laws of the State of California will govern these
> Terms and any claim, without regard to conflict of law provisions.

Ring Decl., Ex. C at 6-7 (emphases added).  Each Plaintiff therefore has agreed to bring *any*

claim against Facebook *arising out or relating to Facebook exclusively* in the Northern District

of California or San Mateo Superior Court.[4]

"[A] valid forum-selection clause [should be] given controlling weight in all but the most

exceptional cases."  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S.

49, 63 (2013);[5] *see also New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d

---

[3] "Facebook Products" is defined as "the products, features, apps, services, technologies, and

software we offer."  Ring Decl., Ex. C at 1.

[4] Each Plaintiff also agreed to a similar California forum selection clause at the time they agreed

to the terms when they signed up for Facebook.  *See* Duffey Decl. ¶¶ 16, 23, 30, 37.  Three of the

four Plaintiffs agreed to a California choice-of-law clause at the time they signed up for

Facebook; the fourth, NFHA, agreed to a Delaware choice-of-law clause, *see id.*, though that has

since been superseded by the current California choice-of-law clause.

[5] Internal quotation marks and internal citations omitted throughout unless otherwise noted.

Cir. 1997) ("A forum selection clause is enforceable unless it is shown that to enforce it would be unreasonable and unjust or that some invalidity such as fraud or overreaching is attached to it."). Accordingly, where, as here, the parties have agreed to a valid forum selection clause, Plaintiffs' choice of forum "merits no weight" and Plaintiffs "bear[] the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine*, 571 U.S. at 63. By agreeing to the forum selection clause, Plaintiffs also have "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. Because the remaining factors[6] of the transfer analysis "will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

Here, there can be no dispute that Plaintiffs agreed to the forum selection clause, because they could not otherwise have a Facebook account. *See* Duffey Decl. ¶ 9; *Fteja*, 841 F. Supp. 2d at 835 ("In order to have obtained a Facebook account, Fteja must have" assented to forum selection clause.). Because the forum selection clause is presumptively enforceable and Plaintiffs cannot carry the "heavy burden" of demonstrating that it should be invalidated, and because "'the interest of justice' is served by holding parties to their bargain," this action should be transferred to the Northern District of California. *Atl. Marine*, 571 U.S. at 66.

_____

[6] The "[p]ublic-interest factors" that may be considered even where a valid forum selection clause applies "may include[:] the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine*, 571 U.S. at 62 n.6. Plainly, none of these factors apply here.

In the FAC, Plaintiffs attempt to avoid their agreement to the forum selection clause by alleging that the fictitious "test" ads they cite in the FAC were not placed using their own Facebook accounts, but were instead placed using the "personal Facebook account[s]" of their employees.  FAC ¶¶ 85, 87-93, 95, 97-112.  The account used to place these ads makes no difference whatsoever to the venue analysis.  As set forth above, Plaintiffs agreed to a valid forum selection clause when they created their Facebook accounts, and that agreement requires Plaintiffs to bring the claims asserted in this action *exclusively* in the Northern District of California or San Mateo Superior Court.

### B.    Two "Competing Lawsuits" Are Pending in the Northern District of California, One of Them for Over a Year

"[W]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second."  *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989).  Cases "compete" when there are "sufficient overlapping factual and legal issues" between them.  *MasterCard Int'l, Inc. v. Lexcel Solutions, Inc.*, 2004 WL 1368299, at *8 (S.D.N.Y. June 16, 2004).  Strong policy considerations dictate application of this rule to prevent duplicative litigation and promote "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation[.]"  *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952).

Here, the first-filed case, *Mobley v. Facebook, Inc.*, No. 5:16-cv-06440-EJD (N.D. Cal.) (filed November 3, 2016), which has been pending in the Northern District of California for well over a year, is a "competing lawsuit" because, just as Plaintiffs do here, the *Mobley* plaintiffs assert claims against Facebook under the Fair Housing Act based on allegations that advertisers *may* use neutral targeting tools on Facebook's ad platform to place discriminatory housing ads.

*See supra* at 3-6; Ring Decl., Exs. D, E (*Mobley* complaints).  The policy justifications underlying application of the first-filed rules exist even where non-overlapping claims and parties exist.  For example, in *United States ex rel. Cestra v. Cephalon, Inc.*, 2014 WL 1087960, at *4 (S.D.N.Y. Mar. 19, 2014), the court applied the first-filed rule because, notwithstanding different parties and claims, transfer served the interests of judicial economy and comity because the two actions "share[d] significant factual allegations, legal issues, and parties."  *See also Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F. Supp. 2d 235, 244-45 (E.D.N.Y. 2012) (same); *Tate-Small v. Saks Inc.*, 2012 WL 1957709, at *2-3 (S.D.N.Y. May 31, 2012) (same).

