# EXHIBIT F

1 | ALFRED G. RAVA (SBN 188318)
2 | RAVA LAW FIRM
3667 Voltaire Street
3 | San Diego, CA 92106
Tel: 619-238-1993
4 | Fax: 619-374-7288
Email: alrava@cox.net
5 |
6 | Attorney for Plaintiffs and the Putative Class

**FILED**
SAN MATEO COUNTY

JUL 1 2 2018

Clerk of the Superior Court
By _____
DEPUTY CLERK

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN MATEO**

9

16 – CIV – 02526
ACM2
Second Amended Complaint
1258757

10 | BERT RIDDICK and ALLAN CANDELORE, on
behalf of themselves and all others similarly
11 | situated,

Case No. 16-CIV-02526

12 | Plaintiffs,

**SECOND AMENDED CLASS ACTION
COMPLAINT FOR STATUTORY
DAMAGES AND INJUNCTIVE RELIEF
FOR:**

13 | v.

14 | FACEBOOK, INC.; and DOES 1 through 5,000,

1. **Violation of Civil Code § 51 - The Unruh
Civil Rights Act; and**
2. **Violation of Civil Code § 51.5.**

15 | Defendants.

16

17

**UNLIMITED JURISDICTION**

18 | All animals are equal, but some animals are more equal than others.

19

20 | – George Orwell, *Animal Farm*

21 | Plaintiffs, on behalf of themselves and all others similarly situated, allege the following:

22

23 | **NATURE AND BASIS OF CLAIMS**

24 | 1.    This case is about unlawful discrimination on steroids. Facebook and its co-defendant

25 | advertisers have intentionally discriminated against tens or hundreds of millions of Facebook users by

26 | collaborating in creating and/or developing the information or content in thousands or millions of

27 | advertisements that were not published, not provided, and not sent to millions of Facebook users based

28 | on users' personal characteristics such as sex, race, color, religion, ancestry, national origin, marital

1

RECEIVED
SAN MATEO COUNTY
JUL 1 2 2018
Clerk of the Superior Court

1    status, citizenship, primary language, immigration status, or those added by the courts, all of which

2    are protected from being used to discriminate against people by California Civil Code sections 51

3    (codification of the Unruh Civil Rights Act) and 51.5. Facebook and its co-defendant advertisers have

4    collaborated in creating or developing Facebook's Multicultural Affinity (née "Ethnic Affinity"[1])

5    (hereinafter "Multicultural Affinity") advertising platform feature and therefore in creating or

6    developing the information or content in ads that were never published, never provided, and never sent

7    to certain disfavored Facebook users, who are the Class members defined below, based on the users'

8    personal characteristics protected by Civil Code sections 51 and 51.5.

9          2.     Facebook's Multicultural Affinity advertising feature has been used by Facebook and

10   its co-defendant advertisers, including by Facebook itself as an advertiser, to not publish, not provide,

11   and not send information in advertisements to Facebook users who would have benefited from the

12   information in such non-published ads for sales, discounts, coupons, limited quantities, free shipping,

13   or other special offers, promotions, employment opportunities, housing, products, accommodations,

14   advantages facilities, privileges, or services but for the disfavored users' real or perceived personal

15   characteristics protected by Civil Code sections 51 and 51.5.

16         3.     Facebook has also created or developed content in advertisements for Facebook itself

17   that Facebook did not publish, did not provide, and did not send to certain Facebook users based on

18   personal characteristics protected by the Unruh Civil Rights Act and Civil Code section 51.5. This

19   includes, but is not limited to, the Facebook employment ad in Exhibit 1 to this Second Amended

20   Complaint, which Facebook developed and created but did not publish, provide, or send to Facebook

21   users, who Facebook determined or perceived to not be between 21 and 55 years old. If Facebook

22   determined or perceived a user to be under 21 years old or over 55 years old, Facebook did not publish,

23   provide, or send the information in that advertisement to that user. The screenshots in Exhibit 1 of this

---

[1] After Plaintiffs filed their original Complaint in this case, Facebook tried to hide its illegal feature by changing the name of its discriminatory ad platform feature from "Ethnic Affinity" to the more politically correct, virtue-signaling name, "Multicultural Affinity." The term "Multicultural Affinity" will be used throughout this Second Amended Complaint to also include its former title of "Ethnic Affinity."

1  Facebook ad for new workers show that Facebook only "wants to reach people ages 21 to 55 who live
2  or were recently in the United States."

3      4.      Both Civil Code sections 51 and 51.5 prohibit business establishments such as
4  Facebook and its advertisers from discriminating against people based on any of the personal
5  characteristics listed in Civil Code section 51 and those added by judicial construction, as well as from
6  discriminating against people based on the *perception* that the people being treated unequally bear or
7  possess any of those protected personal characteristics.

8      5.      Defendant Facebook, under the auspices of being a social-networking site, mines,
9  collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of
10 categories, for whom Facebook claims to be approximately two billion monthly active Facebook users
11 worldwide, as well as on other individuals who do not even have Facebook accounts, in order for
12 Facebook and its advertisers to publish, provide, and send ads to certain groups of Facebook users,
13 and, more importantly, to enable Facebook and its advertisers to not publishing, not providing, and
14 not sending ads to certain other Facebook users. As alleged more fully below, Facebook and its co-
15 defendant advertisers have collaborated to create, develop, implement, market, and use an advertising
16 platform ("Ad Platform") that has created and developed advertisements for products,
17 accommodations, advantages, facilities, privileges, employment opportunities, housing, and
18 services—including, but not limited to advertisements for sales, discounts, coupons, limited quantities,
19 free shipping, or other special offers—that defendants intentionally have not published, not provided,
20 and not sent to Facebook users based on their real or perceived protected personal characteristics. By
21 purposefully and intentionally collaborating to create, develop, and/or use (1) the "Exclude People"
22 feature, or (2) another feature that advertisers have used to include only certain users with favored
23 personal characteristics and thereby exclude those users who are not lucky enough to have the favored
24 personal characteristics (hereinafter "Include People" feature), such as those protected by Civil Code
25 sections 51 and 51.5, defendants have knowingly and intentionally prevented ads and the information
26 and content therein from being published, provided, or sent to users who do not match certain personal
27 characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic
28 US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently

3

in the United States."

