UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL FAIR HOUSING ALLIANCE; FAIR
HOUSING JUSTICE CENTER, INC.; HOUSING
OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.; FAIR HOUSING
COUNCIL OF GREATER SAN ANTONIO,

                     Plaintiffs,

    v.

 FACEBOOK, INC.,

                     Defendant.

No. 1:18-cv-02689

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO
TRANSFER VENUE OR ALTERNATIVELY TO DISMISS PLAINTIFFS' FIRST
AMENDED COMPLAINT**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ..................................................................................iii-viii

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL BACKGROUND..................................................................................2

ARGUMENT .........................................................................................................4

    I.      PLAINTIFFS STATE VIABLE CLAIMS UNDER THE FHA AND NYCHRL ..4

          A.      Plaintiffs State Multiple Claims under the FHA.........................................4

          B.      Plaintiffs State a Claim Under the NYCHRL ..............................................7

    II.     THE COMMUNICATIONS DECENCY ACT DOES NOT SHIELD FACEBOOK FROM PLAINTIFFS' CLAIMS OF DISCRIMINATION...............9

          A.      Plaintiffs' Claims are Not Based on Information Provided by a Third Party .........................................................................................9

                1.      Facebook Creates or Develops the Unlawful Challenged Content10

                2.      Facebook's Pre-Populated List is Not a Neutral Tool ..................12

                3.      Facebook's Authorities are Inapposite..........................................14

          B.      Plaintiffs Do Not Seek to Hold Facebook Liable as the "Publisher or Speaker" of Information Provided by Third-Parties. ................................15

                1.      Facebook's Liability is Premised on its Design of Discriminatory Content .........................................................................................15

                2.      Facebook Uses the Data of its Customers Without Their Consent ........................................................................................16

    III.    PLAINTIFFS HAVE ORGANIZATIONAL STANDING ...................................18

    IV.    THIS CASE SHOULD REMAIN IN THIS DISTRICT .......................................20

          A.      No Forum Selection Clause Governs this Dispute ...................................20

                1.      Legal Standard ...........................................................................21

                  2.      Plaintiffs' Claims Do Not Arise out of or Relate to the Terms of the User Agreement .................................................................22

| | | 3. | Plaintiffs' Claims Do Not Arise Out of Or Relate to "Facebook" or the "Facebook Products" | 23 |
|---|---|---|---|---|
| | B. | | Applying the Forum-Selection Clause Contravenes New York Public Policy | 25 |
| | C. | | The First-Filed Rule Does Not Apply | 27 |
| | | 1. | This Case, *Mobley*, and *Riddick* Are Not Competing Lawsuits | 27 |
| | | 2. | Judicial Efficiency Does Not Warrant Transfer | 28 |
| | | 3. | The Balance of Convenience Favors Plaintiffs | 29 |
| V. | | | THE COURT HAS PERSONAL JURISDICTION OVER FACEBOOK | 30 |
| | A. | | CPLR § 302 Provides Personal Jurisdiction Over Facebook | 30 |
| | B. | | Due Process is Satisfied | 33 |
| | C. | | Pendant Personal Jurisdiction | 35 |
| CONCLUSION | | | | 35 |
| CERTIFICATE OF COMPLIANCE | | | | 37 |

# TABLE OF AUTHORITIES

**PAGE NO(s)**:

**CASES**:

*AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.*,
    326 F. Supp. 2d 525 (S.D.N.Y. 2004) ................................................................. 29

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*,
    474 F. Supp. 2d 474 (S.D.N.Y. 2007) ........................................................... 28, 30

*Ark. ACORN Fair Hous., Inc. v. Greystone Dev't Corp.*,
    160 F.3d 433 (8th Cir. 1998) ........................................................................... 20

*Atlantic Marine Construction Company v. United States District Court for the Western District of Texas*,
    571 U.S. 49 (2013) ......................................................................................... 26

*Bancomer, S. A. v. Superior Court*,
    44 Cal. App. 4th 1450 (1996) .................................................................. 21, 22

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002) ........................................................................ 33, 34

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) .................................................................... 15, 16

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ......................................................................... 16

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................................. 31

*Brown v. Web.com Grp., Inc.*,
    57 F. Supp. 3d 345 (S.D.N.Y. 2014) ............................................................ 31, 33

*Bumpus v. N.Y.C. Transit Auth.*,
    18 Misc. 3d 1131(A) (Sup. Ct., Kings Cty. Feb. 13, 2008) ............................. 26

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ......................................................................................... 33

*Cabrera v. Jakabovitz*,
    24 F.3d 372 (2d Cir. 1994) .............................................................................. 19

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ............................................................ 12, 13, 14, 15

*Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*,
  236 F.3d 629 (11th Cir. 2000) ..................................................................... 20

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666
  (7th Cir. 2008)............................................................................... 10, 11, 13

*Citigroup Inc. v. City Holding Co.*,
  97 F. Supp. 2d 549 (S.D.N.Y. 2000)............................................................. 30

*Cohen v. Facebook, Inc.*,
  252 F. Supp. 3d 140 (E.D.N.Y. 2017) ...................................................... 12, 22

*DeBello v. VolumeCocomo Apparel, Inc.*,
  720 Fed. Appx. 37 (2d Cir. 2017)................................................................ 26

*Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC*,
  No. 03 Civ. 9471, 2004 WL 1574645 (S.D.N.Y. July 13, 2004) ..................... 33

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
  885 F. Supp. 2d 894 (S.D. Ill. 2012)........................................................... 22

*EasyWeb Innovations, LLC v. Facebook, Inc.*,
  888 F. Supp. 2d 342 (E.D.N.Y. 2012) .............................................. 22, 29, 30

*Empl's Ins. of Wausau v. Fox Entm't Grp., Inc.*,
  522 F.3d 271 (2d Cir. 2008)........................................................................ 29

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................. passim

*Farrugia v. N. Shore Univ. Hosp.*,
  13 Misc. 3d 740 (Sup. Ct., N.Y. Cty. 2006) ................................................ 26

*FHJC. v. Allure Rehab. Servs. LLC*,
  No. 15 Civ. 6336, 2017 WL 4297237 (E.D.N.Y. Sept. 26, 2017)................... 20

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d 785 (N.D. Cal. 2011) .................................................... 17, 18

*FTC v. Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) ......................................................... 12, 13, 14

*FTC v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)........................................................ 9, 13, 15, 18

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012).................................................... 22, 24

iv

*Guevara v. UMH Props., Inc.*,
No. 11 Civ. 2339, 2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) .................................. 6

*Hargrave v. Oki Nursery, Inc.*,
646 F.2d 716 (2d Cir. 1980)........................................................................................... 35

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982*)*........................................................................................... 5, 18

*Herrick v. Grindr, LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018)................................................................... 14, 15

*Hous. Rights Ctr. v. Snow*,
No. 05. Civ. 4644, 2007 WL 91148 (E.D. Cal. Jan. 3, 2007)........................................ 7

*Housing Opportunities Made Equal v. Cincinnati Enquirer*,
731 F. Supp. 801 (S.D. Ohio 1990) .............................................................................. 5

*Ikeda v. J. Sisters, 57, Inc.*,
No. 14. Civ. 3570, 2015 WL 4096255 (S.D.N.Y. July 6, 2015) .................................. 34

*In re Marriage of Nassimi*,
3 Cal. App. 5th 667 (2016) ......................................................................................... 24

*In re Orange, S.A.*,
818 F.3d 956 (9th Cir. 2016) ...................................................................................... 22

*J. McIntyre Machinery Ltd. v. Nicastro*,
564 U.S. 873 (2011)..................................................................................................... 34

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016).......................................................................................... 13

*Jewell v. Music Lifeboat*,
254 F. Supp. 3d 410 (E.D.N.Y. 2017) ......................................................................... 32

*Lawson v. Full Tilt Poker Ltd.*,
930 F. Supp. 2d 476 (S.D.N.Y. 2013).......................................................................... 33

*Liberty Mut. Ins. Co. v. Fairbanks Co.*,
17 F. Supp. 3d 385 (S.D.N.Y. 2014)...................................................................... 27, 29

*Licci v. Lebanese Canadian Bank*,
20 N.Y.3d 327 (2012) .................................................................................................. 32

*Lopez v. Shopify, Inc.*,
No. 16 Civ. 9761, 2017 WL 222868 (S.D.N.Y. May 23, 2017).................................... 32

*Manetti-Farrow, Inc. v. Gucci America Inc.*,
    858 F.2d 509 (9th Cir. 1988) ................................................................ 21, 23

*Martinez v. Bloomberg LP*,
    740 F.3d 211 (2d Cir. 2014)................................................................... 21, 26

*Martinez v. Optimus Props., LLC*,
    No. 16 Civ. 08598, 2017 WL 1040743 (C.D. Cal. Mar. 14, 2017) .................................. 6

