UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; FAIR HOUSING JUSTICE CENTER, INC.; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., <br><br> Defendant. | No: 18 Civ. 2689 |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER VENUE, OR ALTERNATIVELY TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, CA  94105
(415) 512-4000

*Counsel for Facebook, Inc.*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT
    OF CALIFORNIA .................................................................................................2

    A.  Plaintiffs' Claims Are Governed by a Valid Forum Selection Clause ...................2

    B.  The First-Filed Rule Favors Transfer ...................................................................4

    C.  Section 1404(a) Factors Favor Transfer ...............................................................4

III. THIS COURT LACKS PERSONAL JURISDICTION OVER FACEBOOOK ...............5

IV. PLAINTIFFS LACK ARTICLE III STANDING ...............................................5

V.  PLAINTIFFS' CLAIMS ARE BARRED BY THE CDA ....................................6

    A.  Facebook Is Not an "Information Content Provider" .............................................7

    B.  Plaintiffs' Claims Treat Facebook as a Publisher or Speaker of Third-Party
    Content ...............................................................................................................12

VI. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FHA OR HRL ....................14

VII. CONCLUSION ....................................................................................................16

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Atlantic Marine Construction Co. v. U.S. District Court for W. Dist. of Texas*,
571 U.S. 49 (2013)..................................................................................................2, 4

*Atlantic Recording Corp. v. Project Playlist, Inc.*,
603 F. Supp. 2d 690 (S.D.N.Y. 2009)..................................................................10

*Bristol-Myers Squibb Co. v. Superior Court*,
137 S. Ct. 1773 (2017)............................................................................................5

*Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co.*,
236 F.3d 629 (11th Cir. 2000) ..............................................................................6

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)................................................................................................5

*Cohen v. Facebook, Inc.*,
252 F. Supp. 3d 140 (E.D.N.Y. 2017) .....................................................1, 12, 15

*DeBello v. VolumeCocomo Apparel, Inc.*,
720 F. App'x 37 (2d Cir. 2017) .............................................................................4

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ...............................................................................13

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) ..................................................... *passim*

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...............................................................13

*Force v. Facebook, Inc.*,
304 F. Supp. 3d 315 (E.D.N.Y. 2018) .................................................................13

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) .................................................................14

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016)..............................................................................6, 12

*Herrick v. Grindr, LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018)..................................................................11

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer*,
943 F.2d 644 (6th Cir. 1991) ...............................................................................15

# TABLE OF AUTHORITIES

**Page**

*Housing Rights Center v. Snow*,
  2007 WL 91148 (E.D. Cal. Jan. 3, 2007) ..............................................................14

*Jones v. Dirty World Entertainment Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ..............................................................................10

*Jurin v. Google Inc.*,
  695 F. Supp. 2d 1117 (E.D. Cal. 2010)...............................................................12

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995)...................................................................................15

*Martinez v. Bloomberg LP*,
  740 F.3d 211 (2d Cir. 2014) ..................................................................................4

*National Fair Housing Alliance v. Federal National Mortgage Association*,
  294 F. Supp. 3d 940 (N.D. Cal. 2018) ..................................................................5

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1222 (N.D. Cal. 2014) ................................................................14

*Red Bull Associates v. Best Western International, Inc.*,
  862 F.2d 963 (2d Cir. 1998)...................................................................................4

*Tyus v. Urban Search Mgmt.*,
  102 F.3d 256 (7th Cir. 1996) ...............................................................................15

*United States v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005).................................................................................14

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
  ___ F.3d ___, 2018 WL 4000257 (9th Cir. Aug. 22, 2018) ..................................2

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ...............................................................................13

**STATE CASES**

*Certain Underwriters at Lloyd's of London v. Superior Ct.*,
  24 Cal. 4th 945 (2001) ..........................................................................................3

*In re New York Times Co. v. City of New York Commission on Human Rights*,
  41 N.Y.2d 345 (1977) ......................................................................................15, 16

# TABLE OF AUTHORITIES

**Page**

**FEDERAL STATUTES**

Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*:

