# Exhibit 1

**SETTLEMENT AGREEMENT AND RELEASE**

This Settlement Agreement and Release ("Agreement") is entered into by and among the National Fair Housing Alliance ("NFHA"), Fair Housing Justice Center, Inc., Housing Opportunities Project for Excellence, Inc., Fair Housing Council of Greater San Antonio (collectively, the "Plaintiffs"), and Facebook, Inc. ("Facebook"). Plaintiffs and Facebook are referred to collectively as the "Parties" and individually as a "Party." Plaintiffs are represented by Emery Celli Brinckerhoff & Abady LLP ("Plaintiffs' Counsel").

## I.    BACKGROUND

On March 27, 2018, Plaintiffs filed a complaint in the Southern District of New York against Facebook alleging that Facebook enables third-party advertisers to discriminate on the basis of race, national origin, sex, disability and familial status through use of audience selection tools in violation of the Fair Housing Act and the New York City Human Rights Law. Plaintiffs amended their complaint on June 25, 2018.

Facebook filed a motion to transfer venue to the Northern District of California, or alternatively to dismiss Plaintiffs' First Amended Complaint.

The Parties have agreed to resolve Plaintiffs' claims against Facebook as described in this Settlement Agreement and Release and the accompanying Exhibit A – Programmatic Relief.

## II.    DEFINITIONS

Terms used in this Agreement shall have the meanings specified below and in Exhibit A.

A.    **"Action"** means *National Fair Housing Alliance, et al., v. Facebook, Inc.*, Case No. 18-cv-02689-JGK, pending in the United States District Court for the Southern District of New York.

B.    **"Audience Selection Tools"** means tools that exist on or before the Effective Date and during the Term of the Agreement by which advertisers select the potential audience for advertisements in Ad Creation Flows.

C.    **"Effective Date"** means the date last executed by any Party as set forth next to the signature of the authorized representative of each Party below.

D.    **"HEC Advertisements"** means Housing Advertisements, Employment Advertisements, and Credit Advertisements as defined in Exhibit A.

E.    **"HEC Flow Implementation Date"** means the date on which advertisers may create HEC Advertisements through the HEC Flow.

F.    **"Term"** means the period that is three (3) years from the Housing Flow Implementation Date.

1

## III.   PROGRAMMATIC RELIEF

A.     The Parties agree to the programmatic relief set forth in Exhibit A to this Agreement as they apply to Housing Advertisements.  For avoidance of doubt, this agreement does not create any obligations between the Parties with respect to Employment Advertisements or Credit Advertisements, except to the extent that Credit Advertisements also falls within the definition of a Housing Advertisement.

## IV.   TRAINING

A.     Facebook will develop and administer training on civil rights laws as they relate to Housing Advertisements to the following Facebook employee groups: Ads Leadership Team, Regulated Ads Solutions, Mega-Taxonomy/Content Understanding Team, Machine Learning Team in BI, Ranking Feature Engineers, Ads Policy, and Advertising Product Counsel. Facebook and NFHA will work in an interactive process to develop the training materials and program.

B.     Facebook and NFHA will hold an initial planning meeting by phone or in person within sixty (60) days of the Effective Date of this Agreement.  Facebook will provide a draft of its proposed training curriculum, manual, and training materials to NFHA for review, comment and discussion and will provide NFHA with a copy of the final training materials prior to providing the training to its employees based upon a timeline agreed to during the initial planning meeting.

C.     Facebook will administer the training to current employees in the groups identified above within six (6) months of the Effective Date of this Agreement.  For new employees hired into those groups during the Term of the Agreement, Facebook will administer the training within sixty (60) days of hire.

D.     During the Term of the Agreement, either Facebook or NFHA may propose changes to the training that may be appropriate due to changed circumstances, such as changes in applicable laws or advertising services provided by Facebook.  Facebook and NFHA agree to provide the other party with the proposed revisions in writing and an opportunity to comment. Facebook and NFHA agree to discuss in good faith any proposed revisions.

## V.   DISMISSAL, CONTINUING JURISDICTION AND COORDINATED COMMUNICATIONS

A.     On the Effective Date, Plaintiffs will file a motion seeking to reopen the Action for the limited purpose of seeking a dismissal order that maintains continuing jurisdiction in the United States District Court for the Southern District of New York to enforce the Agreement. The Parties will file a stipulated motion and proposed order seeking that relief, substantially in the form attached hereto as Exhibit B.