The same is true here.  This case and *Mobley* require resolution of the same core factual and legal issues, including how Facebook's ad platform and targeting tools work, whether claims against Facebook based on ad targeting by advertisers are barred by the CDA or fail for lack of standing, and the viability of plaintiffs' novel theory under the FHA that a publisher can be liable for the targeting decisions of advertisers.  Because these issues are currently pending before the *Mobley* court in the Northern District of California, allowing this case to proceed in this district would "present[] redundancies that contravene the interests of judicial economy and implicate issues of comity."  *Cephalon*, 2014 WL 1087960, at *6.[7]

---

[7] Neither exception to the first-filed rule applies.  As discussed *infra*, the "balance of convenience" factors weigh in favor of transfer.  *See Employers Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 275 (2d Cir. 2008) (explaining that the "balance of convenience" factors "are essentially the same as those considered in connection with motions to transfer venue" under section 1404(a).  And no "special circumstances," such as obvious forum shopping, exist to warrant giving priority to this case over *Mobley*, since the *Mobley* plaintiffs filed their case well over a year ago in the district where Facebook is headquartered, consistent with the forum selection clause also agreed to by Plaintiffs in this case.  *Id*.

10

In addition to *Mobley*, another very similar lawsuit, *Riddick v. Facebook, Inc.*, is now pending in the Northern District of California as well (case number 3:18-cv-04529).  *See* Ring Decl. Ex. F (notice of removal), Ex. G (Second Amended Complaint).  *Riddick* was initially filed in California state court in November 2016 as a California-only class action alleging California law claims under the Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 51.5, based on largely the same theory of liability advanced in *Mobley* and in this case.  *Riddick* was recently removed to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d), based on the broader class definition contained in the Second Amended Complaint.  This further supports a transfer of venue to that district in this case.

### C.    Transfer to the Northern District of California Serves the "Interests of Convenience and Justice" Under 28 U.S.C. § 1404(a)

Courts evaluating whether transfer serves the interests of convenience and justice under 28 U.S.C. § 1404(a) typically consider: (1) convenience of the witnesses; (2) convenience of the parties; (3) location of relevant documents and relative ease of access to sources of proof; (4) location of operative facts; (5) availability of process to compel the attendance of unwilling witnesses; (6) forum's familiarity with the governing law; (7) relative means of the parties; (8) weight afforded plaintiff's choice of forum; and (9) judicial economy and the interests of justice. *See Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 478-79 (S.D.N.Y. 2009).

Here, these factors weigh in favor of transfer.  Because Facebook is headquartered in California, and Plaintiffs' challenge Facebook's advertising policies, practices and platform, it will be far more convenient to litigate this case in California than in New York.  All or nearly all of the witnesses who will testify about Facebook's advertising policies, practices and platform will be Facebook employees based in California.  *See* Duffey Decl. ¶ 3.  Likewise, all of the relevant documents and sources of proof are likely to be located in California.  *See id.* ¶ 4.  The

locus of operative facts is also in California because Facebook makes decisions about its advertising policies, practices and platform at its Menlo Park headquarters. *See id.* ¶ 3; *also 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 135 (S.D.N.Y. 1994) (locus of operative facts where defendant's business decisions and practices occurred).

Judicial economy and the interests of justice also weigh heavily in favor of transfer. As discussed *supra*, the interests of justice are served by enforcing Plaintiffs' agreement to litigate any claims against Facebook in California, which also waived their right to challenge that forum as inconvenient and means their choice of any other forum is given no weight in this analysis. Moreover, *Mobley*, a "competing lawsuit," has been pending in California for over 18 months.

The remaining factors are neutral or should be given little weight. Both districts are familiar with the relevant law. There are no facts to indicate that Plaintiffs would be unable to litigate this action in California, since NFHA is a national organization and two of the other three Plaintiffs reside outside of New York and would have to expend comparable resources regardless of venue. *See Fteja*, 841 F. Supp. 2d at 844.

**************

This case should be transferred to the Northern District of California for the reasons set forth above. If the Court does not transfer the case, Plaintiffs' claims should be dismissed on multiple independent grounds.

## IV.    PLAINTIFFS DO NOT ALLEGE FACTS ESTABLISHING PERSONAL JURISDICTION OVER FACEBOOK IN NEW YORK

Plaintiffs' claims must be dismissed because this Court lacks personal jurisdiction over Facebook. Facebook is not subject to general jurisdiction in New York because it is incorporated in Delaware with its principal place of business in California. FAC ¶ 32. And Plaintiffs do not allege any facts that would make this an "exceptional case" creating general jurisdiction outside

a corporation's state of incorporation or principal place of business.  *Daimler AG v. Bauman*, 571
U.S. 117, 137, 139 n.19 (2014).

      Plaintiffs also fail to allege any basis for specific jurisdiction, which exists only where
"the *defendant's* suit-related conduct … create[s] a substantial connection with the forum state."
*Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (emphasis added); *see also id.* at 1122 ("We have
consistently rejected attempts to satisfy the [personal jurisdiction] inquiry by demonstrating
contacts between the plaintiff (or third parties) and the forum State.").  Plaintiffs do not allege
any conduct by Facebook targeted to New York.  Instead, as Plaintiffs' repeatedly allege, their
claims against Facebook are based on the availability of targeting tools that they claim *may* be
used by housing advertisers to place discriminatory ads throughout the United States.  FAC ¶¶ 2,
4, 44-53.  But the law is clear that a plaintiff's use of a website that is available throughout the
United States is "not … sufficient for personal jurisdiction" in a particular state.  *See Lopez v.
Shopify, Inc.*, 2017 WL 2229868, at *8 n.9 (S.D.N.Y. May 23, 2017), *report and
recommendation adopted*, 2018 WL 481891 (S.D.N.Y. Jan. 17, 2018) ("the Court is not satisfied
that the theoretical availability of RRHustle's allegedly infringing goods to anyone with internet
use in any state, including New York, means that Shopify has 'purposefully directed' its
activities at New York"); *Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 419-20 (E.D.N.Y. 2017)
(the plaintiffs' use of a website available throughout the United States was "not … sufficient for
personal jurisdiction" in New York); *accord Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at
*2 (N.D. Ill. Jan. 21, 2016) (rejecting Illinois plaintiffs' attempt to bring claims against Facebook
in Illinois because "the fact that its site is accessible to Illinois residents does not confer specific
jurisdiction over Facebook").