6.     Facebook, through its creation, development, implementation, promotion, and marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced its advertisers to express illegal preferences of Facebook users based on the users' personal characteristics or perceived personal characteristics as assigned secretly by Facebook, all of which are protected by Civil Code sections 51 and 51.5. Facebook, along with its advertisers, have been responsible, in whole or in part, for the creation or development of the offending content. Facebook's substantial affirmative conduct in promoting its advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools for unlawful purposes has resulted in the unlawful discrimination of many Facebook users. All of this conduct, as further detailed below, makes Facebook a creator or developer of the information or content in the ads that are not published, not provided, and not sent to Facebook users based on the users' genuine or perceived protected personal characteristics. Therefore, Facebook is an information content provider for the ads that are published, provided, and sent to Facebook users based on those users' protected personal characteristics, or the perception created by Facebook from data collected by Facebook or acquired by Facebook from other data collection firms of those users' protected personal characteristics.

7.     But this Second Amended Complaint and the enumerated causes of action concern the information or content not published, not provided, and not sent to the members of the Class by Facebook and its advertiser co-defendants. If instead of not publishing, not providing, and not sending the information or content in the ads to Class members, defendants had just published, provided, or sent the information or content in the ads to the Class members, Plaintiffs would not have filed this lawsuit, because there would not have been any unlawful discrimination such as that alleged herein.

8.     It is especially troubling that Facebook, whose corporate mission statement is "*to give people the power to build community and bring the world closer together*," would create and develop an Ad Platform with its anti-diversity Multicultural Affinity tool that Facebook and its advertisers have used to not publish, not provide, and not send information or content to many in Facebook's community while defendants published, provided, and sent the same information and content to other

4

Facebook community members. This has destroyed any sense of commonality or "community," and has separated the Facebook world into at least two camps: an informed community of Facebook users on one side, and an uniformed community of Facebook users on the other side.

9. After Plaintiffs filed their original Complaint in this case, Facebook COO Sheryl Sandberg announced that Facebook would seemingly at least temporarily disable the "exclude" feature in its Multicultural Affinity tool, as follows:

> Until we can better ensure that our tools will not be used inappropriately, we are disabling the option that permits advertisers to exclude multicultural affinity segments from the audience for their ads. In addition, all advertisers will have to complete the certification described above when they choose to include any of the multicultural affinity segments. We will also conduct a full review of how exclusion targeting is being used across audience segments, focusing particularly on potentially sensitive segments (e.g., segments that relate to the LGBTQ community or to people with disabilities).

Sheryl Sandberg's November 29, 2017, letter to the Congressional Black Caucus. Available at https://www.documentcloud.org/documents/4312370-Facebook-Sheryl-Sandberg-Letter-2017-11-29.html

10. However, Ms. Sandberg's announcement seemingly only temporarily disabled the Exclude People feature with her provisional, "*Until* we can better ensure that our ad tools will not be used inappropriately . . .", emphasis added, language. Moreover, by maintaining that "all advertisers will have to complete the certification described above when they choose to *include* any of the multicultural affinity segments" - emphasis added, Facebook taketh back what it giveth away. This is because whenever people *include* individuals with any favored personal characteristic, such as to include African-American, 18 to 55-year-olds, heterosexuals, or Muslims, they exclude individuals with the disfavored personal characteristics, such as Latinos, Asian-Americans, Caucasians, senior citizens, members of the LGBTQ community, or Christians and Jews. This has the same effect as the seemingly temporarily discarded "exclude" feature, but only rebranded with the new, and innocuous-sounding "include" moniker.

5

1    11.    Just recently, Ms. Sandberg, as Facebook's COO, announced, "We believe advertisers

2    and us should be held accountable for content and ads." Plaintiffs, by filing their original Complaint

3    in November of 2016, and by filing this Second Amended Complaint, endeavor to ensure that

4    Facebook and its advertisers are held accountable for their discriminatory practices of withholding

5    content and ads, and that defendants stop their discriminatory practices and finally begin to treat

6    Facebook users around the world equally no matter their sex, race, religion, sexual orientation,

7    citizenship, and other real or perceived protected personal characteristics.

8    12.    Since Plaintiffs' original Complaint was filed in November of 2016, Facebook, in court

9    filings in this case and in a related federal court discrimination lawsuit against Facebook, has attempted

10   to avoid liability by cavalierly throwing its co-defendant advertisers under the bus by implicating its

11   advertisers as the ones solely responsible for creating or developing the information in the ads that

12   were not published, provided, or sent to the Class, which could only have been accomplished by using

13   the Multicultural Affinity tool at the center of this lawsuit. For example, in Facebook's Demurrer to

14   Plaintiffs' First Amended Complaint, Facebook contended, "Because Facebook plays no role in the

15   creation of ads or in the advertiser's targeting decisions, advertisers, not Facebook, are the only

16   "information content provider[s]" of the content at issue. (47 U.S.C. § 230(f)(3).) Nor does it matter

17   that Plaintiffs seek to hold Facebook liable for aiding violations committed by third-party advertisers:

18   such claims are precisely the kind of claims precluded by the [Communications Decency Act]."

19   Facebooks claims that Facebook has nothing to do with advertisers' targeting decisions is

20   demonstrably, patently false, as revealed in the following excerpts from a recent Bloomberg

21   Businessweek article titled "How Facebook Helps Shady Advertisers Pollute the Internet", available

22   at https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-

23   helps-find-them :

24        "Granted anonymity, affiliates were happy to detail their tricks. They told me that Facebook

25        had revolutionized scamming. The company built tools with its trove of user data that made it

26        the go-to platform for big brands. Affiliates hijacked them. Facebook's targeting algorithm is

27        so powerful, they said, they don't need to identify suckers themselves – Facebook does it

28        automatically."