*Meyer v. Holley*,
    537 U.S. 280 (2003).............................................................................. 22, 32

*Mobley, et al. v. Facebook, Inc.*
    16 Civ. 06440 (N.D. Cal.) ..................................................................... 27, 28

*Narayan v. EGL, Inc.*,
    616 F.3d 895 (9th Cir. 2010) ...................................................................... 8

*New York Times Co. v. City of New York Commission on Human Rights*,
    41 N.Y. 2d 345 (1977) ............................................................................. 8

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011)................................................................... 19, 20

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1222 (N.D. Cal. 2014) ............................................................ 17

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) .................................................................... 19, 20

*Ragin v. N.Y. Times*,
    923 F.2d 995 (2d Cir. 1991)....................................................................... 4

*Red Bull Associates v. Best Western International, Inc.*,
    686 F. Supp. 447 (S.D.N.Y. 1988).............................................................. 25, 26

*Red Bull Associates v. Best Western International, Inc.*,
    862 F.2d 963 (2d Cir. 1988).................................................................... 25

*Riddick, et al. v. Facebook, Inc., et al.*,
    18 Civ. 04529 (N.D. Cal.)...................................................................... 27, 28

*Roden v. AmerisourceBergen Corp.*,
    186 Cal. App. 4th 620 (2010) ................................................................... 24

*Royalty Network Inc. v. Dishant.com, LLC*,
    638 F. Supp. 2d 410 (S.D.N.Y. 2009)........................................................... 31, 32

*Soules v. HUD,*
    967 F. 2d 817 (2d Cir. 1992)..................................................................... 4

*State Farm Fire & Cas. Co. v. Swizz Style, Inc.,*
    246 F. Supp. 3d 880 (S.D.N.Y. 2017).......................................................... 34

*Tomka v. Seiler Corp.,*
    66 F.3d 1295 (2d Cir. 1995)........................................................................ 8

*United States v. Space Hunters,*
    No. 00 Civ. 1781, 2001 WL 968993 (S.D.N.Y. Aug. 24, 2001) ................. 7

*United States v. Space Hunters, Inc.,*
    429 F.3d 416 (2d Cir. 2005).................................................................... 4, 6

*Walden v. Fiore,*
    571 U.S. 277 (2014).................................................................................. 34

*White v. Pacifica Found.,*
    973 F. Supp. 2d 363 (S.D.N.Y. 2013)......................................................... 8

## STATUTES & REGULATIONS

24 C.F.R. § 100.70(c)(1)............................................................................... 7

24 C.F.R. § 100.75(c)(3)............................................................................... 5

24 C.F.R. § 100.80(b)(4)............................................................................... 7

28 U.S.C. § 1404(a)..................................................................................... 29

42 U.S.C. § 3602(i)(2).............................................................................. 5, 18

42 U.S.C. § 3604(a)....................................................................................... 7

42 U.S.C. § 3604(c)................................................................................ 4, 5, 6

42 U.S.C. § 3604(d)....................................................................................... 7

42 U.S.C. § 3604(f)....................................................................................... 7

42. U.S.C. § 3606.......................................................................................... 6

53 Fed. Reg. 44992 (Nov. 7, 1988).............................................................. 19

N.Y. C.P.L.R. § 302(a)(1)................................................................. 30, 32, 33

N.Y. C.P.L.R. § 302(a)(3)................................................................. 30, 32, 33

N.Y.C. Admin. Code § 8-107(6)..................................................................................... 7

**OTHER AUTHORITIES:**

Olivier Sylvain, *Intermediary Design Duties*, 50 Conn. L. Rev. 203 (2018) .............................. 15

## PRELIMINARY STATEMENT

Facebook's omnibus motion to transfer or dismiss Plaintiffs' claims fails on every point. Plaintiffs' well-pleaded allegations make out a more than plausible claim that Facebook violates the Fair Housing Act ("FHA") and New York City Human Rights Law ("NYCHRL") by offering discriminatory advertising features to housing advertisers on a platter.  In the last week alone, both the federal Departments of Justice and Housing and Urban Development ("HUD") have alleged that Facebook's same advertising practices are unlawful.

Nor will the Communications Decency Act ("CDA") shield Facebook.  Facebook itself— not third-party advertisers—created the discriminatory content.  Facebook has gathered and organized its users' data; distilled protected personal characteristics from this data; and invited advertisers to exclude users from housing opportunities based on those characteristics.  There is no lawful reason for Facebook to ask a landlord whether it would like to exclude women or families with children from viewing housing ads.  Facebook is not entitled to immunity.

Facebook's standing challenge fares no better.  Facebook ignores Second Circuit precedent that a fair housing organization's diversion of its resources to investigate unlawful practices that frustrate its mission confers organizational standing.

Facebook's motion to transfer also fails.  Plaintiffs are four nonprofit organizations with 38 full-time employees and an annual budget of just under eight million dollars *combined*. Facebook is an international corporation that earned $40 billion in revenue last year.  Ignoring these disparities, Facebook seeks to force Plaintiffs to litigate across the country based on forum-selection clauses unrelated to this case, and that frustrate the enforcement of both federal and local civil rights laws.

Facebook is subject to personal jurisdiction in New York.  Facebook contracts with New York entities who sell or rent apartments in New York to provide them access to millions of New

York Facebook users.  Facebook also commits discriminatory torts on New York residents during these transactions.

## FACTUAL BACKGROUND

Facebook earned $40 billion in revenue last year almost entirely from advertising.  First Amended Complaint ("FAC") ¶¶ 32,43.  Facebook's advertising is so valuable because it collects a remarkable amount of data about each of its over 2 billion users.  *Id.* ¶¶ 44-46.  This includes hundreds of personal attributes labeled as "demographics," "interests," and "behaviors." *Id.* ¶ 47.  While users voluntarily provide some information to Facebook (for example, age and gender), Facebook extracts most personal information without users' knowledge.  *Id.* ¶ 46. Facebook processes its users' online behavior, both on Facebook and off, and then employs algorithms to sort, analyze, and repackage that data into new categories which allow advertisers to "target the people who are right for [their] business."  *Id.* ¶¶ 47, 50-52.  Users must allow Facebook to "process" their data as a condition of registering for an account.  *Id.* ¶ 48.

Facebook then presents this data to advertisers as a pre-populated list ("Pre-Populated List") of users' demographics, interests and behaviors.  *Id.* ¶ 55.  Advertisers use this list to "include" and "exclude" audience members from viewing their advertisements.  *Id.* ¶¶ 54-62. For example, when an advertiser "excludes" "parents with toddlers," Facebook's algorithms ensure that they do not receive the advertisement.  *Id.*  When users consent for Facebook to "process" their data, they do not consent to Facebook's use of that data to exclude them from seeing housing advertisements based on their sex, family status, national origin, race, or disability (the "Protected Characteristics").  *Id.* ¶ 127.

Advertisers may also use Facebook-created "lookalike audiences."  *Id.* ¶ 63.  To use this feature, Facebook first recommends that advertisers provide it with information about their current customers.  *Id.*  Facebook will then "hash [the customer's]'s data" and "create [a new]

audience" that Facebook believes shares similar attributes with the advertiser's audience.  In doing so, Facebook takes into account audience members' Protected Characteristics.

In response to public reports of Facebook's discriminatory advertising, *id.* ¶¶ 71-76, 81-82, Plaintiff National Fair Housing Alliance ("NFHA") and three of its members, Plaintiffs Fair Housing Justice Center ("FHJC"), Housing Opportunities for Project Excellence, and Fair Housing Council of Greater San Antonio, investigated these allegations.  Plaintiffs are non-profit organizations with the missions of ensuring equal access to housing.

Plaintiffs' employees used personal Facebook accounts to purchase ads on Facebook for fictitious apartments for rent from November 2017 to February 2018.  Using Facebook's Pre-Populated List, each fictitious advertiser selected checkboxes to exclude potential audience members based on their Protected Characteristics.  *Id.* ¶¶ 87-112.  Each ad targeted either the New York City, Washington, D.C., Miami, or San Antonio housing market.  *Id.*  Although Facebook at some point during this time eliminated race and national origin exclusions, it "grandfathered" in these exclusions, allowing existing ads to still use them.  *Id.* ¶ 125.  Throughout Plaintiffs' investigations, Facebook's Pre-Populated List offered inclusion and exclusion categories based on gender and family status.  *Id.* ¶ 86.