    42 U.S.C. § 3604(a) .............................................................................................14

    42 U.S.C. § 3604(c) ....................................................................................7, 14, 15

    42 U.S.C. § 3604(d) .............................................................................................14

    42 U.S.C. § 3604(f) .............................................................................................14

    42 U.S.C. § 3606.................................................................................................14

Communications Decency Act ("CDA"), 47 U.S.C. § 230:

    47 U.S.C. § 230.....................................................................................................1

**FEDERAL REGULATIONS**

24 C.F.R. § 100.75(c)(3).................................................................................................15

## I.      INTRODUCTION

Plaintiffs' Opposition ("Opp.") confirms that the Court need not consider any issue beyond Facebook's motion to transfer venue.  Plaintiffs agreed to litigate the claims asserted in this action before a California court and do not come close to establishing the type of "extraordinary circumstances" necessary to avoid transfer of this action to the Northern District of California under that agreement.  The first-filed rule and Section 1404 also support transfer because earlier-filed lawsuits based on substantially the same factual and legal issues are already pending there and, though they try mightily, Plaintiffs do not identify any valid reason why a federal court in California cannot adjudicate their claims.

If the Court were to reach the merits, it is equally clear that Plaintiffs' claims should be dismissed in their entirety.  Plaintiffs assert discrimination claims against Facebook by alleging that third parties have the "capability" to publish discriminatory housing ads.  There is no merit to Plaintiffs' contention that *their decision* to "investigate" that alleged capability by creating and targeting fake ads to New York users somehow subjects *Facebook* to personal jurisdiction in New York and gives Plaintiffs standing to sue.  Nor can those fake ads establish a claim for *discrimination* under the laws asserted, which have never been applied by any court to publishers, like Facebook, based on ad targeting decisions by advertisers.

Most fundamentally, Plaintiffs' claims are barred by Section 230 of the Communications Decency Act ("CDA").  An allegedly discriminatory ad is only published *if a third-party advertiser* chooses to use "neutral tools" on Facebook's ad platform to (1) create a housing ad and (2) target it in a discriminatory way.  Plaintiffs' attempt to impose liability on Facebook for advertisers' use of these "neutral tools" is barred by the CDA.  Nothing in the Statement of Interest filed by the United States ("SOI") changes that conclusion.

1

## II.      THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Plaintiffs do not dispute that they agreed to Facebook's Terms of Use ("Terms"), including a forum selection clause ("clause") which requires any claim that "arises out of or relates to [the] **Terms** or the **Facebook Products**" to be brought *exclusively* in the Northern District of California or San Mateo Superior Court.  Ring Decl. Ex. C § 4.4 (emphasis added). Plaintiffs fail to demonstrate the "extraordinary circumstances unrelated to the convenience of the parties" necessary to avoid transfer of this action to the Northern District of California under that binding agreement.  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013).  They also fail to demonstrate why this action should not be transferred to that court, even in the absence of a valid forum selection clause, under the first-filed rule and the Section 1404(a) factors.

### A.      Plaintiffs' Claims Are Governed by a Valid Forum Selection Clause

Plaintiffs' position that the clause does not apply to their claims has no merit.  *First*, Plaintiffs argue that their claims do not arise out of or relate to the "**Terms**" because they do not reference or require interpretation of the Terms.  Opp. 22.  But where, as here, a clause covers claims "relating to" an agreement, the question is whether the claims have "some logical or causal connection to" the agreement.  *Yei A. Sun v. Advanced China Healthcare, Inc.*, ___ F.3d ___, 2018 WL 4000257, at *3 (9th Cir. Aug. 22, 2018) ("The dispute need not grow out of the contract or require interpretation of the contract in order to *relate to* the contract.").  Plaintiffs' claims, which are based on Facebook's alleged processing of user data to create targeting tools that Plaintiffs allege allow advertisers to publish discriminatory housing ads on Facebook, have a logical and causal connection to the Terms because they govern Facebook's practices relating to user data and policies prohibiting discrimination.  *See* Ring Decl. Ex. C §§ 2, 3.1, 5; *Id.*, Ex. A.