B.     The Parties agree that dismissal of the Action by the court with continuing jurisdiction to enforce the Agreement are material terms of this Agreement.  If the Action is not dismissed by the court with continuing jurisdiction for any reason within thirty (30) days of the Effective Date, the Agreement will be deemed null and void *ab initio*.  In that event, the Action

will revert to the status that existed as of the Effective Date, and no term or draft of this Agreement, nor any part of the Parties' settlement discussions or communications, will be admissible or used as evidence or argument by any Party for any purpose in the Action or any other proceeding. The Parties may extend by mutual written agreement the 30-day period described in the second sentence of this Section.

## VI.    MONETARY RELIEF

A.    **Payment**. Facebook agrees to pay the total sum of one million, nine hundred fifty thousand and no cents ($1,950,000.00) to Plaintiffs for alleged damages and expenses for (a) diversion of Plaintiffs' resources; (b) frustration of Plaintiffs' mission by funding training for housing advertisers on how social media, including online advertising platforms, can be used by advertisers consistent with their obligations under fair housing/fair lending laws; programming for NFHA member organizations to promote fair housing using social media; and implementing compliance, training, and other activities described in Exhibit A; and (c) attorneys' fees and costs ("Payment").

B.    **Advertising**. Facebook will provide five hundred thousand dollars ($500,000) in credit to the Plaintiffs for advertising on Facebook to promote (1) educational programs such as information on consumer fair housing rights and housing industry fair housing responsibilities, fair housing/fair lending workshops, trainings and conferences; publication of reports on fair housing/fair lending issues;, and other educational activities; and (2) services, such as first-time homebuyer clinics, foreclosure prevention counseling, housing discrimination complaint intake, and landlord/tenant hotlines ("Advertising Credit").

C.    **Payment/Advertising Terms**. Within twenty one (21) days of dismissal of the Action by the court and Facebook's receipt of the necessary W-9 forms, Facebook shall (1) initiate a wire transfer of the Payment to the Emery Celli Brinckerhoff & Abady Attorney Trust Account; and (2) make available the Advertising Credit. Plaintiffs' Counsel will provide Facebook with the account information needed to transfer the Payment within five (5) days of the dismissal.

D.    **Distribution of Payment**. Plaintiffs' Counsel shall be solely responsible for apportionment and distribution of the Payment among Plaintiffs and Plaintiffs' Counsel.

E.    **No Further Payments**. Plaintiffs and Plaintiffs' Counsel waive any rights to seek any further payment for attorney's fees or costs from Facebook of any kind incurred in connection with the Action, including, but not limited to, those that have been, or may be, incurred in entering into this Agreement, verification of implementation as set forth in Section VIII below, and enforcing, if necessary, the terms of this Agreement.

## VII.    VERIFICATION OF IMPLEMENTATION

A.    **Testing**. During the Term of this Agreement, Plaintiffs will be permitted to place test ads for the purpose of evaluating implementation of the Agreement. Facebook agrees to waive any claims it may have against Plaintiffs under Facebook's policies for creating test ads, subject to Plaintiffs' agreement to take steps to ensure that such ads are not published to users,

*e.g.*, setting a publication date at least two (2) weeks from the date a test ad is created to allow time to cancel it.

  B.  **Meetings**.  During the Term of this Agreement, Facebook and NFHA will meet every six (6) months to discuss implementation of the Agreement.  At least fifteen (15) days in advance of those meetings, Facebook will provide NFHA with a report describing steps Facebook has taken to implement the Agreement and identifying any issues.  As part of that report, Facebook will provide NFHA with a list of targeting options to be added to the HEC Flow.  NFHA will have an opportunity to review the list prior to each meeting and to notify Facebook of any objections.  In addition, NFHA may propose targeting options to be added to the HEC Flow by providing Facebook with a list of terms at least fifteen (15) days in advance of the meetings.  Facebook will consider in good faith any such terms and discuss them with NFHA at the meetings.  Facebook will provide NFHA with information that is reasonably necessary to confirm implementation of the Agreement.  For clarity, this includes, for example, information confirming what audience selection tools are available in the HEC Flow, not how those audience selection tools are used.  With respect to the modified Lookalike Audience tool, Facebook agrees to study how it impacts delivery of ads created in the HEC Flow with respect to gender and to discuss the study and any potential modifications of the tool at the meetings.  Facebook also agrees to consider the potential for unintended bias with respect to the modified Lookalike Audience tool more generally.  At the meetings, Facebook will share the status of those efforts, provide NFHA with an opportunity to respond and make recommendations, and consider those recommendations and whether to implement any feasible reforms as part of its ongoing commitment to nondiscrimination in advertising on its platform.