Here, Plaintiffs' claims are based on targeting tools that are available for use throughout the United States, and indeed, throughout the world. Facebook has not directed these tools to New York in any way, let alone in a way that would constitute "purposeful availment" of the benefits and protections of New York. *See D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017) ("purposeful availment occurs when the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship" giving rise to the lawsuit). Asserting personal jurisdiction over Facebook in New York because Plaintiffs or a third party chooses to use these generally available targeting tools does not comport with due process, requiring conduct *by Facebook* to "create a substantial connection with" New York. *Walden*, 134 S. Ct. at 1121. And Plaintiffs offer no explanation at all as to how their claims concerning the housing markets in Washington D.C., Miami, and San Antonio, *see* FAC ¶¶ 87-96, 103-112, bear any connection to New York.[8]

## V.    PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' claims must be dismissed because they have not alleged facts demonstrating Article III standing. The "'irreducible constitutional minimum' of standing consists of three elements": (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs cannot meet this standard.

---

[8] Facebook's California forum selection provision also weighs in favor of declining to find that the court has personal jurisdiction under these circumstances. *Supra* at 7-8; *see, e.g.*, *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *Creative Socio-Medics Corp. v. City of Richmond*, 219 F. Supp. 2d 300, 307 (E.D.N.Y. 2002).

In two directly analogous cases, federal courts of appeal have held that advocacy organizations, like Plaintiffs, lack standing to sue based on discriminatory housing advertisements. In *Fair Housing Council of Suburban Philadelphia v. Main Line Times*, 141 F.3d 439 (3d Cir. 1998), the plaintiff argued that it suffered injury when it "was forced to divert resources from counseling and other activities" because of "the discriminatory effect of … advertisements" placed in a local newspaper. *Id.* at 442. The court held that the plaintiff organization "failed to establish the necessary 'causal connection between the injury and the [advertisements],'" because it alleged "discriminatory advertising *generally*," not that it had suffered harm as a result of specific advertisements the newspaper printed. *Id.* at 443. Similarly, in *Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd.*, 160 F.3d 433 (8th Cir. 1998), the court held that the plaintiff organization lacked standing because it had not alleged "specific facts establishing distinct and palpable injuries fairly traceable to [the defendant's] advertisements." *Id.* at 435.

Here, Plaintiffs' standing allegations are even more tenuous. The plaintiff organizations in *Main Line Times* and *Arkansas ACORN* were at least able to point to *actual* ads they alleged were discriminatory, even though they were unable to connect those ads to their alleged injuries. *Main Line Times*, 141 F.3d at 443; *Ark. ACORN*, 160 F.3d at 434. Here, Plaintiffs allege only fictitious ads that *they created* and targeted using the ad platform's tools and the *possibility* that some unidentified third parties *may* use those tools to place real discriminatory ads. *See* FAC ¶¶ 134-145. This is plainly insufficient.

Plaintiffs likely will argue that they can establish organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But *Havens* serves only to underscore the deficiency in Plaintiffs' allegations. In *Havens*, a white housing applicant and a black housing

15

applicant inquired about availability at a particular apartment complex in Virginia. The black applicant was told no apartments were available, and the white applicant was told the opposite. *Id.* at 368. The organizational plaintiff in *Havens*, in other words, had shown precisely what Plaintiffs here have not: harm to its mission stemming from *actual* discrimination occurring with respect to *specific* housing opportunities. Other courts have rightly interpreted *Havens* in this way, recognizing the "obvious difference" between a situation, like the one here, in which "an organization manufacturers the injury necessary to maintain a suit" and the situation in *Havens* where "an organization incurs diversion of resources and frustration of purpose damages as a result of *specific documented incidents* of unlawful discrimination." *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000) (emphasis added).