6

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

The Bloomberg article further reads:

> "Affiliates once had to guess what kind of person might fall for their unsophisticated cons, targeting ads by age, geography, or interests. Now Facebook does the work for them. The social network tracks who clicks on the ad and who buys the pills, then starts targeting others whom its algorithm thinks are likely to buy. Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. "They go out and find the morons for me," I was told by an affiliate who sells deceptively priced skin-care creams with fake endorsements from Chelsea Clinton."

Facebook is inextricably involved with who does and who does not see ads and the information or content in those ads that are placed on its platform.

### CALIFORNIA CIVIL CODE SECTIONS 51, 51.5, AND 52 AND CALIFORNIA SUPREME COURT PRECEDENT

13.     Effective January 1, 2016, Civil Code section 51 provides the following:

(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, employment opportunities, housing, or services in all business establishments of every kind whatsoever.

14.     Civil Code section 51.5 reads, in pertinent part, as follows:

(a) No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

15.     Civil Code section 52 which provides the remedies for violations of Civil Code sections 51, 51.5 (and 51.6), reads, in pertinent part, as follows:

> (a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

16.     Before January 1, 2016, Civil Code section 51 did not include citizenship, primary language, or immigration status in its list of enumerated personal characteristics, and therefore section 51.5, which adopts the personal characteristics listed in section 51, also did not specifically include these three personal characteristics.  But in 2015, the California Legislature passed, and on September 8, 2015, Governor Gerald Brown signed into law, Senate Bill 600, which would become effective on January 1, 2016, and added citizenship, primary language, and immigration status to the personal characteristics enumerated in Civil Code section 51, and therefore adopted by Civil Code section 51.5.

17.     Despite California's many anti-discrimination statutes, California Supreme Court precedent, and California Attorney General and Department of Fair Employment and Housing actions that prohibit businesses operating in California from treating consumers unequally based on protected personal characteristics such as sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status, Facebook and its co-defendant advertisers have created, developed, and/or utilized the Multicultural Affinity tool and the discriminatory information and content Facebook and its advertisers provided in Facebook and its advertisers' ads to treat Facebook users unequally by not publishing, not providing, and not sending Facebook users ads and the information or content in those ads based on the users' personal characteristics protected by the Unruh Civil Rights Act and Civil Code section 51.5.

18.     The sole reason or motive for Facebook and its co-defendant advertisers' collaboration to create, develop, and/or utilize the discriminatory Multicultural Affinity tool and its Exclude People

8

and Include People features has been to maximize profit for Facebook and its advertisers, regardless of the discriminatory intent and effect.  The California Supreme Court in the Unruh Civil Rights Act case of *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24 strongly denounced businesses that treated customers unequally based on a protected personal characteristic listed in Civil Code section 51 to maximize profits, as set forth below:

> In *Marina Point*, this court held that the fact that a business enterprise was "'[proceeding] from a motive of rational self-interest'" did *not* justify discrimination. (*Marina Point, supra, 30 Cal.3d at p. 740, fn. 9,* disapproving *Newby v. Alto Riviera Apartments (1976) 60 Cal. App. 3d 288, 302 [131 Cal. Rptr. 547].)* This court noted that "an entrepreneur may pursue many discriminatory practices 'from a motive of rational self-interest,' e.g., economic gain, which would unquestionably violate the Unruh Act. For example, an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice." (*Marina Point, supra, 30 Cal.3d at p. 740, fn. 9.)* It would be no less a violation of the Act for an entrepreneur to charge all homosexuals, or all nonhomosexuals, reduced rates in his or her restaurant or hotel in order to encourage one group's patronage and, thereby, increase profits.  The same reasoning is applicable here, where reduced rates were offered to women and not men.

*Koire*, 40 Cal.3d at 35.

> The nightclub attempts to justify its price discount as "remedial" because women tend to have lower incomes than men.  This argument appears to be disingenuous at best. The club's profit motive is obvious.  Jezebel's waives the cover charge for women not because women on the average earn 59 cents for every dollar earned by men (Koziara, Pierson & Johannesson, *The Comparable Worth Issue: Current Status and New Directions* (1983) 34 Lab. L.J. 504, 505), but because it wants to earn as many dollars as it can for itself.  "Ladies' Night" at Jezebel's is not for the benefit of women, but for the benefit of the nightclub.

*Koire*, 40 Cal.3d at 37 n.18.

19.     In a subsequent California Supreme Court Unruh Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167, the Court, in holding that a business could not charge men more than women to be admitted into a supper club because sex discrimination is prohibited by the

9

Unruh Act, perhaps best summarized the purpose and intent of the Unruh Act as follows:

> The Unruh Civil Rights Act (Civ. Code, § 51 et seq.) must be construed liberally in order to carry out its purpose. The act expresses a state and national policy against discrimination on arbitrary grounds. Its provisions are intended as an active measure that creates and preserves a nondiscriminatory environment in California business establishments by banishing or eradicating arbitrary, invidious discrimination by such establishments. The act stands as a bulwark protecting each person's inherent right to full and equal access to all business establishments (§ 51, subd. (b)). The act imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination. The act serves as a preventive measure, without which it is recognized that businesses might fall into discriminatory practices.

## FACEBOOK'S AD PLATFORM AND MULTICULTURAL AFFINITY TOOL

20.     Facebook generates most of its revenue through the sale of advertising. In the second quarter of 2017, Facebook generated $9.16 billion in advertising revenue.

21.     As set out in more detail below, Facebook's Multicultural Affinity tool aids, allows, and enables advertisers, including Facebook itself, to intentionally exclude specific Facebook users from seeing or hearing certain ads and the information or content in those ads. This age-based, sex-based, race-based, etc. exclusion is based on Facebook users' "affinity" groups that are assigned to users by Facebook without the users' knowledge or consent, and which Facebook then uses to determine or perceive to be a person's sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, and/or immigration status or other characteristics or affinities based on the users' Facebook page, users' activity on Facebook and other Facebook owned websites or apps, and countless terabytes of data about its users that Facebook purchases or acquires by other means from various data mining firms and other sources.