Facebook also presented advertisers with checkboxes to exclude viewers based on "interests" that are proxies for Protected Characteristics, such as "disabled American veteran" or "English as a second language."  *Id.*  Facebook provided "suggested" audiences for the fictitious ads, which included discriminatory exclusions based on Protected Characteristics.  *Id.*

Plaintiffs purchased over 40 housing ads on Facebook in which they selected these discriminatory pre-set inclusions and exclusions from the Pre-Populated List.  *Id.* ¶¶ 87-112, 122.  Facebook approved these ads across all four housing markets.  *Id.*  Facebook provided real-time

estimates that each ad would reach anywhere from a few thousand to a few million people.  *Id.*
Plaintiffs removed each ad from Facebook as soon as it was approved.  *Id.* ¶¶ 87-112.

Plaintiffs seek to enjoin Facebook's ongoing discrimination, which violates both the
federal FHA and local NYCHRL.

## ARGUMENT

## I.    PLAINTIFFS STATE VIABLE CLAIMS UNDER THE FHA AND NYCHRL

### A.    Plaintiffs State Multiple Claims under the FHA

Plaintiffs allege sufficient facts to state several claims under the FHA.  Facebook's
motion to dismiss is erroneously premised on the idea that advertising is only unlawful if the
content of the ad itself is discriminatory.  Facebook argues that it is lawful to discriminate when
selecting the audience for an advertisement, so long as the ad's content itself is not
discriminatory.  The FHA is not so narrow, and Facebook's theory should be rejected.

First, Plaintiffs allege that Facebook violates 42 U.S.C. § 3604(c), which applies to any
entity that "publish[es], *or cause[s] to be . . . published* any . . . advertisement, with respect to
the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based
on [Protected Characteristics]" (emphasis added).  The Second Circuit has interpreted § 3604(c)
broadly to apply not only to facially discriminatory advertisements, but to advertising practices
that target consumer groups based on, among other things, Protected Characteristics.  *Ragin v.
N.Y. Times*, 923 F.2d 995, 1000-1002 (2d Cir. 1991).  The test as to whether an advertising
practice violates § 3604(c) is holistic, and evidence of the context of the ad may be considered.
*Soules v. HUD,* 967 F. 2d 817, 824-826 (2d Cir. 1992); *United States v. Space Hunters, Inc.*, 429
F.3d 416, 424 (2d Cir. 2005).

HUD's implementing regulations confirm that § 3604(c) prohibits advertising housing in
a manner that "den[ies] particular segments of the housing market information about housing

4

opportunities" based on Protected Characteristics.  24 C.F.R. § 100.75(c)(3).  Plaintiffs'

allegations that Facebook provides housing advertisers with a Pre-Populated List to exclude

based on users' Protected Characteristics and then, once those selections are made, uses its own

algorithms to deliver the ad to the discriminatorily selected audience, are more than sufficient to

state a claim.  FAC ¶¶ 54-63, 87-112.

Facebook wrongly contends that Plaintiffs' § 3604(c) claim fails because Plaintiffs do not

allege they viewed discriminatory advertisements on Facebook.  The FHA defines an "aggrieved

person" as one who has been injured by a discriminatory housing practice or will be injured by

one "that is about to occur."  42 U.S.C. § 3602(i)(2).  Even though Plaintiffs did not publish any

advertisements for distribution by Facebook, they allege that discrimination did occur—and was

about to occur—when Facebook accepted Plaintiffs' fictitious advertisements for publication

using Facebook's discriminatory targeting classifications.  FAC ¶¶ 87-113.  These types of

testing investigations are precisely how housing discrimination is uncovered.  *See Havens Realty

Corp. v. Coleman*, 455 U.S. 363, 373 (1982*)*.

Facebook misdirects the Court by claiming the Sixth Circuit has refused to hold

publishers liable for discriminatory advertisements.  Defs.' Br. 26.  In fact, *Housing

Opportunities Made Equal v. Cincinnati Enquirer*, 731 F. Supp. 801 (S.D. Ohio 1990), *aff'd*, 943

F.2d 644 (6th Cir. 1991), underscores that § 3604(c) does apply to Facebook.  It explains that

publishers may be liable when they publish advertisements that communicate an obvious

discriminatory preference *or* when the advertisements are rendered discriminatory through

extrinsic circumstances.  731 F. Supp. at 803-05.  Plaintiffs have alleged "extrinsic evidence" of

discrimination in the form of Facebook's targeting categories and algorithms that exclude home seekers based on Protected Characteristics. *Id.*; FAC ¶¶ 54-63; 87-112.[1]

Second, Plaintiffs allege that Facebook violates 42 U.S.C. § 3606, which makes it "unlawful to deny any person access to . . . or participation in any multiple-listing service, real estate brokers' organization *or other* service . . . *relating to the business of selling or renting dwellings . . .* on account of [Protected Characteristics]." (emphasis added). Facebook (1) operates a fee-based service for housing advertisers to place rental and sales advertisements, and (2) excludes certain potential tenants access to that information based on Protected Characteristics. FAC ¶¶ 151-56. Facebook is a service "relating to the business of selling or renting dwellings" within the meaning of § 3606.

Facebook's claim that it is not covered by § 3606 ignores binding Second Circuit precedent. In *United States v. Space Hunters*, 429 F. 3d 416 (2d Cir. 2005), the court upheld a jury verdict finding a vendor who collected information from landlords about available apartments and sold it to prospective tenants had violated § 3606 when it refused to provide information to certain tenants based on their race or disability. *Id.* at 428-29. The Court affirmed that § 3606 is not limited to multiple listing services but covers other services that

---

[1] Facebook's cited cases undermine its position that § 3604(c) permits discriminatory targeting. Defs.' Br. 28-29 (citing *Martinez v. Optimus Props., LLC*, No. 16 Civ. 08598, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) and *Guevara v. UMH Props., Inc.*, No. 11 Civ. 2339, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014)). Since these discriminatory targeting cases were brought against only the advertiser, not the platform that published the ads, the court never addressed the non-party platform's potential liability.

provide tenants with information about apartments available for rent.  *United States v. Space Hunters*, No. 00 Civ. 1781, 2001 WL 968993, *5 (S.D.N.Y. Aug. 24, 2001) *aff'd*, 429 F. 3d. at 421, 429.  Facebook's advertising services provide exactly this function.

Third, Plaintiffs allege that Facebook's advertising services target and deny consumers access to housing information based on Protected Characteristics in violation of 42 U.S.C. § 3604(a), (d), and (f).

With respect to § 3604(d), HUD's implementing regulations are on point.  They explain that the statute bans "limiting information, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of [Protected Characteristics]."  24 C.F.R. § 100.80(b)(4).  This is exactly what Facebook's ad platform does.  Facebook limits information regarding dwellings to potential home seekers based on Protected Characteristics when it solicits advertisers to exclude home seekers from seeing housing ads and then uses its algorithms to prevent the selected persons from seeing the ads.  FAC ¶¶ 54-63, 87-112.  Facebook makes no real effort to explain why §3604(d) does not apply to it.  Defs.' Br. 25-26.

For § 3604(a) and (f), Facebook's exclusion of certain groups from seeing ads unquestionably "make[s]" that housing "unavailable" to those groups.  *Hous. Rights Ctr. v. Snow*, No. 05. Civ. 4644, 2007 WL 91148, at *2 (E.D. Cal. Jan. 3, 2007) (steering families with children away from particular units violates § 3604(a)); 24 C.F.R. § 100.70(c)(1) (unlawful to "discourage[e] any person" from renting housing based on Protected Characteristics).

## B.      Plaintiffs State a Claim Under the NYCHRL

Plaintiffs also state a claim under the NYCHRL.  While direct liability under the NYCHRL is limited to advertisers, the statute bans the "aiding" or "abetting" of "any of the acts forbidden" under the chapter.  N.Y.C. Admin. Code § 8-107(6).  In the context of an analogous

state law, the Second Circuit has held that this same provision applies to "a defendant who actually participates in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013) (same standard applied to claims under analogous state law and NYCHRL).

Plaintiffs allege that Facebook "actually participated" in the wrongdoing, describing each step Facebook undertakes in the process of distributing housing advertisements in a discriminatory manner.[2] FAC ¶¶ 47, 50-63, 71-73, 86.

Plaintiffs did not forfeit their right to assert a NYCHRL claim when they initiated their Facebook accounts and signed a user agreement containing a California choice-of-law clause. Defs.' Br. 29. Under California law (which applies to the interpretation of that contract), a choice-of-law clause displaces the protections of other states' laws when "the claims [] arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract." *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). Plaintiffs' claims under New York City law are unrelated to the contracts they signed when they opened organizational Facebook accounts many years before the at-issue investigations, and the choice-of-law clauses

---

[2] While Facebook relies on *New York Times Co. v. City of New York Commission on Human Rights*, 41 N.Y. 2d 345 (1977), aiding and abetting liability did not apply to the New York Times because the court found no underlying violation to "aid and abet," not because of a *per se* rule that publishers of ads are exempt. *Id.* at 351.