2

*Next*, Plaintiffs argue that their claims do not arise out of or relate to "**Facebook Products**" because they are subject to a prior version of the clause that covers "**Facebook**," instead of "Facebook Products," and that, whichever clause applies, the Court should construe it narrowly to exclude Plaintiffs' claims.

As an initial matter, the distinction Plaintiffs attempt to draw between "Facebook Products" and "Facebook" is a red herring.  "Facebook Products," in the current clause, is defined to include "the products, features, apps, services, technologies, and software we offer." Ring Decl. Ex. C, at 1.  "Facebook," in the prior clause which became effective in 2015, is defined to include "features and services we make available."  Duffey Decl. Ex. D § 17. Plaintiffs either misunderstand or misrepresent the 2015 clause in arguing that it would allow Facebook to "compel anyone with an account to litigate any issue against it in California," including "a New York resident injured delivering a package to Facebook's New York City office."  Opp. 24.  The 2015 clause, like the current clause, covers Facebook products, which Plaintiffs do not, and cannot, dispute are at the center of their claims.  Plaintiffs' claims are thus covered by *both* the 2015 clause and the current clause.

Plaintiffs then invite this Court to err by asking it to rewrite both clauses to apply only to claims concerning "use of, or access to" Facebook products, which Plaintiffs argue excludes their claims which are "general challenges to the content of [Facebook] products."  Opp. 24; *see Certain Underwriters at Lloyd's of London v. Superior Ct.*, 24 Cal. 4th 945, 968 (2001) ("[W]e do not rewrite any provision of any contract … for any purpose.").  Contrary to Plaintiffs' only argument as to why the Court should ignore the plain language of these clauses, there is nothing "illogical" about holding Plaintiffs to their contractual agreements, even if it means others who have not made the same agreement would be able to bring the same claims in this Court.

Plaintiffs' public policy arguments against transfer also lack merit.  Second Circuit decisions after *Atlantic Marine* show that civil rights claims are presumptively subject to forum selection clauses.[1]  *See Martinez v. Bloomberg LP*, 740 F.3d 211, 229 (2d Cir. 2014); *DeBello v. VolumeCocomo Apparel, Inc.*, 720 F. App'x 37, 40–41 (2d Cir. 2017).  And Plaintiffs' position that claims involving the New York housing market cannot be adjudicated before a California court is specious, especially given Plaintiffs' view that a New York court is capable of doing so for the Florida, Texas, and District of Columbia housing markets.

### B.   The First-Filed Rule Favors Transfer

Regardless of *Mobley*'s status as a putative class action and the absence of FHA claims from *Riddick*, these cases require resolution of the same core factual and legal issues, including standing, CDA immunity, and in *Mobley* and here, whether the FHA provides for publisher liability based on targeting decisions by advertisers.  All of these issues are the subject of a pending motion to dismiss in *Mobley*.  And Plaintiffs' argument that this case and *Mobley* are in the same position because there has been no discovery in *Mobley* overlooks the fact that the California court stayed discovery based on CDA immunity after motion practice on that issue.

### C.   Section 1404(a) Factors Favor Transfer

The only factors Plaintiffs challenge are choice of forum and burden, neither of which shift the balance in their favor.  Plaintiffs' choice of forum merits little weight, given that three of the four Plaintiffs are located outside of New York.  They also have not demonstrated that

---

[1] *Red Bull Associates v. Best Western International, Inc.*, 862 F.2d 963, 967 (2d Cir. 1998), cannot be squared with *Atlantic Marine*'s rejection of consideration of the parties' private interests where there is a valid forum selection clause.  *See Atl. Marine*, 571 U.S. at 63–64.

they would be *unable* to litigate in California—indeed, they are currently doing so.  *See Nat'l Fair Housing Alliance v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940 (N.D. Cal. 2018).