  C.  **Confidentiality**.  Any written or oral information exchanged by the Parties during the Term of this Agreement regarding Verification of Implementation that one of the Parties identifies as confidential shall be treated as confidential by the Parties to encourage frank and open discussions between the Parties, except to the extent it is necessary for any of the Parties to disclose confidential information in any dispute resolution undertaken pursuant to Section X.  Information designated confidential by any Party pursuant to this Section shall be treated as such in any dispute resolution process, including by seeking the Court's permission to file it under seal in any proceeding before the Southern District of New York.

## VIII.  MUTUAL GENERAL RELEASES

  A.  **Plaintiffs' General Release of Facebook**.  In consideration of the promises herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaintiffs, on behalf of themselves, on behalf of all entities that are or were owned or controlled by Plaintiffs on or before the Effective Date, and on behalf of all of the respective heirs, executors, administrators, agents, directors, officers, predecessors, successors and assigns of all of the foregoing ("Plaintiffs Releasing Parties"), hereby fully, forever, and irrevocably release, waive, extinguish, and discharge Facebook and all entities that are or were owned and/or controlled by Facebook on or before the Effective Date, all of the respective past, present, and future officers, directors, employees, agents, principals, shareholders, and owners, and all of the respective heirs, executors, administrators, agents, predecessors, successors, and assigns of all of the foregoing ("Facebook Released Parties"), from any and all claims, causes of action, liability, charges, complaints, demands, or rights of recovery of any nature, type or

4

description whatsoever, whether legal, equitable, or statutory, asserted or unasserted, contingent or vested, express or implied, known or unknown, foreseen or unforeseen, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, direct or indirect, that Plaintiffs had, now have, or may have, from the beginning of time through the Term of this Agreement, arising out of or relating to Audience Selection Tools, including but not limited to any and all claims, causes of action, charges, complaints, demands, or rights of recovery of any nature, type, or description whatsoever under the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the New York City Human Rights Law, N.Y. City Admin. Code § 8–107; and similar federal and state anti-discrimination laws ("Plaintiffs Released Claims").  Plaintiffs Released Claims do not include any claims Plaintiffs may have against third parties and do not impact the Parties' right to enforce this Agreement in accordance with the terms set forth in Section X below.

B.    **Plaintiffs' Covenant Not To Sue**.  Plaintiffs, on behalf of themselves and the other Plaintiff Releasing Parties, expressly covenant and agree to forever refrain from instituting, prosecuting, or continuing to maintain or prosecute any suit, action, complaint, or charge involving any court or administrative agency against the Facebook Released Parties in any way relating to the Plaintiffs Released Claims.  Nothing in this Section shall be construed to limit the scope of the dispute resolution process set forth and described in Section X below.

C.    **Facebook's General Release of Plaintiffs**.  Facebook, on behalf of itself, on behalf of all entities that are or were owned or controlled by Facebook on or before the Effective Date, and on behalf of all of the respective heirs, executors, administrators, agents, directors, officers, predecessors, successors and assigns of all of the foregoing ("Facebook Releasing Parties"), hereby fully, forever, and irrevocably release, waive, extinguish, and discharge Plaintiffs and all entities that are or were owned and/or controlled by Plaintiffs on or before the Effective Date, all of the respective past, present, and future officers, directors, employees, agents, principals, shareholders, and owners, and all of the respective heirs, executors, administrators, agents, predecessors, successors, and assigns of all of the foregoing ("Plaintiffs Released Parties"), from any and all claims, causes of action, liability, charges, complaints, demands, and rights of recovery of any nature, type, or description whatsoever, whether legal, equitable, or statutory, asserted or unasserted, contingent or vested, express or implied, known or unknown, foreseen or unforeseen, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, direct or indirect, that Facebook had, now have, or may have, from the beginning of time through the Term of this Agreement, arising out of or relating to Audience Selection Tools ("Facebook Released Claims").  Facebook Released Claims do not include any claims Facebook may have against third parties and do not impact the Parties' right to enforce this Agreement in accordance with the terms set forth in Section X below.

D.    **Facebook's Covenant Not To Sue**.  Facebook, on behalf of itself and the other Facebook Releasing Parties, expressly covenants and agrees to forever refrain from instituting, prosecuting, or continuing to maintain or prosecute any suit, action, complaint or charge involving any court or administrative agency against the Plaintiffs Released Parties in any way relating to the Facebook Released Claims.  Nothing in this paragraph shall be construed to limit the scope of the dispute resolution process set forth and described in Section X below.