Plaintiffs make a series of allegations regarding expenditures they contend have been made because of the availability of the challenged targeting options on Facebook's ad platform. *See* FAC ¶¶ 141-144. But they do not allege any facts showing a connection between these alleged expenditures and any "specific documented incidents of unlawful discrimination," which Plaintiffs also do not allege. Plaintiffs cannot "manufacture[]" their own "injury" for Article III purposes by pointing to fictitious and potential discriminatory ads. *Lowder Realty*, 236 F.3d at 642; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (rejecting plaintiffs' attempt to "manufacture standing merely by inflicting harm on themselves" through expenditures "based on their fears of hypothetical future harm"). And even if this theory of injury were cognizable—which it is not—it still would not establish harm fairly traceable *to Facebook* because the availability of neutral targeting tools on Facebook's ad platform does not have any "determinative or coercive effect" on any decision by an advertiser to use those neutral tools in ways Plaintiffs contend are discriminatory. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

16

## VI.    PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE CDA

Plaintiffs seek to hold Facebook liable for discriminatory housing ads they allege

unidentified third-party advertisers *may* have placed on Facebook.  In the FAC, Plaintiffs attempt

to plead around the CDA, by re-framing their claims as challenging Facebook's creation of ad

targeting tools that Plaintiffs now contend are the "content" they are challenging.  FAC ¶ 2.  But

Plaintiffs cannot escape the fact that there can be no violation of the FHA or the New York laws

they assert without *publication of a discriminatory housing ad*, and there can be no publication

of a discriminatory housing ad unless a *third-party advertiser* chooses to use the challenged

targeting tools in a way that, according to Plaintiffs, results in publication of a discriminatory

housing ad.  Accordingly, the "content" underlying and essential to Plaintiffs' claims are

allegedly discriminatory housing ads placed by third-party advertisers, not targeting options that

are available on Facebook's platform for use by all advertisers for any type of ad.

The CDA prohibits Plaintiffs from seeking to impose liability on Facebook for publishing

third-party content they allege is discriminatory.  Under Section 230 of the CDA, "[n]o provider

or user of an interactive computer service shall be treated as the publisher or speaker of any

information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law

bars liability "under any State or local law that is inconsistent with this section," *id.* § 230(e)(3),

and also extends to federal claims.  The Second Circuit and courts across this country have

"construed [Section 230] broadly" to "effectuate the statute's speech-protective purpose."  *Ricci*

*v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015).

Section 230 "was enacted based on a congressional concern that treating providers of

computer services the same way as traditional publishers would impede the development of the

Internet," and Congress thus "made the legislative judgment to effectively immunize providers

of interactive computer services from civil liability in tort with respect to material disseminated

by them but created by others." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009). "None of this means, of course, that the original culpable party who posts [unlawful content] would escape accountability," but "Congress made a policy choice" to preempt "tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Ricci*, 781 F.3d at 28.

Because the CDA is intended to protect websites "not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles,'" courts "aim to resolve the question of § 230 immunity at the earliest possible stage." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Thus, courts routinely apply the CDA to dismiss cases on the pleadings. *See, e.g.*, *Ricci*, 781 F.3d at 26; *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 586-87 (S.D.N.Y. 2018); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 155 (E.D.N.Y. 2017); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting plaintiff's "effort to circumvent the CDA's protections through 'creative' pleading").

CDA immunity applies when (1) the defendant is "a provider or user of an interactive computer service," (2) "the claim is based on information provided by another information content provider," and (3) "the claim would treat [the defendant] as the publisher or speaker of that information." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016). Applying this standard, courts repeatedly have held that the CDA protects Facebook from claims arising from it publication of content created by third parties alleged to be unlawful. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Cohen*, 252 F. Supp. 3d at 158; *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 328-29 (E.D.N.Y. 2018); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 206 (2017); *Pennie v. Twitter, Inc., et al.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017). The same result is warranted here.

### A.    Facebook Is an Interactive Computer Service Provider

It is beyond dispute that Facebook is a provider of an interactive computer service.  *See, e.g.*, *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access … to a computer server,' 47 U.S.C. § 230(f)(2)"); *Cohen*, 252 F. Supp. 3d at 156 (same).

### B.    Plaintiffs' Claims Are Based on Allegedly Discriminatory Housing Ads Created by Third-Party Advertisers

The "information" upon which Plaintiffs' claims are based—allegedly discriminatory housing ads—is "provided by another information content provider."  47 U.S.C. § 230(c)(1).  As Plaintiffs repeatedly allege, any discriminatory housing ads are created by advertisers.  *See, e.g.*, FAC ¶ 2 (targeting tools make it possible for "*housing advertisers* to exclude certain home seekers from ever seeing their ads") (emphasis added); *id.* ¶ 4 (Facebook "*provides the option* for *advertisers* to exclude families with children and women from receiving advertisements") (emphasis added); *id.* ¶ 86(c) (Facebook "created the capability for *housing advertisers* to exclude people from seeing their ads" on the basis of protected traits) (emphasis added).  Facebook is therefore not an "information content provider" within the meaning of the CDA because Plaintiffs do not, and cannot, allege that Facebook "materially contribut[ed] to [the] alleged unlawfulness" *of the content*, or "assisted in the development of *what made the content unlawful*."  *LeadClick Media*, 838 F.3d at 174 (emphases added); *accord, e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (explaining that "[a] material contribution" to the alleged illegality of content under the CDA "means being responsible for what makes the displayed content allegedly unlawful").