22.     Based on a Facebook user's personal characteristics, a user's perceived personal characteristics, their affinity groups, and/or information Facebook has obtained about its users through data and information Facebook has obtained from various data miners, Facebook builds a profile or a perceived profile of that user that is then utilized and accessed by the Ad Platform to determine what

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

1 | users will not receive the information or content published or provided in certain ads.

2 |      23.    Affinity groups act as a thinly veiled proxy for, or a perception of, users' personal characteristics as a hidden means to determine who does not receive ads based on characteristics protected from discrimination by Civil Code sections 51 and 51.5. Many of these affinity groups are specifically classified as "demographics" by Facebook and designed to mask Facebook's tracking of protected groupings such as "African American (US)," "Hispanic (US – English Dominant)," "Hispanic (US – Spanish Dominant)," "Asian American (US)," "Christians," and "Moms" in order to enable defendants to not publish, not provide, and not send certain ads and the information in those ads to the Facebook  users who have been stereotyped by Facebook into these groupings.

## FACEBOOK'S AD PLATFORM'S MULTICULTURAL AFFINITY TOOL ENABLES ILLEGAL DISCRIMINATION

     24.    Facebook's Ad Platform's Multicultural Affinity tool and its Exclude People and Include People features has allowed advertisers to hide and conceal their illegal discrimination in at least two steps.

     25.    First, Facebook's Ad Platform's Multicultural Affinity tool aids, allows, and enables advertisers, including Facebook itself as an advertiser, to discriminate against specific groups of users by not publishing, providing, or sending ads to certain users for products, accommodations, advantages, facilities, privileges, housing, or services. (See Figure 1 below.) This can be done by "demographic," "interest," or "behavior." For example, the Ad Platform allows targeting of an ad to the demographic "Renters." or to users who have expressed an interest in or like pages related to "Buying a House."

///
///
///
///
///

11

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

1

**Figure 1**

2

Detailed Targeting    INCLUDE people who match at least ONE of the following :

3

Behaviors > Residential profiles

4

**Likely to move**

5

Interests > Additional Interests

6

**Buying a House**

7

**First-time buyer**

**House Hunting**

8

Add demographics, interests or behaviors          **Suggestions    Browse**

9

10

Narrow Audience

11

EXCLUDE people who match at least ONE of the following

12

Demographics > Ethnic Affinity

13

**African American (US)**

14

**Asian American (US)**

**Hispanic (US - Spanish dominant)**

15

16

Add demographics, interests or behaviors                    **Browse**

17

Screen shot from the article by ProPublica entitled "Facebook Lets Advertisers
18
Exclude Users By Race," available at https://www.propublica.org/article/facebook-
19
lets-advertisers-exclude-users-by-race, which shows options from the Facebook Ad
Platform's drop-down menus.

20

        26.       Second, the Ad Platform's Multicultural Affinity tool has affirmatively induced, aided,
21
allowed, and enabled advertisers, including Facebook, to click a button labeled "Exclude People" to
22
prevent the information or content in an ad from being published, provided, or sent to users based on
23
certain personal characteristics or certain perceived personal characteristics, such as "African
24
American" or "Hispanic as seen in Figure 1 above), or as "Hispanic (US – Bilingual)" or "Hispanic
25
(US – Spanish dominant)" as seen in Table 2 below. Facebook's Advertiser Help Center has explained
26
that the platform "offers advanced features like the ability to exclude certain characteristics from your
27
target audience." These characteristics include those listed in Civil Code sections 51 and 51.5.

28

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

27.     Among the "characteristics" or perceived characteristics that can be excluded are "African American (US)," "Asian American (US)," and categories of "Hispanic (US)," the latter broken down into subcategories based on the users' primary language – "bilingual," "English dominant," or "Spanish dominant." Facebook's Multicultural Affinity feature has affirmatively induced advertisers to exclude users based on marital status, by affirmatively inducing advertisers to exclude users such as those who are "Divorced." It has affirmatively induced advertisers to exclude advertisers based on sex by affirmatively inducing advertisers to exclude "Moms." It has affirmatively induced advertisers to exclude users based on religion by excluding users who are "Christian," "Muslim," "Jewish Culture," or "Jews for Judaism." And the Ad Platform has affirmatively induce advertisers to exclude based on national origin, citizenship, or immigration status by affirmatively inducing advertisers to exclude users based on "Expat (All)," which is defined by Facebook as "People whose original country of residence is different from the current country/countries selected above."

28.     Interestingly, Facebook, whose CEO Mark Zuckerberg and COO Sheryl Sandberg are both Caucasians, has not created or developed a feature on it Ad Platform to affirmatively induce advertisers to exclude the demographic or perceived demographic of Whites or Caucasians from being provided or sent ads.

29.     Table 1, below, is a non-exclusive list of the characteristics that are not specifically enumerated in Civil Code sections 51 and 51.5 but are on Facebook's Ad Platform and can be targeted to tailor an advertisement for housing.

**Table 1: Characteristics That Can Be Targeted In Ads to be Tailored to Housing**

Renters
First time homebuyer
Likely to move
Apartment finder
New mover
$8,000 Home Buyer Tax Credit

30.     On the other hand, Table 2 below is a non-exclusive list of the personal characteristics that *are* listed in Civil Code sections 51 and 51.5 and that have been able to be excluded under the Ad Platform, thereby preventing information in certain ads from being published, provided or sent to certain uses based on personal characteristics protected by Civil Code sections 51 and 51.5.