8

in those agreements cannot obliterate valid claims under the NYCHRL.   *See* Part IV.A.1-3, *infra*.

## II.   THE COMMUNICATIONS DECENCY ACT DOES NOT SHIELD FACEBOOK FROM PLAINTIFFS' CLAIMS OF DISCRIMINATION

Facebook's attempt to invoke Section 230 of the CDA to avoid liability for its unlawful discrimination suffers from two fatal errors.  First, Facebook ignores that Plaintiffs challenge the content *that Facebook itself provides* to housing advertisers on its website, not the content of any housing ad placed by an advertiser.  Second, Facebook paints its ad platform as a "neutral tool" used by advertisers across all industries to target the customers who will be most interested in their products.  But Facebook's position is a strawman.  Plaintiffs allege that Facebook's conduct is unlawful *in the context of housing advertisements* where Protected Characteristics may never be considered to decide who receives an advertisement.

CDA immunity applies where the Defendant "(1) is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information."  *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (citation omitted).  Neither of the latter two requirements are satisfied.

### A.   Plaintiffs' Claims are Not Based on Information Provided by a Third Party

Although Facebook is an interactive service provider, CDA immunity does not apply if Facebook also acts as "information content provider"—i.e. "[a] person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service."  *Id.* at 174 (citation omitted).  Immunity is unavailable if the Defendant "assisted in the development of what made the content unlawful." *Id.*

1.      Facebook Creates or Develops the Unlawful Challenged Content

As the Government set forth in its statement of interest, ECF No. 48, Facebook does not merely publish unlawful third-party content.  Instead, Facebook's acts are most akin to cases where a website "develops" unlawful content.

In *Chicago Lawyers' Committee for Civil Rights Under Law, Inc*. *v*. *Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008), the Seventh Circuit held that Craigslist was entitled to immunity when users posting advertisements for apartments used a Craigslist-provided blank box to write "no minorities."  *Id.* at 668.  Because Craigslist did nothing more than provide a blank form for any user to write anything, Craigslist did not develop the unlawful content.

In *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc), the Ninth Circuit addressed a website with features far more like Facebook and denied CDA immunity.  In *Roomates.com*, the website was designed to match persons renting out spare rooms with those seeking rooms to rent.  *Id.* at 1161.  To participate, a user seeking to rent a room was required to disclose her gender, sexual orientation, and whether she had children.  *Id.*  Likewise, potential roommates were required to provide their preferences for those same criteria.  If the proposed renter and the roommate's preferences did not line up, their postings would not be displayed to one another.  *Id.* at 1165.

Plaintiffs sued under the FHA, and the court held that the website was not entitled to immunity.  Although a third-party—the renter—made the discriminating selections, Roomates.com had "designed [a] system so it would steer users based on the preferences and personal characteristics that Roommates itself forces subscribers to disclose."  *Id.* at 1167.  The Court explained that "[w]hen a business enterprise extracts such information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is

10

responsible, at least in part, for developing that information." *Id.* at 1166.  Because Roomates.com had "extracted" users' Protected Characteristics and then used it to "design[] its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children," it had "developed" the unlawful content.  *Id.* at 1166, 1169.

Facebook analogizes this case to *Craigslist* by arguing that the content of discriminatory housing ads is "the only relevant 'content' at issue in this case."  Defs.' Br. 20.  But, unlike *Craigslist*, Plaintiffs do not challenge the content of the housing ads created by third parties and posted on Facebook.  Instead, just like in *Roomates.com*, Plaintiffs allege that Facebook has "designed its [] system" in a manner that promotes discrimination "based on the preferences and personal characteristics that [Facebook] itself forces subscribers to disclose."  521 F.3d at 1167.

Plaintiffs allege that Facebook requires users to allow Facebook to "process" their data.  FAC ¶ 48.  Facebook then analyzes its users' behavior; breaks users up into new categories based on their Facebook-generated demographics, behaviors, and interests; organizes this information into a Pre-Populated List; and, at the point of sale, invites housing advertisers to scroll through the list and "include" or "exclude" audience members based on Protected Characteristics.  *Id.* ¶¶ 50-53, 55, 71-73, 86.  Once an advertiser makes its discriminatory selection, Facebook's algorithms exclude those groups from receiving the ads.  *Id.* ¶¶ 54-63.

It is this system—Facebook's collection, organization, and packaging of users' information including users' Protected Characteristics—and its sale of this package to housing advertisers, that Plaintiffs challenge.  To claim that Plaintiffs seek to hold Facebook liable for content "created solely by [advertisers]," and that Facebook "has not helped in the least to

develop" what makes these targeted ads unlawful, would "strain[] both credulity and English." *Roomates.com*, 521 F.3d at 1166.[3]

> ### 2. Facebook's Pre-Populated List is Not a Neutral Tool

Facebook next argues that even if it creates or develops the Pre-Populated List, it is entitled to CDA immunity because the list is simply a "neutral tool." Defs.' Br. 21-23. When evaluating whether a defendant is entitled to immunity for a feature it created, courts distinguish between "neutral tools" that may be used in both lawful and unlawful ways by third-parties, and website features or behavior that are "inherently unlawful" in and of themselves. *Roommates.com,* 521 F.3d at 1169; *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009).

Two cases from the Ninth Circuit, *Roomates.com* and *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), are instructive. In *Carafano*, a dating website required its users to answer a series of multiple-choice questions with preset answers, some of which contained sexually suggestive answers. 339 F.3d at 1121. A user created a page pretending to be a

---

[3] The cases against Facebook that have been dismissed on CDA grounds, Defs.' Br. 18, arose in distinct contexts that have nothing to do with advertising. In these cases, third-party Facebook users created illegal content on their personal social media pages, and Facebook served only as a neutral forum to amplify their unlawful message. For example, many of these cases address claims that Facebook failed to police the accounts of potential terrorists or connected them to one another through algorithms that identify persons with mutual contacts or who view similar content on Facebook. *See, e.g.*, *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 158 (E.D.N.Y. 2017).

celebrity and selected many of the preset suggestive answers.  *Id.*  The celebrity sued the

website, and the Court held it was immune under the CDA.  *Id.* at 1124.  While the website had

created the suggestive preset answers, neither the questions nor the answers were inherently

unlawful.  It was only the third-party's use of the tool—to impersonate another person—that

created a cause of action.  This reasoning has been followed when a website provides a product

that is lawful in and of itself, and only becomes illegal through a third-party's use of it.  *See Jane

Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016); *Craigslist,* 519 F.3d at 668.

In *Roomates.com*, the Ninth Circuit distinguished *Carafano* and held that the website was

not immune.  521 F.3d at 1164, 1171.  The Court emphasized that if "a real estate broker may

not inquire as to the race of a prospective buyer . . .  when posed face-to-face or by telephone"

the same questions "don't magically become lawful when asked electronically online."  *Id.*

Other courts have followed suit, declining to apply CDA immunity when the challenged

behavior is not "neutral" but is itself illegal.  *See LeadClick Media, LLC*, 838 F.3d at 176

(website not immune for fake news sites posted on its platform by third parties because its "role

in managing the [third party's illegal behavior] far exceeded that of neutral assistance");

*Accusearch Inc.*, 570 F.3d at 1200-01 (website did not provide a "neutral tool" but  "contributed

mightily to the unlawful conduct").

Facebook's Pre-Populated List's use of Protected Characteristics for housing ads serves

no lawful purpose.  As explained above in Part I, *infra*, the FHA prohibits the targeting of

housing ads based on Protected Characteristics.  By creating and providing the Pre-Populated

List, Facebook asks landlords and real estate agents, "Would you like us to refuse to show this

apartment to families with children? To Women? To African-Americans?"   These questions are

unquestionably "unlawful when posed face-to-face or by telephone" and do not "magically

13

become lawful when asked electronically online." *Roomates.com*, 521 F.3d at 1164; *see also id.* at 1166 ("The FHA makes it unlawful to ask certain discriminatory questions for a very good reason: Unlawful questions solicit (a.k.a. 'develop') unlawful answers."). In the case of "lookalike" or "suggested" audiences, the advertiser delegates the unlawful targeting to Facebook. FAC ¶¶ 63, 86.[4]

Facebook "does not merely provide a framework that could be utilized for proper or improper purposes," but "both elicits the allegedly illegal content and makes aggressive use of it in conducting its business"—conduct that is not protected by the CDA. *Roomates.com*, 521 F.3d at 1172.

3.     Facebook's Authorities are Inapposite

Facebook attempts to wedge this suit into the *Carafano* line of cases by arguing that Plaintiffs challenge the Pre-Populated List in all contexts, such as targeting women for women's clothing or parents for back-to-school sales. Defs.' Br. 1. Plaintiffs do not challenge the Pre-Populated List as it operates in these "neutral" contexts. However, in the sale and rental of housing, the FHA and NYCHRL ban such conduct, and the Pre-Populated List's inclusion of Protected Characteristics is "inherently unlawful." *Accusearch Inc.*, 570 F.3d at 1199-1200.