## III.   THIS COURT LACKS PERSONAL JURISDICTION OVER FACEBOOOK

Plaintiffs argue that Facebook is subject personal jurisdiction in New York because "Plaintiff FHJC, a New York resident" placed fake ads that "were to be run in New York City." Opp. 31.  But they offer no support for their theory that a *third party's* decision to use Facebook's ad platform, which is available for use throughout the United States, constitutes "purposeful availment" *by Facebook* of the benefits and protections of New York sufficient to establish personal jurisdiction.  Plaintiffs' reliance on "pendent personal jurisdiction" over the claims of Plaintiffs who have no connection to New York also fails in light of the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), which further supports transfer to the Norther District of California which can exercise general personal jurisdiction over Facebook with respect to all of Plaintiffs' claims.  *Id*. at 1781 ("The mere fact that *other* [in-state] plaintiffs" may bring claims similar or identical to a nonresident plaintiff's claims "does not allow the State to assert specific jurisdiction over the nonresidents' claims.").

## IV.   PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs concede that they have not identified any advertiser who has placed an allegedly discriminatory housing ad on Facebook, but argue that their "investigation" of how an advertiser *could* place such an ad establishes organizational standing.  Opp. 18–20.  This theory of standing, which would allow any organization to sue any entity based on its own decision to investigate that entity, has been rejected by the Supreme Court.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).  All of the cases cited by Plaintiffs involve investigations based on *evidence* that a *particular* housing provider *actually* engaged in discrimination.  They do not cite a single case in which court has found organizational standing absent evidence of "specific documented

incidents of unlawful discrimination." *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000). This Court should reject Plaintiffs' invitation to be the first.

**V.      PLAINTIFFS' CLAIMS ARE BARRED BY THE CDA**

Plaintiffs do not dispute that a website, like Facebook, retains CDA immunity where users create allegedly unlawful content using "neutral tools" on the website—*i.e.*, tools that can be used for both proper and improper purposes. Nor do they dispute that the tools at issue in this case can be used in "neutral contexts." Opp. 13–14. Instead, Plaintiffs argue that they are challenging Facebook's *provision* of the tools, not their *use* by advertisers to publish allegedly discriminatory housing ads on Facebook, *id*. at 9, and therefore insist that "Facebook itself—not third-party advertisers—created the discriminatory content" at issue in this case, *id*. at 1.

But the tools are not the "content" at issue in this case. For CDA immunity, "what matters is whether the cause of action [asserted by a plaintiff] inherently requires the court to treat the defendant as the publisher or speaker of content provided by another." *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 175 (2d Cir. 2016). Plaintiffs assert claims for *housing discrimination* under the Fair Housing Act ("FHA") and New York City Human Rights Law ("HRL"). There is no FHA or HRL claim for housing discrimination without publication of a discriminatory housing ad, and there is no publication of a discriminatory housing ad unless advertisers *use* the tools to target housing ads in a discriminatory manner. Accordingly, the only content relevant to the CDA analysis in this case is allegedly discriminatory housing ads.

Plaintiffs' own allegations prove this point. Nearly half of the FAC is spent explaining how Plaintiffs "investigated Facebook's conduct" by "*creat[ing] dozens of housing advertisements* and complet[ing] Facebook's full ad submission and review process," which "permits *advertisers to publish these ads in a discriminatory manner*." FAC ¶ 4 (emphasis added); *see id*. ¶¶ 87–112. Obviously, Plaintiffs understand that housing discrimination only

occurs if *someone* actually creates and publishes a discriminatory housing ad.  Their position now is contrary to the claims asserted and a clear attempt to avoid the CDA.

The government, by contrast, at least concedes that Plaintiffs' claims turn on use of the tools to publish allegedly discriminatory housing ads.  But, like Plaintiffs, the government relies on a fundamental misreading of the holding in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc) ("*Roommates*") to argue that CDA immunity does not apply in this case.  Plaintiffs and the government are both wrong.