## IX.   ACKNOWLEDGMENT AND WAIVER OF UNKNOWN CLAIMS

A.     Plaintiffs and Facebook each acknowledge that subsequent to the execution of this Agreement they may discover facts or claims in addition to or different from those they now know or believe exist with respect to any of the matters being released through this Agreement, including, but not limited to, Audience Selection Tools, which were unknown or unsuspected at the time this Agreement was executed, and which if known or suspected by them at that time may have materially affected their decision to enter into this Agreement.  Each of Plaintiffs and Facebook each nevertheless agrees that the releases described above in Section VIII apply to any such additional or different claims and notwithstanding any such additional or different facts.  Each of Plaintiffs and Facebook acknowledges that the significance and consequences of the releases in this Agreement have been explained to them by their counsel and that they understand the significance and consequences of the releases in this Agreement.  Nothing in this paragraph shall be construed to expand the scope of the Releases set forth and described in Section VIII above.

B.     Plaintiffs and Facebook each acknowledge that they have been advised of and expressly waives and releases any rights or benefits they may have under Section 1542 of the Civil Code of California that provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

C.     Plaintiffs and Facebook each further expressly waives and releases any rights or benefits they have or may have under any similar law or rule of any other jurisdiction pertaining to the matters released herein.

## X.   DISPUTE RESOLUTION

A.     Any disputes regarding the interpretation, implementation, or violation of the Agreement shall be resolved as described in this Section.

B.     Plaintiffs will notify Facebook in writing if they believe that Facebook is not in compliance with any term of the Agreement and allow Facebook at least sixty (60) days from Facebook's receipt of any such written notice to cure.  As part of the sixty (60) day notice and opportunity to cure time period, Plaintiffs and Facebook will meet and confer in good faith and attempt to resolve the matter.  It is the intent of the Parties to collaborate in good faith to resolve any disputes that may arise between them.

C.     If the Parties cannot resolve the dispute, it will be mediated by Hunter Hughes III or another mediator who is mutually agreeable to the Parties.  Any mediation will take place in New York or Washington D.C. with Facebook to pay the mediator's fee.

D.      If the dispute cannot be resolved through mediation, any Party may bring the dispute before the United States District Court for the Southern District of New York, which will retain jurisdiction over the Action for the purpose of enforcing the Agreement.

E.      The Parties will pay their own attorney's fees and costs.

## XI.    NO ADMISSION OF LIABILITY

A.      Plaintiffs acknowledge that Facebook denies any and all wrongdoing or liability.

B.      Plaintiffs further acknowledge that this Agreement is not an admission by Facebook of any wrongdoing or liability, and that the Parties will not argue in or before any court, administrative agency, or other tribunal, or make any public statement whatsoever, that this Agreement is or may be construed as an admission by Facebook of any wrongdoing or liability.

## XII.   MISCELLANEOUS

A.      **Authority**.  Plaintiffs and Facebook represent and warrant that they have the right and authority to enter into this Agreement and to give the releases and other promises contained in this Agreement.

B.      **No Other Actions**.  Plaintiffs represent and warrant that, other than the Action, they have not filed as a plaintiff or complainant any suit, action, complaint, or charge against the Facebook Released Parties as a defendant or respondent involving any court or governmental agency arising out of or relating to in any way to the Plaintiffs Released Claims.

C.      **Integration.**  Plaintiffs and Facebook acknowledge and agree that this Agreement constitutes the entire agreement between the Parties and supersedes any and all discussions, agreements, or understandings, whether oral, written or implied, regarding the subject matter of this Agreement.  Plaintiffs and Facebook further acknowledge and agree that they have had the benefit of the advice of their respective chosen counsel and financial and tax advisors in connection with the negotiation of this Agreement.

D.      **Disclaimer of Reliance**.  Plaintiffs and Facebook represent and warrant that no statement, communication, promise, representation, inducement, or condition that is not expressed in this Agreement has been made by Facebook to Plaintiffs, or by Plaintiffs to Facebook, in connection with this Agreement.  Plaintiffs and Facebook further represent and warrant that they are not relying on, and expressly disclaim reliance on, any statement, communication, promise, representation, inducement, or condition that does not appear in this Agreement.

E.      **Representation by Counsel**.  Plaintiffs and Facebook represent and warrant that they have each been represented by independent counsel of their own choice throughout all of the negotiations and drafting which preceded and resulted in the execution of this Agreement, and that they are relying solely upon their own judgment in entering into this Agreement.

F.    **Modification**.  This Agreement may not be modified or amended except by an instrument in a writing that specifically states that it is a supplement, modification, or amendment to this Agreement and is signed by an authorized representative of all of the Parties.

G.    **Headings**.  Plaintiffs and Facebook acknowledge and agree that the section headings in this Agreement are used for convenience only and will not be used in construing the Agreement.