In the FAC, Plaintiffs attempt to plead around the CDA by re-framing their claims as challenging Facebook's creation of ad targeting tools, which they now contend is the "content"

they are challenging, as opposed to Facebook's publication of allegedly discriminatory housing ads. This attempt fails. There can be no violation of the FHA or asserted New York laws without *publication of a discriminatory housing ad*. Discriminatory housing ads are therefore the only relevant "content" at issue in this case, and what makes that content allegedly unlawful is controlled by third-party advertisers who create housing ads and then decide to target them in ways Plaintiffs claim are discriminatory. Plaintiffs do not and cannot allege that Facebook makes these decisions. Instead, they allege that Facebook "provides the option," FAC ¶ 4, and therefore "create[s] the capability," for advertisers to decide to target housing ads in discriminatory ways, FAC ¶ 86(c). But it is the decisions, not the *option* to make them, that may result in discriminatory housing ads. Thus, third-party advertisers, not Facebook, are the relevant "information content provider[s]" under the CDA in this case.[9] As explained below, Facebook's creation of neutral targeting tools that third parties may (or may not) choose to use when placing housing ads does not change this fact and therefore does not deprive Facebook of immunity from Plaintiffs' claims under the CDA. *See infra* at 21-23 & n.11 (collecting cases in which courts have held the CDA protects websites that provide "neutral tools" that third-party users may use for lawful or unlawful purposes).

---

[9] Moreover, because the challenged targeting tools are based on information provided by third parties, they are themselves third-party content, *e.g.*, a user's decision to "like" certain content (for instance, articles related to children), *see* FAC ¶¶ 86(c), 91. Facebook's representation of this third-party content in targeting tools that advertisers may (or may not) choose to use does not alter its status as third-party content under the CDA. *See, e.g.*, *Kimzey*, 836 F.3d at 1270 (holding that Yelp's "star rating" system was protected by the CDA because it is "simply a representation of … information received" from third-party users of the site); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 834 (2002) (same conclusion as to eBay's star rating system).

The ad targeting tools challenged by Plaintiffs are exactly the type of "neutral tool[]" protected by the CDA. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc). Courts uniformly have held that such neutral tools, which facilitate the publication of third-party content and may be used for either "proper or improper purposes," do not "contribute[] materially to the alleged illegality" of third-party content. *Id.* at 1168, 1172. As a court in this district recently held, defendants "may not be held liable for so-called 'neutral assistance,' or tools and functionality that are available equally to bad actors and the [website's] intended users." *Herrick*, 306 F. Supp. 3d at 589 (quoting *LeadClick Media*, 838 F.3d at 176). Importantly, such neutral tools are protected *even if* they may be deemed in some sense to contribute to the illegality of the content at issue, as long as the tool are "equally to all users and are not intrinsically offensive or unlawful." *Id.*

In *Herrick*, the plaintiff alleged that Grindr, an online dating app, had facilitated stalking and harassment by providing tools that allowed the plaintiff's ex-boyfriend to "impersonate [him] by posting fake profiles to Grindr" that invited unwanted sexual advances. 306 F. Supp. 3d at 584. Like Plaintiffs here, the plaintiff attempted to avoid CDA immunity by arguing that "Grindr contributes to what makes the impersonating profiles offensive," by creating and providing tools such as a "drop-down menu for 'preferred sexual position,'" that were used by the plaintiffs' ex-boyfriend to post fake profiles. *Id.* at 589. The court rejected this argument and dismissed the complaint with prejudice, emphasizing that "[t]o the extent Grindr contributes to the impersonating profiles, it is through [] … 'neutral assistance'" in the form of tools that were "available equally to all users and are not intrinsically offensive or unlawful." *Id.*[10] "There

---

[10] A prior ruling by the same court had dismissed an earlier version of the complaint as well. *See Herrick v. Grindr, LLC*, 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017).

is nothing … illegal about Grindr's drop-down menus, its geolocational function, or its sorting, aggregation, and display functions," even though the defendant had allegedly misused those tools and functions for improper purposes. *Id.* at 590.

*Herrick* relied upon similar cases from other jurisdictions, most notably *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003). *See Herrick*, 306 F. Supp. 3d at 588-89. In *Carafano*, a dating website provided its users with a "detailed questionnaire" that included multiple-choice questions where "members select[ed] answers ... from menus providing between four and nineteen options" in creating their profiles. 339 F.3d at 1121. The plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the creation of a defamatory impersonated profile. *Id.* The Ninth Circuit held that "[d]oubtless, the questionnaire facilitated the expression of information by individual users" but the "selection of the content was left exclusively to the user"; thus, the defendant "cannot be considered an 'information content provider'" because "no profile has any content until a user actively creates it." *Id.* at 1124.[11]

_____

[11] Numerous other cases, many of which were cited and discussed by the *Herrick* court, are to the same effect. *See, e.g.*, *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 324 (D.N.J. 2015) (holding that Grindr was entitled to CDA immunity against claim that it improperly allowed minors to use its app because it "merely provid[ed] *neutral* tools to carry out what may be unlawful or illicit conduct"); *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *1, *10 (N.D. Cal. Nov. 26, 2017) (holding that a "social-network website" was entitled to CDA immunity against claim brought by the mother of a man who died of a heroin overdose alleging that the cite "us[ed] its proprietary algorithms" to "steer[]" her son toward drug forums and dealers, because the website "merely provide[d] a framework that could be utilized for proper or improper purposes"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197-98 (N.D. Cal. 2009) (Google's "Keyword Tool" that "suggest[ed] the phrase 'free ringtone' to advertisers, allegedly

The same is true here.  Plaintiffs' new allegations in the FAC purporting to explain *how* Facebook creates the challenged targeting tools do not alter this analysis.  For example, Plaintiffs allege that Facebook "employs algorithms to analyze, sort, and repurpose" information provided by users to "designate each Facebook user as falling into ... categories" that "advertisers" may then "choose from when targeting their ads."  FAC ¶¶ 50-52.  Even accepting this and other allegations purporting to explain how the challenged targeting tools are *created*, Plaintiffs' claims are barred by the CDA because there can be no violation of the FHA or asserted New York laws unless advertisers decide to *use* these neutral tools to target housing ads in a discriminatory way.  It is therefore those decisions by advertiser, not the neutral tools, that "ma[k]e the content unlawful."  *LeadClick Media*, 838 F.3d at 174.