13

**Table 2: Characteristics That Can Be Excluded, Allowing Discrimination Against the Protected Categories of Race, Color, Religion, Sex, Marital Status, National Origin, Citizenship, Primary Language, and Immigration Status**

| Race/Color/ Primary Language | Sex | Marital Status | Religion | National Origin/ Citizenship/Im-migration Status |
|---|---|---|---|---|
| African American (US) | Working Women | Family-based Households | *Christian* | *Expats (All)3* |
| Asian American (US) | Moms | New parents | *Christianity* | *Non-resident Indian and person of Indian origin* |
| Hispanic (US - All) | Big-city moms | Housemate-based Households | *Catholicism* | *Immigrant* |
| Hispanic (US - Bilingual) | Corporate moms | Civil Union | *Mainline Protestant* | *Expats (Mexico)4* |
| Hispanic (US - English dominant) | Fit moms | Divorced | *Jewish culture* | *Expats (Pakistan)* |
| Hispanic (US - Spanish dominant) | Green moms | Domestic Partnership | *Jews for Judaism* | *Expats (Philippines)* |
| African-American hair | Moms of grade school kids | Engaged | *Islam* | *Expats (Indonesia)* |
| African-American Conservatives | Moms of high school kids | Married | *Sunni Islam* | *Expats (India)* |
| African-American Conservatives | Moms of preschool kids | Single | *Shia Islam* | *Expats (Ghana)* |
| Indigenous peoples | New Moms | Widowed | *Hinduism* | *Expats (Japan)* |
| Being Latino | Soccer moms | Parents | *Buddhism* | *Expats (Dominican Republic)* |
| Being Indian | Stay-at-home moms | Expectant parents | *Shinto* | *Expats (Senegal)* |

31.     The content Facebook users see and do not see on their Facebook newsfeed is individualized based on their user profile that Facebook created and controls, including any affinity group, perceived affinity group, personal characteristic, or perceived personal characteristic Facebook has labeled users with, without the users' knowledge. Any user excluded from being sent the information in an advertisement based on one or more of the above affinity groups, perceived affinity groups, personal characteristics, or perceived personal characteristics protected by Civil Code sections

14

1   51 and 51.5 will thereby be denied the opportunity to see or hear ads and the information or content
2   therein that were never published, provided, or sent to the user's Facebook page.

3         32.    Facebook has publicly committed to removing "an ad from our platform if the
4   government agency responsible for enforcing discrimination laws tells us that the ad reflects illegal
5   discrimination." But no user can tell whether they are subject to illegal discrimination, because the
6   discrimination occurs with the ads Facebook users are *not* sent and therefore *do not* see or hear. As a
7   result, the problem will not be remedied unless and until Facebook and its advertisers' clandestine
8   intentional discrimination is exposed and the court orders defendants to put an end to this chronic and
9   widespread unlawful discrimination.

10        33.    Accordingly, Plaintiffs bring their claims under California Civil Code sections 51 and
11  51.5 against Facebook and its advertisers who have ever engaged in the unlawful and morally offensive
12  conduct of creating, developing, or using the Multicultural Affinity tool to exclude Facebook users
13  from being sent any ads and the information or content in those ads based on the users' sex, race, color,
14  religion, ancestry, national origin, marital status, citizenship, primary language, immigration status or
15  other personal characteristics added by the courts.

16                                          **PARTIES**

17        34.    At all times relevant hereto, Plaintiff Bert Riddick was an African-American California
18  resident and a Facebook user. He has been harmed by being prevented from hearing or seeing ads on
19  his Facebook page because Facebook's Multicultural Affinity tool prevented ads for Facebook
20  advertisers' products, accommodations, advantages, facilities, privileges, employment opportunities,
21  housing or services—including, but not limited to employment opportunities, housing, sales,
22  discounts, coupons, limited quantities, free shipping, and other special offers, and/or promotions—
23  from being sent to Mr. Riddick's Facebook page based on his personal characteristics protected by
24  Civil Code sections 51 and 51.5, or defendants' perception that Mr. Riddick bore any of these personal
25  characteristics. Mr. Riddick is an IT professional often interested in career opportunities and therefore
26  was harmed by Facebook and other advertisers not sending him ads including, but not limited to, job
27  opportunities in the IT field because of his age, which was over 55 at the time the original Complaint
28  was filed.

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

35.     At all times relevant hereto, Plaintiff Allan Candelore was a Hispanic California resident and a Facebook user. He has been harmed by being prevented from hearing, seeing, or otherwise perceiving advertisements on his Facebook page because Facebook's Multicultural Affinity tool prevented ads for Facebook advertisers' products, accommodations, advantages, facilities, privileges, employment opportunities, housing, or services—including, but not limited to employment opportunities, housing, sales, discounts, coupons, limited quantities, free shipping, and other special offers, and/or promotions—from being sent to Mr. Candelore's Facebook page based on his based on his personal characteristics protected by Civil Code sections 51 and 51.5, or defendants' perception that Mr. Candelore bore any of these personal characteristics.  Mr. Candelore is a residential property manager among other jobs, and is often interested in information about housing and therefore was harmed by Facebook and other advertisers not sending him ads including, but not limited to, ads about housing.

36.     Plaintiffs are informed and believe, and on that basis allege, that Defendant Facebook, Inc. is an American corporation, headquartered in Menlo Park, California, incorporated under the laws of the State of Delaware, registered with the California Secretary of State as a corporation with Entity Number C2711108, and with a California registered agent for service of process. Facebook owns and operates an online social networking website that allows its users to communicate with each other through the sharing of at least text, photographs, and videos. Part of Facebook's website is an Ad Platform Multicultural Affinity tool that has affirmatively induced its advertisers to express illegal preferences of Facebook users based on the users' personal characteristics or perceived personal characteristics – all of which are protected by Civil Code sections 51 and 51.5, thereby making Facebook a creator and/or developer of the information or content in the ads that are not published, not provided, and not sent to Facebook users based on the users' genuine or perceived protected personal characteristics.