Facebook's reliance on *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579 (S.D.N.Y. 2018), is misplaced. *Herrick* involved a neutral tool, a dating website's service that allowed users to share

---

[4] Facebook's invocation of its anti-discrimination "policies" rings hollow. Declaration of Rosemarie Ring ("Ring Decl."), ECF No. 42-3, Ex. B. Facebook is not protected under the CDA so long as it asks housing advertisers whether they would like to discriminate based on Protected Characteristics. FAC ¶¶ 84-133.

their locations which, when misused by an impersonator, allowed persistent harassment. *Id.* at 585. These facts are analogous to *Carafano*, where a facially lawful feature was misused by a third party. Defs.' Br. 22. *Herrick* supports Plaintiffs' position, as CDA immunity applied because the dropdown menu of questions was not "intrinsically offensive or unlawful." *Herrick*, 306 F. Supp. 3d at 589. Unlike in *Herrick*, Facebook asks advertisers the "intrinsically unlawful" question of whether they would like to prevent certain groups from receiving housing ads.

**B.    Plaintiffs Do Not Seek to Hold Facebook Liable as the "Publisher or Speaker" of Information Provided by Third-Parties.**

Facebook is not entitled to CDA immunity as the "publisher or speaker" of third-party content, and Plaintiffs do not allege Facebook acts in this manner. *LeadClick Media,* 838 F.3d at 173.

**1.    Facebook's Liability is Premised on its Design of Discriminatory Content**

While Plaintiffs assert FHA violations based on Facebook's "causing" ads with discriminatory preferences "to be published," Facebook is not a publisher for purposes of CDA immunity. A traditional "publisher" is a website that "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Facebook's conduct goes far beyond this "reviewing" and "editing."

Facebook's system is not one where information simply "flow[s] untouched through providers' servers, from user to user." Olivier Sylvain, *Intermediary Design Duties*, 50 Conn. L. Rev. 203, 271 (2018). Rather, Facebook is "involved in a two-sided business: one that collects user information by dint of [its] ostensible role as a conduit of communication and another that markets user data to advertising networks and data brokers." *Id.* Unlike even the platform at

15

issue in *Roomates.com*, Facebook is not just passing information from buyers to sellers.  It is selling information on users' Protected Characteristics.  Facebook is a party to the transaction where the discrimination occurs.

Facebook's examples of traditional "publishing" only illustrate this point.  When a women's clothing company chooses to run an ad in Vogue, Defs.' Br. 1, Vogue does not analyze its subscription base to mine for Protected Characteristics and ask the advertiser if it wants to exclude these groups.  Further, while the example assumes that Vogue is more popular among women, men are not barred from reading it.  Facebook's ad platform, in contrast, prevents persons from ever seeing posted housing advertisements because of their Protected Characteristics.  FAC ¶¶ 54-63, 84-86.  Selling a carefully crafted custom audience to advertisers who want to discriminate goes far beyond "review[ing] material[s] submitted for publication," and "editing for style or technical fluency."  *Barnes*, 570 F.3d at 1102.

Facebook's invocation of *Roomates.com* on this point, Defs.' Br. 25, is also inapposite. The Court noted that a "housing website that allows users to specify whether they will or will not receive emails by means of *user-defined* criteria" would be a protected publisher.  521 F.3d at 1169.  The unlawful criteria here are not "user-defined." Facebook creates them through a process of mining and analyzing data for discriminatory use.  FAC ¶¶ 43-63.

       2.      <u>Facebook Uses the Data of its Customers Without Their Consent</u>

Even when an interactive computer service publishes third-party content, it is only entitled to "publisher" immunity under the CDA when the "third person or entity that created or developed the information in question furnished it to the provider . . . under circumstances in which a reasonable person. . .  would conclude that the information was provided for publication on the Internet."  *Batzel v. Smith*, 333 F.3d 1018, 1034 (9th Cir. 2003).

The Pre-Populated List also is not "third-party content" merely published by Facebook via its targeting tools.  Defs.' Br. 20. n.9.  It is Facebook's creation, of which Facebook users are not aware.

Courts have declined to grant immunity when a third-party did not consent for the information to be published, and also when it was published in a form that the user could not have expected.  *See Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011) (denying Facebook CDA immunity when a Facebook user clicked the "like" button on Rosetta Stone's Facebook page, and then found her name and likeness in related Facebook advertisement); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1246–49 (N.D. Cal. 2014) (denying LinkedIn immunity when it harvested email addresses from user's contacts and sent emails on user's behalf soliciting contacts to sign up).  While users consent to Facebook's "process[ing]" their data as a condition of using the site, a reasonable person would not conclude that she was consenting to her own exclusion from receiving housing ads based on Protected Characteristics.  FAC ¶¶ 48, 127.  Just as in *Fraley*, Plaintiffs "do not allege merely that Facebook edit[ed] user-created content—such as by correcting spelling, removing obscenity or trimming for length," but that Facebook "transformed the character" of their online behavior for

commercial purposes to which users have not consented.  *Fraley,* 830 F. Supp. 2d at 802-03 (citation omitted); FAC ¶ 127.[5]

Facebook's attempted analogy to cases granting immunity to Yelp and eBay for their "star rating" systems falls flat.  Defs.' Br. 20 n.9.  Users go on Yelp or eBay and knowingly give ratings in accordance with the metrics those websites offer (i.e. a Yelp user knows that he is giving a restaurant "3 stars").  Yelp and eBay then present that rating in the same format that the user gave it.  Facebook's behavior, where a woman can read an article on parenting and then, unbeknownst to her, be denied access to housing ads because she is a mother, is not analogous.

## III.   PLAINTIFFS HAVE ORGANIZATIONAL STANDING

Plaintiffs have standing to challenge Facebook's advertising policies based on their diversion of resources to investigate Facebook's discriminatory practices and Facebook's frustration of their mission through its illegal practices.  *See* FAC ¶¶ 24-31, 134-45.  The Supreme Court held in 1982 that fair housing organizations such as Plaintiffs have standing to sue under the FHA.  *Havens Realty Corp.*, 455 U.S. at 378-79.  Affirming this well-established rule, HUD states that the term "aggrieved person" in Section 3602(i) of the FHA "includes a fair

---

[5] While Plaintiffs believe CDA immunity is inapplicable on the face of the complaint, the issue should be resolved after discovery if the Court has any doubt.  Facebook's affirmative defense turns in part on fact-intensive questions regarding what Facebook does with information it "processes" from third parties.  Plaintiffs are at least entitled to discovery before that defense is credited.  *See, e.g.*, *LeadClick Media,* 838 F.3d at 167.

housing organization . . . who seeks information about the availability of dwellings to determine whether discriminatory housing practices are occurring."  53 Fed. Reg. 44992 (Nov. 7, 1988).

While an organization must plead an "injury in fact" just like a natural person would, the Second Circuit recognizes that "only a 'perceptible impairment' of an organization's activities is necessary."  *Nnebe v. Daus,* 644 F.3d 147, 157 (2d Cir. 2011) (citing *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)).  This standard is satisfied where, as here, an organization spends resources investigating illegal practices that frustrate its mission and takes steps to combat those practices.

In *Ragin*, the Second Circuit found that a similar housing organization to FHJC, the Open Housing Center ("OHC"), had organizational standing based on staff time spent identifying and investigating defendants, attending a conciliation conference, and filing a lawsuit to remedy the unlawful housing advertising practices.  *See also Cabrera v. Jakabovitz*, 24 F.3d 372, 379 (2d Cir. 1994) (affirming OHC's standing, again in part based on OHC's testing investigation).

Facebook wrongly claims that organizational standing only exists when an organization diverts its resources in response to a complaint by a third party who suffered discrimination. Defs.' Br. 16.  An investigation of illegal housing practices confers standing, regardless of whether the testing was in response to a third party's complaint or initiated at the organization's

own behest.  *See, e.g.*, *FHJC. v. Allure Rehab. Servs. LLC*, No. 15 Civ. 6336, 2017 WL 4297237, at *2 (E.D.N.Y. Sept. 26, 2017).[6]

 Lastly, Facebook argues that Plaintiffs lack standing because their claims are based on the decisions of third-party advertisers, and Facebook's behavior has no "determinative or coercive effect" on those decisions.  Defs.' Br. 16.  This misstates Plaintiffs' claims, which are not based on the conduct of advertisers, but on Facebook's own advertising platform.