### A.    Facebook Is Not an "Information Content Provider"

Plaintiffs and the government argue that "Facebook's acts are most akin" to those for which the defendant in *Roommates* was denied CDA immunity.  Opp. 10; *see also* SOI 17.  They argue that, as in *Roommates*, Facebook designed its service based on "preferences and personal characteristics that Facebook itself forces subscribers to disclose."  Opp. 11; SOI 17–21.  This argument misrepresents Facebook's service and misconstrues the holding in *Roommates*.

In *Roommates*, the defendant, Roommate.com LLC ("Roommate"), was an online housing service "designed to match people renting out spare rooms with people looking for a place to live."  521 F.3d at 1161.  Plaintiffs challenged "three specific functions performed by Roommate," *id.* at 1164, each of which were alleged to violate Section 3604(c) of the FHA, which makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to [housing] that indicates any preference, limitation, or discrimination based on [a protected characteristic], or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).

*First*, as a condition of posting or searching for housing listings, Roommate *required* subscribers to answer questions identifying their own protected characteristics and the protected characteristics they would accept in a roommate.  For example, "Roommate *require[d]*

7

subscribers listing housing to disclose whether there are 'Children present' or 'Children not present' and *require[d]* housing seekers to say 'I will live with children' or 'I will not live with children.'"  521 F.3d at 1165 (emphases added).  The plaintiffs asserted FHA claims based on the *questions* as "indicat[ing] an intent to discriminate against [subscribers]," *id*. at 1164, and *requiring answers* to those discriminatory questions as "caus[ing] subscribers to make a statement … with respect to [housing] that indicates [an unlawful] preference," *id*. at 1165. *Second*, the plaintiffs asserted claims based on Roommate's use of the *required unlawful preferences* to create and publish housing listings on its service.  *Id*. at 1165.  *Third*, the plaintiffs asserted claims based on Roommate's use of the *required unlawful preferences* to match subscribers through "emails from Roommate, informing them of available housing opportunities matching their preferences" and search functions.  *Id*. at 1162.

The Ninth Circuit denied CDA immunity for these alleged FHA violations.  Asking discriminatory questions and requiring users to indicate unlawful preferences for housing were Roommate's "own acts," and therefore not protected by the CDA.  *Id*.  With respect to housing listings, which Roommate argued were created by users through its online questionnaire, the court held that a website can also be an "information content provider" for content provided by a third party, but interpreted "information content provider" narrowly.  It is not enough to "provide a framework that *could be* utilized for proper or improper purposes."  *Id*. at 1172 (emphasis added).  Instead, a website must "contribute[] materially to the alleged illegality of the content." *Id*. at 1167–68.  "By *requiring* subscribers to provide the information as a condition of accessing its services and by providing a limited set of pre-populated answers, Roommate [became] … [a] developer, at least in part, of that information."  *Id*. at 1166 (emphasis added).

The court also denied CDA immunity for claims based on Roommate's email notification

and search functions, holding that "If Roommate has no immunity for asking the discriminatory questions, … it can certainly have no immunity for using the answers to the unlawful questions to limit who has access to housing." *Id*. at 1167. Roommate's decision to design an email notification system so that "subscribers with children [would] not be notified of new listings where the owner specifies 'no children'" was not protected. *Id*. Likewise, the CDA did not protect Roommate's search function because Roommate designed it "to use allegedly unlawful criteria so as to limit the results of each search, and to force users to participate in its discriminatory process." *Id*. In so holding, the court distinguished Roommate's search function as "*differ[ing] materially* from generic search engines such as Google, Yahoo! and MSN Live Search," which are "[not] *designed to achieve illegal ends*," and "[t]herefore … play no part in the 'development' of any unlawful searches." *Id*. (emphases added).