H.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

I.    **Construction**. The drafting and preparation of this Agreement is the result of the efforts of all of the Parties and their respective counsel, and the language of all parts of this Agreement shall in all instances be constructed as a whole, according to its fair meaning, and not strictly for or against any Party.  Accordingly, no rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall be employed in the interpretation of this Agreement.

J.    **Severability**.  If any part or provision of this Agreement shall for any reason be determined to be invalid or unenforceable under applicable law, that part or provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the validity or enforceability of the remaining terms in that part or provision or of any other part of provision of the Agreement.

K.    **No Third-Party Beneficiaries**.  The Parties do not intend to create any third party beneficiaries to this Agreement.  Except for agents, officers, directors, trustees, assigns, subsidiaries, and predecessor or successor companies, no person or entity other than the Parties is intended to be bound by, or shall be bound by, the provisions of the Agreement.

L.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together will be deemed an original of the Agreement.  Facsimile and scanned (e.g., PDF) signatures will be deemed valid and effective for all purposes.

M.    **Taxes**.  Plaintiffs and Facebook each acknowledge and agree that they have not made any representations to each other with respect to the tax effects, if any, of this Agreement, and that each shall be solely responsible for the tax liability, if any, arising from this Agreement, including without limitation with respect to the Payment described in Section VI above.

N.    **Notices**.  Unless otherwise designated by a Party in writing, any notice relating to this Agreement shall be made in writing both by electronic mail and by next-day (excluding Saturday and Sunday) express delivery service, and shall be addressed as follows:

        For Plaintiffs:        Lisa Rice
                                      President & CEO
                                      National Fair Housing Alliance
                                      1331 Pennsylvania Ave., NW, Suite 650
                                      Washington, DC 20018

202-898-1661
LisaRice@NationalFairHousing.org

Morgan Williams
General Counsel
National Fair Housing Alliance
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20018
202-898-1661
MorganWilliams@NationalFairHousing.org

Keenya Robertson
President & CEO
Housing Opportunities Project for Excellence (HOPE), Inc
11501 NW 2nd Avenue
Miami, FL 33168
305-651-4673
Keenya@hopefhc.com

Executive Director
Fair Housing Justice Center
30-30 Northern Boulevard, Suite 302
Long Island City, New York 11101
(212) 400-8231
fhjc@fairhousingjustice.org

Sandra Tamez
Executive Director
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
(210) 733-3247
sandra@myfairhousing.org

For Defendant:      Natalie Naugle
Associate General Counsel, Litigation
Facebook, Inc.
181 Fremont Street
San Francisco, CA 94105
nnaugle@fb.com

Rosemarie T. Ring
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
rose.ring@mto.com

**IN WITNESS OF THIS AGREEMENT**, the undersigned have executed this Agreement on the date shown below.

Dated:  March ___18___, 2019                 National Fair Housing Alliance

By: _____

Name  Lisa Rice
Title    President and Chief Executive Officer

Dated:  March _____, 2019                 Fair Housing Justice Center, Inc.

By: _____

Name
Title

Dated:  March _____, 2019                 Housing Opportunities Project for
Excellence, Inc.

By: _____

Name
Title

Dated:  March _____, 2019                 Fair Housing Council of Greater San
Antonio

By: _____

Name
Title

Dated:  March _____, 2019                 Facebook, Inc.

By: _____

Name
Title

**IN WITNESS OF THIS AGREEMENT**, the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019

National Fair Housing Alliance

By: _____
Name
Title

Dated:  March _18_, 2019

Fair Housing Justice Center, Inc.

By: _____
Name  *FRED FREIBERG*
Title  *EXECUTIVE DIRECTOR*

Dated:  March _____, 2019

Housing Opportunities Project for Excellence, Inc.

By: _____
Name
Title

Dated:  March _____, 2019

Fair Housing Council of Greater San Antonio

By: _____
Name
Title

Dated:  March _____, 2019

Facebook, Inc.

By: _____
Name
Title

**IN WITNESS OF THIS AGREEMENT,** the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019                    National Fair Housing Alliance

                                             By: _____
                                             Name
                                             Title

Dated:  March _____, 2019                    Fair Housing Justice Center, Inc.

                                             By: _____
                                             Name
                                             Title

Dated:  March 18th, 2019                     Housing Opportunities Project for
                                             Excellence, Inc.

                                             By: _____
                                             Name: Keenya Robertson
                                             Title: President & CEO

Dated:  March _____, 2019                    Fair Housing Council of Greater San
                                             Antonio

                                             By: _____
                                             Name
                                             Title

Dated:  March _____, 2019                    Facebook, Inc.