### C.    Plaintiffs' Claims Treat Facebook as a Publisher or Speaker

The final element of CDA immunity also is satisfied because Plaintiffs are attempting to impose liability on Facebook because it allegedly "*permits advertisers to publish ... ads* in a discriminatory manner."  FAC ¶ 4 (emphasis added).  Allowing third-party advertisers to choose the audience for their ads is a classic publishing activity protected by the CDA.

Courts have recognized that a lawsuit treats a defendant as a publisher or speaker when it seeks to "hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *LeadClick Media*, 838 F.3d at 174.  "A provider of information services might get sued for

---

facilitating fraudulent advertising, was a "neutral tool" because it did "nothing more than provide options that advertisers may adopt or reject at their discretion"); *Baldino's Lock & Key Serv., Inc. v. Google LLC*, 285 F. Supp. 3d 276, 282 (D.D.C. 2018) (CDA protected Google's provision of "neutral mapping tools" that certain businesses used fraudulently).

violating anti-discrimination laws … or even for negligent publication of advertisements that cause harm to third parties. … [W]hat matters is not the name of the cause of action," but "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009); *accord LeadClick Media*, 838 F.3d at 175 (quoting and citing *Barnes* on this point); *Herrick*, 306 F. Supp. 3d at 590 (noting that "[c]ourts have interpreted 'publication' capaciously to reach claims that, although pleaded to avoid the CDA, 'implicitly require recourse to that content [posted by a third party] to establish liability or implicate a defendant's role'" (quoting *Cohen*, 252 F. Supp. 3d 156)).

Applying these principles, numerous cases recognize that the publication of third-party ads falls squarely within the realm of traditional publisher functions protected by the CDA, even if the ads themselves are discriminatory or otherwise unlawful under federal or state law. *See, e.g.*, *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (CDA barred claim against Craigslist for publishing allegedly discriminatory housing ads in violation of federal FHA); *Goddard*, 640 F. Supp. 2d at 1195-96 (CDA barred claim premised on "allegedly fraudulent web-based advertisements" published by Google); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 329 (4th Cir. 1997) (CDA barred claim premised on allegedly fraudulent third-party ads).

Likewise, Facebook's provision of tools that allow "an advertiser" to decide "exactly who will receive its advertisement" and "where and how frequently the ad appears on the Facebook accounts of its targeted audience," FAC ¶ 69, falls squarely within the traditional publisher functions protected by the CDA. Publishers routinely allow advertisers to target ads and assist them in doing so. For instance, newspapers sell advertising space to sporting goods store in the

24

sports section and broadcast networks sell airtime to advertisers on different channels during different shows depending on the preferred audience. The publication of ads entails more than displaying them; it also entails allowing advertisers the ability to reach their target audience.

That is the same type of service Facebook and other online publishers protected by the CDA offer to advertisers. Courts have consistently held in analogous contexts that ad targeting is a traditional publisher function protected by the CDA. *See, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) (tools allowing ad buyers to "target their advertisements" based on geography would be protected); *Roommates*, 521 F.3d at 1169 (tools allowing users "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria" would be protected, even though such tools "might help some users exclude email from other users of a particular race or sex"). All of Plaintiffs' claims are based on the potential use of targeting tools by advertisers to place discriminatory housing ads. "Facebook's role in publishing that content is thus an essential causal element of [Plaintiffs'] claims," *Cohen*, 252 F. Supp. 3d at 158. Thus, Plaintiffs claims attempt to treat Facebook as the publisher of unlawful content and are barred by the CDA.

## VII.  PLAINTIFFS DO NOT ALLEGE ANY UNLAWFUL CONDUCT BY FACEBOOK

### A.  Plaintiffs Fail to State a Claim Under the Fair Housing Act

Plaintiffs allege that Facebook's provision of targeting tools to third-party advertisers violates several provisions of the FHA: 42 U.S.C. § 3604(a), (c), (d), and (f) (FAC ¶ 148), as well as § 3606 (FAC ¶ 154). None of these provisions apply to Facebook under Plaintiffs' novel theory of liability challenging ad *targeting*, as opposed to *content*, and seeking to hold a publisher liable for targeting decisions made by advertisers. No court has adopted this expansive view of the FHA, and this Court should reject Plaintiffs' invitation to be the first to do so.

Plaintiffs fail to state any claim against Facebook under 42 U.S.C. § 3604(a), (d), or (f).