37.     The true names and capacities of Does 1 through 5,000 are unknown to Plaintiffs and include advertisers who have ever used Facebook's Multicultural Affinity, Exclude People, and/or Include People tools at any time within the statutes of limitation to prevent ads and the information or content in those ads from being published, provided, or sent to Facebook users based on users' personal

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

characteristics protected by California Civil Code sections 51 and 51.5. When the Does' true names and capacities are learned, Plaintiffs will amend this complaint accordingly. Plaintiffs allege that the wrongful acts alleged herein have been committed by defendants and each of them such that each fictitiously named defendant has unequally treated or discriminated against Facebook users based on the users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status. If or when Plaintiffs learn that there are more than 5,000 Doe defendants, Plaintiffs will seek leave to amend this complaint to add more Doe defendants and substitute the true names of those additional defendants for their Doe numbers.

## JURISDICTION AND VENUE

38.   This court has subject matter jurisdiction over this matter pursuant to Article VI, section 10 of the California Constitution because this action is a cause not given by statute to other trial courts, and seeks, among other relief, a permanent injunction.  Subject matter jurisdiction is further premised on, *inter alia*, California Civil Code sections 51 and 51.5.

39.   This court has personal jurisdiction over Facebook and co-defendant advertisers who collaborated with Facebook in utilizing Facebook's Ad Platform to exclude Facebook users from being provided or sent ads based on users' personal characteristics protected by California Civil Code sections 51 and 51.5, because Facebook owns and operates a business that is headquartered in California and conducts substantial business throughout California. Furthermore, this court has personal jurisdiction over defendants because they have conducted and continue to conduct substantial business throughout California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

40.   Venue is proper in this court because Facebook's headquarters is in San Mateo County, California, the discrimination alleged herein originated in and was directed from San Mateo County, California, and the Ad Platform and its Multicultural Affinity, Exclude People, and Include People tools used for the discrimination alleged herein were created, developed, implemented, marketed, and utilized in San Mateo County, California.

17

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

**CLASS ALLEGATIONS**

41.     Plaintiffs bring this class action on their own behalf and on behalf of all other persons similarly situated, defined as follows:

> All Facebook users at any time within the three years before the original Complaint in this action was filed, and continuing through the date of trial, who were not sent an advertisement to the users' Facebook page for products, accommodations, advantages, facilities, privileges, employment opportunities, housing, or services because Facebook advertisers and Facebook used Facebook's Multicultural Affinity, Exclude People, or Include People tool to exclude Facebook users from being sent ads and the information or contact in those ads based on the users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status or other personal characteristics added by the courts to those characteristics protected by Civil Code sections 51 and 51.5 (the "Class").

42.     Not included in the Class are the following individuals and/or entities: Facebook and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Facebook has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all judges and their staff members assigned to hear any aspect of this litigation, as well as such judges' immediate family members; and Plaintiffs' counsel and anyone employed by Plaintiffs' counsel.

43.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

44.     This action has been brought and may properly be maintained pursuant to Code of Civil Procedure section 382 because:

> (a)     The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are approximately 2 billion Facebook users worldwide and approximately160 million Facebook users in the United States. The number of individuals who are members of a protected class under California Civil Code sections 51 and 51.5 and who were registered with Facebook as Facebook users within three years before the filing of the original

18

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

Complaint in this action is likely to be in tens or hundreds of millions and are readily identifiable and ascertainable through Facebook's records for Facebook users.

    (b)    Common questions of law and fact exist as to all members of the proposed Class. These questions predominate over any questions that affect only individual members of the proposed Class. These common legal and factual questions include:

        (1)    Whether defendants have created, developed, and/or utilized Facebook's Multicultural Affinity, Exclude People, or Include People advertising tools, or collaborated with each other to create and develop information and content via the Multicultural Affinity tool with respect to the sale of products, accommodations, advantages, facilities, privileges, housing, or services, and/or with respect to recruiting and/or advertising for employees which has unequally treated and discriminated against Facebook users based on the users' age, sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or other personal characteristics protected by Civil Code sections 51 or 51.5;

        (2)    Whether defendants violated the Unruh Civil Rights Act (Civil Code section 51);

        (3)    Whether defendants violated Civil Code section 51.5; and

        (4)    The amount of statutory damages mandated by Civil Code section 52 that should be levied against Defendants.

45.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs and the Class have been Facebook users during the class period. Each of the Class members was not provided or sent ads on their Facebook page as a result of the choices advertisers made through the Ad Platform and its Multicultural Affinity, Exclude People, and/or Include People tools. Defendants further used

19

1    or endeavored to use the contents of Plaintiffs' and Class members' Facebook profile information,

2    Facebook activity, other Facebook websites or apps, and data about Plaintiffs and Class members that

3    Facebook obtained from data mining firms, to generate stereotypes about Facebook users to lump

4    Plaintiffs and Class members within particular groups based on personal characteristics or perceived

5    personal characteristics that are protected by Civil Code sections 51 and 51.5. Plaintiffs and Class

6    members are entitled to statutory damages and injunctive relief as a result of the conduct complained

7    of herein. Moreover, upon information and belief, the conduct complained of herein is unlawful,

8    morally offensive, systemic, and very profitable for defendants. As a result, the representative

9    Plaintiffs, like all other Class members, face substantial risk of the same injury in the future. The

10   factual basis of defendants' conduct is common to all Class members and represents a common thread

11   of conduct resulting in injury to all members of the Class.

12        46.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.

13   They are members of the proposed Class and have no interests adverse to the interests of the Class.

14   They are champions of equal rights for everyone and are interested in and seek equal treatment for

15   everyone, no matter their sex, race, color, religion, ancestry, national origin, marital status, citizenship,

16   primary language, or immigration status. Plaintiffs have been treated unequally because of defendants'

17   conduct.  This unequal treatment of Plaintiffs provides them with a substantial stake in this action and

18   the incentive to prosecute it vigorously for themselves and for the Class.