## IV. THIS CASE SHOULD REMAIN IN THIS DISTRICT

### A. No Forum Selection Clause Governs this Dispute

 Facebook argues that because each Plaintiff maintains an organizational Facebook account, they are each bound by the Northern District of California forum-selection clauses contained in the user agreement related to that Facebook account.  Defs.' Br. 7.  But Plaintiffs' discrimination claims do not derive from, and in fact have no relationship to, those user agreements. That clause does not apply to this dispute.

---

[6] Facebook's citations to caselaw from other Circuits either apply a different standard or support Plaintiffs' position.  *See Nnebe*, 644 F.3d at 157 (recognizing Third and D.C. Circuits' disagreement with *Ragin*, and reaffirming *Ragin*'s validity); *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000) (rejecting argument that exposing discrimination through an investigation was the equivalent of "creating your own injury");  *Ark. ACORN Fair Hous., Inc. v. Greystone Dev't Corp.*, 160 F.3d 433, 434 (8th Cir. 1998) ("monitoring and investigation" of a specific defendant's unlawful practices would be sufficient to confer standing).

1.      Legal Standard

Each user who signs up for Facebook must agree to a statement of rights and responsibilities ("SRR").  This statement contains a forum-selection clause.  *See* Declaration of Michael Duffy ("Duffy Decl."), ECF No. 43.  The wording of the clause has changed over time, and Plaintiffs have signed differing versions of it.  Duffy Decl. ¶¶ 15-22.  The current version provides that "any claim, cause of action, or dispute" the user has that "arises out of or relates to these Terms or the Facebook Products" must be "resolved exclusively in [the Northern District of California]."  Ring Decl. Ex. C, at 6-7.  The SRR also provides that California law will govern any claim.  *Id.*

When evaluating a motion to transfer based on a forum selection clause, courts ask, among other things, "whether the claims and parties involved in the suit are subject to the forum selection clause."  *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (citation omitted).  In answering this "interpretive" question, courts "apply the body of law selected in an otherwise valid choice-of-law clause."  *Id.* at 217-18.  California law thus applies to determine if the SRR's choice-of-forum clause necessitates transfer.

When a forum-selection clause does not conflict with the protections of a California statute, California courts have applied the standard adopted by the Ninth Circuit in *Manetti-Farrow, Inc. v. Gucci America Inc.,* 858 F.2d 509, 514 (9th Cir. 1988)—holding "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract."  *See Bancomer, S. A. v. Superior Court*, 44 Cal. App. 4th 1450, 1461 (1996) (quoting *Manetti-Farrow, Inc.* 858 F.2d at 514 (9th Cir. 1988)).

21

2.      Plaintiffs' Claims Do Not Arise out of or Relate to the Terms of the User Agreement

Applying these principles, Plaintiffs' fair housing claims are not subject to the SRR.

Housing discrimination claims are tort claims, *see Meyer v. Holley*, 537 U.S. 280, 285 (2003).

Plaintiffs' claims do not "relate to the interpretation" of the SRR.  Resolving Plaintiffs' claims

does not require the Court to even reference that agreement.  *Bancomer,* 44 Cal. App. 4th at

1461; *see also In re Orange, S.A.*, 818 F.3d 956, 962 (9th Cir. 2016).  Plaintiffs filed suit based

on Facebook's violations of the FHA and NYCHRL.  Unlike the cases Facebook cites where it

successfully invoked its forum selection clause, Defs.' Br. 7, Plaintiffs' claims are derived

entirely from federal and city law, not from the contractual relationship the parties established

through the SRR.  *Contra Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 831 (S.D.N.Y. 2012)

(suit transferred when Plaintiff alleged Facebook *disabled his account* without cause); *E.K.D. ex

rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 897 (S.D. Ill. 2012) (class action of Facebook

users whose images were used in Facebook-created ads as a result *of their behavior on the

website*).

This case is similar to other cases that Facebook has litigated in New York, where the

content appearing on Facebook's website, rather than the plaintiff's use of Facebook, is the

subject of the suit.  *See Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140 (E.D.N.Y. 2017) (suit by

persons affected by terrorism alleging that Facebook allows terrorists to promote violence);

*EasyWeb Innovations, LLC v. Facebook, Inc*., 888 F. Supp. 2d 342, 356 (E.D.N.Y. 2012) (suit

accusing Facebook of patent infringement).  In those cases, Facebook did not invoke the SRR,

and the SRR should not be applied here.

Plaintiffs' employees investigated Facebook's discrimination using their personal

Facebook accounts to test how Facebook's ad platform operates.  FAC ¶¶ 87-112.  Each

organization also maintains a separate Facebook account that it uses to communicate with the public, for example about fair housing topics.  But the organizational accounts—the accounts on which Facebook bases its motion to transfer—were not used for this investigation.  Even had they been used, this investigation was performed only to confirm public reports on how Facebook's ad platform operates *for all users* and identify the breadth of the unlawful practice. FAC ¶¶ 71-83.  The fact that Plaintiffs accessed Facebook to investigate the site's unlawful content does not make Plaintiffs' claims "arise out of" or "relate to" the SRR.  The "resolution of" Plaintiffs' FHA and NYCHRL claims still in no way "relates to [the] interpretation of" that agreement.  *Manetti-Farrow, Inc.*, 858 F.2d at 514.

### 3.   Plaintiffs' Claims Do Not Arise Out of Or Relate to "Facebook" or the "Facebook Products"

The latter part of the forum selection clause, that it applies to any claim that "arises out of or relates to . . . the Facebook Products" is also inapplicable.  First, this language does not apply to Plaintiffs, because it was not part of the forum selection clause at the time this lawsuit was filed.  Facebook's current SRR was adopted on April 19, 2018, over three weeks after this lawsuit was filed.  *See* Declaration of Diane Houk ("Houk Decl.") Ex. A at 5.  As of April 16, 2018, the SRR had not been updated since 2015.  Houk Decl. Ex. B at 1.  The 2015 forum-selection clause stated "[y]ou will resolve any claim, cause of action or dispute you have with us arising out of or relating to this *Statement or Facebook* exclusively in the U.S. District Court for the Northern District of California."  *Id.* at 5.

Second, this "or Facebook" language at the end of clause should be read as limited to claims arising out of the assenting account's use of the Facebook site, not to any possible claim against Facebook irrespective of the claim's relationship to the user's Facebook account.  A person or entity agrees to be bound by the SRR when first embarking onto the website.  The SRR

should be construed in the context of that relationship with Facebook.  For example, the plaintiff in *Fteja* who complained that his account deactivated would properly be within this "arising out of or relat[ed] to . . . Facebook" language.  841 F. Supp. 2d at 831.  Plaintiffs' claims, in contrast, bear no relationship to their Facebook accounts and thus do not "relate to Facebook" under the SRR.

To read this language as Facebook advocates, applying to *all* litigation related to *any* claim against Facebook so long as the plaintiff happens to have a Facebook account, would both ignore the purpose of the contract (to govern disputes arising from the account) and would create absurd results.  *See In re Marriage of Nassimi*, 3 Cal. App. 5th 667, 688 (2016) ("the language of a provision should be construed in context, in view of the intended function of the provision and of the contract as a whole"); *Roden v. AmerisourceBergen Corp.*, 186 Cal. App. 4th 620, 651 (2010).  For example, it would be absurd to force a New York resident injured delivering a package to Facebook's New York City office to litigate in California simply because the injured party has a Facebook account.  Such would be the result under Facebook's position that it can compel anyone with an account to litigate *any* issue against it in California.

Lastly, the current SRR's "arises out of or relates to . . . *the Facebook Products*" language does not apply to this case because it appears to have been updated after this lawsuit was filed, but the same logic would prevail even if it did.  The SRR's terms control should the assenting user's claim arise out of its use of, or access to, Facebook's products.  It does not govern general challenges to the content of those products that violate anti-discrimination laws.

If construed more broadly, this language would likewise create results that defy common sense.  It would be illogical if another housing non-profit, who coincidentally does not have an

organizational Facebook account, could file the identical lawsuit in this District, while Plaintiffs could not because they opened Facebook accounts for unrelated purposes.

### B.     Applying the Forum-Selection Clause Contravenes New York Public Policy

Even were the forum-selection clause to encompass this dispute, it should not apply because it is contrary to the public policy of New York City that endorses the vigorous local enforcement of the federal civil rights laws and particularly the NYCHRL.

In *Red Bull Associates v. Best Western International, Inc.*, 686 F. Supp. 447, 452 (S.D.N.Y. 1988), a company managing a franchised motel sued its franchisor under the FHA for terminating its contract for racially discriminatory reasons. *Id.* at 448-50. The Court rejected the franchisor's attempt to invoke a forum-selection clause and move the case to Arizona, explaining that the "public importance of a plaintiff's role as a private attorney general" justified bringing civil rights actions in the market where the discrimination occurs. *Id.* at 451. There was "no merit to defendant's suggestion that these public policy concerns can be equally effectuated in Arizona," where a local jury was unlikely to be concerned with promoting integrated housing in New York. *Id.* at 452.