This case is not remotely "akin" to *Roommates*. Roommate was an *online housing service* used by *only housing advertisers*, whereas Facebook offers a generic *online advertising service* used by *all advertisers* placing ads for *all types of products, services and information*—a distinction that was "material" to the *Roommates* holding. The functions and tools challenged in *Roommates* had *only unlawful uses* because they involved *only housing ads*. In stark contrast, because the vast majority of ads placed on Facebook have nothing to do with housing, the challenged tools have overwhelmingly lawful uses, as Plaintiffs concede. Whereas Roommate *required* users to create *unlawful content*, Facebook allows, but *does not require*, advertisers to create any type of ad using any type of targeting. In the words of the *Roommates* court, while an "anonymous dastard" may use Facebook's neutral tools to publish a discriminatory housing ad, any such decision is made "entirely by the malevolent user." *Id.* at 1171.

While Plaintiffs and the government acknowledge, as they must, that Facebook does not *require* advertisers to use the targeting tools, let alone with housing ads or in ways Plaintiffs claim are discriminatory, they argue that Facebook "invites" advertisers to use a "pre-populated list" of targeting options.  Opp. 11; SOI 21.  According to Plaintiffs, "[b]y creating and providing the [targeting options], Facebook asks landlords and real estate agents, 'Would you like us to refuse to show this apartment to families with children?  To Women?  To African-Americans?'" Opp. at 13.  These arguments are factually baseless and legally irrelevant.

Facebook does not ask advertisers these questions—or any questions at all—which explains why the term "invite" appears nowhere in the FAC.  To the contrary, Facebook expressly prohibits advertisers from engaging in discriminatory targeting.  *See* Mem. 5 & n.2. But even if Plaintiffs could allege that Facebook "invites" advertisers to target housing ads in a discriminatory manner, which they cannot, that would not transform Facebook into an "information content provider."  *Roommates* was clear that "[t]he fact that [a website] *encourages* [let alone *invites*, as Plaintiffs argue here] subscribers to provide something in response to the prompt is not enough to make it a 'develop[er]' of the information."  521 F.3d at 1174 (emphasis added).  Rather, the website must "*requir[e]* subscribers to provide the [unlawful] information."  *Id.* at 1166 (emphasis added); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014) (applying CDA immunity because, "[u]nlike in *Roommates*, the website [] *did not require users* to post illegal or actionable content as a condition of use." (emphasis added)); *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) ("key to the Ninth Circuit's decision was the fact that Roommates.com was actively participating in creating the objectionable content, by providing the questions and by *requiring* users to answer them" (emphasis added)).

10

Nor does Facebook present advertisers with a "pre-populated list" of targeting options, as Plaintiffs misleadingly suggest by attaching exhibits to the FAC showing screen shots of the ad platform *after* they have searched for and selected challenged targeting options.  *See* FAC Exs. A, C, E.  As other exhibits make clear, advertisers are presented with the *option* to create an audience for their ads using tools—*none* of which are required or prepopulated—and use these tools through searches using a blank search box, *see id.*, Ex. E (user typed "Disability" to see options with that term), or by browsing multi-level menus, *see id.*, Ex. C (user browsed 3 levels—demographics, parents, all parents—to reach "Parents with preteens").

Recognizing the narrowness of the *Roommates* holding, and unable to allege that Facebook *requires* advertisers to create and target housing ads in a discriminatory manner, Plaintiffs and the government attempt to draw false analogies between the cases by pointing to allegations that Facebook collects information about its users, some of which is required at sign up (*e.g.*, sex), and uses that information to create the challenged targeting options.  Opp. 10–11; SOI 17–21.  But there is nothing unlawful under the FHA or HRL about Facebook requiring users to identify their sex at signup or using that information to create tools that allow, but do not require, *all advertisers* to target ads for *all types of products, services and information*.