                                             By: _____
                                             Name
                                             Title

**IN WITNESS OF THIS AGREEMENT,** the undersigned have executed this Agreement on the date shown below.

Dated:  March _____, 2019          National Fair Housing Alliance

                                      By: _____
                                      Name
                                      Title

Dated:  March _____, 2019          Fair Housing Justice Center, Inc.

                                      By: _____
                                      Name
                                      Title

Dated:  March _____, 2019          Housing Opportunities Project for
                                      Excellence, Inc.

                                      By: _____
                                      Name
                                      Title

Dated:  March __18__, 2019           Fair Housing Council of Greater San
                                      Antonio

                                      By: _Sandra Jones_____
                                      Name  Sandra Tamez
                                      Title  Executive Director

Dated:  March _____, 2019          Facebook, Inc.

                                      By: _____
                                      Name
                                      Title

10

By: _____
Name
Title

Dated:   March _____, 2019        Housing Opportunities Project for
                                   Excellence, Inc.

By: _____
Name
Title

Dated:   March _____, 2019        Fair Housing Council of Greater San
                                   Antonio

By: _____
Name
Title

Dated:   March ⟨18⟩, 2019          Facebook, Inc.

By: _Paul S. Grewal_____
Name    PAUL S. GREWAL
Title   VICE PRESIDENT +
        DEPUTY GENERAL COUNSEL

**APPROVED AS TO FORM BY COUNSEL:**

Dated: March  18 , 2019               EMERY CELLI BRINCKERHOFF &
                                      ABADY LLP
                                      Attorneys for Plaintiffs

                                      By: _Diane L. Houk_____

                                      Diane L. Houk
                                      Katherine Rosenfeld
                                      David Berman

Dated: March _____, 2019              MUNGER, TOLLES & OLSON LLP
                                      Attorneys for Facebook, Inc.

                                      By: _____

                                      Rosemarie T. Ring
                                      Jonathan H. Blavin
                                      Elizabeth A. Kim

APPROVED AS TO FORM BY COUNSEL:

Dated: March _____, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP
Attorneys for Plaintiffs

By: _____

Diane L. Houk
Katherine Rosenfeld
David Berman

Dated: March _18_, 2019

MUNGER, TOLLES & OLSON LLP
Attorneys for Facebook, Inc.

By: _Rosemarie Ring_

Rosemarie T. Ring
Jonathan H. Blavin
Elizabeth A. Kim

11

**EXHIBIT A**
**PROGRAMMATIC RELIEF**

## I.    DEFINITIONS

As used in the Agreement and this Exhibit, the following terms shall have the meanings specified below.  The singular includes the plural and vice versa.

A.    "**Ad Creation Flows**" means interfaces through which users may create paid advertisements for publication on Facebook, Instagram, Messenger, and/or Audience Network, including but not limited to Ads Manager and boosted posts from Facebook Pages.

B.    "**Audience Selection Tools**" means tools that exist on or before the Effective Date and during the Term of the Agreement by which advertisers select the potential audience for advertisements in Ad Creation Flows.

C.    "**Classifiers**" means automated processes in Ad Creation Flows to identify potential HEC Ads.  Classifiers use complex machine learning technology that will result in both false positives and false negatives.

D.    "**Credit Advertisement**" means an advertisement that is covered by the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"), *i.e.*, an advertisement offering a specific credit opportunity.  Credit Advertisements include advertisements that link or direct users to a page offering such specific credit opportunities.

E.    "**Effective Date**" means the date the Agreement is last executed by any Party.

F.    "**Employment Advertisement**" means an advertisement that is covered by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), or the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA"), *i.e.*, an advertisement offering a specific employment opportunity.  Employment Advertisements include advertisements that link or direct users to a page offering such specific employment opportunities.

G.    "**Housing Advertisement**" means an advertisement that is covered by the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), *i.e.*, an advertisement offering a specific opportunity to rent, lease, sell, hold, convey, transfer, or buy residential real property, and/or offering a specific real-estate related transaction such as a residential mortgage, homeowner's insurance, or home appraisal services.  Housing Advertisements include advertisements that link or direct users to a page offering such specific housing opportunities and/or real-estate related transactions.

H.    "**HEC Advertisements**" means Housing Advertisements, Employment Advertisements, and Credit Advertisements that are identified as set forth in this Agreement.

I.    "**HEC Flow**" means an interface in Ads Manager through which advertisers may create HEC Advertisements using the limited audience selection tools set forth in this Exhibit.