25

These provisions, respectively, make it unlawful to "refuse to sell or rent … or otherwise make unavailable or deny" a dwelling because of membership in a protected class; to "represent to any person" because of membership in a protected class "that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available;" and to "discriminate in the sale or rental" of a dwelling because of a person's "handicap." Plaintiffs do not, and cannot, allege that *Facebook* sells or rents any dwelling, or makes representations to any person regarding the availability of any dwelling. Instead, Plaintiffs allege that "housing advertisers" do this. FAC ¶ 2 (targeting tools allow "landlords and real estate brokers to bar families with children, women, and others from receiving rental and sales ads for housing" and allow "housing advertisers … to exclude certain home seekers from ever seeing their ads"). Moreover, none of these provisions apply to claims based on advertising, let alone targeted advertising or a website's provision of targeting tools. *See Hous. Opportunities Made Equal v. Cincinnati Enquirer, Inc.*, 731 F. Supp. 801, 803 n.1 (S.D. Ohio 1990) (holding that claim against publisher under § 3604(a) based on allegedly discriminatory advertisements was "without any basis"), *aff'd*, 943 F.2d 644 (6th Cir. 1991).

Plaintiffs' claim under 42 U.S.C. § 3606 fails for similar reasons. That provision makes it "unlawful to deny any person access to or membership or participation in any multiple-listing service, real estate brokers' organization or other service, organization, or facility relating to the business of selling or renting dwellings." Facebook plainly is not a "multiple-listing service" or "real estate brokers' organization," *id.*, and Plaintiffs do not allege otherwise. Nor does Facebook qualify as an "other service, organization, or facility." *Id.* Under the interpretive canon of *ejusdem generis*, "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall*

*Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).  Facebook—as a website that publishes ads for many different types of goods and services, not just housing—is fundamentally different from a multiple-listing service or brokers' organization, which are run by brokers themselves for the sole and express purpose of offering and promoting housing opportunities. *See, e.g.*, *South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 885 (7th Cir. 1991).  Section 3606 therefore does not apply to Facebook.

Nor do Plaintiffs state any claim against Facebook under these provisions based on a disparate impact theory.  A disparate-impact claim under the FHA requires a plaintiff to allege "facts at the pleading stage" consisting of "statistical evidence demonstrating a causal connection" between the challenged conduct of the defendant and a disparity based on protected classes.  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015); *see also id.* at 2523-24 (cautioning that courts must "examine with care … at the pleading stage" whether a plaintiff has stated a disparate-impact claim, lest defendants face "abusive disparate-impact claims" that "displace valid governmental and private priorities").  Plaintiffs do not even attempt to make such allegations.  Nor do Plaintiffs allege any facts meeting the "robust causality requirement" the law requires.  *Id.* at 2523.  Any discriminatory targeting would be caused by the intentional choices of advertisers alone.

Plaintiffs also fail to state a claim under 42 U.S.C. § 3604(c), which makes it unlawful to "make, print, or publish … any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on" membership in a protected class.  A HUD regulation, also cited by Plaintiff, provides that it is a violation of Section 3604(c) to "[s]elect[] media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing

opportunities" based on such class membership.  24 C.F.R. § 100.75(c)(3).  While this provision and its related regulation, unlike the first two provisions above, address advertising, Plaintiffs' theory of liability as to Facebook still fails.

*First*, Plaintiffs do not allege any actual housing ads targeted in a discriminatory way have been "made, printed, or published" on Facebook.  Their own fictitious ads offering fictitious housing opportunities do not qualify.  *Second*, even if Plaintiffs were able to identify housing ads targeted by advertisers in a discriminatory way, Section 3604(c) does not extend to those targeting decisions.  The standard applied in determining whether an ad "indicates any preference, limitation, or discrimination" in violation of Section 3604 (c) is whether it "suggests to an ordinary reader" that a protected class of individuals is "is preferred or dispreferred for the housing in question."  *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991).  This test assumes that the plaintiff actually sees an advertisement whose content is either facially or implicitly discriminatory.  Here, Plaintiffs challenge that targeting decisions by advertisers, not any advertisement whose content itself is allegedly discriminatory.  Plaintiffs therefore fail to state a claim under section 3604(c).  *Cf. Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991) (rejecting claim under section 3604(c) against publisher based on allegedly discriminatory "aggregate" effect of multiple advertisements).

Plaintiffs' reliance on 24 C.F.R. § 100.75(c)(3) is misplaced.  As noted above, this regulation prohibits "[s]electing media or locations for advertising."  This plain language applies to advertisers *selecting* media or locations for ads, not to Facebook and other platforms on which ads are placed.  No case has held, or even suggested, that publishers, such as Facebook, are subject to this regulation.  *See Martinez v. Optimus Props., LLC*, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (claim *against advertiser* challenging allegedly discriminatory ad targeting

decisions); *Guevara v. UMH Props., Inc.*, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) (same); *South-Suburban Hous. Ctr.*, 935 F.2d at 873 (same).

In addition, even if the HUD regulation applied to publishers—which it does not—the regulation is invalid because it is inconsistent with the statute, which prohibits advertisements that "*indicate[]* any preference, limitation, or discrimination based on" a protected class.  42 U.S.C. § 3604(c) (emphasis added); *see Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 608 (2013) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.").  The statutory text encompasses only ads that, on their face, are explicitly or implicitly discriminatory.  *See Ragin*, 923 F.2d at 999.  It does not cover ad *targeting*.