19        47.    Plaintiffs have retained competent counsel who is experienced in prosecuting hundreds

20   of Unruh Civil Rights Act claims for the unequal treatment of consumers by businesses based on

21   consumers' personal characteristics protected by Civil Code sections 51 and 51.5, who is familiar with

22   class actions, and who intends to pursue this action vigorously. Plaintiffs' counsel represented the

23   prevailing plaintiffs/appellants at the California Supreme Court in the landmark Unruh Civil Rights

24   Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160. *Angelucci* held that African-

25   Americans, Hispanics, women, Christians, Jews, Muslims, gays, lesbians, and other groups

26   discriminated against by businesses do not have to confront a discriminating business and

27   affirmatively assert their right to equal treatment in order to have standing to file an Unruh Act claim.

28

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

48.    The Judicial Council regularly asks for Plaintiffs' counsel's advice when the Judicial Council considers amending the CACI jury instructions relating to Civil Code sections 51, 51.5, 51.6, or 52, and the Judicial Council has incorporated several of Plaintiffs' counsel's suggested amendments into its revised jury instructions for these statutes.

49.    Plaintiffs' counsel has voluntarily consulted for the State Bar of California several times to change the Bar's existing or planned discriminatory policies or practices. In 2013, Plaintiffs' counsel convinced the State Bar to amend the application requirements for the Bar Foundation's Diversity Scholarship so that now all law school students, no matter their race, color, or national origin, are eligible for the Bar Foundation's Diversity Scholarships. That same year, Plaintiffs' counsel again voluntarily consulted with the Bar and convinced the Bar, which was concerned about the mental acuity of older members, to scrap its misguided plan to require members of the State Bar of California who were 50 years of age and older, lawyers and judges alike, to (1) pass continuing education courses, (2) pass assessment tests, (3) take classes on how to wind down or pass on their law practice, and (4) undergo peer counseling, presumably from a peer who already passed the above age-based courses, tests, and classes.

50.    Plaintiffs' counsel is currently representing Plaintiff Allan Candelore for Mr. Candelore's Unruh Civil Rights Act age discrimination class action lawsuit against the popular matchmaking app Tinder for its eponymously named Tinder Plus premium service that has charged consumers 30 years of age and older twice as much as consumers under 30 - $19.99/month vs. $9.99/month – for the exact same matchmaking service. The Los Angeles County Superior Court dismissed Mr. Candelore's lawsuit in late 2015 after sustaining Tinder's demurrer by unwisely ruling that the Unruh Civil Rights Act does not protect people from age discrimination. But on January 29, 2018, in the published opinion of *Allan Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, the Court of Appeal unanimously reversed the trial court and held that the Unruh Civil Rights Act does indeed prohibit businesses from discriminating against individuals based on their age. In May of 2018, the California Supreme Court denied Tinder's Petition for Review of Mr. Candelore's victory at the Court of Appeal for victims of age discrimination

21

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

51.     Plaintiffs assert that questions of law or fact common to the Class Members predominate over any questions affecting only individual members.

52.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Most members of the Class were not even aware, and still are not aware, that they were being discriminated against because of the hidden nature of the discriminatory aspects of the Ad Platform and its Multicultural Affinity, Exclude People, and Include People tools utilized by defendants. That is, many members of the class did not know, and still do not know, that they were not being sent ads for job opportunities, products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services because the ad buyers used the Ad Platform's Multicultural Affinity, Exclude People, or Include People tool to exclude the Class members based on their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status. For example, defendants did not tell or notify Class members that they were not being sent certain ads for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services because the ad buyers had used the Ad Platform's Multicultural Affinity, Exclude People, or Include People tool to exclude users based on their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status. Therefore, absent a class action, members of the Class will not even know they have legally recognizable discrimination claims against defendants. And many, probably most, members of Class to this day still do not realize that defendants did not send them ads for sales, discounts, coupons, special offers, and other promotions because defendants determined, perceived, or guessed that the Class members were a certain disfavored sex, race, religion, etc.

53.     Even if members of the Class themselves could afford such individual litigation, the court system might not. Given the legal and factual issues involved and considering that the Class could number in the tens or hundreds of millions, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which may otherwise go unheard because of the

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

54. Defendants have acted in ways generally applicable to the Class, thereby making appropriate final and injunctive relief regarding members of the Class as a whole.

55. The names and addresses of the putative class members are available from and can be ascertained by Facebook. To the extent required by law, notice will be provided to the prospective class members easily, effectively, and efficiently via Facebook electronically sending notice to its users, or by use of techniques in a form of notice that has been used customarily in class actions, subject to court approval, such as by first-class mail.

56. Defendants' conduct as described above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

## FIRST CAUSE OF ACTION
### Violation Of The Unruh Civil Rights Act, Civil Code Section 51

57. Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

58. Defendants are "business establishments" within the meaning of the Unruh Civil Rights Act.

59. Through defendants' collaboration in creating, developing, and/or utilizing the Ad Platform's Multicultural Affinity, Exclude People, and Include People  tools, defendants have intentionally not published, not provided, and not sent ads and the information or content in those ads to Plaintiffs and members of the Class for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services based on the Plaintiffs and Class members' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status or other protected personal characteristic.

60. Facebook's Multicultural Affinity, Exclude People, and Include People tools were used by Facebook's advertisers and by Facebook to not publish, not provide, and not send ads and the information in those ads to Plaintiffs and members of the Class based on their protected personal characteristics. As a result, Plaintiffs and members of the Class have been harmed by not having an

23

1    equal opportunity to see or hear ads for products, accommodations, advantages, facilities, privileges,

2    job opportunities, housing, or services.

3          61.     By virtue of defendants' collaboration in creating, developing, and/or utilizing the

4    Multicultural Affinity, Exclude People, or Include People tools, defendants intentionally denied equal

5    accommodations, advantages, facilities, privileges, job opportunities, housing, or services to Plaintiffs

6    and members of the Class on the basis of their sex, race, color, religion, ancestry, national origin,

7    marital status, citizenship, primary language, immigration status or other protected personal

8    characteristic. This intentional unequal treatment is prohibited by the Unruh Civil Rights Act, codified

9    as Civil Code section 51.