The Second Circuit affirmed, explaining that the District Court was correct to "follow[] a strong federal public policy favoring enforcement of the civil rights laws so important to the advancement of modern society and conclude[] that implementation of the forum selection clause would frustrate that purpose." *Red Bull Assocs. v. Best W. Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir. 1988).

As in *Red Bull*, New York has a strong public policy interest in having issues that will affect the New York housing market litigated locally. While Facebook offers a national platform, New York is the largest city with the largest housing market in the country, FAC ¶ 19, and has a specialized local interest in ensuring that fair housing laws are enforced. The New

York City market is also extremely competitive with unusually heavy reliance on real estate brokers—factor that make non-discriminatory access to online listings even more essential. *Id.* ¶¶ 20-21. The San Jose housing market is not a subject of this dispute. It will be a "far less immediate concern" to jurors in California whether Facebook's behavior "deprived citizens of another state thousands of miles away of the benefits sought to be protected by the Civil Rights Acts." *Red Bull*, 686 F. Supp. at 452.

Although *Red Bull* predated the Supreme Court's decision in *Atlantic Marine Construction Company v. United States District Court for the Western District of Texas*, 571 U.S. 49 (2013), *Red Bull*'s holding—that forum selection clauses can be overridden by local public policy interests in civil rights cases—has since been reaffirmed. *See Martinez*, 740 F.3d at 218; *DeBello v. VolumeCocomo Apparel, Inc.*, 720 Fed. Appx. 37, 40 (2d Cir. 2017).

Unlike in *Red Bull*, Plaintiffs have also filed a claim under the NYCHRL. This unique law is "more protective than the . . . federal counterparts," *Farrugia v. N. Shore Univ. Hosp.*, 13 Misc. 3d 740, 747 (Sup. Ct., N.Y. Cty. 2006) and "[t]he legislative history contemplates that the Law be independently construed with the aim of making it the most progressive in the nation," *Bumpus v. N.Y.C. Transit Auth.*, 18 Misc. 3d 1131(A), at *3 (Sup. Ct., Kings Cty. Feb. 13, 2008), *aff'd*, 66 A.D.3d 26 (2d Dep't 2009). New York City has an interest in ensuring that its uniquely strong protections from housing discrimination, catered to the unique needs of its large and diverse market, are enforced locally. Declaration of Fred Freiberg ("Freiberg Decl.") ¶ 6.

**C.     The First-Filed Rule Does Not Apply**

1.     This Case, *Mobley*, and *Riddick* Are Not Competing Lawsuits

This case is not a "competing lawsuit" with the *Mobley* or *Riddick* cases.  The "core"

question" in this analysis is whether "there are common violations of law alleged."  *Liberty Mut.*

*Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 393 (S.D.N.Y. 2014).

First, in *Mobley*, there are few "common violations" of law to this case.  *Mobley* is a class

action of individual Facebook users who allege that they were not shown certain ads for

employment, housing, or credit opportunities based on their race or national origin.  Ring Decl.

Ex. D ¶ 59.  Plaintiffs' lawsuit goes beyond race and national origin, but, unlike *Mobley*, is

limited to housing discrimination.  FAC ¶¶ 146-62, 87-112.

Recent events highlight these distinctions.  Facebook has entered into a settlement with

the Attorney General of Washington, by which it agreed that it will no longer allow housing,

employment, and credit advertisers to exclude audience members explicitly based on race or

national origin.  Houk Decl. Ex. C.  But the settlement is silent as to gender, family status, or the

categories Plaintiffs allege are proxies for disability and national origin.  *Id.*; FAC ¶¶ 122-23.

This resolution may impact *Mobley's* injunctive claims, but it has little to no effect on Plaintiffs'.

Procedurally, *Mobley* is a putative class action brought on behalf of individual Facebook

users.  Ring Decl. Ex. D ¶¶ 59-68.  Plaintiffs here are nonprofit organizations suing based on

their missions to achieve fair housing.  The two sets of Plaintiffs seek different remedies based

on their differing harms.

*Riddick* is also not a "competing lawsuit."  First, there is not a single overlapping

substantive claim.  The *Riddick* plaintiffs brings claims only under California law.  Ring Decl.

Ex. F.  Second, *Riddick* broadly complains of targeting for *all* advertisements, not just housing

advertisements, that exclude based on unlawful characteristics. *Id.* Procedurally, *Riddick* is *both a plaintiff and defendant class action* which will cover thousands of persons and entities on both sides.

While these cases may seem similar at the most general level that they all allege Facebook's advertising platform is a haven for unlawful discrimination, that is where the similarities end. There are different kinds of plaintiffs, different defendants, different claims, different remedies, and different procedural and legal questions presented. The first-filed rule should not apply.

2.    <u>Judicial Efficiency Does Not Warrant Transfer</u>

Even were these cases sufficiently similar, the first-filed rule still would not apply. "The purpose of the first-filed rule is to "promote judicial efficiency" and when "the court with the first filed action has done little with respect to it, the rule carries less weight." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 489 (S.D.N.Y. 2007).

While Facebook emphasizes the dates that the *Mobley* and *Riddick* cases were filed, it omits the subsequent progress of those cases. *Mobley* has been stayed since September 2017 when a motion to dismiss was administratively terminated while the parties mediate, *see Mobley, et al. v. Facebook, Inc.* 16 Civ. 06440 (N.D. Cal.), ECF No. 51. There has been no discovery. *Id.* ECF No. 35. Once the instant motion is fully briefed, this case will be in the same procedural posture as *Mobley*. While *Riddick* was filed in November 2016, it was just removed to federal court on July 26, 2018. This case is already further along. Ring Decl. Ex. G; *Riddick, et al. v. Facebook, Inc., et al.*, 18 Civ. 04529 (N.D. Cal.). No other court has issued any rulings on any purported common issue or is likely to do so in the near future.

3.      The Balance of Convenience Favors Plaintiffs

The first-filed rule also does not apply when the "balance of conveniences" do not favor transfer.  *Empl's Ins. of Wausau v. Fox Entm't Grp., Inc*., 522 F.3d 271, 275 (2d Cir. 2008) (citation omitted).  "The factors relevant to the balance of convenience analysis are essentially the same as those considered in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a)."  *Id.*

These § 1404(a) factors mitigate against transfer.  First, the Plaintiffs chose New York, and that choice is entitled to deference.  *Liberty Mut. Ins. Co*.,17 F. Supp. 3d at 395.  The locus of operative fact also favors New York, as the allegations include discrimination in the New York housing market, and New York is the home forum for one of the Plaintiffs.  *EasyWeb*, 888 F. Supp. 2d at 350 (plaintiff's home forum had "clear connection" to the case when denying Facebook's motion to transfer).  Facebook's ongoing business activities in New York give Plaintiffs' choice of forum additional deference.  FAC ¶¶ 13-23; *AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 531 (S.D.N.Y. 2004).

The relative means of the parties—a factor Facebook glosses over—also weighs in Plaintiffs' favor.  Defendant is a multi-billion-dollar company, FAC ¶¶ 43-45, while Plaintiffs are small, nonprofit organizations with limited resources to expend on travel for depositions and trial.  Moving this case to California would hinder Plaintiffs' ability to participate in the litigation.  Freiberg Decl. ¶¶ 8-16; Declaration of Lisa Rice ("Rice Decl.") ¶¶ 4-17; Declaration of Keenya Robertson ("Robertson Decl.") ¶¶ 4-15.  Litigating in New York, where Facebook has a 1,000 person office, FAC ¶¶ 13-15, would be at worst a mere inconvenience to Facebook.  *EasyWeb*, 888 F. Supp. 2d at 355.  Given these disparities, the convenience of the parties also mitigates against transfer.  *EasyWeb*, 888 F. Supp. 2d at 353.

29

The interests of justice also favor Plaintiffs' choice of forum.  Plaintiffs have a special interest in litigating their claims in the New York market.  Forcing small non-profits, largely tasked as the private attorney generals enforcing the FHA and the NYCHRL, to litigate across the country at a large corporate Defendant's convenience would also stymie enforcement of the civil rights laws.

The remainder of the factors are neutral.  While Facebook emphasizes that most of its witnesses are in California, nearly all of Plaintiffs' witnesses are located either in New York or locations closer to New York than California. Freiberg Decl. ¶ 9; Rice Decl. ¶¶ 5-6; Robertson Decl. ¶ 5; *see also EasyWeb,* 888 F. Supp. 2d at 352.  Facebook claims that "relevant documents" are in California, but "the location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."  *Lafarge N. Am., Inc.*, 474 F. Supp. 2d at 484.