At bottom, Plaintiffs cannot establish a violation of the FHA or HRL without publication of a discriminatory housing ad on Facebook, and there is no publication of a discriminatory housing ad on Facebook *unless* an advertiser decides to (1) create a housing ad and (2) target it in a discriminatory manner.  Likewise, if an advertiser decides to do (1) but not (2), or vice versa, there is no discriminatory housing ad and thus no violation of law.  This is the definition of a "neutral tool" under the CDA and establishes, under well-settled precedent, that Facebook is not an "information content provider" in this case.  *See Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579,

589–90 (S.D.N.Y. 2018) (CDA immunity applies to allegedly unlawful content created through the use of neutral tools—"features [that] are available equally to all users and are not intrinsically offensive or unlawful"); *see also* Mem. 21–23 & n.11 (collecting "neutral tools" cases).[2]

**B.    Plaintiffs' Claims Treat Facebook as a Publisher or Speaker of Third-Party Content**

While Plaintiffs (finally) admit in this section of the Opposition that their claims are "based on Facebook's 'causing' ads with discriminatory preferences 'to be published,'" they argue that the claims do not treat Facebook as a publisher of that third-party content because they are not challenging traditional publisher functions, such as reviewing and deciding whether to publish it.  Opp. 15.  As the Second Circuit has made clear, Plaintiffs cannot have it both ways, relying on third-party content to establish liability and then arguing it is not relevant to CDA immunity:  "[W]hat matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provider by another."  *LeadClick Media*, 838 F.3d at 175; *see also Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017). As discussed above, no matter what Plaintiffs say now, there is no question that their claims turn on use of the challenged tools by third-party advertisers to create and publish allegedly discriminatory housing ads on Facebook.

Moreover, Plaintiffs' claims *do* seek to impose liability on Facebook for traditional publisher functions because they challenge Facebook's failure to monitor and screen ads placed

---

[2] "Lookalike" and "Suggested" audience tools are also neutral tools subject to CDA immunity. *See Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1122–23 (E.D. Cal. 2010) (Google "suggesting" plaintiff's trademarks as "keywords" does not make Google a "information content provider" because Google does "nothing more than provide options that advertisers could adopt or reject at their discretion, thus entitling [Google] to immunity" (emphasis added)).

on its platform to prevent advertisers from publishing discriminatory housing ads.  *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and deletion of content [are] actions quintessentially related to a publisher's role"); *see also Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123–24 (N.D. Cal. 2016) (a website's decision to allow access to its services is publishing activity under the CDA where the decision requires the website to analyze third-party content and "distinguish between users based on [that] content"); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 321–22 (E.D.N.Y. 2018) ("Facebook's choices as to who may use its platform" is a publisher function protected by the CDA).

Facebook provides a generic advertising service available to *all advertisers* who publish ads for *all types of products, services and information*, not only or even significantly housing. As Plaintiffs admit, this means that the challenged tools have predominantly lawful uses, including for housing ads through parallel advertising on Facebook and across different media. *See* Mem. 16.  Plaintiffs' claims therefore challenge, not the tools themselves, but Facebook's alleged failure to prevent housing advertisers from using them to create and publish allegedly discriminatory housing ads, either by banning housing advertisers from its service or blocking publication of housing ads targeted in ways Plaintiffs claim are discriminatory.  But this would require Facebook to "monitor" and "screen" each of the millions of ads placed on its platform to determine (1) whether it is a housing ad and (2) whether it is targeted in a way that results in discrimination (*e.g.*, no parallel advertising through other media), and, if both of those conditions are met, to block publication of the ad according to the advertiser's specifications.  That is not only impossible, it imposes on Facebook the exact burden Congress intended to prevent by enacting the CDA.  *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("It would

be impossible for service providers to screen each of their millions of postings for possible problems.").[3]

## VI.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE FHA OR HRL

Plaintiffs do not identify any actual discriminatory housing ad and therefore fail to state any claim for discrimination under the FHA or HRL.  Even more fundamentally, neither Plaintiffs nor the government identify a single case accepting their theory of liability that publishers, like Facebook, are liable under the FHA or HRL based on ad targeting decisions by advertisers.  This court should reject their invitation to be the first court to do so.