J.    "**HEC Flow Implementation Date**" means the date on which advertisers will be required to create HEC Advertisements through the HEC Flow.

K.    "**Lookalike Audience**" means a tool in Ads Manager that allows advertisers to create audiences with commonalities to a group of users, such as the advertisers' current customers, visitors to their websites or people who like their Facebook pages.

L.    "**Protected Classes**" means race, color, ethnicity, national origin, ancestry, sex, gender, age, familial status, caregiver status, religion, disability, sexual orientation, gender identity, military/veteran status or service, marital status, partnership status, citizenship, immigration status, lawful source of income, medical condition, genetic information, political affiliation, matriculation, personal appearance, place of residence or business (defined as the specific geographical location of home or work which does not preclude the location targeting options described below in Section III.A.1) and/or status as a victim of domestic violence, stalking or sex offenses.  For Housing Advertisements, Protected Classes also include lawful occupation.

M.    "**Term of Agreement**" means the period that is three (3) years from the HEC Flow Implementation Date.

N.    **"Targeting"** means the use of Audience Selection Tools by advertisers to include or exclude users in a potential audience for paid advertisements.

## II.    IDENTIFICATION OF HEC ADVERTISEMENTS

A.    **Overview**.  In Ad Creation Flows, in conjunction with implementing limitations on audience selection tools in accordance with Section III below, HEC Advertisements will be identified in one of two ways as described in this Section.

B.    **Identification by Advertisers**.  Facebook will implement processes to ask advertisers to indicate whether they are placing an HEC Advertisement before the advertisers select the audiences for their advertisements.

C.    **Identification by Facebook**.  Facebook will implement processes to identify HEC Advertisements, automatically and/or through human review prior to the point at which Facebook approves any advertisements for publication.

1.    <u>Accuracy</u>.  Facebook will engage in commercially reasonable efforts to improve the accuracy of the Classifiers, *e.g.*, analyzing false positives and false negatives.

2.    <u>Right of Appeal</u>.  If an advertiser demonstrates to Facebook's satisfaction that an advertisement identified by Classifiers is not an HEC Advertisement, Facebook will permit the advertiser to create that advertisement outside of the HEC Flow.

3.    <u>Failure to Identify</u>.  If advertisers repeatedly fail to indicate they are placing HEC Advertisements when asked to do so by Facebook, Facebook will take appropriate responsive action under its current policies.

### III.   LIMITED AUDIENCE SELECTION TOOLS FOR HEC ADVERTISEMENTS

A.   **Ads Manager**.  On or before September 30, 2019, Facebook will implement the HEC Flow in Ads Manager with modified audience selection tools as described below.

1.   <u>Location</u>:

(a)   No targeting by zip code will be available.

(b)   Targeting by city or town will cover at least a 15-mile radius around the center of the city or town.

(c)   Targeting by address or pin drop will cover at least a 15-mile radius around the address or pin drop.

(d)   For Housing Advertisements, the Parties agree that the 15-mile radius may be adjusted up or down upon written agreement between the Parties based on facts showing that it is either irrelevant or ineffective to address concerns about perpetuating racial segregation.

2.   <u>Age</u>:  No profile age targeting options will be available.

3.   <u>Gender</u>:  No profile gender targeting options will be available.

4.   <u>Detailed Targeting (Demographics, Interests, or Behaviors)</u>:  Targeting options will be modified as follows:

(a)   No targeting options that Facebook determines are direct descriptors of, or semantically or conceptually related to, a person or group of people based on Protected Classes will be available.  "Direct Descriptors" means targeting options whose names directly describe persons in Protected Classes.  "Semantically or Conceptually Related To" means targeting options whose names appear to be associated with a Protected Classes or persons in a Protected Classes.

(b)   Upon its initial launch, the HEC Flow will include targeting options that Facebook and Plaintiffs determine comply with the standards in Section III.A.4 above.  Targeting options will only be available to advertisers as an option for including users.

(c)   During the Term of the Agreement, targeting options that comply with the standards in Section III.A.4.(a) above may be added to the HEC Flow from time to time. Facebook will provide such targeting options to Plaintiffs, who will be given a reasonable opportunity to review and notify Facebook of any objections before the targeting options are added to the HEC Flow.

(d)   Targeting options may be different as between Housing Advertisements, Employment Advertisements, and Credit Advertisements.

3

5.     <u>Lookalike Audience ("LAL")</u>:  In the HEC Flow, LAL tool and marketing will be modified as follows:

(a)     LAL tool may consider the following user profile fields: country, region, profession and field of study.  LAL tool will not consider the following user profile fields: age, gender, relationship status, religious views, school, political views, interested in, or zip code.