Finally, Plaintiffs cannot rely on an aiding-or-abetting theory of liability to skirt these fatal flaws in their FHA claims.  The text of the FHA does not provide for such liability, so it is not available.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994); *Rivera v. Incorporated Village of Farmingdale*, 2011 WL 1260195, at *3 (E.D.N.Y. Mar. 30, 2011) (noting that an aiding-and-abetting theory of liability under the FHA has not been recognized).

### B.    Plaintiffs Fail to State a Claim Under New York Law

First and foremost, Plaintiffs' claims under New York law fail because Facebook's terms of service, which govern Plaintiffs' relationship with Facebook, contain a valid California choice-of-law clause.  *Supra* at 6-8 & n.4 (noting Plaintiffs' assent to Facebook's terms of service and California choice-of-law clause).  Each Plaintiff therefore agreed that any claim they may have against Facebook would be governed by California law, not New York law.

Even if New York law could apply, Plaintiffs' claim would still fail.  Plaintiffs rely entirely on the aiding-and-abetting provision of the Human Rights Law, N.Y.C. Admin. Code § 8-107(6), *see* FAC ¶¶ 157-160, which New York courts have held, in construing parallel

language under New York state law, is subject to common law principles of aiding and abetting. *See Nat'l Org. for Women v. Buffalo Courier-Express, Inc.*, 337 N.Y.S.2d 608, 610 (Sup. Ct. 1972) (applying "judicial principles governing criminal liability through accessorial conduct"); *accord Foley v. Mobil Chem. Co.*, 647 N.Y.S.2d 374, 381 (Sup. Ct. 1996) (similar). These common law principles foreclose Plaintiffs' theory of liability.

Aiding-and-abetting liability requires a plaintiff to plead and prove that the defendant had a "shared intent or purpose" with the person committing the offense. *People v. Kaplan*, 76 N.Y.2d 140, 144-45 (1990); *accord Buffalo Courier-Express*, 337 N.Y.S.2d at 610 (same). Here, even assuming Plaintiffs could allege any actual discriminatory housing ads placed by advertisers, they do not and cannot allege that Facebook shared a discriminatory intent or purpose with those unidentified advertisers. Allegations that Facebook made available neutral targeting tools to *all* advertisers and that *some* of those advertisers *may* misuse them does not come close to demonstrating a shared illegal intent. Common law principles also require an aider and abettor to provide "substantial assistance" to the offender, which "means more than just performing routine business services for the alleged" violator. *McBride v. KPMG Int'l*, 135 A.D.3d 576, 579 (N.Y. App. Div. 2016). But, again, that is all that Plaintiffs allege here—that Facebook made available neutral targeting tools to all advertisers that some *may* use to target housing ads in ways Plaintiffs claim are discriminatory. FAC ¶¶ 44-70.

Moreover, in cases that involved print publishers and predated enactment of the CDA, New York courts rejected attempts to impose liability on print publishers on an aiding-and-abetting theory unless the ad at issue is unlawful on its face, which Plaintiffs do not allege here. *See In re N.Y. Times Co. v. City of N.Y. Comm'n on Human Rights*, 41 N.Y.2d 345, 351 (1977); *see also Buffalo Courier-Express*, 337 N.Y.S.2d at 610-11. In the *Times* case, the appellate court

rejected claims by the Human Rights Commission that, by publishing employment ads in apartheid-era South Africa, the *Times* was liable for aiding or abetting discriminatory employment practices in South Africa, 41 N.Y.2d at 358, 361, holding that the *Times* "may be held as an aider and abettor of discrimination only if it published *advertisements that expressed discrimination*," *id.* at 351 (emphasis added).  Under that standard, which is binding New York law, there is no claim against Facebook on an aiding-and-abetting theory.

## VIII.    CONCLUSION

For the above reasons, the Court should transfer this action to the Northern District of California, or, alternatively, dismiss Plaintiffs' complaint without leave to amend.

DATED:  July 30, 2018                         MUNGER, TOLLES & OLSON LLP

By:  */s/ Rosemarie T. Ring*
                                              ROSEMARIE T. RING
                                              Attorneys for Defendant Facebook, Inc.

                                              MUNGER, TOLLES & OLSON LLP
                                              560 Mission Street, 27th Floor
                                              San Francisco, CA  94105
                                              (415) 512-4000

                                              ROSEMARIE T. RING
                                              rose.ring@mto.com
                                              JONATHAN H. BLAVIN
                                              jonathan.blavin@mto.com
                                              JOSHUA PATASHNIK
                                              josh.patashnik@mto.com
                                              ELIZABETH A. KIM
                                              elizabeth.kim@mto.com

**CERTIFICATION OF COMPLIANCE**

In compliance with this Court's Individual Practice 2(D), the undersigned counsel states that this brief is 9,897 words long, excluding the portions exempted by the rule.  *See* ECF No. 26 (order setting limit of 10,000 words for this motion).  In preparing this certificate, I relied on the word count generated by Microsoft Word.  I also certify that the brief complies with this Court's formatting rules.

*/s/ Rosemarie T. Ring*
Rosemarie T. Ring