10         62.     Facebook, through its creation, development, implementation, promotion, and

11    marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its

12    collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced

13    its advertisers to express illegal preferences of Facebook users based on the users' personal

14    characteristics or perceived personal characteristics, all of which are protected by Civil Code section

15    51. Facebook, along with its advertisers, have been responsible, in whole or in part, for the creation or

16    development of the offending content in the ads that are sent or not sent to Class members based on

17    certain protected personal characteristics. Facebook's substantial affirmative conduct in promoting its

18    advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools for unlawful

19    purposes has resulted in the unlawful discrimination of many Facebook users.

20         63.     Pursuant to Civil Code section 52, defendants are liable to Plaintiffs and the members

21    of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense,

22    and attorneys' fees that may be determined by the court in addition thereto.

23         64.     Pursuant to Civil Code section 52, injunctive relief is necessary and appropriate to

24    prevent defendants from repeating their discriminatory actions as alleged above. Plaintiffs are entitled

25    to injunctive relief on behalf of themselves and the Class.

26

27

28

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

**SECOND CAUSE OF ACTION**
**Violation Of Civil Code Section 51.5**

65.　　Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

66.　　Defendants are "business establishments" within the meaning of California Civil Code section 51.5.

67.　　Through defendants' collaboration in creating, developing, and/or utilizing the Ad Platform's Multicultural Affinity, Exclude People, and Include People  tools, defendants have intentionally not published, not provided, and not sent ads and the information or content in those ads to Plaintiffs and members of the Class for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services based on the Plaintiffs and Class members' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status.

68.　　Facebook's Multicultural Affinity, Exclude People, and Include People tools were used by Facebook's advertisers and by Facebook itself to not publish, not provide, and not send ads and the information in those ads to Plaintiffs and members of the Class based on their protected personal characteristics. As a result, Plaintiffs and members of the Class have been harmed by not having an equal opportunity to see or hear ads for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services.

69.　　By virtue of defendants' collaboration in creating, developing, and/or utilizing the Multicultural Affinity, Exclude People, or Include People tools, defendants discriminated against Plaintiffs and the Class and such discrimination is prohibited by Civil Code section 51.5.

70.　　Facebook, through its creation, development, implementation, promotion, and marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced its advertisers to express illegal preferences of Facebook users based on the users' personal characteristics or perceived personal characteristics, all of which are protected by Civil Code section 51.5. Facebook, along with its advertisers, have been responsible, in whole or in part, for the creation or development of the offending content in the ads that are sent or not sent to Class members based on

25

1    certain protected personal characteristics. Facebook's substantial affirmative conduct in promoting its

2    advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools for unlawful

3    purposes has resulted in the unlawful discrimination of many Facebook users.

4         71.    Pursuant to Civil Code section 52, defendants are liable to Plaintiffs and the members

5    of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense,

6    and attorneys' fees that may be determined by the court in addition thereto.

7         72.    Pursuant to Civil Code section 52, injunctive relief is necessary and appropriate to

8    prevent defendants from repeating their discriminatory actions as alleged above.  Plaintiffs are entitled

9    to injunctive relief on behalf of themselves and the Class.

10                              **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiffs pray for the following relief:

12        1.     For an order certifying the proposed Class under California Code of Civil Procedure

13   section 382, appointing Plaintiffs and their counsel to represent the Class, and directing Defendants to

14   provide reasonable notice of this action to the Class;

15        2.     For an order providing equitable and injunctive relief permanently enjoining

16   Defendants from engaging in unequal treatment of Facebook users in violation of Civil Code sections

17   51 and 51.5, specifically permanently enjoining defendants from employing or utilizing Facebook's

18   Multicultural Affinity tool in such a way that defendants illegally unequally treat or discriminate

19   against Facebook users based on any of the personal characteristics protected by California Civil Code

20   sections 51 and 51.5.

21        3.     For an order requiring defendants and their officers, management, employees, and

22   independent contractors to undergo sensitivity, diversity, and sex discrimination training;

23        4.     For statutory damages mandated by and pursuant to Civil Code section 52 for each and

24   every offense committed by defendants against Plaintiffs and each member of the Class;

25        5.     For an award of reasonable attorneys' fees pursuant to Civil Code section 52 and Code

26   of Civil Procedure section 1021.5, and an award of litigation costs reasonably incurred; and

27        6.     For such other and further legal and equitable relief as this court may deem proper.

28

26

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

Dated: July 11, 2018

RAVA LAW FIRM

By: _____
ALFRED G. RAVA
Attorney for Plaintiffs and the Putative Class

27

Second Amended Class Action Complaint for Statutory Damages and Injunctive Relief

# Exhibit 1

 **Facebook Careers**
Sponsored · 🌐



Wonder what it's like to work on the Facebook recruiting team? Meet a few of our recruiting leaders and learn about our work, culture, and opportunities. We're hiring!

**#FacebookLife #FBRecruiting #Careers #JoinUs**



**Inside Facebook Recruiting: It All Starts Here**
Facebook's mission is to bring the world closer together....
facebook.com

 2.1k                    192 Comments · 145 Shares

 Like          💬 Comment           Share



One reason you're seeing this ad is that
Facebook Careers wants to reach **people who may be similar to their customers**. Learn more.

There may be other reasons you're seeing this ad, including that Facebook Careers wants to reach **people ages 21 to 55 who live or were recently in the United States**. This is information based on your Facebook profile and where you've connected to the internet.

**PROOF OF SERVICE**

I, the undersigned, declare that I am over the age of 18 years and not a party to San Mateo County Superior Court Case Number Case No. 16-CIV-02526. I am a resident of and employed in the County of San Diego, State of California, and my business address is 3667 Voltaire Street, San Diego, California 92106.

On July 11, 2018, I served the Second Amended Complaint by placing this documents in a sealed envelope and depositing the envelope with United States Postal Service for delivery to the following address:

Rosemarie T. Ring, Esq.
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105
Attorney for Facebook, Inc.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Alfred G. Rava