## V.     THE COURT HAS PERSONAL JURISDICTION OVER FACEBOOK

Assessing personal jurisdiction is a two-part inquiry.  "First, it must be determined whether New York law permits the exercise of personal jurisdiction over a defendant." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000).  If so, it must be determined whether exercising jurisdiction "comports with due process."  *Id.*  Plaintiffs satisfy both requirements.

### A.     CPLR § 302 Provides Personal Jurisdiction Over Facebook

Personal jurisdiction is permitted under New York's long-arm statute.  Plaintiffs allege that Facebook transacts business within the state and commits a tortious act outside the state causing injuries to persons within the state.  N.Y. C.P.L.R. § 302(a)(1) & (a)(3).

First, under § 302(a)(1), a company "transacts business within the state" if it (1) "transacts any business" in New York and, (2) the relevant cause of action "aris[es] from" such a

business transaction.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation omitted).

Courts in the Southern District have identified a "spectrum" ranging from "passive" websites that merely display information, to more interactive websites that "clearly allow defendant to transact business in the forum state over the internet, and thus sustain jurisdiction." *Brown v. Web.com Grp., Inc.*, 57 F. Supp. 3d 345, 357 (S.D.N.Y. 2014) (citation omitted).  A website is sufficiently "interactive" to confer jurisdiction where it "knowingly transmit[s] goods or services to users in other states."  *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009).

Facebook "knowingly transmits" its services into the New York market.  *Id.*  Plaintiff FHJC, a New York resident, investigated Facebook by creating ads for fictitious apartments for rent in New York City to be placed, for a fee, on Facebook's website.  FAC ¶¶ 97-102.  These ads were to be run in New York City and its surrounding areas only.  *Id.*  Facebook *approved* each of the seven ads and estimated in real time the number of New York users the advertisements would reach.  *Id.*  FHJC's investigation illustrates that Facebook "knowingly transacts" business with New York residents via its advertising platform, and then, using its own

algorithms, delivers those ads exclusively to New York Facebook users.  *Royalty Network Inc*, 638 F. Supp. 2d at 418.[7]

Plaintiffs' causes of action also "arise from" Facebook's business with the state.  This inquiry is "relatively permissive" and requires only a "articulable nexus" between the alleged wrongdoing and Facebook's business in the state.  *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 328 (2012).  Plaintiffs' investigation is sufficient to satisfy this "nexus."  The unlawful features alleged by Plaintiffs are used by Facebook when it knowingly transacts business with New York advertisers to sell them access to New York Facebook users.  FAC ¶¶ 97-102.

Second, Plaintiffs' allegations satisfy both C.P.L.R. § 302(a)(3)(i) and (ii), as Facebook committed a tortious act without the state causing injury to a person within the state and both "regularly does business" and "engages in . . . [a] persistent course of conduct" in the state.

Housing discrimination claims are tort claims, *Meyer*, 537 U.S. at 285, and the tort of creating the discriminatory platform occurred "outside the state" for purposes of § 302(a).  *See Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 421 (E.D.N.Y. 2017).  FHJC is a person within the state alleging injury caused by Facebook's discrimination in the New York City market. FAC ¶¶ 25-27, 134-45.

---

[7] Facebook's citations, for a proposition Plaintiffs do not argue, that a nationwide website is not per se subject to nationwide jurisdiction, are irrelevant.  Defs.' Br. 13.  *See, e.g.*, *Lopez v. Shopify, Inc.*, No. 16 Civ. 9761, 2017 WL 2229868, at *8 n.9 (S.D.N.Y. May 23, 2017) ("[plaintiff] does not allege that [defendants] sold any products in New York, marketed the site to New York residents, or targeted the state or its residents in any way").

While Plaintiffs only need to satisfy one of subsections (i) and (ii), Plaintiffs' allegations satisfy both.  Plaintiffs allege that Facebook "regularly does or solicits business" and "engages in any other persistent course of conduct" in New York.  § 302(a)(3)(i).  Facebook has registered with the New York State Division of Corporations and has a 1,000 person office in New York City that is "centered around products that specifically benefit from being in New York."  FAC ¶¶ 13-18.  These allegations establish jurisdiction under § 302(a)(3)(i).  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 126 (2d Cir. 2002).

Plaintiffs allege Facebook "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  C.P.L.R. § 302(a)(3)(ii).  Facebook operates an advertising platform for nearly 4 million clients, many of whom are brokers and landlords in the largest housing market, with one of the lowest vacancy rates, in the country.  FAC ¶¶ 19-21, 33.  Facebook should "reasonably expect" its platform for housing advertisements to have consequences in New York.  Plaintiffs also allege that Facebook derives substantial revenue from interstate or international commerce.  FAC ¶¶ 32-43; *Lawson v. Full Tilt Poker Ltd.*, 930 F. Supp. 2d 476, 486 (S.D.N.Y. 2013).

**B.**     **Due Process is Satisfied**

Due process is satisfied if the Defendant has "minimum contacts" in the jurisdiction and exercising jurisdiction would "comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  The due process "minimum contacts" test is "in essence, the same" as the "transacting business" test under New York's long arm statue in non-defamation cases.  *Donini Int'l, S.p.A. v. Satec (U.S.A.) LLC*, No. 03 Civ. 9471, 2004 WL 1574645, at *5 (S.D.N.Y. July 13, 2004).  The same facts that satisfy New York's long-arm statute also satisfy the minimum contacts analysis.  *Brown*, 57 F. Supp. 3d at 358.

The Supreme Court's decisions in *Walden v. Fiore*, 571 U.S. 277 (2014) and *J. McIntyre Machinery Ltd. v. Nicastro*, 564 U.S. 873 (2011), do not impact this case.  While *Walden* and *MacInytre* narrowed the scope of specific jurisdiction, courts continue to find due process satisfied when an out-of-state business *explicitly approved* more than a single isolated sale into New York.  *See State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 892 (S.D.N.Y. 2017).  Here, Facebook approved seven ads in the span of a month that advertised New York City housing and were targeted exclusively to New York residents.  FAC ¶¶ 97-102. *Walden* and *McIntyre*'s concerns regarding over-expansive jurisdiction are not implicated.[8]

Where a plaintiff makes the threshold showing of the minimum contacts required for due process, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert*, 305 F.3d at 129.  Facebook makes no such showing.[9]

---

[8] *Walden* and *McIntyre* were both were fact-specific cases regarding physical transactions.  The Court did not address "the very different questions whether and how a defendant's virtual presence and conduct [over the internet] translate into contacts with a particular State."  *Walden*, 571 U.S. at 290 n.9; *see also McIntyre*, 564 U.S. at 890 (Breyer, J. concurring).

[9]  Should the Court find Plaintiff's allegations insufficient to establish jurisdiction over Facebook, Plaintiffs respectfully request limited jurisdictional discovery to establish Facebook's business connections with the state.  *See* FAC ¶¶ 19-23; *Ikeda v. J. Sisters 57, Inc.*, No. 14. Civ. 3570, 2015 WL 4096255, at *1 (S.D.N.Y. July 6, 2015).

### C.      Pendant Personal Jurisdiction

Once personal jurisdiction over Facebook is established with respect to Plaintiffs' claims concerning the New York housing market, this Court should retain jurisdiction over Plaintiffs' claims with respect to the Washington D.C., Miami, and San Antonio housing markets pursuant to the doctrine of pendent jurisdiction.  So long as a District Court has "acquired personal jurisdiction over defendant" and all allegations stem from a "common nucleus of operative fact," the District Court has the "power to determine all of the claims asserted in the complaint." *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719-21 (2d Cir. 1980).

All of Plaintiffs' claims operate under the same nucleus of operative facts, challenge the same aspects of Facebook's advertising platform, and involve the same course of investigation. This Court should exercise its discretion to hear the entire case together.  *Hargrave* 646 F.2d at 719.

### CONCLUSION

For the above reasons, Plaintiffs respectfully request that Defendants' motion to dismiss and motion to transfer be denied.

Dated:  August 24, 2018
        New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


_____/s/_____
Diane L. Houk
Katherine Rosenfeld
David B. Berman

600 Fifth Avenue, 10th Floor
New York, New York 10020

*Attorneys for all Plaintiffs*


Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Ave. NW, Suite 710
Washington, DC 20005
(202) 898-1661

*Attorney for Plaintiff National Fair Housing Alliance*

**CERTIFICATE OF COMPLIANCE**

In compliance with this Court's Individual Practice 2(D), I state that this brief is 9,997 words long in accordance with the Court's order setting a word limit of 10,000 words.  In preparing this certificate, I relied on the word count generated by Microsoft Word.  I also certify that the brief complies with this Court's formatting rules.


              /s/
Diane L. Houk