FHA Sections 3604(a), (d), and (f), and Section 3606.  No court has imposed liability on a publisher under these provisions, let alone based on ad targeting.  All of the cases Plaintiffs cite involve entities with a direct relationship to housing transactions, such as landlords, real estate brokers, and property managers.  *See United States v. Space Hunters, Inc.*, 429 F.3d 416, 419 (2d Cir. 2005) (defendant "communicate[d] with owners or landlords … and refer[red] prospective tenants according to their preferred neighborhood and price range"); *Hous. Rights Ctr. v. Snow*, 2007 WL 91148, at *1–2 (E.D. Cal. Jan. 3, 2007) (defendants managed rental properties).

FHA Section 3604(c).  Although this provision, unlike the others, covers publishing, no court has ever applied it to impose liability on a publisher based on ad targeting decisions made

---

[3] Plaintiffs and the government also argue that Facebook is not entitled to CDA immunity because it allegedly used user data without consent, seeking to analogize this case to *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011), and *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014).  Opp. 16–18; *see* SOI 19–21.  Those cases, which involved allegations that the defendant websites added *their own content* to user data and then published it to other users, are inapposite.

by advertisers.  Even assuming the validity of the implementing regulation relied upon by Plaintiffs, that regulation does not apply to publishers.  In their brief, Plaintiffs conspicuously omit the italicized language of the regulation, which prohibits, in relevant part, "*[s]electing media or locations* for advertising … [that] deny particular segments of the housing market information about housing opportunities."  24 C.F.R. § 100.75(c)(3) (emphasis added).  *Advertisers* "select" media; *publishers* "are" media.  On its face, this regulation applies to the party making the "selection"—advertisers, not publishers—and for good reason.  Unlike claims based on discriminatory ad *content*, a claim for discriminatory ad *targeting* must consider the effect of "an advertising campaign as a whole," which publishers do not have sufficient information to do.  *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 265 (7th Cir. 1996).  Under Plaintiffs' theory, "[p]ublishers would become the government's policemen in enforcing section 3604(c), having to ensure that advertisers and the message of advertisements individually and in the aggregate comply with this section."  *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer*, 943 F.2d 644, 653 (6th Cir. 1991) (rejecting this theory of liability against a publisher).

<u>No Discriminatory Intent</u>.[4]  Plaintiffs have not pled facts remotely suggesting any discriminatory intent or "animus against the protected group" by *Facebook* in creating the challenged tools or any use of them by advertisers to publish discriminatory housing ads to support a FHA claim against Facebook.  *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995).  Likewise, for their HRL claims, Plaintiffs have not alleged discriminatory intent or "substantial assistance" by Facebook in any decision by housing advertisers who used the tools in a discriminatory manner.  *See* Mem. 29–31.  Plaintiffs' attempt to distinguish *In re New York*

---

[4] Plaintiffs do not claim to satisfy the elements of an FHA claim under a disparate impact theory, and therefore have forfeited this theory of liability.

*Times Co. v. City of New York Commission on Human Rights*, 41 N.Y.2d 345 (1977), only highlights its similarity to this case in rejecting publisher liability on an aiding and abetting theory unless the ads at issue "expressed discrimination." *Id.* at 351.

**VII.    CONCLUSION**

For the above reasons, the Court should transfer this action to the Northern District of California, or, alternatively, dismiss Plaintiffs' complaint without leave to amend.

DATED:  September 24, 2018                MUNGER, TOLLES & OLSON LLP

By:  */s/ Rosemarie T. Ring*
　　　ROSEMARIE T. RING
Attorneys for Defendant Facebook, Inc.

MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105
(415) 512-4000

ROSEMARIE T. RING
rose.ring@mto.com
JONATHAN H. BLAVIN
jonathan.blavin@mto.com
ELIZABETH A. KIM
elizabeth.kim@mto.com

## CERTIFICATION OF COMPLIANCE

In compliance with this Court's Individual Practice 2(D), the undersigned counsel states that this brief is 4,919 words long, excluding the portions exempted by the rule.  *See* ECF No. 55 (order setting limit of 5,000 words for this reply).  In preparing this certificate, I relied on the word count generated by Microsoft Word.  I also certify that the brief complies with this Court's formatting rules.

/s/ Rosemarie T. Ring
Rosemarie T. Ring