(b)     LAL tool may consider user behavior (e.g., ads, apps, pages, pixels), except with Facebook Groups.

(c)     LAL tool will be renamed so that it does not refer to finding users who "look like" users provided by advertisers to Facebook to create LAL audiences.

(d)     LAL marketing will not use human models.

B.     **Other Ad Creation Flows**.  On or before December 31, 2019, Facebook will implement audience selections tools at least as restrictive as those in the HEC Flow for all remaining Ad Creation Flows, e.g., Facebook's Marketing API.

C.     **Scope**.  The Parties acknowledge and agree that nothing in this Agreement will prevent Facebook from making changes to its products, services, or written policies (including, without limitation, its terms of use and data policy) that Facebook deems appropriate in conducting its business, provided that such changes are not inconsistent with the terms of this Agreement.

## IV.     HOUSING SEARCH PORTAL

A.     On or before December 31, 2019, Facebook will make available an interface that allows users to search and view current Housing Advertisements by advertiser or by location targeting options chosen by the advertiser.  Users will be able to view Housing Advertisements placed by advertisers, regardless of whether those users are in the audience selected by those advertisers (with formatting adjusted as necessary to fit the platform).

## V.     ADVERTISER NON-DISCRIMINATION CERTIFICATION

A.     Facebook requires and will continue to require all advertisers to certify compliance with Facebook's policies prohibiting discrimination and with applicable federal, state and local anti-discrimination laws.  Facebook will develop the form and content of the certification and provide to Plaintiffs for comment and discussion.

## VI.     ADVERTISER EDUCATION

A.     In Ad Creation Flows, in conjunction with implementing limitations on audience selection tools in accordance with Section III above, Facebook will implement features alerting advertisers that engaging in unlawful discrimination is prohibited by Facebook's policies and applicable federal and state anti-discrimination laws and will provide education on those policies

and laws.  Facebook will develop the form and content of the certification and provide to plaintiffs for comment and discussion.

## VII.  ALGORITHMIC FAIRNESS

A.      Facebook will engage academics, researchers, civil society experts, and privacy and civil rights/liberties advocates to study the potential for unintended bias in algorithmic modeling.  Facebook will share the status of its efforts to investigate and understand this issue in meetings between the Parties provided for in the Agreement, provide the Parties with an opportunity to respond and make recommendations, and consider those recommendations and whether to implement any feasible reforms as part of its ongoing commitment to nondiscrimination in advertising on its platform.

**EXHIBIT B**
**STIPULATION AND PROPOSED ORDER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL FAIR HOUSING ALLIANCE; FAIR
HOUSING JUSTICE CENTER, INC.; HOUSING
OPPORTUNITIES PROJECT FOR
EXCELLENCE, INC.; FAIR HOUSING                    Index No:  18 Civ. 02689
COUNCIL OF GREATER SAN ANTONIO,

                                   Plaintiffs,     **STIPULATION AND ORDER**

            v.

     FACEBOOK, INC.,

                                   Defendant.

        WHEREAS, on February 6, 2019, this action was dismissed without prejudice to

the parties' restoring the action to the Court's calendar, provided the motion to restore the action

was made within 45 days of the date of the Court's order of dismissal;

        WHEREAS, Plaintiffs and Defendant, through their undersigned counsel,

stipulate and agree as follows:

        1.      This action is reopened and restored to the Court's calendar;

        2.      This action is hereby dismissed with prejudice, pursuant to the terms of

the Settlement Agreement attached hereto as Exhibit 1.

        3.      The Court shall retain jurisdiction over this action for the sole purpose of

enforcing compliance with the terms of the Settlement Agreement and Order.

        4.      A facsimile or scanned copy of this stipulation will be considered the same

as an original and may be filed with the court electronically or by facsimile transmission.

*[signature page to follow]*

Dated:  March 19, 2019
        New York, New York


**EMERY CELLI BRINCKERHOFF**                 **MUNGER, TOLLES & OLSON LLP**
**& ABADY LLP**


By: _____         By: _____
        Diane L. Houk                              Rosemarie T. Ring
        Katherine Rosenfeld                         Jonathan H.  Blavin
        David Berman                                Elizabeth A. Kim
        *Attorneys for Plaintiffs*                   *Attorneys for Defendant*
        600 5th Avenue, 10th Floor                   560 Mission Street, 27th Floor
        New York, New York 10020                     San Francisco, California 94105
        (212) 763-5000                               (415) 512-4008



**SO ORDERED:**

Dated: March _, 2019              _____
                                          HON. JOHN G. KOELTL
                                       United States District Court Judge

2